# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| AUDACIOUS INQUIRY LLC and COLLECTIVE MEDICAL TECHNOLOGIES, INC., | § § § § | |
| Plaintiffs, | § § | |
| v. | § § | Civil Action No. 1:25-CV-02264-JRR |
| CHESAPEAKE REGIONAL INFORMATION SYSTEM FOR OUR PATIENTS and CRISP SHARED SERVICES INC. AND AFFILIATES, | § § § § § | |
| Defendants. | § § | |

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

## TABLE OF CONTENTS

I.   Introduction ...................................................................................................... 1

II.  Legal Standards ............................................................................................... 2

    A.   Motion to Dismiss Under Fed. R. Civ. P. 12(b)(6) ................................. 2

    B.   Patent Eligibility Under 35 U.S.C. § 101 ............................................... 3

    C.   Standing to Bring a Patent Infringement Claim ...................................... 4

III. Argument ......................................................................................................... 4

    A.   All Patent Infringement Claims Must Be Dismissed Because All Claims of the
Asserted Patents Are Invalid Under 35 U.S.C. § 101. ............................ 4

        1.   The Asserted Patents ................................................................. 4

        2.   *Alice* Step One: The Asserted Patents are Directed to an Abstract Idea..... 9

            a.   The Asserted Patents recite generic steps for processing data
similar to those found ineligible in many other cases.................... 9

        3.   *Alice* Step Two: The Asserted Patents Recite No Inventive Concept. ..... 15

            a.   The claims of the Asserted Patents fail to provide any inventive
concept and recite only conventional and well-understood
techniques or components............................................... 15

            b.   The dependent claims of the Asserted Patents do not provide an
inventive concept. ...................................................... 19

        4.   Assignor Estoppel Does Not Bar Defendants' Invalidity Challenge........ 19

            a.   Plaintiffs cannot benefit from Assignor Estoppel because
Audacious was always an original owner of the Asserted Patents 20

            b.   Assignor estoppel also cannot apply because any purported
assignment long predates the claims of the Asserted Patents. ...... 21

            c.   Assignor estoppel is barred by a subsequent change in law. ........ 22

    B.   The Unfair Competition Claim is Preempted By Federal Patent Law and
Otherwise Fails For the Same Reasons as the Patent Claims. .............. 24

    C.   Audacious Lacks Standing and Must Be Dismissed From This Case ................ 28

IV.  Conclusion ..................................................................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abraxis Bioscience, Inc. v. Navinta LLC*,
    625 F.3d 1359 (Fed. Cir. 2010) ........................................................................ 29, 30

*Adaptive Streaming Inc. v. Netflix, Inc.*,
    836 F. App'x 900 (Fed. Cir. 2020) ........................................................................ 13

*AI Visualize, Inc. v. Nuance Commc'ns, Inc.*,
    97 F.4th 1371 (Fed. Cir. 2024) ................................................................ 1, 11, 13, 15

*Alice Corp. v. CLS Bank Int'l*,
    573 U.S. 208 (2014) .......................................................................................... 3, 15, 23

*Am. Axle & Mfg., Inc. v Neapco Holdings LLC*,
    967 F.3d 1285 (Fed Cir. 2020) ........................................................................ 16

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) .......................................................................................... 3, 17

*Aviation Cap. Partners, LLC v. SH Advisors, LLC*,
    No. 24-1099, 2025 WL 1303663 (Fed. Cir. May 6, 2025) ........................... 13

*B# on Demand LLC v. Spotify Tech. S.A.*,
    484 F. Supp. 3d 188 (D. Del. 2020) ........................................................................ 15

*Bell Atl. v. Twombly*,
    550 U.S. 544 (2007) .......................................................................................... 3

*Beteiro, LLC v. DraftKings Inc.*,
    104 F.4th 1350 (Fed. Cir. 2024) ................................................................ 1, 3, 14, 17

*Bilski v. Kappos*,
    561 U.S. 593 (2010) .......................................................................................... 3

*Bluebonnet Internet Media Servs., LLC v. Pandora Media, LLC*,
    No. 22-2215, 2024 WL 1338940 (Fed. Cir. Mar. 29, 2024) ........................... 14

*Bot M8 LLC v. Sony Corp. of Am.*,
    4 F.4th 1342 (Fed. Cir. 2021) ........................................................................ 11

*BSG Tech. LLC v. Buyseasons, Inc.*,
    899 F.3d 1281 (Fed. Cir. 2018) ........................................................................ 15

*CareDx, Inc. v. Natera, Inc.*,
  40 F.4th 1371 (Fed. Cir. 2022) ............................................................ 11

*Carson Optical, Inc. v. Prym Consumer USA, Inc.*,
  11 F. Supp. 3d 317 (E.D.N.Y. 2014) ..................................................... 27

*ChargePoint, Inc. v. SemaConnect, Inc.*,
  920 F.3d 759 (Fed. Cir. 2019) ......................................................... 16, 17

*Classen Immunotherapies, Inc. v. Shionogi, Inc.*,
  993 F. Supp. 2d 569 (D. Md. 2014) ......................................................... 5

*Cleveland Clinic Found. v. True Health Diagnostics LLC*,
  859 F.3d 1352 (Fed. Cir. 2017) .............................................................. 3

*Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*,
  776 F.3d 1343 (Fed. Cir. 2014) .............................................................. 4

*Convatec, Inc. v. HR Pharms., Inc.*,
  C.A. No. 24-1248-RGA-SRF, 2025 WL 1859228 (D. Del. June 10, 2025) ............... 24, 26, 27

*Core Optical Techs., LLC v. Nokia Corp.*,
  102 F.4th 1267 (Fed. Cir. 2024) ........................................................... 29

*Darcangelo v. Verizon Communs., Inc.*,
  292 F.3d 181 (4th Cir. 2002) ............................................................... 20

*directPacket Research, Inc. v. Polycom, Inc.*,
  No. 24-1147, 2025 WL 1752247 (Fed. Cir. June 25, 2025) ............................. 12, 18

*EasyWeb Innovations, LLC v. Twitter, Inc.*,
  689 F. App'x 969 (Fed. Cir. 2017) ................................................... 13, 16, 18

*Eclipse IP LLC v. McKinley Equip. Corp.*,
  No. CV 14-154-GW(AJWx), 2014 WL 4407592 n.5 (C.D. Cal. Sep. 4, 2014) ............... 24

*Elec. Power Grp., LLC v. Alstom S.A.*,
  830 F.3d 1350 (Fed. Cir. 2016) ..................................................... *passim*

*Ericsson Inc. v. TCL Commc'n Tech. Holdings Ltd.*,
  955 F.3d 1317 (Fed. Cir. 2020) ............................................................ 14

*Finnavations LLC v. Payoneer, Inc.*,
  No. 1:18-cv-00444-RGA, 2018 WL 6168618 n.3 (D. Del. Nov. 26, 2018) ................ 18

*Geoscope Techs. Pte. Ltd v. Google LLC*,
  No. 24-1003, 2025 WL 1276235 (Fed. Cir. May 2, 2025) ................................. 9

*Glasswall Sols., Ltd. v. Clearswift Ltd.*,
    754 F. App'x 996 (Fed. Cir. 2018) ........................................................................ 1, 12, 13, 18

*Goines v. Valley Cmty. Servs. Bd.*,
    822 F.3d 159 (4th Cir. 2016) ........................................................................................... 20

*Hawk Tech. Sys., LLC v. Castle Retail, LLC*,
    60 F.4th 1349 (Fed. Cir. 2023) ....................................................................................... 13

*Hunter Douglas, Inc. v. Harmonic Design, Inc.*,
    153 F.3d 1318 (Fed. Cir. 1998)..................................................................................... 2, 26

*IBM Corp. v. Zillow Grp., Inc.*,
    50 F.4th 1371 (Fed. Cir. 2022) .................................................................................. 10, 15

*IBM Corp. v. Zillow Grp., Inc.*,
    549 F. Supp. 3d 1247 (W.D. Wa. 2021) ............................................................................. 5

*iLife Techs., Inc. v. Nintendo of Am., Inc.*,
    839 F. App'x 534 (Fed. Cir. 2021) .................................................................................. 11

*Impact Engine, Inc. v. Google LLC*,
    No. 22-2291, 2024 WL 3287126 (Fed. Cir. July 3, 2024)................................................. 11, 12

*Intell. Ventures I LLC v. Erie Indem. Co.*,
    850 F.3d 1315 (Fed. Cir. 2017)............................................................................... 4, 12, 17

*Intell. Ventures I, LLC v. Capital One Bank (USA), N.A.*,
    792 F.3d 1363 (Fed. Cir. 2015)........................................................................................ 4

*Inventor Holdings, LLC v. Bed Bath & Beyond, Inc.*,
    876 F.3d 1372 (Fed. Cir. 2017)....................................................................................... 23

*JDS Techs., Inc. v. Exacq Techs.*,
    No. 15-10387, 2016 WL 3165724 (E.D. Mich. June 7, 2016) ................................................ 24

*Jerrold Stephens Co. v. Alladin Plastics, Inc.*,
    229 F.Supp. 536 (S. D. Cal. 1964)................................................................................... 26

*Knova Software, Inc. v. Inquira, Inc.*,
    C.A. No. 06-381-JJF, 2007 WL 1232186 (D. Del. Apr. 27, 2007) ................................... 25, 26

*Lans v. Dig. Equip. Corp.*,
    252 F.3d 1320 (Fed. Cir. 2001)....................................................................................... 29

*Litton Sys. v. Whirlpool Corp.*,
    728 F.2d 1423 (Fed. Cir. 1984)....................................................................................... 28

*MacroPoint, LLC v. FourKites, Inc.*,
  No. 1:15-cv-1002, 2015 WL 6870118 (N.D. Ohio Nov. 6, 2015)............................................ 10

*Mayo Collab. Servs. v. Prometheus Labs, Inc.*,
  566 U.S. 66 (2012) ............................................................................................................ 4

*Microstrategy Inc. v. Apttus Corp.*,
  118 F. Supp. 3d 888 (E.D. Va. 2015) ................................................................................ 23

*Midwest Indus., Inc. v. Karavan Trailers, Inc.*,
  175 F.3d 1356 (Fed. Cir. 1999).......................................................................................... 2

*Minerva Surgical, Inc. v. Hologic, Inc.*,
  594 U.S. 559 (2021) ...................................................................................... 20, 21, 22, 23

*Mobile Acuity Ltd. v. Blippar Ltd.*,
  110 F.4th 1280 (Fed. Cir. 2024) .................................................................................. 13, 17

*Mortg. Grader, Inc. v. Costco Wholesale Corp.*,
  No. SACV 13-00043 AG (ANx), 2014 WL 10763261 (C.D. Cal. Oct. 27, 2014).................. 24

*Mortg. Grader, Inc. v. First Choice Loan Servs.*,
  811 F.3d 1314 (Fed. Cir. 2016)..................................................................................... 15, 23

*Murj, Inc. v. Rhythm Mgmt. Grp., LLC*,
  622 F. Supp. 3d 109 (D. Md. 2022)............................................................................... 1, 9

*Nagle Indus., Inc. v. Ford Motor Co.*,
  173 F.R.D. 448 (E.D. Mich. 1997) .............................................................................. 26, 27

*Neonatal Prod. Grp., Inc. v. Shields*,
  276 F. Supp. 3d 1120 (D. Kan. 2017)........................................................................... 25, 26

*Ortho Pharm. Corp. v. Genetics Inst., Inc.*,
  52 F.3d 1026 (Fed. Cir. 1995)........................................................................................... 30

*Paradise Creations, Inc. v. UV Sales, Inc.*,
  315 F.3d 1304 (Fed. Cir. 2003)...................................................................................... 4, 29

*Pedersen v. Geschwind*,
  141 F. Supp. 3d 405 (D. Md. 2015)................................................................................... 29

*People.ai, Inc. v. Clari Inc.*,
  No. 22-1364, 2023 WL 2820794 (Fed. Cir. Apr. 7, 2023) ................................................. 17

*PowerOasis, Inc. v. T-Mobile USA, Inc.*,
  522 F.3d 1299 (Fed. Cir. 2008)......................................................................................... 21

*Rady v. Bos. Consulting Grp., Inc.*,
    No. 22-2218, 2024 WL 1298742 (Fed. Cir. Mar. 27, 2024)...................................... 10

*Rite-Hite Corp. v. Kelley Co.*,
    56 F.3d 1538 (Fed. Cir. 1995)........................................................................ 30

*Rodime PLC v. Seagate Tech., Inc.*,
    174 F.3d 1294 (Fed. Cir. 1999)...................................................................... 24

*S. Volkswagen, Inc. v. Centrix Fin., LLC*,
    357 F. Supp. 2d 837 (D. Md. 2005).................................................................. 28

*SAP Am., Inc. v. InvestPic, LLC*,
    898 F.3d 1161 (Fed. Cir. 2018)........................................................................ 9

*Sears, Roebuck & Co. v. Stiffel Co.*,
    376 U.S. 225 (1965)...................................................................................... 28

*Secured Mail Sols., LLC v. Universal Wilde, Inc.*,
    873 F.3d 905 (Fed. Cir. 2017).......................................................................... 3

*Sgromo v. Target Brands Inc.*,
    No. 21-1702, 2021 WL 4592277 (Fed. Cir. Oct. 6, 2021)........................................ 29

*Sicom Sys. Ltd. v. Agilent Techs., Inc.*,
    427 F.3d 971 (Fed. Cir. 2005)..................................................................... 4, 30

*Sorias v. Nat'l Cellular USA, Inc.*,
    124 F. Supp. 3d 244 (E.D.N.Y. 2015) .............................................................. 26

*TDE Petroleum Data Sols., Inc., v. AKM Enter., Inc.*,
    657 Fed.Appx. 991 (Fed. Cir. 2016).................................................................. 13

*TLI Commc'ns LLC Patent Litig.*,
    87 F. Supp. 3d 773 (E.D. Va. 2015) ................................................................. 24

*Trinity Info Media, LLC v. Covalent, Inc.*,
    72 F.4th 1355 (Fed. Cir. 2023) ........................................................... 10, 14, 16

*Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*,
    874 F.3d 1329 (Fed. Cir. 2017)............................................................... 5, 8, 11

*Ultra-Precision Mfg. v. Ford Motor Co.*,
    411 F.3d 1369 (Fed. Cir. 2005)........................................................................ 24

*Uniloc USA, Inc. v. ADP, LLC*,
    772 F. App'x 890 (Fed. Cir. 2019) ............................................................. 12, 15

*Univ. of Fla. Rsch. Found., Inc. v. Gen. Elec. Co.*,
  916 F.3d 1363 (Fed. Cir. 2019) ........................................................................ 5

*Veto Pro Pac, LLC v. Custom Leathercraft Mfg. Co.*,
  No. 3:08-cv-00302 (VLB), 2009 WL 276369 (D. Conn. Feb. 5, 2009) ............ 25, 26

*Visual Memory LLC v. NVIDIA Corp.*,
  867 F.3d 1253 (Fed. Cir. 2017) ........................................................................ 3

*Voip-Pal.Com, Inc. v. Apple Inc.*,
  375 F. Supp. 3d 1110 (N.D. Cal. 2019) ............................................................ 5

*Voit Techs., LLC v. Del-Ton, Inc.*,
  757 F. App'x 1000 (Fed. Cir. 2019) ................................................................ 8, 10

*Waner v. Ford Motor Co.*,
  331 F.3d 851 (Fed. Cir. 2003) .......................................................................... 28

*WiAV Sols. LLC v. Motorola, Inc.*,
  631 F.3d 1257 (Fed. Cir. 2010) ........................................................................ 30

**Statutes**

35 U.S.C. § 101 ......................................................................................... *passim*

**Rules**

Fed. R. Civ. P. 12(b)(1) ................................................................................ 8

Fed. R. Civ. P. 12(b)(6) ................................................................................ 4

## I.    **INTRODUCTION**

The Defendants in this case, Chesapeake Regional Information System for Our Patients, Inc. ("CRISP") and CRISP Shared Services Inc. ("CSS"), are non-profit organizations providing services that allow sharing of health information among doctors' offices, hospitals, labs, or other healthcare organizations. CRISP is specifically authorized by the Maryland Health Care Commission as the state-designated Health Information Exchange ("HIE"). The Plaintiffs in this case, Audacious Inquiry, LLC ("Audacious") and Collective Medical Technologies, Inc. ("CMT") are for-profit vendors owned by a large Canadian entity, PointClickCare Corporation (*See* Dkt. 3).

While Audacious has historically served as a vendor of software services to Defendants, that relationship terminated in 2024 because of Audacious's inability to keep up with the growing demands of clients utilizing HIE services. Since then, Audacious has engaged in a retaliatory campaign against Defendants, of which this lawsuit appears to be the latest salvo.

For the reasons detailed below, the Complaint should be dismissed in its entirety.

**First**, the Federal Circuit has endorsed granting, and district courts routinely grant, Motions to Dismiss patent infringement claims under 35 U.S.C. § 101 where, as here, the asserted patents are directed to the unpatentable abstract idea of gathering and analyzing data. *Murj, Inc. v. Rhythm Mgmt. Grp., LLC*, 622 F. Supp. 3d 109, 114-18 (D. Md. 2022) (claims directed to collecting and analyze data from medical devices in different formats found invalid). Indeed, cases involving patents with significantly more technical detail and complexity than those here have been found invalid. *See, e.g., Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1353-56 (Fed. Cir. 2016) (claims directed to gathering and analyzing data from electric power grid found ineligible); *Beteiro, LLC v. DraftKings Inc.*, 104 F.4th 1350, 1355-59 (Fed. Cir. 2024); *Glasswall Sols. Ltd. v. Clearswift Ltd.*, 754 F. App'x 996, 997-99 (Fed. Cir. 2018); *AI Visualize, Inc. v. Nuance*

*Commc'ns, Inc.*, 97 F.4th 1371, 1378-81 (Fed. Cir. 2024).

The equitable doctrine of "assignor estoppel" does not bar CRISP and CSS's eligibility challenge. The doctrine was developed to ensure fair dealing and protect a party buying a patent who relied on a seller's express or implied warranty that the patent was valid. Audacious was an original owner of U.S. Patent Nos. 10,938,962, 11,114,194, and 12,047,475 (collectively, the "Asserted Patents") asserted in this case (all but one inventor was an Audacious employee), and it was Audacious who retained counsel to pursue the Asserted Patents. Audacious never relied on any warranty of validity by Defendants, and "assignor estoppel" was never intended to apply to the transfer of rights from one joint owner to an equally situated joint owner.[1] Indeed, it would be **inequitable** to apply the doctrine here given CRISP's lack of involvement with the Asserted Patents. What is more, myriad exceptions to the application of assignor estoppel apply.

**Second**, the Federal Circuit has also made clear that state law unfair competition claims that arise from allegations of patent infringement, such as Plaintiffs' threadbare pleading in this case, should also be dismissed as preempted by federal patent law. *See, e.g., Hunter Douglas, Inc. v. Harmonic Design, Inc.*, 153 F.3d 1318, 1335 (Fed. Cir. 1998), *overruled in part on other grounds by Midwest Indus., Inc. v. Karavan Trailers, Inc.*, 175 F.3d 1356, 1359 (Fed. Cir. 1999).

While the Complaint should be wholly dismissed, if it is not, Defendants request that Audacious be dismissed for lack of standing as it is no longer the owner of the Asserted Patents.

## II.    LEGAL STANDARDS

### A.    Motion to Dismiss Under Fed. R. Civ. P. 12(b)(6)

"To survive a motion to dismiss, a complaint must contain sufficient factual matter,

---

[1] It is presently unclear whether CRISP owned any rights to any Asserted Patents. David Horrocks, the sole inventor whom Plaintiffs allege owed a duty to assign to CRISP "upon information and belief," was not an employee of CRISP. However, the Court need not reach this issue. Assuming the allegations in the complaint are true, and that CRISP conveyed an interest in certain patents to Audacious in 2013, Plaintiffs' allegations nonetheless fail as a matter of law.

accepted as true, to 'state a claim that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. v. Twombly*, 550 U.S. 544, 570 (2007)). The court does not credit "bare assertions" or "conclusory" statements. *Id*. at 681. "[A] court need not 'accept as true allegations that contradict matters properly subject to judicial notice or by exhibit,' such as the claims and the patent specification." *Secured Mail Sols., LLC v. Universal Wilde, Inc.*, 873 F.3d 905, 913 (Fed. Cir. 2017). While factual allegations are accepted as true, legal conclusions are given no deference and left for the court. *See Iqbal*, 556 U.S. at 678. In the patent context, "generalized assertions that factual considerations about the state of the art preclude a decision at the pleadings stage do not prevent a district court from granting a motion to dismiss, nor [the Federal Circuit] from affirming." *Beteiro*, 104 F.4th at 1358.

Patentability under § 101 is a threshold legal issue. *Bilski v. Kappos*, 561 U.S. 593, 602 (2010). Accordingly, the § 101 inquiry is properly raised at the pleadings stage if it is apparent from the face of the patent that the claims are not directed to eligible subject matter. *Cleveland Clinic Found. v. True Health Diagnostics LLC*, 859 F.3d 1352, 1360 (Fed. Cir. 2017).

### B.    Patent Eligibility Under 35 U.S.C. § 101

To determine if claims are directed to patent-ineligible subject matter under § 101, courts utilize the two-part *Alice* test. *Alice Corp. v. CLS Bank Int'l*, 573 U.S. 208, 217-18 (2014). First, courts determine "whether the claims at issue are directed to a patent-ineligible concept." *Id*. at 218; *see also Visual Memory LLC v. NVIDIA Corp.*, 867 F.3d 1253, 1258 (Fed. Cir. 2017). Second, if the claim contains an abstract idea, the court evaluates whether there is "an 'inventive concept'— i.e., an element or combination of elements that is 'sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself.'" *Alice*, 573 U.S. at 217-18. "For the role of a computer in a computer-implemented invention to be deemed meaningful in the context of this analysis, it must involve more than performance of 'well-

3

understood, routine, [and] conventional activities previously known to the industry.'" *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1347-48 (Fed. Cir. 2014) (internal citation omitted). Applying an abstract idea on a computer is not an inventive concept. *Intell. Ventures I, LLC v. Capital One Bank (USA), N.A.*, 792 F.3d 1363, 1367 (Fed. Cir. 2015). A claim is also not meaningfully limited if it includes only token or insignificant pre- or post-solution activity. *See Mayo Collab. Servs. v. Prometheus Labs, Inc.*, 566 U.S. 66, 79 (2012).

### C.    Standing to Bring a Patent Infringement Claim

Whether a plaintiff has standing to join a patent infringement claim is properly resolved under Fed. R. Civ. P. 12(b)(1). *See Intell. Ventures I LLC v. Erie Indem. Co.*, 850 F.3d 1315, 1320-24 (Fed. Cir. 2017) (affirming dismissal for lack of standing). In the patent context, a "plaintiff must demonstrate that it held enforceable title to the patent *at the inception of the lawsuit*." *Paradise Creations, Inc. v. UV Sales, Inc.*, 315 F.3d 1304, 1309 (Fed. Cir. 2003) (original emphasis) (collecting cases). Thus, as a general matter, only the owner of a patent or an exclusive licensee who holds "all substantial rights" in a patent may bring or join claims for infringement. *Sicom Sys. Ltd. v. Agilent Techs., Inc.*, 427 F.3d 971, 976 (Fed. Cir. 2005). "A nonexclusive license confers no constitutional standing on the licensee to bring suit or even to join a suit with the patentee because a nonexclusive licensee suffers no legal injury from infringement." *Id.*

## III.    ARGUMENT

### A.    All Patent Infringement Claims Must Be Dismissed Because All Claims of the Asserted Patents Are Invalid Under 35 U.S.C. § 101.

All Asserted Patents are directed to the ineligible abstract idea of gathering and analyzing data, and lack any inventive concept. Accordingly, Counts I-III must be dismissed.

#### 1.    The Asserted Patents

The abstract nature of the claims is evident from their lack of specificity as to **how** any of

the recited steps should actually be accomplished. The claim language is "entirely result-oriented, describing various operations . . . without explaining how to accomplish any of the tasks." *See IBM Corp. v. Zillow Grp., Inc.* 549 F. Supp. 3d 1247, 1263 (W.D. Wa. 2021). That sort of result-focus abstract claiming has been held ineligible time and again. *See Univ. of Fla. Rsch. Found., Inc. v. Gen. Elec. Co.*, 916 F.3d 1363, 1368-69 (Fed. Cir. 2019) (holding as abstract claims directed to receiving data from multiple sources, converting data, and presenting results); *Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329, 1337-38 (Fed Cir. 2017); *Voip-Pal.Com, Inc. v. Apple Inc.,* 375 F. Supp. 3d 1110, 1130-31 (N.D. Cal. 2019), *aff'd sub nom. Voip-Pal.com, Inc. v. Twitter, Inc.*, 798 F. App'x 644 (Fed. Cir. 2020).

Representative independent claims for each of the Asserted Patents are provided below.

U.S. Patent No. 10,938,962 ("the '962 Patent," Ex. A) Claim 1:[2]

> 1. A network comprising:
>
> > [a][3] a plurality of data streams, wherein at least one of the data streams includes data updated in real-time, wherein the plurality of data streams include HL7[4] Admit, Transfer, Discharge (ADT) Messages;

---

[2] Claims 1 and 10 of the '962 Patent are the only independent claims. Claim 1 is representative of all the claims of the '962 Patent because none of the other claims add anything substantive of significant for the purposes of assessing the abstract nature of the claim. Claim 10 refers to "data sources" and Claim 1 to "data streams," the specification makes clear that these terms are used interchangeably, and both fundamentally refer to receiving data (whether from data sources, or data streams originating from data sources). Indeed, the specification explicitly states that a stream may act as a source (Ex. A at 5:1-3) or equates the two terms (*id.* at 4:2-3). Claim 10 also recites "aggregating" as opposed to "multiplexing" data, yet both refer to combining data and indeed the specification treats them in the same fashion. *Id.* at 4:36-38. Additionally, abstract idea of Claim 1 remains the focus of all the dependent claims, which do not recite anything substantive, significant, or otherwise non-abstract and instead refer to further abstract aspects of data manipulation or rote and generic aspects of conventional computer systems, including receiving more data and reformatting it in an unspecified manner (claim 2); further discarding/filtering data (claims 3 and 11); utilizing different data formats and further aggregating them (claims 7 and 8); utilizing a conventional computer touchpad (claim 9); or various generic aspects of conventional computerized graphical user interfaces (claims 4-6 and 12-14).

[3] The elements of each claim have been labeled for further reference elsewhere in this brief.

[4] HL7 refers to the pre-existing "Health Level 7" standard, which was known well before the filing of the patent and provides an industry-standard format for data, including Admit, Discharge, Transfer (ADT) messages. *See* Ex. D (part of the prosecution history). Documentation for the HL7 standard was submitted as prior art to the Patent Office during prosecution. *See, e.g.,* Ex. E (disclosing "CATALYZE, HL7 201" ADT standard). As part of the prosecution history, the Court may take judicial notice of these HL7 materials. *Classen Immunotherapies, Inc. v. Shionogi, Inc.*, 993 F. Supp. 2d 569, 580 n.10 (D. Md. 2014) ("The Court may consider public records of [the asserted] patents' prosecution history as documents appropriate for judicial notice.").

[b] a plurality of protocol interfaces each connected to at least one of the data streams, wherein at least one of the protocol interfaces is configured for HL7;

[c] a processor coupled with the protocol interfaces;

[d] an output interface coupled to a display for showing a graphical user interface; and

[e] a memory coupled to the processor including instructions that when executed by the processor, cause the processor to,

[e.1] multiplex a plurality of signals from the plurality of data streams via the protocol interfaces into a single output, wherein the multiplexing is executed based on an identity of the one of the data stream from which the signal originated,

[e.2] dispose a portion of the HL7 ADTs based on content of the HL7 ADTs and client input, and

[e.3] output the single output to the graphical user interface based on the content and the client input via the output interface, wherein the graphical user interface includes a plurality of fields, and wherein the single output populates at least one of the fields based on the identity of the one of the data stream in real-time.

<u>U.S. Patent No. 11,114,194 ("the '194 Patent," Ex. B) Claim 1:</u>[5]

1. A method comprising:

[a] electronically receiving, with a notification system including a computer processor and memory networked with a plurality of distinct healthcare

---

[5] Claims 1, 10, and 16 are the only independent claims of the '194 Patent (Ex. B). Claim 1 is representative of all claims of the '194 Patent because none of the other claims add anything substantive of significant for the purposes of assessing the abstract nature of the claim. All independent claims mostly mirror each other with minor difference. Each requires receiving or storing patient identifying information, receiving and/or providing healthcare information in a variety of formats, parsing healthcare information, comparing separate healthcare information, and generating and transmitting a readmission notification. Minor difference include, for example that Claim 10 requires that some data not be formatted and include "at least two thousand pieces of healthcare information generates in a day." As explained elsewhere herein, limiting a claim to a particular type or amount of data does not render it non-abstract. Claim 10 also refers to "remote access," though all the claims would equally apply to systems with both local and remote components. Meanwhile, Claim 16 specifically recites generic and conventional computer "interfaces" which add nothing non-abstract to the claims. Additionally, the abstract idea of Claim 1 remains the focus of all the dependent claims, which do not recite anything substantive, significant, or otherwise non-abstract and instead refer to further abstract aspects of data manipulation or rote and generic aspects of conventional computer systems, including receiving unspecific parameters for data manipulation (claims 2, 4, 8, and 19); the amount of data (claim 3); the source and/or type of data (claims 5, 7, 11, 12, 13, 14, 17, and 18); that data be "directly" received (claim 6); and the rote calculation of the passage of time between two points in time (9, 15, and 20).

information sources, healthcare information in several different formats dependent on hardware and/or software used by a computer of the sources from the plurality of distinct healthcare information sources and including treatment details for patients at a first healthcare provider and a second healthcare provider;

[b] parsing, with the computer processor, the healthcare information for HL7 Admit-Discharge-Transfer (ADT) messages and storing patient-identifying information in a standardized format from the HL7 ADT messages in the memory;

[c] determining, with the computer processor, from the stored patient-identifying information, a readmission time for a patient by comparing a first HL7 ADT message indicating admission of the patient at the first healthcare provider against a second HL7 ADT message for the patient, wherein the readmission time is a difference in time between the first HL7 ADT message and the second HL7 ADT message;

[d] generating in real-time with receipt of the first HL7 ADT message, with the computer processor, a readmission notification for the patient and transmitting the notification to the first healthcare provider so that the first healthcare provider has immediate access to up-to-date patient information, wherein the generating is executed if,

> [d.1] the readmission time is within a readmission time threshold stored in the memory, and

> [d.2] the patient-identifying information indicates the first HL7 ADT message and the second HL7 ADT message identify a same patient.

<u>U.S. Patent No. 12,047,475 ("the '475 Patent," Ex. C) Claim 1:</u>[6]

1. A network connected between a plurality of parallel streams and users to condition and route the streams, the network comprising:

---

[6] Claims 1, 12, and 20 are of the '475 Patent (Ex. C) are the only independent claims. Claim 1 is representative of all the claims of the '475 Patent because none of the other claims add anything substantive of significant for the purposes of assessing the abstract nature of the claim. Claims 1 and 20 are nearly identical, but for minor differences such as Claim 20 specifying that streams are from sources such as hospitals and that protocols are specifically "communication" protocols (which they would have to be in the context of claim 1). There are no substantive or significant differences from the perspective of assessing abstractness. Meanwhile, Claim 12 is also largely the same, except that the last element refers to writing data to a source where the data was not previously stored (as opposed to limiting the flow of data). Simply writing data is arguably **more** abstract than limiting the flow of data, and regardless, both are abstract as explained elsewhere in this brief. Additionally, the abstract idea of Claim 1 remains the focus of all the dependent claims, which do not recite anything substantive, significant, or otherwise non-abstract and instead refer to further abstract aspects of data manipulation or rote and generic aspects of conventional computer systems, including formatting data (claims 2 and 15); combining/aggregating data (claims 3, 7, and 16); the source and/or type of data (4, 5, 9, 13, and 17); disposing, filtering, or limiting of data (claims 6, 10, 14, 18, 21, 22); writing or adding data (claims 8 and 11); or the location of components (claim 19).

[a] a protocol interface connected to the plurality of streams, wherein the plurality of streams operate on different protocols and include at least one Health Level 7 (HL7) Admit Discharge Transfer message (ADT) stream, wherein the protocol interface is configured for different protocols including HL7;

[b] an intake interface configured to receive parameters for network operation on the plurality of streams from a plurality of users separate from the plurality of streams; and

[c] a processor and memory coupled to the intake interface and protocol interface, wherein the memory includes instructions that when executed by the processor, cause the processor to,

[d] limit flow of the plurality of streams to a receiving user of the plurality users to only an HL7 ADT or a portion of the HL7 ADT, wherein the HL7 ADT or the portion of the HL7 ADT complies with the parameters for network operation for the receiving user, wherein the limiting is executed in real-time with the streams.

At base, the claims of the Asserted Patents amount to nothing more than gathering data from a network, aggregating (or "multiplexing") or parsing it, analyzing it (such as filtering it or determining a readmission time with respect to the '194 Patent), and communicating or displaying data to a user via a graphical user interface ("GUI") or notification. The Asserted Patents do not purport to improve the operation of computers or networks. At most, they describe results-oriented functional language implemented on generic computer components (network, memory, processors, and interfaces). *See Two-Way Media*, 874 F.3d at 1337-41 (claims directed to processing data streams, transmitting them, and then confirming data about them, were no more than conventional computer and network components operating per their ordinary functions.). Use of particular standards does not make claims patent eligible. *Voit Techs., LLC v. Del-Ton, Inc.*, 757 F. App'x 1000, 1003 (Fed. Cir. 2019) (claims using "industry standard [] format . . . or other proprietary or commercially available techniques" were abstract).

### 2.    *Alice* Step One: The Asserted Patents are Directed to an Abstract Idea

#### a.    The Asserted Patents recite generic steps for processing data similar to those found ineligible in many other cases.

Gathering and analyzing data and presenting it back to a user are all conventional aspects of data analysis in the abstract. In *Elec. Power Grp., LLC v. Alstom S.A.*, the Federal Circuit affirmed a patent ineligibility finding on claims directed to real-time conveyance of data from various sources from an electric grid by receiving, monitoring, determining metrics, analyzing, and displaying data. 830 F.3d at 1353-56. As is the case here, the claims at issue in *Electric Power Group* also concerned a network with multiple data streams from disparate data sources. *Id.* at 1351-52. The Court there remarked that "the claims do not go beyond requiring the collection, analysis, and display of available information in a particular field, stating those functions in general terms, without limiting them to technical means for performing the function . . ." and noted that "the essentially result-focused, functional character of claim language has been a frequent feature of claims held ineligible under § 101 . . . ." *Id.* at 1351, 1356.

Years later, this District relied on *Electric Power Group* in granting a Motion to Dismiss under 35 U.S.C. § 101 for claims that purported to cover both a "device" and "process" for converting data received in multiple formats from various medical devices and displaying that data to users via a portal. *See Murj*, 622 F.Supp. 3d at 114-15. Notably, the scope of the claims at issue in both *Murj* and *Electric Power Group* echo the scope of the claims at issue here.

Limiting a claim to a particular type of data (such as data in an HL7/ADT message format) does not render an otherwise patent-ineligible claim eligible. *See Elec. Power Grp.*, 830 F.3d at 1353-54; *Geoscope Techs. Pte. Ltd v. Google LLC*, No. 24-1003, 2025 WL 1276235, *3 (Fed. Cir. May 2, 2025) ("The fact that the asserted claims of the [asserted] patent relate to a particular type of information—data about location—does not remove them from the realm of the abstract."); *SAP*

*Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1168 (Fed. Cir. 2018) ("[E]ven if a process of collecting and analyzing information is 'limited to particular content' or a particular 'source,' that limitation does not make the collection and analysis other than abstract."). The same is true of claims requiring the use of a large amount of data; such elements do not render otherwise patent-ineligible claims eligible. *IBM Corp. v. Zillow Grp., Inc.*, 50 F.4th 1371, 1378 (Fed. Cir. 2022) (finding claims ineligible where patent owner asserted improved user ability to "identify and analyze relevant data in otherwise large data sets"); *Trinity Info Media, LLC v. Covalent, Inc.*, 72 F.4th 1355, 1363-64 (Fed. Cir. 2023) (finding claims ineligible where patent owner argued humans could not aggregate "result values with huge numbers of polls and members" resulting claims being directed to "operations that a human could not perform as quickly as a computer").

As disclosed in the prosecution history, the HL7/ADT data format is a prior art industry standard that predates the patents. *See, e.g.,* Ex. D at A16 (describing standard as "frequently used and in-demand"), A19 ("The ADT message is one of the most common"), A20 (discussing format of ADT data). Indeed, Audacious itself acknowledged how conventional the HL7 ADT standard is by disclosing it to the USPTO. Ex. E. Simply requiring data in HL7/ADT message format cannot transform the claims into patentable subject matter. *Voit Techs.*, 757 F. App'x at 1003; *see also MacroPoint, LLC v. FourKites, Inc.*, No. 1:15-cv-1002, 2015 WL 6870118, at *5 (N.D. Ohio Nov. 6, 2015), *aff'd*, 671 F. App'x 780 (Fed. Cir. 2016) (finding claims that "incorporate pre-existing industry standards" and perform simple functions like "transmit[ing]" and "receiv[ing]" data ineligible); *Rady v. Bos. Consulting Grp., Inc.*, No. 22-2218, 2024 WL 1298742, at *4 (Fed. Cir. Mar. 27, 2024) (finding that patent's description of "widely-used standard protocols" underscored "that the claimed invention relies on the conventional use of existing . . . technology").

### i.    The '962 Patent is Directed to an Abstract Idea.

Claim 1 of the '962 Patent recites: (a) multiple sources ("streams") of data in a known

format), (b) generic computer interfaces that receive said data); (c) a generic processor, (d) a generic computer interface and display, and (e) a generic memory with instructions to: (e.1) aggregate ("multiplex") data into a single collection of data ("output"), (e.2) dispose a portion of the data; and (e.3) output the data to a generic display ("graphical user interface").

Each of these elements, taken individually and as a combination, is directed to an established abstract idea. The Federal Circuit has routinely found claims directed to aggregation or multiplexing of data to be patent ineligible. *See, e.g., CareDx, Inc. v. Natera, Inc.*, 40 F.4th 1371, 1373, 1378-79 (Fed. Cir. 2022) (finding "multiplex" claim steps to be "conventional techniques"); *iLife Techs., Inc. v. Nintendo of Am., Inc.,* 839 F. App'x 534, 536-37 (Fed. Cir. 2021) ("We have routinely held that claims directed to gathering and processing data are directed to an abstract idea."); *In re Gale*, 856 F. App'x 887, 889 (Fed. Cir. 2021) (claims "directed to the abstract idea of (1) collecting information . . . , (2) analyzing the information (here, calculating a usage pattern and determining its compliance with a predetermined usage pattern), and (3) reporting the results," ineligible); *Bot M8 LLC v. Sony Corp. of Am.*, 4 F.4th 1342, 1358 (Fed. Cir. 2021) (claims directed to slot machines connected to servers to "aggregate" results data found ineligible); *Two-Way Media*, 874 F.3d at 1337-41 (claims requiring processing data streams, transmitting them, and then confirming data about them, were directed to an abstract idea and reflected nothing more than conventional computer and network components operating ordinarily); *Elec. Power Grp.*, 830 F.3d at 1353-54 ("[W]e have treated collecting information, including when limited to particular content (which does not change its character as information), as within the realm of abstract ideas.").

That the claim recites data updated in real-time cannot salvage it. *See AI Visualize*, 97 F.4th at 1380 (rejecting assertion that "creation of virtual views 'on demand' or in 'real-time' in response to a user request transforms the claims into something 'significantly more' than the abstract idea");

*Uniloc USA, Inc. v. ADP, LLC*, 772 F. App'x 890, 902 (Fed. Cir. 2019) (finding real-time availability of information to be "a staple of a conventional network").

Courts also routinely find claims directed to disposing, or filtering, of data patent ineligible. *Glasswall Sols.*, 754 F. App'x at 999 (claims directed to filtering of electronic data ineligible); *In re McDonald*, No. 24-1015, 2024 WL 4128908, at *3 (Fed. Cir. Sept. 10, 2024) (claims including filtering consumer data found abstract). Likewise, courts also routinely find claims directed to displaying such data patent-ineligible. *Elec. Power Grp.*, 830 F.3d at 1353-54; *McDonald*, 2024 WL 4128908, at *3; *Impact Engine, Inc. v. Google LLC*, No. 22-2291, 2024 WL 3287126, at *6 (Fed. Cir. July 3, 2024) (where claims recited display on a GUI, "[t]he focus of the claims is the abstract idea of processing information—turning user-provided input into user-tailored output").

That the elements of the claim are limited to a particular field, type, or format of data does not change their abstract and ineligible nature. *Erie Indem.*, 850 F.3d at 1330 ("[A]s we have previously observed, '[a]n abstract idea does not become nonabstract by limiting the invention to a **<u>particular field</u>** of use or technological environment.'") (emphasis added); *Elec. Power Grp.*, 830 F.3d at 1353. Accordingly, the claims of the '962 Patent all fail *Alice* step 1.

### ii.    The '194 Patent is Directed to an Abstract Idea.

Claim 1 recites: (a) receiving data (in different formats) with a generic computer containing a generic processor and generic memory; (b) analyzing the data for data in a known format and storing it, (c) determining (in an unspecified manner) a "readmission time" for a patient by comparing pieces of data, and (d) generating and transmitting a notification based on said data.

As explained above with respect to the '962 Patent, the Federal Circuit and district courts have routinely found claims of this scope patent ineligible. That data may arrive in multiple formats makes no difference. *See directPacket Research, Inc. v. Polycom, Inc.*, No. 24-1147, 2025 WL 1752247, at *5 (Fed. Cir. June 25, 2025) (finding claims directed to method for multimedia

communication using incompatible communication protocols invalid as directed to abstract ideas of encoding and decoding data and converting formats); *EasyWeb Innovations, LLC v. Twitter, Inc.*, 689 F. App'x 969, 970 (Fed. Cir. 2017) (finding claims directed to accepting data in "multiple ways" and changing its format ineligible).

Analyzing, parsing, and storing data is also abstract. *Glasswall Sols.*, 754 F. App'x at 998-99 (claims for "parsing" data found abstract); *Elec. Power Grp.*, 830 F.3d at 1355; *AI Visualize*, 97 F.4th at 1378 ("We have explained that the steps of obtaining, manipulating, and displaying data, particularly when claimed at a high level of generality, are abstract concepts"); *Mobile Acuity Ltd. v. Blippar Ltd.*, 110 F.4th 1280, 1284, 1292-95 (Fed. Cir. 2024) (claims directed to "storing information so that it can be accessed using a captured image" found abstract). Likewise, the idea of converting multiple formats into a standardized or singular format is also abstract. *Adaptive Streaming Inc. v. Netflix, Inc.*, 836 F. App'x 900, 903 (Fed. Cir. 2020) ("[T]he ideas of encoding and decoding image data and of converting formats, including when data is received from one medium and sent along through another, are by themselves abstract ideas"); *Hawk Tech. Sys., LLC v. Castle Retail, LLC*, 60 F.4th 1349, 1357 (Fed. Cir. 2023) ("[C]onverting information from one format to another . . . is an abstract idea."). Analysis that includes making determinations based on compared data (such as a readmission time) is also abstract. *Glasswall Sols.*, 754 F. App'x at 999 (claims directed to determining a data format represent an abstract idea); *Mobile Acuity*, 110 F.4th at 1292-95 (claims directed to the abstract idea of "comparing images and displaying information based on the comparison"); *TDE Petroleum Data Sols., Inc., v. AKM Enter., Inc.*, 657 Fed.Appx. 991, 993 (Fed. Cir. 2016) (holding claims ineligible where "determining" step was analogous to a "most ordinary of steps in data analysis"); *see also Aviation Cap. Partners, LLC v. SH Advisors, LLC*, No. 24-1099, 2025 WL 1303663, at *3 (Fed. Cir. May 6, 2025) (finding claims including

"determining" step directed to the abstract idea of analyzing information).

Generating and transmitting notifications is also abstract. *Beteiro*, 104 F.4th at 1355-57 ("[T]he claims broadly recite generic steps of a kind we have frequently held are abstract: detecting information, generating and transmitting a notification based on the information"); *Trinity*, 72 F.4th at 1365 (finding claim abstract even when "generating a likelihood of match" limitation required meeting predetermined threshold of likelihood). *Trinity*, in fact, concluded that providing conditions for a function such as meeting a threshold simply "reflects the kind of data analysis that the abstract idea of matching necessarily includes." 72 F.4th at 1365; *see also Bluebonnet Internet Media Servs., LLC v. Pandora Media, LLC*, No. 22-2215, 2024 WL 1338940, at \*2 (Fed. Cir. Mar. 29, 2024) (finding claims directed to a computer system for generating media playlists based on a user's ratings invalid).

Thus, the '194 Patent's representative claim and all other claims fail *Alice* step 1.

### iii.      The '475 Patent is Directed to an Abstract Idea.

Claim 1 of the '475 Patent recites: (a) a generic computer interface for receiving data in a known format; (b) a generic computer interface for receiving parameters from users, and (c) a generic processor and generic memory with instructions to: (d) limit the receipt of data by a user.

As explained above with respect to the '962 Patent and '194 Patent, the Federal Circuit and district courts routinely find claims of this scope patent ineligible. Data analysis has long been held an abstract idea. *Elec. Power Grp.*, 830 F.3d at 1355 (affirming summary judgment that claims directed to a method and system "for performing real-time performance monitoring of an electric power grid by collecting data from multiple data sources, analyzing the data, and displaying the results" were invalid under § 101). Likewise, limiting a user's access to data (or the "flow" of data) is also abstract. *Ericsson Inc. v. TCL Commc'n Tech. Holdings Ltd.,* 955 F.3d 1317, 1326 (Fed. Cir. 2020) (claims directed to the abstract idea of "controlling access to, or limiting permission

to," resources abstract); *B# on Demand LLC v. Spotify Tech. S.A.*, 484 F. Supp. 3d 188, 206-07 (D. Del. 2020) (claims ineligible where directed to "abstract idea of limiting access to distributed media based on predetermined rules").

Thus, the'475 Patent's representative claim fails *Alice* step 1, as do all other claims.

### 3.    *Alice* Step Two: The Asserted Patents Recite No Inventive Concept.

The claims do not recite any inventive concept, but merely invoke "well-understood, routine [and] conventional" technology to carry out the abstract ideas. *See Alice*, 573 U.S. at 225.

#### a.    The claims of the Asserted Patents fail to provide any inventive concept and recite only conventional and well-understood techniques or components.

When claims only "add . . . generic computer components such as 'interface,' 'network,' and 'database[,]' [t]hese generic computer components do not satisfy the inventive concept requirement." *Mortg. Grader, Inc. v. First Choice Loan Servs.*, 811 F.3d 1314, 1324-25 (Fed. Cir. 2016) Accordingly, "if a claim's only 'inventive concept' is the application of an abstract idea using conventional and well-understood techniques, the claim has not been transformed into a patent-eligible application of an abstract idea." *BSG Tech. LLC v. Buyseasons, Inc.*, 899 F.3d 1281, 1290-91 (Fed. Cir. 2018).

The Asserted Patents do not claim an enhancement or improvement to the functioning of computers nor computer networks. As discussed above, they recite simply aggregating, analyzing, and displaying data with routine and conventional generic computer components like "interfaces," "processors," and "memory." Further, there is nothing inventive about a computer performing a function in "real-time." *AI Visualize*, 97 F.4th at 1380; *Uniloc*, 772 F. App'x at 902.

When the Asserted Patents use "functional language, at a high level of generality and divorced from the computer technology, to recite the claimed functions," the limitations are seen as simply "describ[ing] the abstract method without providing more." *IBM*, 50 F.4th at 1379. Here,

the claims may recite receiving, aggregating, multiplexing, parsing, determining, generating, etc. data but do not describe how to accomplish those results and provide no inventive concepts.

Plaintiffs evidently recognized the abstract nature of the claims, and devote a significant portion of their Complaint to an attempt to manufacture an inventive concept. *See* Dkt. 1 at ¶¶ 40-41, 47-49, and 56-57. For example, the Complaint alleges that prior art did not teach a "unified treatment of multiple disparate data streams and combining them into a single output that alters its display based on the content of the data and input from the client requesting the information." Dkt. 1 at ¶ 40. But this is not inventive; the alleged inventive aggregation of data has previously been held ineligible under § 101. *Bot M8,* 4 F.4th at 1358; *EasyWeb*, 689 F. App'x at 970. In addition, the complaint alleges that this happens through "a processor that multiplexes . . . ." Dkt. 1 at ¶ 40. But the specification admits that multiplexors generating a single output based on multiple inputs was well-known. Ex. A at 1:43-46 (describing a prior art "simple multiplexor feeding signals from each spoke data source to each spoke client in composite or multiplexed fashion").

Finally, the complaint alleges that "conventional networks predating the '962 patent did not involve having data streams with specific interfaces and all being aggregated through a single data cluster and output engine . . ." Dkt. 1 at ¶ 41. But the claims of the '962 Patent do not recite components such as a "data cluster" or "output engine." *Trinity*, 72 F.4th at 1363-64 (finding claims ineligible under § 101 where patent owner arguments were untethered to the asserted claims). "[T]he § 101 inquiry must focus on the language of the Asserted Claims themselves, and the specification cannot be used to import details from the specification if those details are not claimed." *ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 769 (Fed. Cir. 2019) (internal citations and quotation marks omitted); *see also Am. Axle & Mfg., Inc. v Neapco Holdings LLC*, 967 F.3d 1285, 1293 (Fed Cir. 2020) ("[F]eatures that are not claimed are irrelevant as to step 1 or

step 2 of the *Mayo/Alice* analysis.").

For another example, with respect to the '194 Patent, the Complaint alleges: "The prior art does not teach or suggest the claimed implementation of generating and transmitting readmission notifications." Dkt. 1 at ¶ 47. But generating and transmitting notifications has repeatedly been found ineligible subject matter by the Federal Circuit. *Beteiro*, 104 F.4th at 1355-59 (holding ineligible claims directed to generating and transmitting a notification); *Erie Indem.*, 850 F.3d at 1330 ("as we have previously observed, '[a]n abstract idea does not become nonabstract by limiting the invention to a particular field of use or technological environment'").

Further, the Complaint alleges "the claimed invention specifically improves the computer technology of HIE network computers at least with regard to the accuracy and efficiency of managing healthcare information . . . ." Dkt. 1 at ¶ 47. But the Federal Circuit has also held that increased accuracy and efficiency do not constitute an inventive concept. *People.ai, Inc. v. Clari Inc.,* No. 22-1364, 2023 WL 2820794, at *14 (Fed. Cir. Apr. 7, 2023) (finding that improvements in speed and accuracy are laudable, but remain abstract). What is more, the claims themselves do not recite improved accuracy or efficiency. *See ChargePoint,* 920 F.3d at 769. In addition, while the Complaint alleges improved computer technology, all it actually describes is a method for managing healthcare information and conducting it on a computer instead of having a person do it, rendering the allegations of improved functionality conclusory. *Iqbal*, 556 U.S. at 678 (court need not credit "bare assertions" or "conclusory" statements). The Complaint further alleges: "The conventional methods and systems for readmission notifications did not involve comparing HL7 ADTs." Dkt. 1 at ¶ 48. But again, the Federal Circuit has held simple data comparisons as ineligible under § 101. *Mobile Acuity*, 110 F.4th at 1292-95. In short, none of these allegations can change the abstract nature of the actual claims of the Asserted Patents.

The Complaint alleges that the applicant successfully overcame a § 101 challenge by arguing that the '194 Patent recites a "specific improvement over prior art systems by allowing remote users to share information in realtime in a standardized format regardless of the format in which the information was input by the user" (Dkt. 1 at ¶ 49), yet Federal Circuit precedent is replete with cases demonstrating that such format conversion amounts to nothing more than patent ineligible data manipulation. *See directPacket*, 2025 WL 1752247, at *5 (claims directed to the abstract ideas of encoding and decoding data and converting formats ineligible); *EasyWeb*, 689 F. App'x at 970 (holding ineligible claims for receiving data in multiple ways and requiring format change). A mistaken patent examiner cannot overrule Federal Circuit precedent. *Finnavations LLC v. Payoneer, Inc.*, No. 1:18-cv-00444-RGA, 2018 WL 6168618, at *2 n.3 (D. Del. Nov. 26, 2018) (claims directed to method of "delivery of transaction data to a financial management program" found ineligible even when applicant overcame a § 101 rejection during prosecution).

For another example, with respect to the '475 Patent, the Complaint alleges the inventive concept of the '475 Patent is "a network that can interface with different data streams and provide a means for healthcare providers to specifically request and limit the streams of information to meet their specific needs or to access the most relevant information." Dkt. 1 at ¶ 56. But this once again amounts to nothing more than manipulating or filtering data—which has long been found to be ineligible subject matter. *Glasswall Sols.*, 754 F. App'x at 999; *Elec. Power Grp.*, 830 F.3d at 1354. The Complaint continues to allege "inventive" concepts already found ineligible under § 101 such as parsing and aggregating "disparate information about specific patients into a manageable form." Dkt. 1 at ¶ 57. But "parsing" and "aggregating" data, regardless of the particular field, are ineligible under § 101. *Glasswall Sols.*, 754 F. App'x at 999 (claims directed to "parsing" content data, essentially "the conventional manipulation of information by a computer," were abstract);

18

*Bot M8,* 4 F.4th at 1358. The allegations of the Complaint cannot establish patentability in the face of this overwhelming precedent.

    **b.**  **The dependent claims of the Asserted Patents do not provide an inventive concept.**

  None of the dependent claims provide an inventive concept either, and instead merely add additional abstract concepts concerning data manipulation, or generic conventional computer components. In particular, many of the dependent claims simply refer to the source, amount, and/or type of data (which provides no inventive concept). *See* Ex. B at claims 3, 5, 7, 11, 12, 13, 14, 17, and 18, Ex. C at claims 4, 5, 9, 13, and 17. Other dependent claims similarly add nothing inventive and cover nothing more than: formatting data (Ex. A at claim 2, Ex. C at claims 2 and 15); disposing, filtering, and/or limiting data (Ex. A at claims 3 and 11, Ex. C at claims 6, 10, 14, 18, 21, 22); combining/aggregating data (Ex. A at claims 7 and 8, '475 Patent claims 3, 7, and 16); receiving unspecified parameters for data manipulation (Ex. B at claims 2, 4, 8, and 19); the rote calculation of the passage of time (Ex. B at at 9, 15, and 20); the "direct" receipt of data (Ex. B at claim 6); writing or adding data (Ex. C at claims 8 and 11); the location of various components (Ex. C at claim 19); and conventional aspects of computers like trackballs or aspects of a GUI. (Ex. A at claims 4-6, 9, and 12-14.)

    **4.**  **Assignor Estoppel Does Not Bar Defendants' Invalidity Challenge.**

  Assignor estoppel does not bar CRISP and CSS's patent eligibility challenge under 35 U.S.C. § 101 to the '962 and '452 Patents, despite Plaintiffs' unfounded pleading to the contrary. *See* Dkt. 1 at 20. Plaintiffs do not allege that assignor estoppel would apply to any challenge of the '194 Patent, nor could they, as that patent appears to only have inventors who were always employed by Audacious and has only ever been entirely owned by Plaintiffs.

  The doctrine of "assignor estoppel" is "rooted in an idea of fair dealing" and "limits an

inventor's ability to assign a patent to another for value and later contend in litigation that the patents is invalid." *Minerva Surgical, Inc. v. Hologic, Inc.*, 594 U.S. 559, 563 (2021). The doctrine, however, is limited—"it reaches only so far as the equitable principle long understood to lie at its core." *Id.* It "applies when, **but only when**, the assignor's claim of invalidity contradicts explicit or implicit representations he made in assigning the patent." *Id.* (emphasis added).

The Supreme Court in *Minerva* went on to discuss non-limiting exemplary situations where no such "contradiction" exists and, accordingly, assignor estoppel would not apply. These include situations where the assignment predates the patent claims at issue, as well as situations where changes in law after the purported assignment might render the claims invalid. *Id.* at 576-78.

> **a.    Plaintiffs cannot benefit from Assignor Estoppel because Audacious was always an original owner of the Asserted Patents**

The current situation simply does not implicate the concerns over fair dealing that Assignor Estoppel was intended to protect. *See Minerva*, 594 U.S. at 578. At best,[7] the December 2013 conveyance was to Audacious as an equally situated **joint owner** of the Asserted Patents. Audacious did not rely on any implicit or express warranty of validity from CRISP, nor would that have made any sense. The Complaint itself acknowledges that four out of the five inventors of the '962 and '452 Patents were Audacious employees, and it was Audacious who retained counsel and

---

[7] The complaint refers to the assignment in the 2013 agreement, and also refers to later assignments by David Horrocks directly to Audacious. The 2013 agreement is the only agreement involving a purported assignment directly by CRISP, and is attached as Ex. F. Plaintiffs relied on this purported assignment to support the allegations in the Complaint, although they failed to attach the agreement as an exhibit. *See* Dkt. 1 at ¶¶ 77-81 (further misstating date of execution as April 2014 rather than December 2013). Accordingly, the Court may consider the facts set forth in this agreement, including the date the agreement was executed, in deciding this Motion. *Darcangelo v. Verizon Communs., Inc.*, 292 F.3d 181, 195 n.5 (4th Cir. 2002). Likewise, the Court may consider the patents themselves, which reflect the relevant application dates. *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 164 (4th Cir. 2016). To the extent any later assignments from Mr. Horrocks to Audacious were considered assignments of interests owned by CRISP, they were expressly made "[i]n accordance with [his] obligation(s) under the Agreement for Acquisition of CRISP's Encounter Notification Service," as confirmed by the express terms of those assignments (Exs. G-K) and thus cannot impact the scope of any warranties of validity from CRISP, let alone CSS, which was founded in 2020, years after the ENS Acquisition Agreement was executed.

drove the prosecution of the Asserted Patents. As the Supreme Court stressed in *Minerva*, the application of assignor estoppel should only "reach so far" as the equitable principles underlying it. *Id.* at 563. There is absolutely no reason to extend the doctrine to an assignment from one joint owner to another.

### b. Assignor estoppel also cannot apply because any purported assignment long predates the claims of the Asserted Patents.

The application that led to the '962 Patent was not filed until March 4, 2018, while the application that led to the '475 Patent was not filed until March 2, 2021—more than 4 and 7 years **after** the purported assignment of December 2013 from CRISP to Audacious respectively. *See* Ex. A, Ex. C. Both patents also claim priority to intervening continuation-in-part ("CIP") applications filed by Audacious well after December of 2013, and which necessarily add "new matter" to the inventions not present in the originally assigned applications.[8] Indeed, the prosecution history of the '962 and '475 Patents demonstrate that both patents claim priority to U.S. Patent App. No. 15/808,887, which is a CIP application that combined **five different patent families,** three of which lacked any alleged inventive contribution from Mr. Horrocks whatsoever.[9]

The Supreme Court in *Minerva* made abundantly clear that where, as here, the final scope of the Asserted Patents was unknown at the time of the assignment, the assignor cannot possibly make a warranty of validity with respect to those unknown claims:

> One example of non-contradiction is when the assignment occurs before an inventor can possibly make a warranty of validity as to specific patent claims. Consider a common employment arrangement. An employee assigns to his employer patent rights in any future inventions he develops

---

[8] *See PowerOasis, Inc. v. T-Mobile USA, Inc.*, 522 F.3d 1299, 1304 n.3 (Fed. Cir. 2008) ("A 'CIP' application is a continuation-in-part application containing a portion or all of the disclosure of an earlier application together with added matter not present in that earlier application. . . . Generally, a CIP adds new matter on which at least one claim relies for support.").

[9] *See* Ex. A & Ex. C (providing chain of priority for the '962 and '475 Patents, respectively); Ex. L (patent application publication for parent patent application No. 15/010,142, not identifying Horrocks as an inventor); Ex. M (same as to parent patent application No. 14/872,445); Ex. N (same as to parent patent application No. 14/445,562).

> during his employment; the employer then decides which, if any, of those inventions to patent. In that scenario, the assignment contains no representation that a patent is valid. How could it? The invention itself has not come into being.

594 U.S. at 576. Here, any assignment of rights by CRISP was made long before the drafting of any claims of the Asserted Patents, and thus there cannot be any warranty of validity as to those claims. The claims simply did not exist when the purported assignment was made.

To the extent Plaintiffs attempt to rely on assignments from David Horrocks (*see* Dkt. 1 at ¶¶ 59-60, 64-76, 82-90), these assignments similarly fall within the scope of the exception set forth in *Minerva*. By their very terms, these assignments and all other inventor assignments filed during prosecution of the patent applications in the chain of priority leading to the '962 Patent and the '475 Patent make clear that Horrocks was preemptively obligated to assign any and all IP before the applications were filed or claims drafted. Exs. G-K. This kind of preemptive assignment from an inventor to a third party who then decides—without inventor input—the scope of claims to pursue is precisely the arrangement contemplated by the Supreme Court in *Minerva* as a situation in which assignor estoppel cannot apply.

That the asserted patents involve intervening CIP applications only bolsters the fact that assignor estoppel should not apply in this case. In accord with *Minerva*, there can be no warranty of validity from Mr. Horrocks, CSS, or CRISP as to the new matter incorporated from these CIP applications that incorporate subject matter that neither CRISP nor Mr. Horrocks had anything to do with and are necessarily beyond the scope of anything Mr. Horrocks ever invented (let alone assigned). *See Minerva*, 594 U.S. at 577.

### c.    Assignor estoppel is barred by a subsequent change in law.

In *Minerva*, the Supreme Court also recognized that a change in law after an assignment was made would also bar the application of assignor estoppel:

> A second example [of non-contradiction] is when a later legal development renders irrelevant the warranty given at the time of assignment. Suppose an inventor conveys a patent for value, with the warranty of validity that act implies. But the governing law then changes, so that previously valid patents become invalid. The inventor may claim that the patent is invalid in light of that change in law without contradicting his earlier representation. What was valid before is invalid today, and no principle of consistency prevents the assignor from saying so.

*Minerva*, 594 U.S. at 577. Here, both the December 2013 agreement between CRISP and Audacious, as well as all of Mr. Horrocks's original assignments to the earliest applications to which the '962 and '475 Patents claim priority, predate the Supreme Court's June 19, 2014 ruling in *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208 (2014), which is the basis of CRISP and CSS's Motion to Dismiss.[10] The *Alice* decision marked a sea change in the law regarding patent eligibility, and is exactly the sort of intervening change in law that would bar assignor estoppel (were it to have ever applied in the first place).

Courts routinely acknowledge that *Alice* was a significant change in law that substantively altered the patent eligibility analysis, particularly for software-related patent claims. This includes the Federal Circuit and district courts both in the Fourth Circuit and elsewhere, which have found that *Alice* effectively created new invalidity positions under § 101 where none previously existed. *Inventor Holdings, LLC v. Bed Bath & Beyond, Inc.*, 876 F.3d 1372, 1379 (Fed. Cir. 2017) ("[W]e find that *Alice* was a significant change in the law as applied to the facts of this particular case."); *Mortg. Grader*, 811 F.3d at 1322 ("[A] § 101 defense previously lacking in merit may be meritorious after *Alice*."); *Microstrategy Inc. v. Apttus Corp.*, 118 F. Supp. 3d 888, 899 (E.D. Va. 2015) ("[P]atentees relied on a low bar when writing applications to the Patent and Trademark

---

[10] To the extent Audacious and CMT attempt to rely on additional inventor assignments executed in connection with later nonprovisional applications that directly issued as the '962 and '475 Patents (Dkt. 1 at ¶¶ 85-88), these assignments clearly post-date any assignment by CRISP and, by the terms of the assignments themselves, were executed pursuant to the terms of the pre-*Alice* ENS Acquisition Agreement. Ex. G; Ex. H. These assignments thus squarely fall within the scope of the first exception discussed above and cannot form the basis for any later purported warranty of validity or assignor estoppel.

Office, but since *Bilski, Mayo,* and *Alice,* the rules have changed. . . . Unfortunately for the patentees, this results in ineligible patents."); *In re TLI Commc'ns LLC Patent Litig.*, 87 F. Supp. 3d 773, 782 (E.D. Va. 2015) ("In two recent decisions—[*Mayo*] and [*Alice*]—the Supreme Court invalidated patents for failing to pass muster under § 101, and in doing so, significantly altered the § 101 legal landscape."); *see also, e.g., JDS Techs., Inc. v. Exacq Techs.*, No. 15-10387, 2016 WL 3165724, at *9 (E.D. Mich. June 7, 2016); *Mortg. Grader, Inc. v. Costco Wholesale Corp.*, No. SACV 13-00043 AG (ANx), 2014 WL 10763261, at *7 (C.D. Cal. Oct. 27, 2014); *Eclipse IP LLC v. McKinley Equip. Corp.*, No. CV 14-154-GW(AJWx), 2014 WL 4407592, at *3 n.5 (C.D. Cal. Sep. 4, 2014).

**B.    The Unfair Competition Claim is Preempted By Federal Patent Law and Otherwise Fails For the Same Reasons as the Patent Claims.**

Plaintiffs' unfair competition claim must also be dismissed because it is preempted by federal patent law. Whether a state law claim is preempted by federal patent law is governed by Federal Circuit law. *Ultra-Precision Mfg. v. Ford Motor Co.*, 411 F.3d 1369, 1376 (Fed. Cir. 2005). As the Federal Circuit has explained, "[f]ederal law preempts state law that offers 'patent-like protection' to discoveries unprotected under federal patent law." *Id.* at 1377-78 (citations omitted). That is, state law claims are preempted if they fail to "include additional elements not found in the federal patent law cause of action," or if they are "an impermissible attempt to offer patent-like protection to subject matter addressed by federal law." *Rodime PLC v. Seagate Tech., Inc.*, 174 F.3d 1294, 1306 (Fed. Cir. 1999). In this context, district courts routinely find that unfair competition claims are preempted where they are premised on allegations that a defendant is unfairly using patented technology or non-trade secret technology that could have been (but was not) patented. *See, e.g., Convatec, Inc. v. HR Pharms., Inc.*, C.A. No. 24-1248-RGA-SRF, 2025 WL 1859228, at *3 (D. Del. June 10, 2025) (recommending dismissal of unfair competition claim

as preempted where complaint "alleges that HRHC 'engaged in unfair competition, with willful, wanton and reckless disregard for Convatec's patent rights'" but "does not aver any conduct in support of the claim, such as bad faith conduct by HRHC, beyond the acts alleged in connection with the patent infringement claims"); *Neonatal Prod. Grp., Inc. v. Shields*, 276 F. Supp. 3d 1120, 1151 (D. Kan. 2017); *Veto Pro Pac, LLC v. Custom Leathercraft Mfg. Co.*, No. 3:08-cv-00302 (VLB), 2009 WL 276369, at *2-3 (D. Conn. Feb. 5, 2009); *Knova Software, Inc. v. Inquira, Inc.*, C.A. No. 06-381-JJF, 2007 WL 1232186, at *3 (D. Del. Apr. 27, 2007).

Here, the allegations underlying the unfair competition claim are scantily pled, but they essentially boil down to an assertion that CRISP and CSS have engaged in unfair competition by developing and selling a product that allegedly infringes the Asserted Patents. Indeed, the Complaint's only allegations that describe the allegedly unfair "acts" that underlie its claim under "Maryland's Unfair Competition Law" are as follows:

> 103. Audacious has led the software development and implementation of ENS for CRISP (and CSS) until September 2024, when CRISP transitioned from ENS to CEND.

> 104. Upon information and belief, the CEND solution had been commercially available for less than a year at the time CSS submitted its bid in response to AHCA's ITN.

> 105. Upon information and belief, CSS misrepresented the CEND system in its submission to AHCA by, among other things, deliberately obscuring the **infringing nature of the technology**, the volume of notifications it had made, the time period during which it was developed and used, and its ability to transition the Florida market to **CSS's infringing technology.**

> 106. Upon information and belief, CSS provided such misrepresentations to AHCA through misleading oral and written statements.

Dkt. 1 at ¶¶ 103-106. All other allegations in this section of the Complaint describe actions taken by Audacious itself or by the Florida Agency for Healthcare Administration ("AHCA"). *Id.* at ¶¶ 98-107. Thus, in essence, Audacious and CMT allege unfair competition on the basis that CSS

and CRISP have allegedly infringed certain patents by making and using CEND. All other alleged acts by CSS and CRISP – i.e., choosing not to renew their license agreement and submitting a winning bid to the AHCA that survived an earlier protest by Audacious – constitute lawful conduct and normal competition.

Plaintiffs' unfair competition claim is therefore the essence of a preempted claim. As the Federal Circuit has explained, "[i]f a plaintiff bases its tort action on conduct that is protected or governed by federal patent law, then the plaintiff may not invoke the state law remedy, which must be preempted for conflict with federal patent law." *Hunter Douglas*, 153 F.3d at 1335. As pled, the alleged conduct could only be "unfair" if Plaintiffs had an enforceable right to prevent CSS and CRISP from using the technology purportedly claimed in the Asserted Patents or otherwise implemented in Ai's commercially available ENS system, i.e., an enforceable right akin to patent protection. But for decades, courts have consistently found similar claims for unfair competition relying on allegations that a defendant is unfairly using patented technology or using unpatented technology that is not maintained as a trade secret to be preempted. *E.g., Sorias v. Nat'l Cellular USA, Inc.*, 124 F. Supp. 3d 244, 262 (E.D.N.Y. 2015); *Nagle Indus., Inc. v. Ford Motor Co.*, 173 F.R.D. 448, 455 (E.D. Mich. 1997); *Jerrold Stephens Co. v. Alladin Plastics, Inc.*, 229 F.Supp. 536, 539 (S. D. Cal. 1964); *Neonatal Prod. Grp.*, 276 F. Supp. 3d at 1151; *Convatec*, 2025 WL 1859228, at *3; *Veto Pro Pac*, 2009 WL 276369, at *2-3; *Knova*, 2007 WL 1232186, at *3. The unfair competition claim is preempted and should be dismissed.

To the extent Audacious and CMT argue that they have also alleged facts beyond those necessary for its claims for infringement, these arguments must fail. The only allegation Audacious and CMT plead in support of their unfair competition claim that even arguably goes to conduct other than its patent infringement allegations are its bald assertion that CSS "misrepresented the

CEND system in its submission to AHCA by . . . obscuring . . . the volume of notifications it had made, the time period during which it was developed and used, and its ability to transition the Florida market to CSS's infringing technology." Dkt. 1 at ¶ 105. Such a conclusory allegation is insufficient to support a claim for unfair competition, but even if it had been pled with more specificity, this allegation—which appears to assert that CSS and CRISP acted in bad faith by using their knowledge of the Encounter Notification Service ("ENS") to take an improper shortcut to develop and offer the CEND system—cannot prevent preemption. *See Nagle*, 173 F.R.D. at 456 (finding unfair competition claims preempted where plaintiff alleged unfair competition by "misappropriat[ing] the time, talent and effort it expended in creating and developing its idea for the '281 patented invention" because "[e]ffort expended by [plaintiff] to create its pull-pull cable assembly concept is effort expended to create its '281 patented invention; and, as such, falls within the scope of patent protection."); *Convatec*, 2025 WL 1859228, at *3 (recommending dismissal of unfair competition claims where "complaint alleges only that HRHC became knowledgeable about Convatec's products and manufacturing process through its role as Convatec's supplier, and it used that knowledge to create its own allegedly infringing products"); *see also Carson Optical, Inc. v. Prym Consumer USA, Inc.*, 11 F. Supp. 3d 317, 330-34 (E.D.N.Y. 2014).

Likewise, the preemption analysis does not change if the technology at issue is not covered by a valid patent, whether that be because (as here) the patents at issue are invalid or because the allegedly copied technology was never patented. In either case, Plaintiffs cannot resort to state unfair competition law to prevent others from making use of technology that is not protected by patents and is purportedly incorporated into its commercially available ENS products and services. As the Supreme Court has held, it is impermissible for state unfair competition laws to prohibit the copying or reverse engineering of a product that is not protected by a Federal patent and is sold

or disclosed to the public and thus in the public domain. *Sears, Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225, 231-33 (1964) ("An unpatentable article, like an article on which the patent has expired, is in the public domain and may be made and sold by whoever chooses to do so. . . . [B]ecause of the federal patent laws a State may not, when the article is unpatented and uncopyrighted, prohibit the copying of the article itself or award damages for such copying."); *Litton Sys. v. Whirlpool Corp.*, 728 F.2d 1423, 1448 (Fed. Cir. 1984); *see also Waner v. Ford Motor Co.*, 331 F.3d 851, 856 (Fed. Cir. 2003) ("Absent secrecy, state law cannot create a collateral set of rights available as an adjunct or expansion to patent rights.").

Here, ENS is not secret; it is commercially available to customers and the public at large. Indeed, the Complaint expressly states that Audacious "has provided services to customers leveraging ENS in multiple markets throughout the United States," making ENS and its technology publicly available. Dkt. 1 at ¶ 98. To the extent the technology embodied in ENS is unpatentable or unpatented, Audacious and CMT cannot prevent others, like Defendants, from using it by claiming unfair competition.

Accordingly, any unfair competition claim premised on CSS and CRISP's creation of a competing product—to the extent not patented—must be dismissed. *Sears*, 376 U.S. at 231-33; *Litton*, 728 F.2d at 1448; *see also S. Volkswagen, Inc. v. Centrix Fin., LLC*, 357 F. Supp. 2d 837, 852-53 (D. Md. 2005) (dismissing unfair competition claim premised on same allegations as other dismissed claims without other alleged conduct "that would be considered to be a traditional common law unfair competition cause of action," *e.g.*, passing off, deceptive advertising, or trademark infringement).

### C.    Audacious Lacks Standing and Must Be Dismissed From This Case

To the extent the patent infringement claims are not dismissed, Audacious must be dismissed from this case for lack of standing. Only a party who owns exclusive rights to enforce a

patent—i.e., the patent's owner or exclusive licensee—at the time the suit is initiated has standing to sue for infringement. *Paradise Creations*, 315 F.3d at 1309 (Fed. Cir. 2003); *Abraxis Bioscience, Inc. v. Navinta LLC*, 625 F.3d 1359, 1364 (Fed. Cir. 2010); *Core Optical Techs., LLC v. Nokia Corp.*, 102 F.4th 1267, 1272-73 (Fed. Cir. 2024). Thus, a former patent owner who has assigned all rights in the relevant patents to another, even a related entity, lacks standing to sue for infringement of those patents. *See Lans v. Dig. Equip. Corp.*, 252 F.3d 1320, 1328 (Fed. Cir. 2001) (holding that plaintiff-inventor lacked standing where he assigned patent to corporation in which he was the sole shareholder and managing director before lawsuit); *Sgromo v. Target Brands Inc.*, No. 21-1702, 2021 WL 4592277, at *3 (Fed. Cir. Oct. 6, 2021).

As admitted in the Complaint, Audacious assigned all rights in the Asserted Patents to CMT before filing the Complaint, leaving CMT as the only owner of the patents when this action was initiated. Dkt 1 at ¶¶ 25, 29, 33. This is confirmed by the June 24, 2024 assignment itself,[11] by which Audacious assigned to CMT "all of Audacious' rights, title and interest, in and to . . . the Transferred Assets in any and all jurisdictions, free and clear of all charges, liens, security interests, claims or encumbrances of any kind whatsoever . . . ." Ex. O at § 3. "Transferred Assets" is defined as including "all of Audacious' rights, title and interest in and to all Technology and associated Intellectual Property Rights," with "Intellectual Property Rights" further including "any and all proprietary or industrial rights provided under . . . patent law . . . including all past, present, and future causes of action, rights of recovery, and claims for damage, accounting for profits, royalties or other relief relating, referring, or pertaining to any of the foregoing." *Id.* at Recitals, § 2. Thus, when this action was initiated on July 14, 2025, only CMT had any enforceable rights in the

---

[11] The assignment is part of the USPTO's assignment records, which are public records of which the Court may take judicial notice. Moreover, "where, as here, the defendant moves to dismiss on the grounds that the Court lacks subject matter jurisdiction, the Court may consider evidence outside the pleadings without thereby converting the motion to one for summary judgment." *Pedersen v. Geschwind*, 141 F. Supp. 3d 405, 407 n.2 (D. Md. 2015).

Asserted Patents; CMT was therefore the only party with standing to sue for infringement of those patents, including any potential past infringement predating the assignment from Audacious.

Audacious's status as a wholly owned subsidiary of CMT makes no difference. "Common corporate structure does not overcome the requirement that even between a parent and a subsidiary, an appropriate written assignment is necessary to transfer legal title from one to the other. Without the transfer of legal title of the patents, [the party without title] had no standing to bring this infringement action." *Abraxis*, 625 F.3d at 1366. Likewise, that Audacious now has a limited nonexclusive license to the Asserted Patents (Ex. O at § 4) does not confer standing. "A nonexclusive license confers no constitutional standing on the licensee to bring suit or even to join a suit with the patentee because a nonexclusive licensee suffers no legal injury from infringement." *Sicom*, 427 F.3d at 976; *Ortho Pharm. Corp. v. Genetics Inst., Inc.*, 52 F.3d 1026, 1031 (Fed. Cir. 1995) ("A holder of such a nonexclusive license suffers no legal injury from infringement and, thus, has no standing to bring suit or even join in a suit with the patentee."); *see also WiAV Sols. LLC v. Motorola, Inc.*, 631 F.3d 1257, 1265 (Fed. Cir. 2010). Nonexclusive licensees who join a purported infringement suit must be dismissed for lack of standing. *See Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1553-54 (Fed. Cir. 1995) (parties without standing could not join patent suit as co-plaintiffs); *Ortho Pharm.*, 52 F.3d at 1031.

Accordingly, even if the patent claims survive the instant motion to dismiss—and they should not—Audacious should be dismissed for lack of standing.

## IV.     CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court dismiss Plaintiffs' Complaint in its entirety with prejudice.

Respectfully submitted,

**FOLEY & LARDNER LLP**

By: ___/s/ Jarren N. Ginsburg___
    Jarren N. Ginsburg
    D. Md. Bar No. 19688
    FOLEY & LARDNER LLP
    Washington Harbour
    3000 K Street, N.W. Suite 600
    Washington, D.C. 20007-5109
    Telephone: (202) 672-5300
    Facsimile: (202) 672-5399
    jginsburg@foley.com

    Ruben J. Rodrigues *(pro hac vice)*
    FOLEY & LARDNER LLP
    111 Huntington Avenue
    Boston, MA 02199
    Telephone: (617) 342-4000
    Facsimile: (617) 342-4001
    rrodrigues@foley.com

    Sarah E. Rieger *(pro hac vice)*
    FOLEY & LARDNER LLP
    777 East Wisconsin Avenue
    Milwaukee, WI 53202
    Telephone: (414) 271-2400
    Facsimile: (414) 297-4900
    srieger@foley.com

**ATTORNEYS FOR DEFENDANTS
CHESAPEAKE REGIONAL INFORMATION
SYSTEM FOR OUR PATIENTS, INC. AND
CRISP SHARED SERVICES, INC.**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on September 8, 2025, a copy of the foregoing document was electronically filed on the Court's CM/ECF system, which will automatically send a notice of electronic filing to all counsel of record.

/s/ Jarren N. Ginsburg
Jarren N. Ginsburg

4924-0944-9056