**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

|  |  |
|---|---|
| **AUDACIOUS INQUIRY LLC**<br>10377 S Jordan Gateway, Suite 600<br>South Jordan, UT 84095<br><br>and<br><br>**COLLECTIVE MEDICAL**<br>**TECHNOLOGIES, INC**.<br>10377 S Jordan Gateway, Suite 600<br>South Jordan, UT 84095<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>**CHESAPEAKE REGIONAL**<br>**INFORMATION SYSTEM FOR OUR**<br>**PATIENTS**<br>10480 Little Patuxent Parkway, Suite 800<br>Columbia, MD 21044<br><br>and<br><br>**CRISP, INC. SHARED SERVICES AND**<br>**AFFILIATES**<br>10480 Little Patuxent Parkway, Suite 800<br>Columbia, MD 21044<br><br>　　　　Defendants. | Civil Action No. ~~~~~~~~~~~~~~~~~**1:25-****CV-02264-JRR**<br><br>**JURY TRIAL DEMANDED** |

**FIRST AMENDED COMPLAINT**

Plaintiffs Audacious Inquiry LLC ("Audacious") and Collective Medical Technologies,

Inc. ("CMT") (collectively, "Plaintiffs"), by and through their attorneys, for their **Amended**

Complaint against Defendants Chesapeake Regional Information System for our Patients

("CRISP") and CRISP, Inc., Shared Services and Affiliates ("CSS") (collectively, "Defendants"),

hereby allege as follows:

## NATURE OF THE ACTION

1.     Plaintiffs bring this Action to halt the unauthorized and unlawful exploitation of their patented innovations by CRISP and CSS **and those Defendants' deceptive and unfair acts to gain a competitive advantage**.  This case arises from **the** Defendants' willful misappropriation of Plaintiffs' intellectual property and their calculated affront to the principles of fair competition and the rule of law that underpin technological advancement in healthcare.

2.     Specifically, Plaintiffs bring this Action for infringement for one or more of the claims of the following three patents (collectively, the "Patents-in-Suit"):

- U.S. Patent No. 10,938,962 ("the '962 patent");

- U.S. Patent No. 11,114,194 ("the '194 patent"); and

- U.S. Patent No. 12,047,475 ("the '475 patent").

3.     Plaintiffs further bring this Action under Maryland's common law on unfair competition ("Unfair Competition Law") in view of Defendants' unfair, abusive, or deceptive business practices.

4.     Plaintiffs are leaders in the provision of software services and infrastructure to Health Information Exchanges ("HIEs") throughout the United States.  Plaintiffs' software services facilitate data exchange between health care institutions, payors, and other interested parties.

5.     Audacious helped pioneer the use of Event Notification Services ("ENS") in patient care.  Plaintiffs' ENS solutions send alerts to a patient's primary care physician or other members of a patient's care team when the patient is admitted to a hospital, transferred to another facility,

discharged, etc.  Such services allow for proper care coordination and follow-up, and to prevent unnecessary hospital readmissions, among other advantages.

6.      Audacious collaborated with CRISP and/or CSS for years to develop Plaintiffs' ENS technology.

**7.**      7. CRISP subsequently sold its rights to the intellectual property covering ~~the~~ ENS technology to Audacious in 2014.

**8.**      8. From 2014 to around 2024, Plaintiffs provided, subject to various agreements and statements of work, certain software services and support services to Defendants, including services relating to ENS technology.  Subject to the aforementioned agreements and/or statements of work, Defendants received a limited license to the Patents-in-Suit.

**9.**      9. In 2024, Defendants ceased licensing the Patent-in-Suit.  Almost immediately after giving notice that they would allow their license to lapse, Defendants launched a copycat product called "CRISP Event Notification Delivery" ("CEND")**, endeavored to migrate all of their users from Plaintiffs' ENS technology to CEND,** and began competing directly with Plaintiffs in one or more jurisdictions.  CEND infringes Plaintiffs' patents and Defendants' conduct in developing, launching, **marketing,** and/or selling CEND violates Maryland's Unfair Competition Law.

**10.**      10. Defendants have infringed the Patents-in-Suit at least by using, offering to sell, selling, profiting from, and charging access to, the accused CEND system to customers in Maryland and across the United States.  The CEND system includes elements that directly infringe the claims in the Patents-in-Suit.

**11.** ~~11.~~ Defendants' campaign to use, offer to sell, sell, profit from, and charge access to the accused CEND system**, including through deliberate misrepresentations regarding the CEND system's capabilities,** violates Maryland's Unfair Competition law.

**12.** ~~12.~~ Through their extensive partnership with Plaintiffs, Defendants not only witnessed the development of the ENS technology but also gained full knowledge of its intricate workings. Subsequently, Defendants ceased licensing the ENS technology, including the Patents-in-Suit, purportedly "developed" and marketed their CEND product, and replaced ENS with CEND in all CSS markets all within a year. Defendants' brazen **and willful** infringement is rooted in the misappropriation of Plaintiffs' intellectual property regarding the product's core functionality, which combines various vital healthcare encounter data streams into a single output and generates real-time notifications of those encounters. There is ample proof that further exposes Defendants' improper leverage of their relationship with Plaintiffs—CSS touts CEND to potential customers as its ENS replacement while noting the main difference is its internally operated nature. Further, CSS intentionally misrepresents CEND's capabilities by comingling and conflating statistics from ENS while marketing and selling CEND**, providing CSS with an unfair advantage in competitive contracting situations, such as state procurements, and causing Plaintiffs to lose business opportunities and profits**

**13.** ~~13.~~ There is no doubt that Defendants are aware of the Asserted Patents, as they have licensed them for years. Defendants' actions in developing and marketing CEND amount to willful patent infringement. By rightfully protecting their intellectual property, Plaintiffs are ensuring the continued and legitimate investment in innovative healthcare solutions that directly ~~improves~~**improve** patient safety, care coordination, and well-being.

**PARTIES**

**14.**    ~~14.~~ Plaintiff Audacious is a limited liability company organized under the laws of the State of Delaware, with its principal place of business at 10377 S Jordan Gateway Suite 600, South Jordan, Utah 84095.

**15.**    ~~15.~~ Plaintiff CMT is a corporation organized under the laws of the State of Delaware, with its principal place of business at 10377 S Jordan Gateway Suite 600, South Jordan, Utah 84095.  CMT is the sole member of Audacious and Audacious is a wholly owned subsidiary of CMT.  **As the owner and sole member of Audacious, all corporate profits of Audacious inexorably flow to CMT.**

**16.**    ~~16.~~ Defendant CRISP is a nonprofit corporation incorporated under the laws of the State of Maryland, with its principal place of business at 10480 Little Patuxent Parkway, Suite 800, Columbia, Maryland.

**17.**    ~~17.~~ Defendant CSS is a nonprofit corporation incorporated under the laws of the State of Maryland, with its principal place of business at 10480 Little Patuxent Parkway, Suite 800, Columbia, Maryland.

**18.**    ~~18.~~ Upon information and belief, CSS is a wholly owned subsidiary of CRISP.

## JURISDICTION AND VENUE

**19.**    ~~19.~~ This civil action for patent infringement arises under the patent laws of the United States, 35 U.S.C. §§ 1 *et seq*.

**20.**    ~~20.~~ This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1332, 1338(a), 1367, 2201, and 2202.

**21.**    ~~21.~~ This Court also has diversity jurisdiction because each Defendant is a Maryland citizen, none of CMT, Audacious, or the sole member of Audacious (CMT) are citizens of Maryland, and because the amount in controversy exceeds $75,000.

**22.** ~~22.~~ This Court has personal jurisdiction over Defendants, because CRISP and CSS are Maryland corporations subject to general jurisdiction in Maryland, and because this controversy relates to acts of infringement and acts of unfair competition that CRISP and CSS have committed in Maryland.

**23.** ~~23.~~ Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1400(b) because both Defendants reside in Maryland (within the meaning of both Sections 1391(b)(1) and (c)(2) and 1400(b)) and because both Defendants maintain a regular and established place of business in this District and have committed acts of infringement in this District.

## FACTUAL BACKGROUND

### The Patents-in-Suit

**24.** ~~24.~~ The '962 patent issued on March 2, 2021, and is entitled "Network Architecture for Multiple Data Stream Management and Endpoint Visualization."

**25.** ~~25.~~ The inventors on the '962 patent include Bill Howard, Paul Cahill, Sandeep Antony, Scott Afzal, and David Horrocks, and the patent has been assigned to CMT.

**26.** ~~26.~~ The '962 patent issued from U.S. Patent Application No. 15/911,137 and has a priority date of March 15, 2013.

**27.** ~~27.~~ Claim 1 of the '962 patent reads:

> A network comprising:
> a plurality of data streams, wherein at least one of the data streams
>     includes data updated in real-time, wherein the plurality of data
>     streams include HL7 Admit, Transfer, Discharge (ADT) Messages;
>  a plurality of protocol interfaces each connected to at least one of the
>     data streams, wherein at least one of the protocol interfaces is
>     configured for HL7;
> a processor coupled with the protocol interfaces;
> an output interface coupled to a display for showing a graphical use
>     interface; and
> a memory card coupled to the processor including instructions that when
>     executed by the processor, cause the processor to,

multiplex a plurality of signals from the plurality of data streams via the protocol interfaces into a single output, wherein the multiplexing is executed based on an identity of the one of the data stream from which the signal originated,

dispose a portion of the HL7 ADTs based on the content of the HL7 ADTs and client input, and

output the single output to the graphical user interface based on the content and the client input via the output interface, wherein the graphical user interface includes a plurality of fields, and wherein the single output populates at least one of the fields based on the identity of the one of the data stream in real time.

**28.**    ~~28.~~ The '194 patent issued on September 7, 2021, and is entitled "Network-Based Systems and Methods for Providing Readmission Notifications."

**29.**    ~~29.~~ The inventors of the '194 patent include Sandeep Antony, Scott Afzal, Evan Carter, Christopher Brandt, and Yedong Tang, and the patent has been assigned to CMT.

**30.**    ~~30.~~ The '194 patent issued from U.S. Application No. 14/872,445 and has a priority date of October 1, 2015.

**31.**    ~~31.~~ Claim 1 of the '194 patent reads:

A method comprising:

electronically receiving, with a notification system including a computer processor and memory networked with a plurality of distinct healthcare information sources, healthcare information in several different formats dependent on hardware and/or software used by a computer of the sources from the plurality of distinct healthcare information sources and including treatment details for patients at a first healthcare provider and a second healthcare provider;

parsing, with the computer processor, the healthcare information for HL7 Admit-Discharge-Transfer (ADT) messages and storing patient-identifying information in a standardized format from the HL7 ADT messages in the memory;

determining, with the computer processor, from the stored patient-identifying information, a readmission time for a patient by comparing a first HL7 ADT message indicating admission of the patient at the first healthcare provider against a second HL7 ADT message for the patient, wherein the readmission time is a difference in time between the first HL7 ADT message and the second HL7 ADT message;

generating in real-time with receipt of the first HL7 ADT message, with the computer processor, a readmission notification for the patient and transmitting the notification to the first healthcare provider so that the first healthcare provider has immediate access to up-to-date patient information, wherein the generating is executed if,

the readmission time is within a readmission time threshold stored in the memory, and

the patient-identifying information indicates the first HL7 ADT message and the second HL7 ADT message identify a same patient.

**32.** 32. The '475 patent issued on July 23, 2024, and is entitled "Parallel Network Architecture for Aggregate Data Routing."

**33.** 33. The inventors of the '475 patent include Sandeep Antony, Scott Afzal, and David Horrocks, and the patent is assigned to CMT.

**34.** 34. The '475 patent issued from U.S. Application No. 17/190,358 and has a priority date of March 15, 2013.

**35.** 35. Claim 1 of the '475 patent reads:

A network connected between a plurality of parallel streams and users to condition and route the streams, the network comprising:

a protocol interface connected to the plurality of streams, wherein the plurality of streams operate on different protocols and include at least one Health Level 7 (HL7) Admit Discharge Transfer message (ADT) stream, wherein the protocol interface is configured for different protocols including HL7;

an intake interface configured to receive parameters for network operations on the plurality of streams from a plurality of users separate from the plurality of streams; and

a processor and memory coupled to the intake interface and protocol interface, wherein the memory includes instructions that when executed by the processor, cause the processor to,

limit flow of the plurality of streams to a receiving user of the plurality users to only an HL7 ADT or a portion of the HL7 ADT complies with the parameters for network operation for the receiving user, wherein the limiting is executed in real-time with the streams.

**The Patents-in-Suit Cover Patentable Subject Matter**

8

**36.** ~~36.~~ The '962 patent claims patent-eligible subject matter and is valid and enforceable. A true and correct copy of the '962 patent is attached hereto as **Exhibit 1**.

**37.** ~~37.~~ The '962 patent relates to a network architecture and a graphical user interface ("GUI") with multiple endpoints populated with content from various disparate data streams that aggregate and display information from these streams into a single output. Ex. 1 ('962 Patent) at Abstract, 3:61–67.

**38.** ~~38.~~ Healthcare information data streams are often operated and controlled by disparate organizations and entities that use various communication protocols, interfaces, and data types. *Id.* at 3:44–47. As such, prior to the claimed invention, no single network was able to aggregate and combine all information from these various streams, all of which are likely to be dynamic and changing in real-time, into a single output that "interrelates all relevant data" for a query or a particular parameter. *Id.* at 3:47–60. Typical networks at the time connected to different third-party hosts or other databases where each data source often required unique signal management, authentication, and/or communications protocols. *Id.* at 1:10–21. Each data source effectively then required each server or port to be configured, either with hardware or software, to satisfy the various protocols or authentication sessions, further complicating the sharing and spread of healthcare information. *Id.* The massive amounts of healthcare information spread across various sources also created a problem where healthcare providers would have to sift through irrelevant or unwanted information before finding what they actually needed. There was a need for a network that could interface with multiple data streams, each operating on distinct protocols and offering different but inter-related data and provide a single, unitary interface that allowed users to read and interact with the data. *Id.*

**39.**    ~~39.~~ To address this problem, the '962 patent discloses a technological solution in the form of a novel network architecture that has multiple interfaces that receive and analyze signals carrying information from multiple data streams/sources to which various interfaces are connected. *Id.* at 4:18–24. A universal interface that may intercept, receive, and analyze all signals from all streams, can be configured with several protocols to determine an operating protocol and properly interface with and analyze data in the protocol. *Id.* at 4:24–35, Claim 1. There is a data stream engine that multiplexes or otherwise aggregates all the incoming signals from the various interfaces and provides the data to a data cluster, which can categorize, organize, store, and/or retrieve real-time and requested data. *Id.* at 4:36–49, 4:65–5:1. This data cluster acts as an interface through which users can retrieve or query data streams for single-line network processing and analysis. *Id.* at 5:3–6. The information from the data cluster can be provided to an output engine, which formats the output signal according to the endpoint, a GUI. *Id.* at 5:15–22. The GUI can display graphical output from the output engine in specified fields, surfaces, places, and manner as dictated by the data cluster and output engine. *Id.* at 5:38–58. The '962 patent specifically contemplates scenarios where the various data streams include healthcare information formatted as a Health Level Seven ("HL7") message or Consolidated Clinical Document Architecture ("CCDA") message, configured for a network like Healthcare Information Exchanges ("HIE") and other healthcare providers. *Id.* at 5:25–31. The cluster can be configured to dispose of information or portions of data streams that contain irrelevant information based on client input, such as provider-generated messages for an internal transfer that has no meaning outside of that provider's specific facility, or messages with typographical information. *Id.* at 5:10–17.

**40.**    ~~40.~~ The network claimed by the '962 patent was neither well-known nor conventional to skilled artisans as of the priority date. The prior art did not teach this unified

treatment of multiple disparate data streams and combining them into a single output that alters its display based on the content of the data and input from the client requesting the information. Specifically, the '962 patent claims a network with multiple data streams that are updated in real-time with healthcare information streams, such as HL7 Admit, Discharge, Transfer ("ADT") messages, and with multiple protocol interfaces connected to the data streams, at least one of the protocols being configured for HL7. The '962 patent further claims the network being equipped with a GUI responsive to each data stream's requirements as the output interface and a processor that multiplexes, based on the identity of the stream, the signals/information from the data streams into the GUI as a single output where the output is displayed based on content and client input, including information from the content of any HL7 ADT messages received. *Id*. at Claim 1. The claimed invention is thus directed to a specific solution for accomplishing the technological improvement of HIEs and their associated provider networks' access to and viewing of relevant healthcare information, and not an abstract idea.

**41.**    41. As described above, the '962 patent's claims are inventive and describe a substantial improvement in HIEs and the access and viewing of relevant healthcare information. Namely, the claims describe a network for aggregating, processing, and displaying multiple disparate data streams into a single output in a manner that is more than just the performance of well-understood, routine, or conventional activities previously known in the field. Specifically, the claimed network is configured to receive data from multiple data streams and based on client input, read the HL7 ADT messages and dispose of portions of the HL7 ADT messages that are not needed or requested, and then output the aggregated (and most relevant) information to the GUI. The conventional networks predating the '962 patent did not involve having data streams with specific interfaces and all being aggregated through a single data cluster and output engine nor did

they allow users like healthcare providers to limit or dispose of irrelevant or unnecessary information. The '962 patent's claims serve to make it easier for healthcare providers to interact with and receive various relevant pieces of healthcare information from disparate sources, regardless of the specific format or protocol requirements of each information source or the amount of information being sent. Further, the use of a GUI that accounts for HL7 message data, the type of data streaming in, and client input was novel at the time of the '962 patent's invention.

**42.** 42. The '194 patent claims patent-eligible subject matter and is valid and enforceable. A true and correct copy of the '194 patent is attached hereto as **Exhibit 2**.

**43.** 43. The '194 patent relates to improvements in managing healthcare information about patients in computer-based networks between healthcare information sources, like providers, insurers, payers, and entities subscribed to the healthcare information systems. Ex. 2 ('194 Patent) at Abstract, 4:28–33. The '194 patent focuses on a notification system for delivering timely, accurate, and consistent updates and notifications to relevant stakeholders when patients, members, and/or citizen populations experience important types of healthcare encounters. *Id.*

**44.** 44. Prior to the claimed invention, HIE network computers and notification systems relied solely on information from sources such as HL7 ADT messages from providers to alert the appropriate recipient. *Id.* at 4:34–40. This information was often prone to error**errors** because it was commonly recorded by hand and relied heavily on information a patient provided at registration, sometimes under the duress of being in an emergency room or a similar situation. *Id.* There has also always been the problem that patients do not necessarily provide all the relevant information or, in some cases, do not know the correct information. *Id.* at 4:42–47. Thus, at the time of the '194 patent's invention, conventional HIEs and notification systems may have passed poor-quality information to subscribing entities or failed to pass relevant information at all because

the routing of the information was based on bad information from patients. *Id.* In addition to being under-inclusive and of poor quality, prior HIEs and notification systems often passed too much information directly to providers, resulting in an overwhelming volume and irrelevance of information that did not provide any value to the providers. *Id.* at 4:47–54. Another problem with previous systems was that there are so many different types of healthcare information systems, and these sources and previous systems often were not configured to connect, receive, and process information from such disparate sources to provide timely and useful alerts about patients. *Id.* at 4:58–5:10, Fig. 1.

**45.**    45. To address these problems with conventional HIE and notification system architecture, the '194 patent claims a novel technological solution in the form of methods and a notification system for receiving, parsing, and storing healthcare information from multiple different sources and in different formats and issuing relevant alerts or notifications about specific patients based on received healthcare information. *See id.* at Claims 1, 10, and 16. Unlike conventional systems, the '194 patent's system can simultaneously be connected to typical HIEs and other systems, like a healthcare provider network system or other databases with different data and interface configurations. *Id.* at 5:44–58, Fig. 2. The notification system can receive and parse information in various formats including Consolidated Clinical Document Architecture (CCDA) messages and HL7 messages (e.g., ADT messages). *Id.* at 7:14–38; 10:41–46.

**46.**    46. The '194 patent allows subscribing parties (i.e., parties interested in receiving notifications) to define some services and/or actions to be provided by the notification system and also enables subscribing parties to provide specific patient information, potentially reducing concerns about the accuracy of patient data. *Id.* at 6:4–34. Additionally, the '194 patent's system allows subscribers to delimit a variety of circumstances for which they receive healthcare

information and alerts about patients, reducing the overwhelming amount of notifications and information received when using conventional systems. *Id.* at 6:52–65. For example, subscribers can receive notifications about specific patients who are readmitted due to chronic diseases, poor quality of clinical healthcare delivery, or noncompliance with malingering patients. *Id.* at 11:1–16. This notification would be generated based on the system receiving two separate ADT messages about the same patient with similar information content within a short timeframe, such as several months. *Id.* at 11:1–25. The system can prepare such notifications using information from anywhere in the system, including data derived from ADT messages or data from databases such as a master person index, thereby alleviating concerns about having incomplete or irrelevant data. *Id.* at 8:15–25.

**47.** 47. The methods and systems disclosed in the '194 patent were neither well-known nor conventional to skilled artisans as of the priority date. The prior art does not teach or suggest the claimed implementation of generating and transmitting readmission notifications. For example, the '194 patent teaches a system configured to read healthcare information from at least two different sources, with at least two different health record standards. The '194 patent also teaches, in certain embodiments, parsing healthcare information from a first-received HL7 ADT messages and storing patient-identifying information in a standardized format, and then using the stored information to compare the first-received HL7 ADT message to a second-received HL7 ADT message. The '194 patent further teaches, based on this comparison, to determine a readmission time (the difference in time between the two HL7 ADT messages) and generate a readmission notification in real-time so that both all interested healthcare providers have immediate access to up-to-date patient information. Thus, the claimed invention specifically improves the computer technology of HIE network computers at least with regard to the accuracy

and efficiency of managing healthcare information related to patients' readmissions. The claimed invention is thus directed to specific steps to accomplish a technological improvement and not an abstract idea.

**48.** 48. As described above, the '194 patent's claims are inventive and describe a substantial improvement in HIE network computers and managing healthcare information and accurately and timely generating notifications about patients for healthcare providers and other relevant stakeholders. Namely, the claims describe methods and systems for networking multiple healthcare information sources with various data formats and parsing and aggregating all this disparate information about specific patients into a manageable form, generating notifications about patient readmissions. The claims recite particulars of how to achieve a solution (comparison of HL7 ADTs separated by a timeframe) by a computer in a novel manner. The conventional methods and systems for readmission notifications did not involve comparing HL7 ADTs. The ordered combination of reading multiple sources of information, parsing HL7 ADTs, storing patient-identifying information, and then comparing the first-received HL7 ADTs to a later-received HL7 ADT to determine whether both refer to the same patient and whether the readmission time falls within a specified threshold was novel at the time of the '194 patent's invention. These techniques and strategies were not routinely used or conventional before the '194 patent was filed; therefore, they constitute an improvement in HIE network computers and managing healthcare information and relevant notifications.

**49.** 49. Furthermore, the '194 patent has already faced and overcome a 35 U.S.C. § 101 challenge for being directed to the abstract idea of collecting and analyzing information and then displaying certain results. **Exhibit 4** (Excerpts from the '194 File History) at 4, 49. The Examiner withdrew the § 101 rejection based on the applicant's amendments to the claims that are reflected

in the claims as currently issued and arguments that these amendments now recite a "specific improvement over prior art systems by allowing remote users to share information in realtime in a standardized format regardless of the format in which the information was input by the user." *Id.* at 22, 42. Further, the applicant argued that the limitations of the independent claims taken together recite a "specific, novel, and integrated configuration and operating protocol for a network that provides a specific solution, not all ways of performing the method of organizing human activity identified in the rejection." *Id.* at 23. The examiner agreed with the applicant's arguments and withdrew the § 101 rejection, ultimately allowing the claims. *See id.* at 42, 50.

**50.**    ~~50.~~ The '475 patent claims patent-eligible subject matter and is valid and enforceable. A true and correct copy of the '475 patent is attached hereto as **Exhibit 3**.

**51.**    ~~51.~~ The '475 patent relates to a healthcare network architecture that can interface with multiple diverse inputs. Ex. 3 ('475 patent) at Abstract. The HL7 ADTs in the input streams can control network configuration to an extent such that the output is limited to communications that match specific user parameters with a specific focus on providing communications in real-time. *Id.*

**52.**    ~~52.~~ A major problem with exchanging healthcare information has always been that different sources of information (healthcare providers, insurance providers, labs, etc.) often have their own unique data formats, standards, and communication protocols, etc., which take the form of both real-time streams and periodic batch data transfers. *Id.* at 2:16–28. This inconsistency in format along with the fact that the information flow includes potentially thousands or millions of different entries on a daily basis, created a need for a more streamlined and inclusive network. Indeed, prior networks, before the invention of the '475 patent, operated on a one-way, serial flow of data which required users to either query the health information exchange at set intervals, not

in real-time or be overwhelmed with a huge volume of raw information that was not particularly useful. *Id.* at 4:63–5:4. Such post-hoc queries or a real-time feed with no appropriate filter do not accurately provide users with timely and well-fitted data about healthcare related encounters such as hospitalizations. *Id.* at 5:6–9.

53. 53. Another common problem with prior art HIE networks was that the data itself, including individual ADT fields, was often lower-quality and was not always useful alone to direct information and/or accurately associate with related information. *Id.* at 5:10–14. ADT messages alone often contain errors because they may have been recorded by hand or the information was provided under duress during an emergency encounter, resulting in less useful and actionable information. *Id.* at 5:14–26. A solution was needed that incorporated parallel data sources containing related information to fill in the gaps or make lower-quality information more complete, despite the often disparate nature of these data sources, including different communication protocols and distinct information interfaces. *Id.* at 5:27–44.

54. 54. To address this need and the others described above, a new technological solution for a network architecture that "can interface with multiple data sources having distinct protocols, formatting, or standards and offering unique but related data through a single output interface" was needed. *Id.* at 5:45–49. The '475 patent's claimed invention provides this very solution as it is a network that interfaces with multiple, disparate data streams to aggregate the data streams, thereby providing better delivery and quality of relevant healthcare information. *Id.* at 5:54–60. Specifically, the '475 patent teaches a network that includes an HIE connected to a cluster that is configured to receive, process, and deliver desired healthcare information to healthcare providers that are subscribed to the network. *Id.* at 6:4–13. The claimed network and its associated cluster can receive subscriber parameters from the healthcare providers, which define

the specific information and serve the specific needs of each healthcare provider. *Id.* at 6:14–29. This includes information like "a roster of patent information (hospital identifier, member ID, any names, home address, city, state, zip code, date of birth, gender, [social security number], phone numbers, membership status, etc. or portions thereof)" that identifies patients under the care or covered by these subscribing healthcare providers. *Id.* The healthcare providers seeking this information can also include a limiting set of events or circumstances for the desired information, i.e. a doctor may only want information or notifications when a patient has multiple emergency room visits for a condition that the doctor has previously treated. *Id.* at 6:30–52.

**55.** ~~55.~~ Based on the subscriber parameters, the cluster can provide specific, relevant, and well-tailored healthcare information to healthcare providers, rather than the overwhelming deluge of information provided by the prior art. *Id.* at 7:12–15. The cluster also includes an interface that can be programmed based on the configuration of a known master database or "master person index" instead of an HIE and knows how to read the data structures in this master person index specifically. *Id.* at 7:23–31. The master person index can store client-identifying information provided by the healthcare providers to associate correct patient information with incoming data, thereby enhancing ADT messages and properly associating the ADT message with the correct patient and providing the correct context to the healthcare provider receiving the notification about a patient's admission. *Id.* at 7:43–59. The cluster can be configured to compare the contents of any received ADT message against the patient-identifying information stored in the master person index and identify every message relating to a patient, regardless of any partial or incorrect information being present in the ADT message. *Id.* at 7:64–8:8. To further solve the issue of irrelevant information coming in to healthcare providers, the cluster can be configured to discard messages or portions of messages that contain duplicate, incorrect, or low value contents

such as provider-generated messages for an internal transfer that has no meaning outside of that provider's specific facility or messages with typographical information.  *Id.* at 8:9–24.  This is done by comparing the received messages to already known and stored correct patient information. *Id.*

56.    ~~56.~~  The networks disclosed in the '475 patent were neither well-known nor conventional to skilled artisans as of the priority date.  The prior art does not teach or suggest the claimed implementation of a network that can interface with different data streams and provide a means for healthcare providers to specifically request and limit the streams of information to meet their specific needs or to access the most relevant information.  For example, the '475 patent claims a network that is configured to read healthcare information from multiple different sources with different protocols and to have an intake interface that is configured to receive parameters from the network's users, which modify the information the users can retrieve from the network.  Users can provide parameters to the network to control its operation.  For example, users can provide parameters that limit the incoming information such that users receive only HL7 ADT streams or specific portions of the HL7 data streams, thereby limiting the information they receive to the most relevant and necessary healthcare information rather than a deluge of overwhelming and potentially irrelevant information.  The '475 patent's claimed network can also utilize the user's parameters to write patient-identifying information to the data source providing the data stream so as to correct any incorrect or irrelevant patient identifying information, further ensuring that future ADT messages or other notifications are associated with the correct patient.  Thus, the claimed network specifically improves HIE networks and other sources of healthcare information, at least with regard to the accuracy and efficiency of managing healthcare information related to patients and their specific encounters, as well as providing targeted, relevant patient information to

healthcare providers when needed.  The claimed invention is thus directed to a specific network that serves as a technological improvement and not an abstract idea.

**57.**  57.  As described above, the '475 patent's claims are inventive and describe a substantial improvement in HIE networks and managing healthcare information, enabling the accurate and timely provisions of patient-specific information to healthcare providers.  Namely, the claims describe a network that can interface with multiple healthcare information sources with various data formats and parse and aggregate all this disparate information about specific patients into a manageable form, allowing healthcare providers to request and view information that is accurate and most relevant.  The claims recite the particulars of how to achieve this solution (comparing HL7 ADT messages to the receiving user's parameters for network operation) in a novel manner by a computer.  The conventional networks at the time of the '475 patent's invention did not adequately consider the requesting user's inputs and did not dispose of or filter out the irrelevant or incorrect information from incoming HL7 ADT messages.  The ordered combination of reading multiple sources of information, reading and processing a user's specific network parameters, comparing the network parameters to the incoming HL7 ADT messages, and then limiting the stream to only relevant information such that healthcare providers were not receiving overwhelming and often not useful information was novel at the time of the '475 patent's invention.  Similarly, the '475 patent's claims that allow the network to communicate back to the data sources and write information into those data sources that was not previously present or correct mistakes, thereby minimizing incorrect and irrelevant healthcare information, were also novel.  These techniques and strategies were not routinely used or conventional before the '475 patent was filed and, therefore constitute an improvement in HIE networks and managing healthcare information.

**58.    CRISP has recognized the advantages offered by patented technology.  For example, in a press release issued in 2017, CRISP stated "[b]y the end of 2012, 57 organizations – including primary care practices, cancer regimes and specialty practices – were receiving real-time, actionable information on their patients during critical moment in their health care experience."  CRISP further stated that "[w]ith five years of ENS, patients are able to experience better transitions of care, more timely follow-up appointments post-hospital discharge and more efficient care coordination."**

**Defendants are Prohibited From Contesting the Validity of the '962 and '475 Patents Under the Doctrine of Assignor Estoppel**

59.    Plaintiff Audacious was founded in 2004 as a consulting firm providing information technology services.

60.    Defendant CRISP was incorporated on or around June 3, 2008 by David Horrocks.

61.    Defendant CSS was incorporated on or around October 5, 2020 by David Horrocks.

62.    On or around August 5, 2009, Audacious entered into a Master Professional Services Agreement ("MSA") with Defendant CRISP to provide consultation and/or development services to CRISP.  **Under the MSA, any discoveries made while performing services would be owned by CRISP.  The MSA was signed by David Horrocks as then-President of CRISP.**

63.    After executing the MSA, Audacious and CRISP worked together to develop and deploy various products and services relevant to the exchange of health care information.  Among the products and/or services jointly developed by Audacious and CRISP is the Encounter Notification Service ("ENS").  **As described above, under the MSA, the ENS and all rights related to it was initially owned by CRISP.**

64.    On February 26, 2013, the parties amended the MSA to give Audacious a sublicense to the ENS system in certain territories. The February 2013 Amendment also defined

terms through which Audacious could acquire ENS and all associated intellectual property developed in conjunction with ENS**, but the Amendment itself made no such assignment**.

65.     On March 15, 2013, Audacious and/or CRISP caused to be filed U.S. Patent Application No. 13/844,332 ("the '332 Application").  The named inventors listed in the '332 Application are Sandeep Antony and David Horrocks.

66.     At the time it was filed, the '332 Application was owned by CRISP.

67.     At the time the '332 Application was filed, David Horrocks was an employee of CRISP.

68.     At the time the '332 Application was filed, David Horrocks was an officer of CRISP.

69.     On December 27, 2013, Audacious and/or CRISP caused to be filed U.S. Patent Application No. 14/142,625 ("the '625 Application").  The named inventors listed in the '625 Application are Sandeep Antony, Scott Afzal, and David Horrocks.

70.     At the time it was filed, the '625 Application was owned by CRISP.

71.     At the time the '625 Application was filed, David Horrocks was an employee of CRISP.

72.     At the time the '625 Application was filed, David Horrocks was an officer of CRISP.

73.     On February 25, 2014, Audacious and/or CRISP caused to be filed U.S. Patent Application No. 14/189,225 ("the '225 Application").  The named inventors listed in the '225 Application are Sandeep Antony, Scott Afzal, David Horrocks, and Yedong Tang.

74.     At the time it was filed, the '225 Application was owned by CRISP.

75.     At the time the '225 Application was filed, David Horrocks was an employee of CRISP.

76.     At the time the '225 Application was filed, David Horrocks was an officer of CRISP.

77.     On information and belief, David Horrocks was subject to an employment agreement with CRISP that obligated him to assign to CRISP any inventions developed within the scope of his employment at CRISP.

78.     In April 2014, Audacious and CRISP executed an "Agreement for the Acquisition of CRISP's Encounter Notification Service" ("ENS Acquisition Agreement").  Pursuant to the ENS Acquisition Agreement, Audacious acquired, for consideration, ~~certain~~ "ENS Technology" and "ENS IP."  **David Horrocks signed the agreement on behalf of CRISP.**

79.     The acquired "ENS Technology" included all software, hardware, and documentation developed for CRISP by Audacious under the MSA and then identified as being part of the ENS.

80.     The acquired "ENS IP" included CRISP's rights in the '332 Application, the '625 Application, and the '225 Application as well as all patents issuing therefrom and with priority therefrom.  ENS IP also included CRISP's rights in the "ENS Technology" including ideas, concepts, information and current and future improvements of the ENS Technology.

81.     CRISP further agreed in the ENS Acquisition Agreement that CRISP and its employees and officers will assign all rights in the ENS IP it may own as an inventor to Audacious.

**82.     CRISP also agreed in the ENS Acquisition Agreement to reasonably assist Audacious in the acquisition and enforcement of the ENS IP.**

**83.** ~~81.~~ Pursuant to the ENS Acquisition Agreement, Audacious agreed to grant CRISP certain Licensed Rights set forth in a patent license agreement attached to the ENS Acquisition Agreement as Addendum A.

**84.** ~~82.~~ On June 5, 2014, David Horrocks executed an agreement assigning all rights, titles, and interests in the '332 Application, the '625 Application, and the '225 Application, as well as all applications therefrom, including all rights of priority resulting from the filing or the applications, to Audacious. **Mr. Horrocks agreed that he would "generally do everything possible to aid [Audacious], its successors, assigns, and nominees to obtain and enforce proper patent protection for the invention and its improvements in all countries."**

**85.** ~~83.~~ At the time he executed the June 5, 2014 assignment, David Horrocks was employed by CRISP.

**86.** ~~84.~~ At the time he executed the June 5, 2014 assignment, David Horrocks was an officer of CRISP.

**87.** ~~85.~~ On February 14, 2018, David Horrocks executed an agreement assigning all rights, titles, and interests in ~~US~~U.S. Patent Application No. 15/911,137 ("the '137 Application") and all applications therefrom, including all rights of priority resulting from the filing or the applications, and all continuations to Audacious. **Mr. Horrocks agreed that he would "refrain from bringing any validity challenge with respect to, execute all divisional, continuation, reexamination and reissue applications for, and make all rightful oaths and generally do everything possible to aid [Audacious], its successor, assigns, and nominees to obtain and enforce, proper patent protection for the invention and its improvements in all countries."**

**88.** **On February 14, 2018, David Horrocks also executed an agreement assigning all rights, titles, and interests in U.S. Patent Application No. 15/808,887 ("the '887**

**Application"), and all applications therefrom, including all rights of priority resulting from the filing or the applications, and all continuations to Audacious.  Mr. Horrocks agreed that he would "refrain from bringing any validity challenge with respect to, execute all divisional, continuation, reexamination and reissue applications for, and make all rightful oaths and generally do everything possible to aid [Audacious], its successor, assigns, and nominees to obtain and enforce, proper patent protection for the invention and its improvements in all countries."**

**89.** 86. At the time he executed the February 14, 2018 ~~assignment~~**assignments**, David Horrocks was employed by CRISP.

**90.** 87. At the time he executed the February 14, 2018 ~~assignment~~**assignments**, David Horrocks was an officer of CRISP.

**91.** 88. The '475 patent issued from U.S. Patent Application No. 17/190,358 ("the '358 Application"), an application that is a continuation of the '137 Application.

**92.** 89. David Horrocks executed an oath identifying himself as an inventor of the inventions set forth in the '358 Application.

**93.** 90. David Horrocks executed an oath identifying himself as an inventor of the inventions set forth in the '137 Application.

**94.    David Horrocks executed an oath identifying himself as an inventor of the inventions set forth in the '887 Application.**

**95.** 91. The PTO issued the '962 patent from the '137 Application.  The final claims issued in the '962 patent ~~were~~**are** narrower than the claims in the '137 Application **that were assigned by Mr. Horrocks to Audacious**.

**96.    The final claims issued in the '962 patent are narrower than the claims in the '358 Application that were assigned by Mr. Horrocks to Audacious.**

**97.    The final claims issued in the '962 patent are narrower than the claims in the '887 Application that were assigned by Mr. Horrocks to Audacious.**

**98.** ~~92.~~ The PTO issued the '475 patent from the '358 Application.  The final claims issued in the '475 patent ~~were~~**are** narrower than the broad claims in the '358 Application **that were assigned by Mr. Horrocks to Audacious**.

**99.    The final claims issued in the '475 patent are narrower than the claims in the '137 Application that were assigned by Mr. Horrocks to Audacious.**

**100.    The final claims issued in the '475 patent are narrower than the claims in the '887 Application that were assigned by Mr. Horrocks to Audacious.**

**101.** ~~93.~~ Between 2013 and 2024, the parties renewed the ENS License **at least** three separate times.  **Throughout this time, CRISP paid license fees to Audacious and never challenged the validity of the Patents-in-Suit or in any way suggested that the Patents-in-Suit are invalid.**

**102.** ~~94.~~ On or around September 1, 2022 Audacious and CRISP amended the ENS Acquisition Agreement to license the ENS IP and/or ENS Technology to CSS for renewable one year terms (the "Full ENS Use License").

**103.** ~~95.~~ Audacious and CRISP renewed the Full ENS Use License for an additional 1 year term commencing in 2023.

**104.** ~~96.~~ On May 8, 2024, Plaintiffs received written notice from CSS that they would not renew the ENS License**.  The written notice provided no explanation for termination of the license.  The written notice in no way suggested that the Patents-in-Suit are invalid**.  The

ENS License lapsed on September 1, 2024. With the lapse of the ENS License, Defendants no longer have the right to use the claimed systems and methods of at least the '962, '194, and '475 patents.

**105.** ~~97.~~ Defendants, through at least their past licenses to the '962, '194, and '475 patents, were aware of such patents prior to the initiation of this suit.

**CSS ~~Violated Maryland's~~Has Engaged in Unfair Competition ~~Law by Deceptively Developing the CEND System, Terminating the ENS License, and Competing Directly with Plaintiffs using Infringing Technology~~To Switch Customers Away From ENS to its New Infringing System.**

**106.** ~~98.~~ Audacious has provided services to customers leveraging ENS in multiple markets throughout the United States, including ~~a contract with the Florida Agency for Healthcare Administration ("AHCA").~~ **Maryland. Audacious had** led the software development and implementation of ENS for CRISP (and CSS) until September 2024, when CRISP transitioned from ENS to CEND.

**107. In connection with its decision not to renew the ENS license, Defendants have taken steps, in Maryland and throughout the United States, to redirect customers to the infringing CEND system through various unscrupulous and deceitful actions. Indeed, even before it allowed its license to ENS to lapse, CRISP took steps to migrate ENS users directly to CEND by August 2024. Upon information and belief, such actions were taken in Maryland. CRISP used the licensed technology to gain a foothold in the market that it then exploited to direct users to an infringing product.**

**108. Defendants have also engaged in unfair acts, in Maryland and throughout the United States, to deprive Plaintiffs of valuable contracts, including through fraudulent misrepresentations to customers.**

**109.** 99. With For example, before Defendants launched their CEND system, Audacious had a contract with the Florida Agency for Healthcare Administration ("AHCA") to provide services using ENS. On or around May 6, 2024, with the impending expiration of the current contract to use ENS, AHCA issued an invitation to negotiate procurement ("ITN") on or around May 6, 2024.

**110.** 100. . Audacious, along with three other companies, submitted replies to the AHCA procurement. One of those companies is CSS, which submitted a reply to the AHCA shortly after it had provided notice that it would not renew the ENS license.

**111.** Upon information and belief, CSS falsely represented to the AHCA that its CEND system is a fully integrated, productized, solution that delivers timely patient-specific alerts for a variety of events (such as ADTs, lab results, CCDs, pre-hospital care, post-acute care, and primary and specialty care visits) to treating providers from connected participants. But, on information and belief, CEND does not include all of these features. For example, CEND has been described alternatively as a collection of a variety of discrete technologies which are neither productized nor fully integrated having been in existence and operational since at least 2017, and as the replacement for CSS's prior event notification and alerting service (i.e. ENS) only operational for months prior to CSS's submission to AHCA. It cannot be both.

**112.** Upon information and belief, Defendants also misrepresented to AHCA the number of notifications that have been sent from the software it refers to as CEND using whatever definition is convenient to sell its services.

**113.** **Upon information and belief,** CSS provided such misrepresentations to AHCA **and the DOAH** through misleading oral and written statements **made in Maryland and throughout the United States.**

114. ~~101. On January 23, 2025, AHCA posted its intended award of the contract to CSS with the CEND technology as the basis for CSS's bid.~~

115. ~~102. Audacious subsequently filed a protest of the intent to award the AHCA contract to CSS.~~

116. ~~103. Audacious has led the software development and implementation of ENS for CRISP (and CSS) until September 2024, when CRISP transitioned from ENS to CEND.~~

**117.** ~~104.~~ Upon information and belief, the CEND solution had been commercially available for less than a year at the time CSS submitted its bid in response to AHCA's ITN.

**118.** ~~105.~~ Upon information and belief, CSS misrepresented the CEND system in its submission to AHCA by, among other things, deliberately obscuring the infringing nature of the technology, the volume of notifications it had made, the time period during which it was developed and used, and its ability to transition the Florida market to CSS's infringing technology.

**119.** On January 23, 2025, AHCA posted its intended award of the contract to CSS with the CEND technology as the basis for CSS's bid.

**120.** Audacious subsequently filed a protest of the intent to award the AHCA contract to CSS **before the Florida Department of Administrative Hearings (DOAH).**

**121.** ~~106.~~ Upon information and belief, ~~CSS provided such misrepresentations to AHCA through misleading oral and written statements.~~ **CSS's false representations to AHCA and DOAH regarding the nature and capabilities of the CEND system ultimately led to DOAH's decision to award the contract to CSS.**

**122.**    Upon information and belief, CSS's false representations to AHCA regarding the nature and capabilities of the CEND system ultimately led to AHCA's decision to award the contract to CSS instead of Audacious, the second highest scoring bidder.  But for those unfair acts, AHCA would have elected to continue to use ENS and awarded its contract to Audacious.

**123.**    Upon information and belief, CSS's false representations to AHCA regarding the nature and capabilities of the CEND system are responsible for AHCA's decision to award the contract to CSS.  But for those unfair acts, AHCA would have elected to continue to use ENS and awarded its contract to Audacious.

**124.**    ~~107.~~Upon information and belief, CSS has continued and will continue to use CEND to compete with Plaintiffs unfairly and deceptively throughout the country.

## COUNT I
### (DIRECT INFRINGEMENT OF U.S. PATENT NO. 10,938,962)

**125.**    ~~108.~~Plaintiffs incorporate by reference the preceding allegations of this Complaint.

**126.**    ~~109.~~Defendants CRISP and CSS have infringed at least claims 1, 8, and 10 of the '962 Patent under 37 U.S.C. § 271(a) by jointly and/or individually making, using, offering to sell, selling, and/or importing the CEND system.  For example, on information and belief, Defendants jointly offered to sell and/or sold infringing instrumentalities as part of the HIE in the State of Florida.  An exemplary claim chart demonstrating infringement of ~~the~~at least one claim of the '962 patent is attached hereto as **Exhibit 5**.

**127.**    ~~110.~~Neither CRISP, CSS, nor their customers have a license or authority to use the '962 Patent.

**128.** ~~111.~~ As a result of Defendants' infringement of the '962 Patent, Plaintiffs have suffered and continue to suffer damages in an amount not yet determined, of at least a reasonable royalty.

**COUNT II**
**(DIRECT AND INDIRECT INFRINGEMENT OF U.S. PATENT NO. 11,114,194)**

**129.** ~~112.~~ Plaintiffs incorporate by reference the preceding allegations of this Complaint.

**130.** ~~113.~~ Defendants CRISP and CSS have infringed at least claims 1, 10, 13, and 16 of the '194 Patent under 35 U.S.C. § 271(a) and 35 U.S.C. § 271(b) jointly and/or individually making, using, offering to sell, selling, and/or importing the CEND system and directly and indirectly infringing the '194 patent by inducing others to infringe.  For example, on information and belief, Defendants jointly offered to sell and/or sold infringing instrumentalities as part of the HIE in the State of Florida.  An exemplary claim chart demonstrating infringement of ~~the~~ at least one claim of the '194 patent is attached hereto as **Exhibit 6**.

**131.** ~~114.~~ Neither CRISP, CSS nor their customers have a license or authority to use the '194 Patent.

**132.** ~~115.~~ As a result of **the** Defendants' infringement of the '194 Patent, Plaintiffs have suffered and continue to suffer damages in an amount not yet determined, of at least a reasonable royalty.

**COUNT III**
**(DIRECT INFRINGEMENT OF U.S. PATENT NO. 12,047,475)**

**133.** ~~116.~~ Plaintiffs incorporate by reference the preceding allegations of this Complaint.

**134.** ~~117.~~ Defendants CRISP and CSS have infringed at least claims 1, 12, 13, and 20 of the '475 Patent under 37 U.S.C. § 271(a) by jointly and/or individually making, using, offering to sell, selling, and/or importing the CEND system.  For example, on information and belief, Defendants jointly offered to sell and/or sold infringing instrumentalities as part of the HIE in the

State of Florida.  An exemplary claim chart demonstrating infringement of ~~the~~ at least one claim of the '475 patent is attached hereto as **Exhibit 7**.

**135.** ~~118.~~ Neither CRISP, CSS, nor their customers have a license or authority to use the '475 Patent.

**136.** ~~119.~~ As a result of Defendants' infringement of the '475 Patent, Plaintiffs have suffered and continue to suffer damages in an amount not yet determined, of at least a reasonable royalty.

<u>**COUNT IV**</u>
**(VIOLATION OF MARYLAND COMMON LAW OF UNFAIR COMPETITION)**

**137.** ~~120.~~ Plaintiffs incorporate by reference the preceding allegations of this Complaint.

**138.** ~~121. By the acts described herein,~~ Defendants **CRISP and CSS** have engaged in unfair, abusive, or deceptive business practices**, in Maryland and throughout the United States,** that have injured and will continue to injure Plaintiffs and their business.

**139.** **By fraud, deceit, trickery, or unfair methods, including but not limited to making false or misleading allegations concerning the features, functionalities and/or capabilities of CEND to compete with Plaintiffs, Defendants CRISP and CSS have wrongfully diverted Plaintiffs' business to themselves and caused harm to Plaintiffs' commercial relations and have thus committed the tort of unfair competition.**

**140.** **For example, on information and belief, Defendants CRISP and CSS have mispresented the nature and capabilities of the CEND system to customers and potential customers in Maryland and throughout the United States, including the AHCA in Florida. As a direct result of Defendants' unfair acts, they have secured business in Maryland and throughout the United States that would have otherwise gone to Plaintiffs for use of ENS.**

**141.    Defendants' unfair competition is willful, malicious and/or in wanton disregard of Plaintiffs' rights.**

**142.    As a result of Defendants' conduct, Plaintiffs have suffered and will continue to suffer damages in Maryland and throughout the United States in an amount to be determined at trial. For example, Plaintiff Audacious lost business from the State of Florida AHCA as a result of Defendants' acts of unfair competition.**

## PRAYER FOR RELIEF

For the foregoing reasons, Plaintiffs request that the Court enter judgment in their favor and against Defendants as follows:

a)    Declaring that CRISP and CSS have been and are currently infringing the '194, '475, and '962 patents;

b)    Declaring that CRISP and CSS have engaged in unfair, abusive, or deceptive business in violation of Maryland common law of unfair competition;

c)    Awarding damages as described in each of the above claims, in favor of Plaintiffs and against CRISP and CSS in amounts to be determined at trial;

d)    Enjoining CRISP, CSS, and their respective officers, agents, servants, employees and attorneys, and all other persons in active concert or participation with them, from using Plaintiffs' patented technology and from selling, offering for sale, marketing, or using any Event Notification Service software covered by the '194, '475, and '962 patents;

e)    A determination that Defendants' infringement of the '194, '475, and/or '962 patents was willful, and an award of treble damages pursuant to 35 U.S.C. § 284;

f)      A judgment that this is an exceptional case and that Plaintiffs be awarded their attorneys' fees incurred in this action pursuant to 35 U.S.C. § 285;

g)      Attorneys' fees under Md. Code, Commercial Law § 13-408(b);

h)      An order awarding Plaintiffs pre- and post-judgment interest on their damages;

i)      Costs and expenses in this action; and

j)      Awarding such other relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs respectfully demand a jury trial pursuant to Fed. R. Civ. P. 38 on all issues so triable.

Dated: ~~July 14~~**September 22**, 2025                    Respectfully submitted,

                                                                 */s/ Brian T. Burgess*

                                                                 Brian T. Burgess (Bar No. 19251)
                                                                 William C Jackson (*pro hac vice*
                                                                 forthcoming)
                                                                 Sravan K. Tumuluri (*pro hac vice*
                                                                 forthcoming)
                                                                 **GOODWIN PROCTER LLP**
                                                                 1900 N Street, N.W.
                                                                 Washington, D.C. 20036-1612
                                                                 Telephone: (202) 346-4444
                                                                 Fax: (202) 346-4444
                                                                 WJackson@goodwinlaw.com
                                                                 BBurgess@goodwinlaw.com
                                                                 STumuluri@goodwinlaw.com

                                                                 Srikanth K. Reddy (*pro hac vice* ~~forthcoming~~)
                                                                 Kevin J. DeJong (*pro hac vice* ~~forthcoming~~)
                                                                 Anna Zhou (*pro hac vice* forthcoming*)
                                                                 **GOODWIN PROCTER LLP**
                                                                 100 Northern Avenue
                                                                 Boston, MA 02210

Telephone: (617) 570-1000
Fax: (617) 523-1231
SReddy@goodwinlaw.com
KDejong@goodwinlaw.com
AZhou@goodwinlaw.com

*Attorneys for Plaintiffs Audacious Inquiry
LLC and Collective Medical Technologies,
Inc.*