# EXHIBIT P

# STATE OF FLORIDA
# DIVISION OF ADMINISTRATIVE HEARINGS

AUDACIOUS INQUIRY, LLC,

Petitioner,

vs. Case No. 25-1165BID

AGENCY FOR HEALTH CARE ADMINISTRATION,

Respondent,

and

CRISP SHARED SERVICES AND HIE NETWORKS, LLC D/B/A/CENTRALIS HEALTH,

Intervenors.
_______________________________________/

## RECOMMENDED ORDER

On March 28, and March 31, through April 1 and 2, 2025, Administrative Law Judge (ALJ) Robert J. Telfer III, of the Florida Division of Administrative Hearings (DOAH), conducted a final hearing pursuant to section 120.57(1) and (3), Florida Statutes (2024), in Tallahassee, Florida.

## APPEARANCES

For Petitioner: Louise Wilhite-St. Laurent, Esquire
Panza, Maurer & Maynard, P.A.
201 East Park Avenue, Suite 200-A
Tallahassee, Florida 32301

Lindsay K. Ervin, Esquire
Panza, Maurer & Maynard, P.A.
2400 East Commercial Boulevard, Suite 905
Ft. Lauderdale, Florida 33308

For Respondent: Joseph M. Helton, Jr., Esquire
Sydney Herring, Esquire
Agency for Health Care Administration
2727 Mahan Drive, Mail Stop 3
Tallahassee, Florida 32308

For Intervenor: Robert H. Hosay, Esquire
Mallory Neumann, Esquire
Foley & Lardner, LLP
106 East College Avenue, Suite 900
Tallahassee, Florida 32301

Kevin A. Reck, Esquire
Foley & Lardner, LLP
201 East Pine Street, Suite 1200
Orlando, Florida 32801

## STATEMENT OF THE ISSUE

Whether Respondent, Agency for Health Care Administration's (AHCA or Agency), intended award of the contract arising out of AHCA ITN 012-23/24 for the Statewide Health Information Exchange (HIE) Service (the ITN), to Intervenor, CRISP Shared Services (CSS), was contrary to AHCA's governing statutes, rules, or policies, or the ITN's specifications.

## PRELIMINARY STATEMENT

On May 6, 2024, AHCA issued the ITN. On June 4, 2024, AHCA issued an addendum that provided its responses to written questions, and modified the ITN's requirements and exhibits.[1] On June 17, 2024, four prospective vendors, including Petitioner Audacious Inquiry, LLC (Ai), and Intervenor CSS, submitted replies in response to the ITN. On January 23, 2025, AHCA announced its notice of intent to award the contract to CSS.

[1] AHCA issued two additional addenda to the ITN, which will be discussed in the Statement of Facts.

Ai timely filed with AHCA a notice of intent to protest the intended award to CSS, and timely filed a Formal Written Protest and Petition for Administrative Hearing, along with a certified check for one percent of the estimated contract amount, on February 7, 2025. On February 11, 2025, CSS filed its Notice of Intervention in this proceeding. On February 26, 2025, AHCA referred this matter to DOAH. The undersigned conducted a telephonic scheduling conference on March 4, 2025, and noticed this matter for hearing beginning on March 28, and March 31 through April 2, 2025.

On March 11, 2025, the undersigned entered a Protective Order Regarding Confidential Information (Protective Order), which, *inter alia,* required the undersigned and the parties to identify and treat confidential information in a certain manner.

On March 11, 2025, HIE Networks, LLC d/b/a Centralis Health (Centralis) filed a Motion to Intervene, as well as a Motion for Protective Order. On March 13, 2025, the undersigned entered an Order on Centralis Health's Motion to Intervene and Order to Show Cause which, *inter alia,* granted Centralis's Motion to intervene, "to the extent Centralis Health seeks entry of a protective order … to protect any trade secret or other proprietary or confidential information in response to ITN 012-23/24, or any documents reflecting negotiations held between Centralis Health and AHCA that would reveal trade secret and sensitive business information, from production in this proceeding." After receiving responses from the parties on Centralis's motions, the undersigned, on March 18, 2025, entered an Order Granting, in Part, Centralis Health's Motion for Protective Order.

On March 25, 2025, Ai filed an Unopposed Motion for Leave to Amend Formal Written Protest and Petition for Administrative Hearing, which the undersigned granted on March 26, 2025. On March 25, 2025, Centralis filed

an Amended Motion to Intervene, which requested "the opportunity to cross-examine witnesses presented by the existing parties of what the appropriate remedy is in the event AHCA's recommended award to CRISP is vacated." On March 27, 2025, the parties filed a Joint Pre-hearing Stipulation.

The undersigned conducted the final hearing in Tallahassee, as scheduled, on March 28, and March 31, through April 2, 2025. At the outset of the final hearing on March 28, the undersigned considered Centralis's Amended Motion to Intervene, and heard argument from counsel. The undersigned orally denied Centralis's Amended Motion to Intervene on March 28, 2025, and subsequently issued an Order Denying Centralis Health's Amended Motion to Intervene that same date. Additionally, on March 28, 2025, the undersigned considered Ai's Motion to Compel Continued Deposition of CSS's Corporate Representative, which it filed on March 27, 2025. The undersigned orally granted Ai's Motion to Compel on March 28, 2025, and issued an Order Granting Motion to Compel Continued Deposition of CSS Corporate Representative that same date.

The undersigned admitted into evidence Joint Exhibits J12, J22 through J40, and J42 through J63. The undersigned further admitted into evidence: Petitioner's Exhibits P2, P7, P9, P13, P18, P22, P25, P37 through P56, P58 through P65, and P67 through P88; Respondent's R1 through R3; and Intervenor's Exhibit I1. Petitioner presented the testimony of: David Rodriguez, Vice President of East Markets for Point Click Care (PCC); Suzanne Kirayoglu, an evaluator and the E-PLUS Program Administrator for AHCA; Weston McKain, the Procurement Officer and Government Analyst II for AHCA; Trey Collins, Procurement Director for AHCA; Dylan Dunlap, FCCN, PMP, and Lead Negotiator for AHCA; Milly Hardin, an Evaluator and Negotiator, and the HIE Policy Coordinator for AHCA; and Pamela King, an Evaluator and Negotiator, and the Unit Manager for the HIE Program for

AHCA. AHCA and CSS presented additional testimony from these witnesses, and CSS called an additional witness: Craig Behm, President and CEO of CSS.

The six-volume Transcript, which includes confidential testimony pursuant to the Protective Order, was filed with DOAH on May 5, 2025. The parties timely submitted Proposed Recommended Orders (PRO), which the undersigned has considered in the preparation of this Recommended Order.

All statutory references are to the 2024 codification of the Florida Statutes, unless otherwise indicated.

## FINDINGS OF FACT

### Background and Parties

1. In July 2009, the Florida Health Records Exchange Act was created in section 480.051, Florida Statutes. On May 28, 2010, the Governor signed House Bill 5001 into law, directing AHCA to issue an Invitation to Negotiate to create the Florida Health Information Exchange Infrastructure. In July 2010, AHCA issued the first Invitation to Negotiate for the creation of the Florida HIE infrastructure.

2. The initial vision and goals for the HIE program included strengthening the Florida healthcare system through the timely, secure, and authorized exchange of patient health information among healthcare stakeholders and supporting patient-centered healthcare through continuous improvements in the quality, safety, and efficiency of care through the sharing of patient health information.

3. AHCA awarded Florida's first HIE contract on November 30, 2010. Beginning in 2014, Ai served as a subcontractor for the HIE contract. AHCA subsequently entered into a contract with Ai in April 2017 to manage the

Florida HIE. Ai currently provides Florida HIE services. This is a no-cost contract; subscriber fees fund the Florida HIE.

4. Ai developed its proprietary admit, discharge, and transfer system (ADT), known as the Encounter Notification Service (ENS), that AHCA utilized to provide Florida's HIE services.

5. Unless extended, the contract between Ai and AHCA expires on August 22, 2025.

6. In 2020, the Chesapeake Regional Information System for Our Patients (CRISP) founded CSS. CSS serves as a technology partner for CRISP and provides HIE services. CSS is a not-for-profit entity, and reinvests its profits into CSS rather than paying dividends to shareholders.

7. CRISP previously had a relationship with Ai. Mr. Behm testified that the two entities "essentially helped codevelop the encounter notification service." CRISP ultimately sold the intellectual property involving ENS to Ai so they could "prioritize and expand it[,]" and then CRISP licensed it back.

8. CRISP then developed its own technology to support HIEs starting around 2017, and in 2024, started calling its new HIE technology CRISP Event Notification Delivery (CEND), which differs from the ENS platform offered by Ai, and does not rely not the ENS platform. Mr. Behm explained that CEND is broader than an ADT network, and can receive and transmit other data and statistics beyond what Ai's ENS system currently offers.

<u>Point Click Care Acquires Ai</u>

9. In March 2022, Point Click Care (PCC) acquired Ai. Staff from Ai became PCC employees after this acquisition, and worked under the PCC Acute and Payer Business Unit. This PCC Acute and Payer Business Unit services the Florida HIE, through Ai. PCC's other business unit, Senior Care, makes up approximately 85 percent of PCC's revenues. PCC staff who operate the Florida HIE in support of Ai are employees of PCC located at

various PCC offices, and have supported the operation of Florida's HIE under Ai since the PCC acquisition.

10. After the acquisition, PCC had discussions with AHCA about transitioning the Florida HIE off of ENS, and onto PCC's national HIE platform. Ai had no ability to require this transition to the PCC national platform, and doing so would require a new contract or contract amendment with AHCA.

11. AHCA had concerns related to the consent model that the PCC national HIE platform utilizes, and in particular, whether it complied with Florida's state behavioral data consent requirements (which require the specific consent of the patient).

12. Given these concerns, as well as the scheduled end date of the contract and the changes in technology, AHCA made the decision to issue an ITN for the Florida HIE platform. AHCA stated, in its ITN Authorization:

> Due to rapidly changing technology, as well as frequent changes to regulations and technical standards associated with electronic health records and health information exchange, the Agency may not be aware of all potential HIE solutions and tools. There are also many unknowns given the complexity of the technical standards involved with national networks, as well as privacy and security considerations that must be analyzed further. The services provided in this procurement support the Agency's mission by improving patient care delivery and coordination. Therefore, it is essential that the Agency identify the best value for the state given these services affect the health care of all Floridians.

<u>The ITN</u>

13. AHCA issued the ITN on May 6, 2024, "to select a vendor to provide Statewide Health Information Exchange services." The "Scope of Services" of the ITN provided as follows:

The Agency has the responsibility for creating and administering a sustainable Florida statewide health information exchange (HIE) network, as per sections 408.062 and 408.15, Florida Statutes that will provide state-level infrastructure and shared service capabilities as prioritized by Florida health care stakeholders. The Office of Health Information Exchange and Policy Analysis (HIE) governs and oversees the Agency for Health Care Administration's Health Information Exchange initiatives, including the operations of the Florida HIE services, with input from stakeholder advisory bodies, i.e., subcommittees of the State Consumer Health Information and Policy Advisory Committee – Health Information Exchange Coordinating Committee (HIECC) & the HIE Legal Workgroup. Florida's goal is to support HIE services that assist providers in care coordination, improving efficiencies of provider-to-provider communication, and enhancing public health services. In addition, the Agency desires to foster competition to allow market innovation and ultimately lower health care costs over the long term.

Florida has a large number of health care organizations of varying degrees of adoption of health information technology. It is desirable that health care providers are participants as a source of data and consumers of data, but the Agency recognizes the varying functionalities available. To meet these needs, the Agency has developed a statewide health information network which is called the Florida Health Information Exchange (Florida HIE). The services offered by the Florida HIE enable health care providers to engage at various levels of technical sophistication and resource commitment.

The Agency would like to enter into a no-cost agreement with a Vendor for the Florida HIE Services, which are sustained by user fees. These services provide important statewide infrastructure for Florida, while operating under a market and stakeholder-driven sustainable approach. The

> Vendor shall contribute innovative technology, strategic insight, and manage the day-to-day operations of the Florida HIE Services.

14. No vendor filed a protest to the terms or specifications of the ITN.

15. On June 4, 2024, AHCA issued Addendum 1 to the ITN, answering prospective respondents' questions and modifying the ITN specifications and exhibits, including Submission Requirement Components (SRCs).

16. AHCA issued Addendum 2 to the ITN on September 25, 2024, which amended the solicitation timeline.

17. AHCA issued Addendum 3 to the ITN on November 26, 2024, which again amended the solicitation timeline.

18. No vendor filed a protest to the terms or specifications of any of the addenda to the ITN.

19. The ITN ultimately provided a deadline of June 17, 2024, to submit replies.

<u>Vendors, Replies, and Evaluation Phase</u>

20. Four prospective vendors timely submitted replies to the ITN: Ai; CSS; Centauri Health Solutions, Inc.; and Centralis.

21. On June 18, 2024, Agency Secretary Jason Weida issued a memorandum that appointed four AHCA employees to serve as independent evaluators of the ITN, pursuant to section 287.057(1)(a), Florida Statutes: Will Armstrong, a Data Processing Manager with the Division of Information Technology; Ms. King; Dr. Kiryaoglu; and Ms. Hardin.

22. Ms. King, who served as AHCA's HIE Program Director in the Office of Health Information Exchange and Policy Analysis, recommended that she, Mr. Armstrong, Dr. Kirayoglu, and Ms. Hardin be appointed evaluators for the ITN.

23. Ms. Hardin is the current contract manager for Ai's HIE contract with AHCA. Dr. Kiryaoglu is the current Emergency Patient Look-Up System (E-

Plus) contract manager for Ai's contract with AHCA to provide emergency patient look-up services during declared states of emergency in Florida. Ms. King, Ms. Hardin, and Dr. Kiryaoglu evaluated Submission Requirement Components (SRCs) two through seven. Mr. Armstrong, the Data Processing Manager in the Division of Information Technology, evaluated SRCs eight through ten, which involved more technical issues concerning health information privacy and security.

24. The credible evidence presented at the final hearing established that Ms. King, Ms. Hardin, and Dr. Kiryaoglu, individually and collectively, possessed experience and knowledge regarding HIE at AHCA. The credible evidence further established that Mr. Armstrong possessed experience and knowledge regarding health information privacy and security.[2]

25. Before providing the replies to the evaluators for scoring, AHCA personnel reviewed the replies for compliance with the "Mandatory Response Content" using a checklist that contained the following categories: complete vendor verification form; original response; one duplicate copy of the original response; electronic copy of the response; electronic redacted copy of the response; Exhibit A-2 transmittal letter; Exhibit A-4-V2 submission requirements and evaluation criteria (technical response); Exhibit A-5 cost proposal; Exhibit A-6 certification of drug-free workplace program; and proposal guarantee.

26. As part of this compliance review, AHCA personnel did not review the respondents' responses to the individual SRCs; as Mr. McKain testified, "we make sure the SRCs are there, but we don't read through the content of the

---

[2] Mr. Rodriguez testified that Ai was not challenging the collective knowledge or experience of the evaluators. He testified that Ai challenged Dr. Kirayoglu's "knowledge for the scope of HIE services as a subject matter expert[]" as she served as the E-Plus contract manager; the undersigned finds that Dr. Kirayoglu possessed the requisite experience and knowledge regarding HIE at AHCA.

SRCs." It was the evaluators' responsibility to read through the content of the SRC responses for evaluation and scoring.[3]

27. The evaluators all received training prior to the evaluation of the replies.

28. The ITN stated, in part, that the evaluators would base their evaluations on the narrative contained in the SRC form fields and any associated attachments. It further provided that the evaluators will award points based on the criteria and points scale using a "Standard Evaluation Criteria Scale." The "Standard Evaluation Criteria Scale" was as follows:

| Point Score | Evaluation |
|---|---|
| 0 | The component was <u>not addressed</u> anywhere in the response submission. |
| 1 | The component is <u>unsatisfactory</u>. It contained significant deficiencies and omissions and lacked meaningful detail. |
| 2 | The component is <u>poor</u>. It met some of the minimum requirements but did not address all elements requested. |
| 3 | The component is <u>adequate</u>. It met the minimum requirements with minimal content and detail. |
| 4 | The component is <u>good</u>. It exceeded the minimum requirements and contained good content and detail. |
| 5 | The component is <u>excellent</u>. It exceeded the minimum requirements and contained exceptional content and detail. |

29. The ITN also instructed that respondents "**shall not** include website links, embedded links and/or cross references between SRCs."

30. All respondents had cross-references in their replies, including CSS and Ai. The evaluators testified that if a reply contained a cross-reference, the evaluator reviewed that cross-reference or relied on their memory if the cross-reference was to a previous SRC. Notably, with respect to a cross-reference in Ai's response in SRC 4 that it attached to SRC 8, Ms. King,

[3] In its PRO, Ai contends that Ms. King did not make any responsiveness determinations as part of her evaluation. Ms. King testified that she did not make any responsive determinations with regard to the "mandatory response content," but, as will be discussed in further detail in the Statement of Facts, she, and the other evaluators, considered the responsiveness of the vendors' replies during the evaluation phase.

Ms. Hardin, and Dr. Kiryaoglu would have been unable to review such cross-referenced information because it was included within a SRC that only Mr. Armstrong was assigned to score. Ms. King testified that she raised this issue with Mr. McKain.

31. The evaluators testified credibly that they treated all respondents equally with respect to cross-references. There is no evidence that Mr. Armstrong (who did not testify at the final hearing) did not treat all respondents equally as well.

32. The ITN further instructed that "[a]ttachments are acceptable for any SRC but must be referenced in the form field for the respective SRC and located behind each respective SRC response. Respondents shall name and label attachments to refer to respective SRCs by SRC identifier number."

a. SRC 2

33. SRC 2 concerned "Organizational Structure and Information Technology Requirements." Ai has raised numerous issues concerning AHCA's evaluation of SRC 2 and scoring of CSS's reply, including: (a) CSS omitted the number of CSS personnel engaged in the services specified in the ITN, including names and brief biographies of senior managers and partners that would be assigned to the Florida project, and did not indicate where the HIE services fell within the CSS organizational structure; and (b) CSS omitted any information about its proposed subcontractor, Ruvos, including its size, resources, date established, ownership information, Federal Employer Identification Number, Florida Corporate Charter Number, primary line of business, total number of employees, and number of personnel engaged in the services specified in the ITN, including the names and brief biographies of senior managers and partners assigned to the project.

34. Ai contends that despite these omissions, the evaluators awarded CSS scores of 5, 4, and 4 for each of the evaluation criteria for SRC 2.

35. CSS provided its total number of employees at the time it submitted its reply, and the evaluators testified consistently that they understood that the employees noted in CSS's reply were employed by CSS. CSS further provided biographies of senior managers and key personnel engaged in the HIE services. CSS also provided, as an attachment to SRC 2, an organizational chart that depicted the CSS Executive Leadership Team. Again, the evaluators testified consistently that they understood where the Florida HIE services would fall within the organizational structure displayed in this chart.

36. In contrast, Ai provided in its reply different total numbers of employees, as the employees proposed in the reply were employees of PCC. The evaluators testified that it was unclear from Ai's reply which entity employed the listed employees. For example, Dr. Kiryagolu testified "I was actually confused about that whole concept of whose employees … So I think I was just left kind of not sure." Ms. King testified "[i]t was not clear. I assumed Point Click Care employees though."

37. Similarly, the evaluators testified that Ai's organizational chart was confusing. For example, Ms. King testified "I remember being confused about if it was PCC or Audacious Inquiry staff." Dr. Kirayoglu, when asked about the Ai organizational chart, testified "Yes, it was a little confusing."

38. SRC 2 also requested "[b]ackground information on the Respondent's … proposed subcontractor's organization(s), the size, and the resources." The ITN defined "subcontract" as "[a]n agreement entered into for provisions of services on behalf of the successful respondent as related to this solicitation." The ITN also defined "subcontractor" as "[a]ny entity with the successful respondent to perform the services or to fulfill any of the requirements requested in this solicitation or any entity that is a subsidiary of the successful respondent that performs the services or fulfills the requirements requested in this solicitation."

39. Additionally, the Standard Contract requires that the selected contractor receive prior written approval from AHCA to use subcontractors.

40. CSS did not identify any proposed subcontractors in its reply to SRC 2, stating that it will support all of the requirements within the ITN with its dedicated team. CSS also stated that it planned to work with the Tallahassee-based technology firm Ruvos to augment its team "depending on the growth rate and timeline of the FL HIE." This response did not contain information about the size or resources of Ruvos.

41. Similarly, Ai did not identify any proposed subcontractors in its reply to SRC 2. However, Mr. Rodriguez testified that Ai uses, and intended to use under the ITN, Inpriva for direct messaging, which is required under the ITN.

42. Dr. Kirayoglu testified that her evaluation of CSS's reply to SRC 2, concerning the description of Ruvos, was "they proposed the use of Ruvos, a company that's been in Tallahassee for over 20 years, it was not necessarily like we're using them. It was more like we plan on working with this company depending upon the time line and what's needed." Ms. Hardin testified that she had "some confusion" over CSS's use of Ruvos, but that she "learned that they would be brought on for outreach and marketing if CSS was selected and if during the transition … there were issues with the incumbent vendor getting the ball rolling." Ms. King testified that "[i]t was just not clear in their response if [Ruvos was] a true subcontractor or how they would be used," as a true subcontractor would perform services under the contract.[4]

<u>b. SRC 3</u>

43. SCR 3 requested information relating to "Vendor Staffing," stating that a respondent "shall identify its proposed team, including key staff

[4] Ms. King testified that, during negotiations, she obtained an understanding of why CSS listed Ruvos in its reply, and that CSS "would not be using them unless they needed to assist if there were issues with transitioning from the current system to CEND."

members," "shall describe the qualifications of key staff members and include their resumes," and "shall provide a detailed description of proposed staff, including proposed subcontractor's staff, by type/credentials, including the number (total and full-time equivalent), qualifications, locations, and project functions of staff." The evaluation criteria for SRC 3 was "[t]he adequacy of the proposed team, key staff, and subcontractor(s)."

44. Ai contends that CSS's reply omitted the qualifications of key staff members, and did not attach, but rather cross-referenced, resumes from its reply to SRC 2. Ai also contends that CSS's reply to SRC 3 failed to include a detailed description of its staff, and failed to provide the requested information for Ruvos's staff credentials.

45. CSS's reply reflected that it intended to employ, as required by the ITN, a project director, technical and operations director, and a marketing and outreach manager. CSS's reply also proposed to hire an executive director, which was not required under the ITN. CSS's reply also reflected that it intended to fill these positions if AHCA awarded the ITN to it; in other words, CSS's reply did not reference specific individuals for these positions. CSS's reply referenced current CSS leadership and management, and cross-referenced the resumes for those individuals from SRC 2.

46. Ai's reply to SRC 3 proposed to fill the three required positions with individuals employed by PCC, one of whom is located in Florida. Ai's reply also referenced senior staff with PCC. Ai's reply to SRC 3 included the resumes of the individuals it proposed to fill the three required positions.

47. With respect to CSS's reply to SRC 3, all evaluators testified that they reviewed resumes attached to SRC 2 in their evaluation of SRC 3. Dr. Kirayoglu testified that she understood that CSS "would hire the three and then also an executive director they said they would hire, and that would be our primary point of contact." She further testified that CSS had adequately demonstrated the qualifications of its proposed team and key staff. Ms. Hardin testified that CSS's reply met the minimum requirement

for the three staff positions, and exceeded this requirement with a fourth position; she stated that "I thought it was a well thought out methodology." Ms. King testified that as CSS was not the incumbent HIE provider for Florida, she would not have expected it to have existing staff in Florida, and took into account the three required positions as well as the executive director position when scoring this SRC.

c. SRC 6

48. SRC 6 requested information pertaining to "Project Management and Service Delivery Approach," including demonstration of "knowledge of the Office of National Coordinator for Health Information Technology [ONC] standards (such as the Trusted Exchange Framework and Common Agreement [TEFCA])."

49. CSS's reply to SRC 6 did not explicitly mention ONC. The evaluators testified that they did not need to see this precise term to understand that CSS's response adequately demonstrated knowledge of ONC and TEFCA.

d. Evaluation of Other SRCs

50. In its Proposed Recommended Order, Ai does not contend that any additional errors occurred in the evaluation of other SRCs from the ITN. Additionally, at the final hearing, the parties did not elicit testimony or evidence concerning the evaluation of every SRC contained within the ITN. The undersigned will address the evaluation of other SRCs that were mentioned at the final hearing or in a PRO.

51. SRC 4 requested information pertaining to "Past and Current Health Information Exchange Activity Experience." The competent, substantial evidence presented at the final hearing reflects that the responses of Ai and CSS provided the requested description of contracts and experience with HIE services.

52. SRC 7 requested information pertaining to "Related Services and Enhancements[,]" and asked respondents to "detail how it plans to handle need identification, stakeholder input, governance, and implementation of

potential innovations and/or enhancements." CSS contends that Ai's reply fails to detail how it plans to handle governance. A review of this reply does not reveal the word "governance." CSS's reply states that "a governance framework will be established … ."

e. Scoring

53. At the conclusion of the evaluation phase, the final score totals were as follows:

| Rank | Responding Vendor | Final Total Score |
|---|---|---|
| 1 | CSS | 735 |
| 2 | Centralis | 696 |
| 3 | Ai | 673 |
| 4 | Centauri | 582 |

54. Pursuant to the ITN, AHCA used the scores from the evaluation phase to determine the "competitive range" of respondents that would advance to negotiations. AHCA determined that the top three highest-scoring respondents—CSS, Centralis, and Ai—would advance to the negotiations phase. Ms. Hardin testified that Centauri's reply was substantially inferior to the other respondents' replies as it was "very vague and unclear …"

Negotiation Phase

55. On July 9, 2024, Agency Secretary Weida issued a memorandum that appointed three negotiation team members as voting members, under sections 287.057(17)(a). and 287.057(17)(b)1. and 2. for the ITN: (1) Mr. Dunlap, the negotiation team lead; (2) Ms. King; and (3) Ms. Hardin.

56. Mr. Dunlap fulfilled the role of Certified Contract Negotiator and Project Management Professional for the negotiation team.

57. AHCA held nine negotiation team strategy meetings, between July 18 and August 12, 2024. The ITN provides, in part:

> The Agency's negotiation team will conduct negotiation strategy sessions pursuant to Section 286.0113, F.S. Negotiation strategy includes determining best value criteria and developing award recommendation(s). During its strategy sessions, the Agency's negotiation team will develop a recommendation as to the award that will provide the best value (as defined in Section 287.012(4), F.S.) to the State.

58. Between August 13 and September 12, 2024, the negotiation team held three rounds of negotiations with the respondents who advanced to the negotiations phase of the ITN.

<u>a. Development of Best Value Criteria</u>

59. The negotiation team created, and refined, a spreadsheet referred to as the "best value matrix" that contained the best value criteria, and notes concerning each respondents' best value proposition relating to each criteria. The negotiation team created several drafts of the best value matrix over the course of the negotiation phase. Initially, the negotiation team relied on examples of spreadsheets from past AHCA procurements to model the best value matrix for this ITN.

60. Early drafts of the best value matrix contained columns titled "SRC Crosswalk" and "Priority." Mr. McKain explained that the negotiation team used the SRC Crosswalk "to identify specific information related to those [best value] criteria[,]" and to "check that the SRCs and the scope of services tied to the best value criteria." The negotiation team used the Priority column as an "internal tool" to guide when negotiators would talk about specific topics with respondents.

61. On some earlier versions of the best value matrix drafts, the priority column contained some text that states high, medium, and low. Those drafts also state that priority is for discussion and organizational purposes, and not used as a weighted value in award determination. The negotiation team did

not use the "Priority" column as a method to weigh or rank the best value criteria.

62. The negotiation team ultimately provided a final best value matrix to the respondents that did not contain the SRC Crosswalk and Priority columns; Mr. Dunlap explained that the negotiation team did not want to "confuse the respondents with an internal tool that the negotiation team was using." For similar reasons, the negotiation team removed these columns from the version of the best value matrix it provided to the AHCA Secretary with the Award Recommendation Memorandum; Mr. Dunlap explained "[a]gain, we didn't want to confuse the secretary with our internal tools. We wanted to give him the information that we had captured during negotiations."

63. The negotiation team did not finalize the best value criteria until after the third round of negotiations with the respondents. AHCA provided the final best value criteria to the respondents in an e-mail dated September 13, 2024. This e-mail also included a round 3 commitments list and public health slides.

64. The negotiation team provided the respondents with the best value criteria in various ways prior to the September 13, 2024, e-mail that contained the written version of the final best value criteria. For example, before each round of negotiations, AHCA provided each respondent with a "Negotiation Agenda." The agenda topics for each round of negotiations tracked the best value criteria. Additionally, Mr. Dunlap testified that "my opening statement of round 1 after I mentioned the best value definition from statute, I described the different components that we would be looking at to make the determination based on the best value criteria that the team had developed."

65. Mr. Dunlap testified that, during training for the negotiation team, there was a recommendation to provide the best value criteria early in the negotiation process. However, he also felt that the best value criteria should

not be provided to the respondents before the negotiation team finalized it, "[b]ecause we didn't know if anything would change over the course of negotiations."

66. After sending the September 13, 2024, e-mail that contained the best value criteria to the respondents, AHCA did not receive any requests from any respondent for an additional negotiation session. The negotiation team testified that they felt that they had covered all of the best value criteria with the respondents and did not need a fourth round. Ai asked whether there would be a fourth round, but did not specifically request one.

b. Sustainability

67. "Sustainability" and "Program Sustainability" were agenda topics for the first and second negotiation rounds, and ultimately, were considered in the best value criteria.

68. By way of background, in 2013, after receiving federal funding for HIE services, AHCA transitioned to a self-sustaining HIE model. After 2013, the Florida HIE did not rely on any federal or state funding, and is sustained exclusively by subscriber fees.

69. The round one agenda included an item for "Sustainability." When it received this agenda, Ai requested clarification on sustainability, asking "[w]e believe AHCA would like to hear details around the sustainability of the technology/program we will be discussing; we also have a rich corporate sustainability program (but I don't believe that is intent)." On August 8, 2024, Mr. McKain responded, "[y]es, AHCA would like to hear details around the technology/program we will be discussing."

70. On August 8, 2024, Ai sent another e-mail seeking additional clarification:

> Can you define what you mean by stability? We believe you want information about the long-term viability of the solutions and the company. Happy to add additional information or change our interpretation as needed.

71. AHCA did not respond to the August 8, 2024, request for clarification. Mr. McKain testified that he had already provided Ai with an answer to this question, and would not have time to address it with the negotiation team prior to the round one negotiation session.

72. During negotiations, the negotiation team heard from the respondents concerning their experience with obtaining funding sources, such as Advance Planning Document (APD) funding. Although Ai did not specifically address its experience with obtaining federal funding for HIE services during the negotiations, the negotiation team provided all respondents with the opportunity to discuss this topic, which ultimately became sub-criteria 3.5 of the best value criteria:

> **3.5** Whether the respondent provides evidence of experience identifying funding sources and obtaining funding for enhanced HIE solutions including, but not limited to, federal Advanced Planning Document (APD) collaboration with HIEs.

73. Mr. Behm testified that CSS felt sustainability included "providing cost-effective services and building in flexibility to drive more customers and to creative solutions to innovate and to look at new types of funding solutions."

74. Mr. Dunlap testified that after the end of the round one negotiation meeting, he asked Ai specifically about federal funding. He stated that Ai "described their high-level process for how they would approach that." He also stated that Ai's CEO commented that it focused on "delivering value over chasing funding." Ai later clarified that it was not chasing investment funding, creating short-term value for investors, and then finding a way to exit.

75. Mr. Dunlap also testified that he gave Ai another opportunity to follow up on funding and sustainability, and that Ai "mentioned the different entities involved," that Ai had internal employees that focus on federal

funding, that Ai leveraged external resources for federal funding, and that Ai had experience with federal agencies.

76. Mr. Rodriguez testified that Ai addressed federal funding during the question and answer portion of the round one negotiation meeting, "but we did not present content on it the way I think certainly CSS did."
Mr. Rodriguez also testified that Ai would have provided other funding models from other states relating to its federal funding experience if it had understood the sustainability topic to include federal funding. As will be discussed below with respect to the Best and Final Offer (BAFO), AHCA provided Ai the opportunity to present this information in its BAFO.

c. Inadvertent Public Records Release

77. On July 23, 2024, AHCA inadvertently released redacted copies of the ITN replies of Ai and Centralis to counsel for Centralis. Mr. Collins described this release as "a deviation from our normal process."

78. AHCA staff internally discussed options to address this inadvertent release. On September 6, 2024, Mr. McKain informed the respondents in an e-mail that stated:

> AHCA recently received a public records request for the vendors' response to AHCA ITN 012-23/24. Our Agency's typical practice is to exercise the exemption in Chapter 119, Florida Statutes, and not release vendors' responses until after an award decision is publicly posted in the Vendor Information Portal. AHCA staff inadvertently released redacted ITN responses to the requester, who was later determined to be legal counsel representing one of the ITN respondents with whom the Agency is currently conducting negotiations.
>
> Given this situation, AHCA would like to ensure an equitable and fair negotiation process. If your company would like to obtain copies of the redacted ITN responses from the other respondents, you may submit a public records request to me as the Agency's Procurement Officer.

79. AHCA staff informed the negotiation team of the public records release, but did not tell them who requested the records. Mr. Collins testified:

> We didn't want there to be any bias in the minds of the negotiation team about who may have seen other vendors' responses and maybe have a competitive advantage over another vendor. So we thought it best just to let them know what generally has occurred not naming specific parties and informed them of what the process we were going to follow to try to correct that situation.

80. Neither CSS nor Ai submitted public records requests to AHCA in response to the September 6, 2024, e-mail.

81. The negotiation team included a broad agenda topic in round three negotiations that would have allowed a respondent to ask questions about the inadvertent release. No respondent offered or asked to address any issues related to the inadvertent release.

82. The competent, substantial evidence presented at the final hearing demonstrated that the inadvertent public records release had no influence over the development of the best value criteria or the timing of the release of the best value criteria to the respondents.

83. The competent, substantial evidence presented at the final hearing demonstrated that the inadvertent public records release did not impact the negotiation team's best value determination. Mr. Dunlap credibly testified that the release "had no impact[]" on the best value determination. Ms. King also credibly testified that the release had no effect on her best value analysis and determination.

d. BAFOs

84. After round three negotiation meetings, on September 13, 2024, AHCA sent each respondent an identical email with a request for a BAFO and the spreadsheet containing the best value criteria.

85. On October 4, 2024, the negotiation team held a final meeting with each respondent to answer questions about the BAFO instructions. During

Ai's session, it asked if it could address the best value criteria provided in the September 13, 2024, e-mail, specifically referencing sub-criteria 3.5. Mr. Dunlap advised Ai that it could address the best value criteria in the BAFO commitments list or in the BAFO cost proposal, and testified:

> I notified them that they … could address anything within the commitment list session because we had left that where the respondents had a chance to provide additional commitments at any point during the process including the best and final offer. And in their case I think I also told them that it would be okay if they provided a narrative within their cost proposal.

86. Ai addressed two best value criteria in its BAFO commitments list, including sub-criteria 3.5. Mr. Dunlap testified this response "was related to funding request and advanced planning documents." Further, Mr. Rodriguez testified "we felt like we answered it [sub-criteria 3.5] in our cost proposal for the BAFO."

87. All three respondents timely submitted a BAFO.

<u>Best Value Determination</u>

88. At the conclusion of the negotiation phase, the negotiation team considered all of the best value criteria to determine which Respondent offered the best value to the State.

89. As part of the process to determine which respondent provided the best value, the negotiation team color-coded the best value matrix, with each vendor, for each criteria, assigned either the color green (to indicate the respondent ranking first), yellow (to indicate the second-best respondent), red or possibly pink (to indicate the third-best respondent), and gray for when all respondents were on equal standing.

90. The negotiation team tallied the number of green boxes each respondent received; CSS ranked highest in ten criteria, Ai followed with seven, and Centralis ranked highest for only one of the criteria. Based on this

exercise, the negotiation team eliminated Centralis, and then spent over a week discussing the best value criteria as it related to Ai and CSS.

91. Ai contends in its proposed recommended order that the negotiation team made arbitrary assumptions concerning its pricing proposal, which, in its BAFO, proposed a price increase over its current subscriber fees, and offered additional services, including, *inter alia,* providing 80 percent of skilled nursing facility data. Ai contends that the negotiation team "assumed" that an increase in subscriber cost would result in higher patient costs. Ms. King testified that the negotiation team looked at the price for those participating in the HIE service to see "where they would get the most value for the cost." She further testified:

> [T]he Agency has a responsibility to the stakeholders in Florida. Not only does [price] impact what the providers have to pay or the payers have to pay for the service, but ultimately those prizes go down to the patients and so we have to look out. It's part of our duty to ensure that we are providing the best services possible through the HIE without impacting the patients as much as possible.

92. Ai also contends in its proposed recommended order that the negotiation team "lacked understanding" about the tenure of the executive management of Ai, which was part of sub-criteria 1.1. Sub-criteria 1.1 states:

> Whether the respondent provides evidence of the employment of <u>executive managers</u> with expertise and experience providing statewide Health Information Exchange (HIE) services that assist providers in care coordination, improving efficiencies of provider-to-provider communication, and enhancing public health services.

93. Mr. Dunlap testified that the negotiation team found CSS and Ai ranked closely for this sub-criteria, but that the "distinguishing factor" was that the executives from CSS "had been providing Health Information Exchange services for much longer than the executives at Point Click Care."

Mr. Dunlap testified that this sub-criteria was not "the distinguishing factor" in the negotiation team's decision that CSS provided the best value to the State.

94. Ai also contends that the negotiators' belief that CSS's corporate status—as a not-for-profit entity—made CSS more capable than Ai of reinvesting in the Florida HIE. Mr. Dunlap testified that "[i]n terms of our best value criteria, yes, we did not care about whether they were nonprofit or for profit,]" and "[t]he team did not have a preference of whether someone was for profit or not for profit. We had a preference for a vendor that demonstrated a willingness to reinvest in the Florida HIE." Ms. Hardin testified that "[w]e were focused on the ability of [CSS] to reinvest into the Health Information Exchange and that was couched within them being a nonprofit." There was no competent, substantial evidence to support a contention that AHCA favored CSS over Ai (or other respondents) because of its not-for-profit status or was biased against Ai (or other respondents) that were for-profit entities.

95. At the conclusion of the negotiation phase, and after consideration of the BAFOs, on October 18, 2024, the negotiation team came to the consensus that CSS offered the best value to the State based on the best value criteria.

<u>Award</u>

96. On October 23, 2024, the negotiation team prepared a memorandum that contained their recommendation to Agency Secretary Weida to award the contract for the Florida HIE service to CSS. This memorandum, *inter alia,* contained a summary of the negotiation team's best value analysis with examples, and stated that the "examples demonstrate why the Respondent selected for award provides the best value to the State in terms of price, quality, design, and workmanship, and the best value criteria established by the negotiation team." The summary included how CSS addressed the topics

of staffing, service delivery, program sustainability, and marketing and outreach.

97. Ai contends that AHCA's bias against it "permeated the procurement process." It contends that it began with PCC suggesting that AHCA join the PCC national platform, and spread to the evaluation phase, where "evaluators scored arbitrarily based on assumptions and feelings," where the scores "were assigned outside of compliance with the instructions of the ITN," and spread to the negotiation phase, where negotiators shared opinions on Ai's performance that were not accurate. Ai contends that AHCA was determined to move away from Ai after PCC raised the issue of moving to the national platform.

98. The competent, substantial evidence adduced at the final hearing contradicts Ai's contentions of bias. Although some aspects of the ITN process did not go perfectly—for example, the inadvertent release of redacted ITNs during the negotiation phase, and the evaluation team's across-the-board decision to review cross-references of all respondents in their replies to SRCs—the undersigned found no evidence of bias against Ai or any respondent, or evidence of bias in favor of CSS or any respondent, in this process.

99. On January 23, 2025, AHCA posted the Notice of Agency Decision, which reflected that it intended to award the contract for AHCA ITN 012-23/24 to CSS.

100. Ai timely filed its notice of intent to protest on January 28, 2025, and timely filed a formal protest on February 7, 2025.

## CONCLUSIONS OF LAW

101. DOAH has jurisdiction over the subject matter and the parties to this proceeding in accordance with sections 120.569 and 120.57(1) and (3).

102. Ai challenges the Agency's intended award of the contract to CSS. Pursuant to section 120.57(3)(f), the burden of proof in this matter rests with

Ai as the party protesting the proposed agency action. *See State Contracting & Eng'g Corp. v. Dep't of Transp.*, 709 So. 2d 607, 609 (Fla. 1st DCA 1998).

103. Section 120.57(3)(f) provides that in a competitive procurement protest:

> [T]he administrative law judge shall conduct a de novo proceeding to determine whether the agency's proposed action is contrary to the agency's governing statutes, the agency's rules or policies, or the solicitation specifications. The standard of proof for such proceedings shall be whether the proposed agency action was clearly erroneous, contrary to competition, arbitrary, or capricious.

104. The "governing statute" for the Agency's use of the invitation to negotiate process to procure the contractual services is section 287.057(1)(c). Section 287.057(1)(c)4. provides:

> The agency shall evaluate replies against all evaluation criteria set forth in the invitation to negotiate in order to establish a competitive range of replies reasonably susceptible of award. The agency may select one or more vendors within the competitive range with which to commence negotiations. After negotiations are conducted, the agency shall award the contract to the responsible and responsive vendor that the agency determines will provide the best value to the state, based on the selection criteria.

105. Additionally, section 287.012(4) defines "best value" as:

> [T]he highest overall value to the state based on factors that include, but are not limited to, price, quality, design, and workmanship.

106. The ITN is a process used by agencies "to determine the best method for achieving a specific goal or solving a particular problem." *AT&T Corp. v. Dep't of Mgmt. Servs.,* 201 So. 3d 852, 855 (Fla. 1st DCA 2016) (citing § 287.067(1)(c), Fla. Stat.); *see also Securus Technologies, Inc. v. Dep't of Corr.*, 308 So. 3d 282 (Fla. 1st DCA 2020).

107. The phrase "de novo proceeding" describes a form of intra-agency review. The purpose of the ALJ's review is to "evaluate the action taken by the agency." *J.D. v. Fla. Dep't of Child. & Fams.,* 114 So. 3d 1127, 1132 (Fla. 1st DCA 2013). A de novo proceeding:

> [S]imply means that there was an evidentiary hearing during which each party had a full and fair opportunity to develop an evidentiary record for administrative review purposes. It does not mean … that the [ALJ] sits as a substitute for the Department and makes a determination whether to award the bid *de novo.*

*Intercontinental Props., Inc. v. Dep't of HRS,* 606 So. 2d 380, 386 (Fla. 3d DCA 1992). "The [ALJ] may receive evidence, as with any formal hearing under section 120.57(1), but the object of the proceeding is to evaluate the action taken by the agency." *State Contracting,* 709 So. 2d at 609.

108. Ai, as the party protesting the Agency's intended award, must prove, by a preponderance of the evidence, that the Agency's proposed action is either: (a) contrary to its governing statutes; (b) contrary to its rules or policies; or (c) contrary to the specifications of the ITN. The standard of proof Ai must meet to establish that the award to CSS was improper is whether the Agency's decision is: (a) clearly erroneous; (b) contrary to competition; or (c) arbitrary or capricious. *See* §§ 120.57(3)(f) and 120.57(1)(j), Fla. Stat.; *AT&T Corp.,* 201 So. 3d at 854.

109. Florida courts have defined the "clearly erroneous" standard to mean "the interpretation will be upheld if the agency's construction falls within the permissible range of interpretations." *Colbert v. Dep't of Health,* 890 So. 2d 1165, 1166 (Fla. 1st DCA 2004); *see also Holland v. Gross,* 89 So. 2d 255, 258 (Fla. 1956) (holding that when a finding of fact by a trial court "is without support of any substantial evidence, is clearly against the weight of the evidence or … the trial court has misapplied the law to the established facts, then the decision is 'clearly erroneous.'"). However, if "the agency's

interpretation conflicts with the plain and ordinary intent of the law, judicial deference need not be given to it." *Colbert,* 809 So. 2d at 1166.

110. An agency action is "contrary to competition" if it unreasonably interferes with the purpose of competitive procurement. The "contrary to competition" test forbids agency actions that: (a) create the appearance and opportunity for favoritism; (b) reduce public confidence that contracts are awarded equitably and economically; (c) cause the procurement process to be genuinely unfair or unreasonably exclusive; or (d) are abuses, *i.e.,* dishonest, fraudulent, illegal, or unethical. *See* § 287.001, Fla. Stat.; *Harry Pepper & Assoc., Inc. v. City of Cape Coral,* 352 So. 2d 1190, 1192 (Fla. 2d DCA 1977).

111. To determine whether an agency acted in an "arbitrary or capricious" manner involves consideration of "whether the agency: (1) has considered all relevant factors; (2) given actual, good faith consideration to the factors; and (3) has used reason rather than whim to progress from consideration of these factors to its final decision." *Adam Smith Enter. v. Dep't of Env't. Regul.*, 553 So. 2d 1260, 1273 (Fla. 1st DCA 1989). In *Dravo Basic Materials Co. v. Department of Transportation*, 602 So. 2d 632, 632 n.3 (Fla. 2d DCA 1992), the court stated:

> If an administrative decision is justifiable under any analysis that a reasonable person would use to reach a decision of similar importance, it would seem that the decision is neither arbitrary nor capricious.

Standing

112. To have standing to initiate a bid protest, a petitioner must establish that an agency's decision "adversely affected" its substantial interests. *See* §§ 120.569(1) and 120.57(3)(b), Fla. Stat. A petitioner shows that it was "adversely affected" by demonstrating that it would be eligible for the award of the contract if its bid challenge is successful. *See Preston Carroll Co. v. Fla. Keys Aqueduct Auth.,* 400 So. 2d 524, 525 (Fla. 3d DCA 1981); *Madison*

*Highlands, LLC v. Fla. Hous. Fin. Corp.,* 220 So. 3d 467, 473 (Fla. 5th DCA 2017) ("The second lowest bid establishes that substantial interest because if the lowest bid is disqualified, the second lowest bid may receive the award.").

113. The undersigned concludes that that Ai has established that AHCA's decision "adversely affected" its substantial interests, and it thus has standing in this proceeding.

AHCA's Use of the Best Value Criteria Was Not Contrary to Governing Statutes, Rules, or the ITN Specifications

114. Ai contends that AHCA negotiators made their best value determination based on undisclosed best value criteria that it did not provide to Ai "until after substantive negotiation sessions occurred." It further contends that the criteria used to determine best value criteria was outside of the scope of services and ITN specifications.

115. The ITN explicitly provided that the negotiation team would develop the best value criteria during negotiation sessions. Ai again contends that it does not dispute that the ITN provided for the development of the best value criteria during negotiation strategy meetings, but, instead, that AHCA should have disclosed this criteria prior to any of the three rounds of negotiations, so it "would have the opportunity to tailor its presentations around the criteria the [negotiation team] deemed to be important to determining best value."

116. Ai did not timely protest the specifications of the ITN within the 72-hour window to challenge the terms, conditions, or specifications of a solicitation, provided in section 120.57(3)(b), which further provides that "[f]ailure to file a notice or protest or to file a formal written protest shall constitute a waiver of proceedings under this chapter." Ai's failure to protest that portion of the ITN related to the development of the best value criteria, and its belief that AHCA had an obligation to provide the full extent of the best value criteria prior to the negotiation meetings, constitutes a waiver of this argument. *See Consultech of Jacksonville, Inc. v. Dep't of Health,* 876 So.

2d 731, 734 n.5 (Fla. 1st DCA 2004) (noting that specification challenges are intended to allow an agency to correct or clarify plans and specifications prior to accepting bids in order to save expense to the bidders and to assure fair competition among them).

117. Putting aside the waiver, Ai contends that sub-criteria contained in the best value criteria—specifically, executive staffing and sustainability—did not "tie back" to any ITN specifications and was not disclosed to Ai.

118. As detailed in the statement of facts, the competent, substantial evidence presented at the final hearing demonstrated that AHCA and the negotiation team provided the best value criteria to Ai and other respondents in various ways prior to the release of the final best value criteria. Each negotiation agenda contained agenda topics that tracked the best value criteria. Mr. Dunlap's opening statement of the first negotiation session described the different components that the negotiation team intended to consider for best value criteria. Further, after providing Ai and the other respondents with the final best value criteria, AHCA did not receive any requests from any respondent for an additional negotiation session.

119. The "SRC Crosswalk" and "Priority" columns from earlier drafts of the best value matrix were not undisclosed criteria; the competent, substantial evidence at the final hearing demonstrated that the negotiation team used these columns as internal organizational tools, and did not use them as method to weigh or prioritize any of the best value criteria.

120. The competent, substantial evidence presented at the final hearing also demonstrated that Ai had multiple opportunities to address sub-criteria 3.5 and the topic of sustainability. Mr. Dunlap specifically asked Ai about federal funding after the round one negotiation meeting, and again, with respect to its BAFO, Ai addressed this sub-criteria in is BAFO commitments list.

121. Ai also contends that the negotiation team's consideration of executive staffing, and specifically, the tenure of executive staff, did not "tie

back" to any ITN specifications and was not disclosed as a "deciding criterion" to the respondents. Mr. Dunlap credibly testified that this was not a "distinguishing factor" in the negotiation's team that CSS provided best value to the State. Additionally, the competent, substantial evidence presented at the final hearing demonstrated that CSS's reply to this component revealed that CSS executives had provided HIE services for a longer term than what Ai listed for its PCC executives.

AHCA's Intended Award Is Not Clearly Erroneous, Contrary to Competition, or Arbitrary or Capricious

122. Ai also contends that AHCA's decision to not provide the final best value criteria prior to the first round of negotiations resulted in an exercise of discretion that was arbitrary and capricious. As found in the statement of facts, and as concluded above, Ai was provided multiple opportunities to address sub-criteria 3.5, concerning sustainability, and ultimately provided a detailed response in its BAFO. Mr. Rodriguez testified that Ai did not present content on this sub-criteria in the way CSS did, but also testified that Ai answered this question in its response to BAFO.

123. Ai contends that "[a] consistent theme throughout the procurement was AHCA's unfair bias against [Ai], contrary to competition." Ai takes issue with: the responsiveness review, including the scoring during the evaluation phase; AHCA's consideration of CSS's not-for-profit status, claiming that this status indicated a preference for CSS; AHCA's belief that the CEND system could support the Florida HIE; and alleged assumptions the negotiation team made after the inadvertent public records release.

124. With respect to the responsiveness review and scoring during the evaluation phase, the competent, substantial evidence presented at the final hearing demonstrated that AHCA's procurement personnel reviewed all replies to ensure that the replies tracked to minimum mandatory response criteria in the ITN—and did not review the content of the responses to the SRC. The evaluators reviewed the SRC responses for evaluation and scoring.

125. Ai contends that the evaluators "used assumptions and inferences without reason" in its scoring of CSS. The competent, substantial evidence presented at the final hearing demonstrated, through the credible testimony of the evaluators, that the evaluators relied on the criteria provided in the ITN, and fairly and reasonably assigned scores based on the replies to those criteria.

126. With respect to the evaluators' consideration of cross-references, the evaluators candidly testified that they considered cross-references of all respondents equally. The evidence presented at the final hearing showed that both Ai and CSS used cross-references in their replies to the SRCs. Similarly, the replies of both Ai and CSS did not identify any proposed subcontractors, although CSS identified Ruvos to "augment" its team if necessary, and Ai utilized Inpriva for direct messaging. A bidder cannot rely on defects in a winning bidder's submission to overturn an award when its own submission suffers from the same or similar flaws. *See Intercontinental Props.,* 606 So. 2d at 385 ("At the least, a party protesting an award to the low bidder must be prepared to show not only that the low bid was deficient, but must also show that the protestor's own bid does not suffer from the same deficiency. To rule otherwise is to require the State to spend more money for a higher bid which suffers from the same deficiency as the lower bid.").

127. Additionally, the evidence presented at the final hearing showed that these alleged defects of both CSS and Ai replies were minor irregularities—i.e., the defects did not affect price, confer a substantial advantage to wither CSS or Ai, or restrict or stifle competition. AHCA was within its discretion to waive such minor irregularities. *See Tropabest Foods, Inc. v. State, Dep't of Gen. Servs.,* 493 So. 2d 50, 52 (Fla. 1st DCA 1986) (defining a material change as one that "gives the bidder a substantial advantage over the other bidders and thereby restricts or stifles competition.").

128. Further, the evaluation scores were only relevant to determine which respondents advanced to the negotiations phase. Ai advanced to the

negotiations phase, and the negotiation team did not consider the evaluation scores in making a best value determination.

129. With respect to Ai's contention that AHCA exhibited bias in considering CSS's not-for-profit status as more capable than Ai of reinvesting in the Florida HIE, and as detailed in the Statement of Facts, there was no competent, substantial evidence to support this contention. "[A] finding of bias 'must be based upon 'hard facts,' not mere 'suspicion or innuendo.''" *Logisticare Solution, LLC v. Comm'n for the Transp. Disadvantaged,* Case No. 06-2393BID, at ¶ 102 (DOAH Sep. 29, 2006; Fla FDOT _____).

130. With respect to Ai's contention that AHCA "assumed the new CEND system was functional enough to support Florida's HIE," and that it assumed the transition to CEND would not affect the Florida HIE's "value," there was no competent, substantial evidence presented at the final hearing to support such a contention. AHCA was entitled to rely on the representations made by CSS. The competent, substantial evidence presented at the final hearing showed that CSS and the CEND system were capable of performing the contract requirements, and provided additional enhancements over the ENS system. There was no evidence introduced at the final hearing that demonstrated that CSS provided inaccurate, false, or misleading information in its reply or during negotiations. Additionally, the current and new contract both protect AHCA in the event of an unsuccessful transition, as these contracts contain liquated damages for failing to timely transition or perform.

131. With respect to Ai's contention that the negotiation team made inappropriate assumptions after the inadvertent public records release that evidenced bias in this process, it is clear that AHCA erred in releasing redacted replies of two vendors during this process. AHCA took reasonable steps to address this issue when it offered to the respondents, during the negotiation phase, the opportunity to make a similar public records request, which neither Ai nor CSS opted to choose. AHCA did not disclose to the negotiators which respondent made the request and received the records to

avoid any potential bias against the respondent who requested the records (Centralis). There was no competent, substantial evidence presented at the final hearing that demonstrated that this inadvertent public records release was prejudicial to Ai, or that the negotiation team exhibited any bias in favor of or against any respondent as a result of the inadvertent public records release.

132. The undersigned concludes that AHCA's proposed action in awarding the contract to CSS is not contrary to AHCA's governing statutes, rules, or the ITN specifications, and was not clearly erroneous, contrary to competition, arbitrary, or capricious.

## RECOMMENDATION

Based upon the foregoing Findings of Fact and Conclusions of Law, the undersigned hereby RECOMMENDS that AHCA enter a final order that dismisses the Amended Petition for Formal Administrative Hearing and awards the contract for AHCA ITN 012-23/24, for the Statewide Health Information Exchange Service, to CRISP Shared Services.

DONE AND ENTERED this 9th day of June, 2025, in Tallahassee, Leon County, Florida.

*Robert J. Telfer III*
Case No. 25-1165BID
ROBERT J. TELFER III
Administrative Law Judge
DOAH Tallahassee Office

Division of Administrative Hearings
1230 Apalachee Parkway
Tallahassee, Florida 32301-3060
(850) 488-9675
www.doah.state.fl.us

Filed with the Clerk of the
Division of Administrative Hearings
this 9th day of June, 2025.

COPIES FURNISHED:

Lindsay K. Ervin, Esquire
(eServed)

Louise Wilhite-St Laurent, Esquire
(eServed)

Mallory Neumann, Esquire
(eServed)

Sydney Herring, Esquire
(eServed)

Brad Herter, Agency Clerk
(eServed)

Kim Kellum, Esquire
(eServed)

Andrew T. Sheeran, General Counsel
(eServed)

Joseph M. Helton, Jr., Esquire
(eServed)

Robert H. Hosay, Esquire
(eServed)

Kevin A. Reck, Esquire
(eServed)

Derek E. Bruce, Esquire
(eServed)

Shevaun Harris, Secretary
(eServed)

Glenn Rininger, Esquire
(eServed)

Thomas Hoeler, Esquire
(eServed)

NOTICE OF RIGHT TO SUBMIT EXCEPTIONS

All parties have the right to submit written exceptions within 10 days from the date of this Recommended Order. Any exceptions to this Recommended Order should be filed with the agency that will issue the Final Order in this case.