## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

**AUDACIOUS INQUIRY LLC**

and

**COLLECTIVE MEDICAL
TECHNOLOGIES, INC**.

       Plaintiffs,

    v.

**CHESAPEAKE REGIONAL
INFORMATION SYSTEM FOR OUR
PATIENTS**

and

**CRISP, INC. SHARED SERVICES AND
AFFILIATES**

       Defendants.

Civil Action No. 1:25-CV-02264-JRR

**PLAINTIFFS AUDACIOUS INQUIRY LLC'S AND COLLECTIVE MEDICAL
TECHNOLOGIES, INC.'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

## <u>TABLE OF CONTENTS</u>

**INTRODUCTION** ................................................................................................. 1

**FACTUAL BACKGROUND** ................................................................................ 2

**LEGAL STANDARD** .......................................................................................... 4

**ARGUMENT** ....................................................................................................... 5

**I.   Assignor Estoppel Bars Defendants From Challenging Validity of the '962 and '475 Patents, or At Minimum, There is a Fact Dispute on Whether Estoppel Applies** ...... 5

    A.   Assignor Estoppel Bars Defendants' Validity Challenge Against the '962 and '475 Patents ............................................................................................... 5

    B.   Defendants Cannot Evade Assignor Estoppel on Their Motion to Dismiss ........... 7

        1.   Defendants' "joint ownership" argument is baseless ...................................... 8

        2.   The exception for later-issuing patent claims that materially broaden post-assignment is inapplicable here ............................................................... 10

        3.   No "change in law" exception to estoppel applies here ................................ 11

**II.   The Asserted Patents Cover Patentable Subject Matter** ................................. 14

    A.   Legal Standard for Patentable Subject Matter Under Section 101 ...................... 14

    B.   The Asserted Claims of the '194 Patent Are Patent Eligible .............................. 14

        1.   The '194 Patent File History and *Alice* Step One .......................................... 14

        2.   *Alice* Step Two ............................................................................................ 17

    C.   The '962 and '475 Patents Cover Patentable Subject Matter ............................. 20

        1.   *Alice* Step One ............................................................................................. 21

        2.   *Alice* Step Two ............................................................................................. 23

**III.   The Amended Complaint States a Claim for Unfair Competition** ............................. 25

    A.   The Amended Complaint Plausibly Alleges That Defendants Have Engaged in Acts That Rise to the Level of Unfair Competition .............................. 26

    B.   Plaintiffs' Unfair Competition Claim is Not Preempted ..................................... 29

**CONCLUSION** .................................................................................................. 30

# <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                                        **Page(s)**

*10x Genomics, Inc. v. Vizgen, Inc.*,
   654 F. Supp. 3d 310 (D. Del. 2023).................................................................30

*Aarow Elec. Sols. v. Tricore Sys., LLC*,
   693 F. Supp. 3d 525 (D. Md. 2023)..................................................................25

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*,
   573 U.S. 208 (2014)............................................................................... *passim*

*Aloi v. Moroso Inv. Partners, LLC*,
   No. 11-cv-2591, 2012 WL 4341741 (D. Md. Sept. 20, 2012)..................................9

*Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*,
   841 F.3d 1288 (Fed. Cir. 2016)........................................................... *passim*

*Balt. Bedding Corp. v. Moses*,
   182 Md. 229 (D. Md. 1943)..........................................................................25

*BearBox, LLC v. Lancium LLC*,
   125 F.4th 1101 (Fed Cir. 2025) .....................................................................29

*Berkheimer v. HP Inc.*,
   881 F.3d 1360 (Fed. Cir. 2018)......................................................................14

*Mortgage Grader, Inc. v. Costco Wholesale Corp.*,
   No. 13-cv-43, 2014 WL 10763261 (C. D. Cal. Oct. 27, 2014) ..............................13

*Bosiger v. U.S. Airways, Inc.*,
   510 F.3d 442 (4th Cir. 2007) ...........................................................................8

*Bot M8 LLC v. Sony Corp. of Am.*,
   4 F.4th 1342 (Fed. Cir. 2021) .......................................................................22

*CareDx, Inc. v. Natera, Inc.*,
   40 F.4th 1371 (Fed. Cir. 2022) .....................................................................21

*CLS Bank Int'l. v. Alice Corp. Pty. Ltd.*,
   717 F.3d 1269 (Fed. Cir. 2013)......................................................................12

*Contour IP Holdings LLC v. GoPro, Inc.*,
   113 F.4th 1373 (Fed. Cir. 2024) ...................................................................17

*Convatec, Inc. v. HR Pharms., Inc.*,
   No. 24-cv-1248, 2025 WL 1859228 (D. Del. June 10, 2025) ...............................30

*Corbitt v. Balt. City Police Dep't*,
    675 F. Supp. 3d 578 (D. Md. 2023) ................................................................28

*Davidson v. Sarnova, Inc.*,
    No. 27-cv-1067, 2017 WL 5564654 (D. Md. Nov. 20, 2017) .................................27

*Desktop Alert, Inc. v. Alertus Techs, LLC*,
    No. 22-cv-3337, 2024 WL 3819123 (D. Md. Aug. 14, 2024) ....................19, 20, 21

*Diamond v. Diehr*,
    450 U.S. 175 (1981) .......................................................................................14

*Dow Chem. Co. v. Exxon Corp.*,
    139 F.3d 1470 (Fed. Cir. 1998) ..................................................................29, 30

*E.I. du Pont de Nemours & Co. v. Kolon Indus. Inc.*,
    637 F.3d 435 (4th Cir. 2011) ..........................................................................4

*Eclipse IP LLC v. McKinley Equip. Corp.*,
    No. 14-cv-154, 2014 WL 4407592 (C.D. Cal. Sept. 4, 2014) .........................13

*Electric Power Grp., LLC v. Alstom S.A.*,
    830 F.3d 1350 (Fed. Cir. 2016) ..................................................................15, 17

*Enfish LLC v. Microsoft Corp.*,
    822 F.3d 1327 (Fed. Cir. 2016) ..............................................................14, 16, 17

*Ericsson Inc. v. TCL Commc'n Tech. Holdings Ltd.*,
    955 F.3d 1317 (Fed. Cir. 2020) ....................................................................23

*Extreme Tech., LLC v. Stabil Drill Specialties, LLC*,
    No. 19-cv-1977, 2023 WL 5613414 (S.D. Tex. July 5, 2023) .........................5

*Farm Fresh Direct Direct By a Cut Above, LLC v. Downey*,
    No. 17-cv-1760, 2017 WL 4865481 (D. Md. Oct. 26, 2017) .........................25, 26

*G. W. Aru, LLC v. W. R. Grace & Co.-Conn.*,
    344 F.R.D. 446 (D. Md. 2023) ......................................................................25

*In re Gale*,
    856 F.App'x 887 (Fed. Cir. 2021) ................................................................22

*Hinks v. Board of Educ. of Hartford Cnty.*,
    No. 09-cv-1672, 2010 WL 5087598 (D. Md. Dec. 7, 2010) .........................30

*iLifeTechs., Inc. v. Nintendo of Am. Inc.*,
    839 F. App'x 534 (Fed. Cir. 2021) ..............................................................21, 22

*Impact Applications, Inc. v. Concussion Mgmt., LLC*,
   19-cv-3108, 2021 WL 978823 (D. Md. Mar. 16, 2021) .................................................28, 29

*Inventor Holdings, LLC v. Bed Bath & Beyond, Inc.*,
   876 F.3d 1372 (Fed. Cir. 2017) .................................................................................13

*James v. j2 Cloud Servs., LLC*,
   887 F.3d 1368 (Fed. Cir. 2018) ...................................................................................9

*JDS Techs., Inc. v. Exacq Techs.*,
   No. 15-cv-10387, 2016 WL 3165724 (E.D. Mich. June 7, 2016) ..........................13

*Jerrold Stephens Co. v. Alladin Plastics, Inc.*,
   229 F. Supp. 536 (S.D. Cal. 1964)...............................................................................30

*Knova Software, Inc. v. Inquira, Inc.*,
   No. 06-cv-381, 2007 WL 1232186 (D. Del. Apr. 27, 2007) ..................................30

*Lowry's Reports, Inc. v. Legg Mason, Inc.*,
   271 F. Supp. 2d 737 (D. Md. 2003) ...........................................................................26

*Malibu Media, LLC v. Doe*,
   No. 13-cv-365, 2014 WL 7188822 (D. Md. Dec. 16, 2014) ..................................27

*Mayo Collaborative Servs. v. Prometheus Lab'ys, Inc.*,
   566 U.S. 66 (2012).................................................................................................12, 13

*McRO, Inc. v. Bandai Namco Games Am. Inc.*,
   837 F.3d 1299 (Fed. Cir. 2016) .................................................................................14

*MedServ Int'l, Inc. v. Rooney*,
   No. 05-cv-3173, 2006 WL 8457075 (D. Md. June 28, 2006)................................26

*Mentor Graphics Corp. v. Quickturn Design Sys., Inc.*,
   150 F.3d 1374 (Fed. Cir. 1998)..............................................................................7, 10

*MicroStrategy Inc. v. Aptus Corp.*,
   118 F. Supp. 3d 888 (E.D. Va. 2015) ......................................................................13

*Minerva Surgical, Inc. v. Hologic, Inc.*,
   594 U.S. 559 (2021)........................................................................................... *passim*

*Monterey Mushrooms, Inc. v. HealthCare Strat., Inc.*,
   No. 20-cv-3061, 2021 WL 1909592 (D. Md. May 12, 2021)................................27

*Mortgage Grader, Inc. v. First Choice Loan Servs., Inc.*,
   811 F.3d 1314 (Fed. Cir. 2016).................................................................................13

*Murj, Inc. v. Rhythm Mgmt. Grp., LLC,*
  622 F.Supp. 3d 109 (D. Md. 2022) ................................................................17

*Nagle Indus., Inc. v. Ford Motor Co.,*
  173 F.R.D. 448 (E.D. Mich. 1997) ................................................................30

*Neonatal Prod. Grp., Inc. v. Shields,*
  276 F. Supp. 3d 1120 (D. Kan. 2017) ...........................................................30

*Paccar Inc. v. Elliot Wilson Capitol Trucks LLC,*
  905 F. Supp. 2d 675 (D. Md. 2012) ..............................................................25

*Philips N.A. LLC v. Hayes,*
  No. 20-cv-1409, 2020 WL 5407796 (D. Md. Sept. 9, 2020) ..........................4

*Phreesia, Inc. v. Certify Glob., Inc.,*
  No. 21-cv-678, 2022 WL 911207 (D. Md. Mar. 29, 2022) ......................25, 27

*Q.G. Prods., Inc. v. Shorty, Inc.,*
  992 F.2d 1211 (Fed. Cir. 1993) .....................................................................10

*Rivers v. Roadway Exp., Inc.,*
  511 U.S. 298 (1994) ......................................................................................12

*Rodime PLC v. Seagate Tech., Inc.,*
  174 F.3d 1294 (Fed. Cir. 1999) .....................................................................29

*U.S. ex rel. Sheldon v. Forest Lab'ys, LLC,*
  754 F. Supp. 3d 615 (D. Md. 2024) ..............................................................28

*Sirius Fed., LLC v. Jelen,*
  No. 22-cv-223, 2023 WL 2213929 (D. Md. Feb. 24, 2023) ..........................28

*Sorias v. Nat'l Cellular USA, Inc.,*
  124 F. Supp. 3d 244 (E.D.N.Y. 2015) ...........................................................30

*SRI Int'l, Inc., v. Cisco Systems, Inc.,*
  930 F.3d 1295 (Fed. Cir. 2019) .....................................................................14

*Swierkiewicz v. Sorema N.A.,*
  534 U.S. 506 (2002) ........................................................................................4

*In re TLI Commc'ns LLC v. Patent Litig.,*
  87 F. Supp. 3d 773 (E.D. Va. 2015) ..............................................................13

*Two-Way Media Ltd. v. Comcast Cable Comms.,*
  874 F.3d 1329 (Fed. Cir. 2017) .....................................................................22

*Veto Pro Pac, LLC v. Custom Leathercraft Mfg. Co.*,
    No. 08-cv-302, 2009 WL 276369 (D. Conn. Feb. 5, 2009)....................................................30

*Victor Stanley, Inc. v. Creative Pipe, Inc.*,
    No. 06-cv-2662, 2007 WL 9896432 (D. Md. Apr. 30, 2007)...................................................27

*Vivimetrix, LLC v. Monument Traders All., LLC*,
    No. 24-cv-3046, 2025 WL 744079 (D. Md. Mar. 7, 2025) .......................................................26

*Whiting-Turner Cont. Co. v. Liberty Mut. Ins. Co.*,
    912 F. Supp. 2d 321 (D. Md. 2012) .............................................................................................4

*Yellow Cab Co. v. Uber Techs., Inc.*,
    No. 14-cv-2764, 2015 WL 4987653 (D. Md. Aug. 19, 2015)................................................25

*Zak v. Chelsea Therapeutics Int'l, Ltd.*,
    780 F.3d 597 (4th Cir. 2015) ....................................................................................................29

**Statutes**

35 U.S.C. § 101..............................................................................................................12, 13, 14, 17

**Other Authorities**

Fed. R. Civ. P. 12(b)(6)..............................................................................................................4, 26

Fed. R. Civ. P. 15(a)(2)...................................................................................................................30

## TABLE OF ABBREVIATIONS

| Abbreviation | Full Name |
|---|---|
| '194 patent | U.S. Patent No. 11,114,194 |
| '475 patent | U.S. Patent No. 12,047,475 |
| '962 patent | U.S. Patent No. 10,938,962 |
| '137 application | U.S. Patent Application No. 15/911,137 |
| '225 application | U.S. Patent Application No. 14/189,225 |
| '332 application | U.S. Patent Application No. 13/844,332 |
| '358 application | U.S. Patent Application No. 17/190,358 |
| '625 application | U.S. Patent Application No. 14/142,625 |
| '887 application | U.S. Patent Application No. 15/808,887 |
| AHCA | Florida Agency for Healthcare Administration |
| Asserted Patents | '194 patent, '475 patent, and '962 patent |
| Audacious | Audacious Inquiry LLC |
| CEND | CRISP Event Notification Delivery |
| CRISP | Chesapeake Regional Information System |
| D.I. | Docket Index |
| DOAH | Florida Department of Administrative Hearings |
| ENS | Event Notification Services |
| HIE | Health Information Exchange |
| MSA | Master Services Agreement |

# INTRODUCTION

This case concerns complicated and inventive computer software (known as ENS) that automatically notifies a patient's care team when a patient seeks medical care. But the fact pattern that led to this case is not novel. Audacious and CRISP had a cooperative business relationship for over a decade. Audacious provided consulting services to CRISP, which by agreement owned any work product generated while performing such services, including the intellectual property which led to the patented ENS technology. After CRISP deployed a HIE in Maryland that used the patented ENS technology, Audacious purchased the intellectual property from CRISP so that it could provide ENS services throughout the country. CRISP licensed the ENS technology for many years before abruptly terminating its license in 2024 and launching a directly competing service. Not satisfied with merely copying Audacious's patented technology, CRISP has resorted to making false and misleading statements to take Plaintiffs' business.

Defendants argue that the patent claims should be dismissed because all 56 claims in the three Asserted Patents allegedly cover non-patentable subject matter. They do not contest the sufficiency of Plaintiffs' patent infringement allegations. Indeed, in trying to justify why CRISP ceased offering its ENS services to its customers, Defendants do not even try to argue that CRISP developed a competitor ENS service that works in a different, non-infringing way. Defendants cannot excuse their copying with a misguided effort to challenge the Asserted Patents.

To start, as to the '962 patent and the '475 patent, this Court has no occasion even to evaluate whether the patents cover patentable subject matter. Because CRISP sold the patent applications resulting in the '962 and '475 patents, assignor estoppel precludes Defendants from now arguing that these patents are invalid. Contrary to Plaintiffs' arguments, which repeatedly rely on disputed facts outside the pleadings, no exception to assignor estoppel applies.

In any event, the Asserted Patents cover patentable subject matter at least for the reasons discussed in the Federal Circuit's opinion in *Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, 841 F.3d 1288 (Fed. Cir. 2016). The asserted claims include specific technical solutions that improve the functioning of computers. None of the arguments put forward meaningfully engage with this improvement or provide any reason to doubt validity. Indeed, as to the '194 patent, for example, Defendants recycle nearly all of the same arguments that were presented *and eventually withdrawn* by the Examiner during patent prosecution. At minimum, the Court should deny the motion to dismiss to permit the parties to develop expert testimony on the state of the art as of the invention and whether the claims themselves require a technological solution to achieve the claimed output.

Finally, the Amended Complaint plausibly alleges that Defendants committed unfair competition under Maryland law by, *inter alia*, (i) misusing its license to Plaintiffs' ENS technology to siphon off Plaintiffs' customers, (ii) misrepresenting the capabilities of the software it launched to directly compete with Plaintiffs, and (iii) injuring Plaintiffs through their actions.

Plaintiffs brought this Action to halt the unauthorized and unlawful exploitation of their patented innovations by Defendants, and to put an end to Defendants' deceptive and unfair acts. Defendants' motion should be denied.

## FACTUAL BACKGROUND

Audacious, is a leader in providing critical software to HIEs, which share patient health information electronically between different healthcare providers. D.I. 24 ¶ 4. The Asserted Patents cover technical solutions that facilitate the exchange of patient health information between health care institutions, payors, and other interested parties. *Id.* ¶ 4.

Audacious's ENS software, and the patents that cover the technology, arose from a collaboration with Defendant CRISP, a Maryland HIE. *Id.* ¶¶ 61-62. In 2009, the parties signed

a MSA wherein Audacious would provide services to CRISP. *Id.* ¶ 61. Under the MSA, executed by David Horrocks (the founder and then President of CRISP), any discoveries made during development were to be solely owned by CRISP. *Id.* Audacious and CRISP developed the ENS technology, with CRISP as the sole owner. *Id.* ¶¶ 61-62. The ENS system facilitates the exchange of health care information and alerts a patient's care team when the patient is admitted to a hospital, transferred to another facility, or discharged. *Id.* ¶ 5.

In February 2013, the parties amended the MSA to permit Audacious to sublicense the ENS technology in certain territories. *Id*. ¶ 63. In April 2014, Audacious paid to acquire all rights to the ENS technology from CRISP. *Id.* ¶ 77. By agreement, CRISP assigned all ownership rights to Audacious for the software, hardware, and documentation developed for CRISP by Audacious, as well as all patent rights to the technology, including any future improvements. *Id.* ¶¶ 77-80. CRISP also agreed to assist Audacious in the acquisition and enforcement of the ENS patents. *Id.* ¶ 81. CRISP received a limited license to practice the intellectual property. *Id.* ¶ 82.

Between 2013 and 2024, CRISP renewed its license to the ENS technology at least three times. *Id.* ¶ 100. And between 2014 and 2018, Mr. Horrocks executed an oath and agreement at least three times assigning all his rights, titles, and interests to the intellectual property to Audacious and agreeing that he would "do everything possible to aid [Audacious], its successors, assigns, and nominees to obtain and enforce proper patent protection for the invention and its improvements in all countries" whose validity he would not challenge. *Id.* ¶¶ 83, 86-87.

In May 2024, CRISP notified Audacious that it would not renew its license. *Id.* ¶ 103. Almost immediately thereafter, CRISP launched a copycat product called CEND and began competing directly with Plaintiffs. *Id.* ¶ 8. CRISP also redirected existing customers from ENS to CEND. *Id.* ¶ 8, 106. And CRISP engaged in other unfair acts, misrepresenting the capabilities

of CEND to steal business away from Plaintiffs. *Id.* ¶ 107. For example, before CRISP launched its competing CEND system, Audacious had a contract with a Florida agency, the AHCA, to provide services using ENS. *Id.* ¶ 108. On or around May 6, 2024, with the impending expiration of the current contract to use ENS, AHCA issued an invitation to negotiate procurement. *Id.* Audacious, along with Defendant CSS and others, submitted replies to the AHCA. *Id.* Upon information and belief, CSS falsely represented to the AHCA that its CEND system is a fully integrated, productized, solution that includes all of the same features and functionalities of ENS, when in fact CEND lacks all such features and functions. *Id.* ¶ 109. CSS also misrepresented the number of notifications that have been sent from CEND. *Id.* ¶ 110. These and other misrepresentations led the AHCA to award the contract to CSS over Audacious. *Id.* ¶¶ 116-118.

## LEGAL STANDARD

This Court's task in reviewing the sufficiency of claims under Fed. R. Civ. P. 12(b)(6) is limited. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Id.* (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)). Assessment of a party's factual allegations turns on whether sufficient notice has been given to defendants concerning the factual and legal bases for the claims against them. *Philips N.A. LLC v. Hayes*, No. 20-cv-1409, 2020 WL 5407796, at *4 (D. Md. Sept. 9, 2020). This Court "must accept as true all of the factual allegations contained in the complaint" and must "draw all reasonable inferences [from those facts] in favor of the plaintiff." *E.I. du Pont de Nemours & Co. v. Kolon Indus. Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted). "[A] court is not to consider matters outside the pleadings or resolve factual dispute when ruling a motion to dismiss." *Whiting-Turner Cont. Co. v. Liberty Mut. Ins. Co.*, 912 F. Supp. 2d 321, 332 (D. Md. 2012) (citation omitted).

## ARGUMENT

**I.    Assignor Estoppel Bars Defendants From Challenging Validity of the '962 and '475 Patents, or At Minimum, There is a Fact Dispute on Whether Estoppel Applies**

As the Supreme Court recently reaffirmed, the "'well-settled' patent-law doctrine" of assignor estoppel limits one's "ability to assign a patent to another for value and later contend in litigation that the patent is invalid." *Minerva Surgical, Inc. v. Hologic, Inc.*, 594 U.S. 559, 563 (2021). Assignor estoppel is squarely applicable here, and it prevents Defendants from raising an invalidity defense to infringement of the '962 and '475 patents. *See* D.I. 24 ¶¶ 58-104.

Defendants' attempts to evade assignor estoppel are baseless, particularly on a motion to dismiss. Indeed, Defendants repeatedly rely on factual assertions about patent ownership and claim scope that are outside—and contradicted by—the pleadings. *See infra* § II.B. Defendants thus provide no grounds for circumventing assignor estoppel at this early stage.

### A.    Assignor Estoppel Bars Defendants' Validity Challenge Against the '962 and '475 Patents

In reaffirming assignor estoppel, the Supreme Court recently explained it is "rooted in an idea of fair dealing" and "limits an inventor's ability to assign a patent to another for value and later contend in litigation that the patent is invalid." *Minerva*, 594 U.S. at 563. An assignment conveys an "explicit or 'implicit representation'" that the patent he is assigning is 'not worthless,'" which deprives the assignor "of the ability to challenge later the patent's validity." *Id.* (quoting *Diamond Sci. Co. v. Ambico, Inc.*, 848 F.2d 1220, 1224 (Fed. Cir. 1988) (brackets omitted)). Simply put, "'the assignor can not be heard to question' the assignee's rights in what was conveyed." *Id.* (quoting *Westinghouse Elec. & Mfg. Co. v. Formica Insulation Co.*, 266 U.S. 342, 349 (1924)). This rule also applies in cases in which "an inventor assigns a patent application." *Id.* at 577; *see also Extreme Tech., LLC v. Stabil Drill Specialties, LLC*, No. 19-cv-1977, 2023 WL 5613414, at *5-8 (S.D. Tex. July 5, 2023) (applying estoppel based on assignment of patent

applications). In that context, the relevant question is whether there is "inconsistency" in the assignor's positions. *Minerva*, 495 U.S. at 577. Estoppel does not apply to issued claims that are "materially broader than the old claims" from the assigned application, but the doctrine extends to whatever the assignor expressly or implicitly "represented in assigning the patent application." *Id.*

Applying these principles, Defendants' attempt to challenge the validity of the '962 and '475 patents is barred because of the implicit and explicit representations of validity made by CRISP and its officers. Audacious acquired both patents by virtue of assignments for value of the underlying patent applications by Defendants and those in privity with Defendants. Under the MSA, all discoveries made while Audacious performed services for CRISP would be owned by CRISP. D.I. 24 ¶¶ 61-62. Thus, when the initial patent applications for the ENS technology were filed (the '332 application, the '625 application, and the '225 application), those applications were "owned by CRISP." *Id.* ¶¶ 65, 69, 73.[1] Then, in April 2014, Audacious and CRISP executed an agreement for Audacious to purchase ENS, including the "ENS IP." *Id.* ¶¶ 77. That ENS Acquisition Agreement (signed by Mr. Horrocks[2]), conveyed CRISP's rights in the '332, '625, and '225 applications to Audacious, any patents issuing from those applications, along with other ideas and potential improvements related to ENS. *Id.* ¶¶ 77, 79. The '962 and '475 patents issued from those assigned applications, with claims that are *narrower* than the original claims in the assigned applications. *Id.* ¶¶ 94-99. The Agreement also directed that CRISP and its officer/employees would assign all inventor rights in the ENS IP to Audacious, and that CRISP would assist Audacious with enforcement of the IP. *Id.* ¶¶ 80-81. In 2018, Mr. Horrocks, as an

---

[1] As noted on the face of each patent, the '962 and '475 patents claim priority to the '887 application. D.I. 24, Ex. 1, Ex. 3. The '887 application claims priority to the '332, '625, and '225 applications. *See, e.g.*, D.I. 24, Ex. 1 at 1-2.

[2] Incredibly, Defendants claim that Mr. Horrocks was "not an employee of CRISP," D.I. 28-1 at 2 n.1, despite the fact that he was President of CRISP and a founder. D.I. 28-1, Ex. F, Ex. O.

officer of CRISP, assigned additional related ENS patent applications to Audacious, including the '887 application, for which he was named as an inventor. *Id.* ¶¶ 86-93.

Thus, the '962 and '475 patents in the ENS technology are "ENS IP" that Audacious purchased from CRISP, and which CRISP and its founder/President, Mr. Horrocks, represented have value as patentable subject matter. Assignor estoppel exists to prevent what CRISP attempts here. CRISP seeks "to profit doubly": it secured "the price of assigning" the IP rights that issued in the '962 and '475 patents yet it now asserts "the continued right to use the invention" for free by insisting the subject-matter is not patent eligible. *Minerva*, 594 U.S. at 575. Basic "fair dealing" precludes CRISP from taking that inconsistent position, *id.* at 563, after it sold the patent rights for value and pledged to assist with enforcement. Defendant CSS, as a wholly owned subsidiary of CRISP, D.I. 24 ¶ 17, is likewise estopped. *See, e.g., Mentor Graphics Corp. v. Quickturn Design Sys., Inc.*, 150 F.3d 1374, 1379 (Fed. Cir. 1998) (applying assignor estoppel to the subsidiary of the assignor acquired post-assignment, and recognizing that "[a]ssignor estoppel also prevents parties in privity with an estopped assignor from challenging the validity of the patent").[3]

## B. Defendants Cannot Evade Assignor Estoppel on Their Motion to Dismiss

Defendants try to justify their challenge to the validity of patent rights they sold, but none of their arguments provides any basis for side-stepping assignor estoppel, particularly at the pleading stage. As a threshold matter, Defendants arguments are replete with factual assertions that go outside—and repeatedly contradict—the Amended Complaint. For example, Defendants deny that the MSA granted IP rights in discoveries to CRISP, and then accuse Audacious of "misstating" the date of execution for the ENS Acquisition Agreement. D.I. 28-1 at 20-21 & n.8.

---

[3] For this reason, the fact that CSS "was founded years after the ENS Acquisition Agreement was executed," D.I. 28-1 at 20 n.8, is a legally irrelevant distraction.

Defendants' factual assertions are wrong,[4] and, more fundamentally, are inappropriate for consideration on a motion to dismiss. *See Bosiger v. U.S. Airways, Inc.*, 510 F.3d 442, 450 (4th Cir. 2007). Accepting the well-pled facts as true, Defendants cannot avoid assignor estoppel.

### 1.    Defendants' "joint ownership" argument is baseless

Defendants first contend that "[t]he current situation . . . does not implicate the concerns over fair dealing" underlying assignor estoppel because Audacious supposedly had ownership rights independent of the assignments by CRISP and its founder/President, Mr. Horrocks. D.I. 28-1 at 20-21. Defendants offer *no* case law support for their novel "joint owner" exception to assignor estoppel, and there is no basis to credit it here.

To start, Defendants' argument relies on factual premises that contradict the well-pled facts of the Amended Complaint. Defendants point to assignments of patent rights from Audacious employees to Audacious, *id.* at 20-21, but no such assignments could have been in effect but-for the ENS Acquisition Agreement, in which Audacious purchased the ENS IP rights from CRISP. Prior to that agreement, the relationship between Audacious and CRISP was governed by the MSA, under which CRISP owned any "discoveries" arising from the services that Audacious (and Audacious's employees) provided to CRISP. D.I. 24 ¶ 61. Audacious then purchased the rights to those discoveries—and the resulting patent applications and patents—from CRISP in the ENS

---

[4] Defendants assume that a date at the top of the ENS Acquisition Agreement (December 9, 2013) is the agreement execution date. *See* D.I. 28-1 at 20 n.8 (citing D.I. 28-1, Ex. F). But that is facially implausible, since the agreement identifies patent applications by number that were filed *after* December 9, 2013. *Compare* D.I. 28-1, Ex. F at 2 (referencing, *inter alia*, the '625 and '225 applications), *with* D.I. 24 ¶¶ 68, 72 (providing filing dates for those applications). Moreover, the agreement specifies that the assignment would become effective "[u]pon CRISP's receipt of the Acquisition Price," D.I. 28-1, Ex. F at 1, and there is no indication on the face of the document when that occurred. Similarly, as discussed below, Defendants' reading of the MSA as silent regarding IP ownership defies the Agreement's plain language and contradicts the parties' contemporaneous understanding. *See infra* § I.B.1.

Acquisition Agreement.  *Id.* ¶¶ 77, 79.  In other words, CRISP sold rights to the '962 and '475 patents to Audacious that Audacious would not have held absent the ENS Acquisition Agreement.

Defendants resist that conclusion by arguing that the MSA did not allocate invention rights to CRISP, but rather addressed only ownership of "work product and deliverables."  D.I. 28-1 at 21 (quoting D.I. 28-1, Ex. O at 4 (§8.2)).  But Defendants ignore that the MSA defined "Work Product" broadly to include "discoveries."  *See* D.I. 28-1, Ex. O at 4 (§8.2).  The contemporaneous understanding of the parties confirms that "Work Product" included potential inventions:  the ENS Acquisition Agreement presupposes that Audacious was buying IP rights in the ENS technology that previously belonged to CRISP.  *See* D.I. 24 ¶¶ 63, 77, 79.  At a minimum, CRISP's contrary reading cannot be credited on a motion to dismiss.[5]  *See Aloi v. Moroso Inv. Partners, LLC*, No. 11-cv-2591, 2012 WL 4341741, at *9 (D. Md. Sept. 20, 2012) ("'The construction of a contract is a question of fact which, if disputed, is not susceptible of resolution under a motion to dismiss for failure to state a claim.'") (quoting *Wolman v. Tose*, 467 F.2d 29, 34 (4th Cir. 1972)).

In any event, even if there were a factual basis for characterizing Audacious as a joint owner of the patents, that still would not justify precluding application of assignor estoppel.  As the Supreme Court explained in *Minerva*, the doctrine is "grounded" "in a principle of fairness," establishing that when one "lawfully conveys to another a patented right," "fair dealing should prevent him from derogating from the title he has assigned."  594 U.S. at 568-569 (quotation marks and citation omitted).  In other words, the doctrine prevents an assignor from trying "to profit doubly" by "saying one thing" at the time of an assignment for value "and then saying another" in

---

[5] *James v. j2 Cloud Servs., LLC*, 887 F.3d 1368, 1374-75 (Fed. Cir. 2018), cited by Defendants (D.I. 28-1 at 21) makes clear that a dispute over interpretation of an agreement should not be resolved at the pleading stage.  *Id.* at 1375 ("[W]e conclude that the SDA can, and therefore at the present stage of this case must, be construed in Mr. James's favor.").

litigation.  *Id.* at 575; *see also Mentor Graphics*, 150 F.3d at 1377 (explaining that the doctrine "prevents the unfairness and injustice of permitting a party to sell something and later to assert that what was sold is worthless" (quotation marks omitted)).  Nothing in that fair-dealing rationale depends on the identity of the assignee.  And contrary to Defendants' arguments, *see* D.I. 28-1 at 21, assignor estoppel has never turned on proof of an assignee's reliance on the assignor's representations or the assignee's relative sophistication regarding the patent.  *See, e.g.*, *Q.G. Prods., Inc. v. Shorty, Inc.*, 992 F.2d 1211, 1212 (Fed. Cir. 1993) (applying assignor estoppel in case where assignment had the effect of reversing a previous assignment and reverting ownership to the inventor).  Thus, the alleged facts do implicate fair-dealing concerns as CRISP sold inventions to Audacious that CRISP now argues are unpatentable and worthless.

### 2. The exception for later-issuing patent claims that materially broaden post-assignment is inapplicable here

Defendants next contend that assignor estoppel does not apply because the "final scope" of the claims of the Asserted Patents was "unknown at the time of the assignment."  D.I. 28-1 at 21-23.  But the Supreme Court in *Minerva* recognized that estoppel may apply to the assignment of patent applications and other "inchoate" rights that are "less certainly defined than that of a granted patent."  594 U.S. at 577 (quoting *Westinghouse*, 266 U.S. at 353-353).  The legal principle is based on a duty of "consistency."  *Id.* at 576.  If a patent issues with "new claims" that are "materially broader" than contemplated at assignment, then estoppel does not apply "because there is no inconsistency" between the representation as of the assignment and a later invalidity challenge.  *Id.* at 576.  But absent such post-assignment broadening of claim scope, estoppel applies.  *See id.* at 578 (remanding for a determination of whether the new claim was "materially broader," since "[r]esolution of that issue" would "determine whether assignor estoppel applies").

Here, David Horrocks, pursuant to the ENS Acquisition Agreement and as an officer of

CRISP, assigned the '137, '358, and '887 applications to Audacious for value. D.I. 24 ¶¶ 86-87, 90. The final claims that issued in the '962 and the '475 patents "are narrower" than the claims in any of those assigned applications. *Id.* ¶¶ 94-99. Estoppel should accordingly apply: Defendants' invalidity arguments here contradict the representation conveyed by assignment of the underlying applications. *See Minerva*, 594 U.S. at 577.

Resisting that conclusion, Defendants assert that the Court should disregard the assignments by Mr. Horrocks because he was "preemptively obligated" to assign any patent applications, which they suggest undercuts an implicit representation of validity. D.I. 28-1 at 22. Defendants ignore that the assignments themselves include *express* representations of validity with pledges to refrain from "acting in any manner that may support an invalidity challenge." D.I. 28-1, Ex. H at 5; Ex. I at 5; *see supra* § I.A. Moreover, as Defendants acknowledge, D.I. 28-1 at 21-22, these 2018 patent applications claim priority to the originally filed '332, '625, and '225 applications, which were drafted and filed *before* the initial assignment by CRISP in the ENS Acquisition Agreement. *See* D.I. 24 ¶¶ 64-83. Defendants insinuate that because the '962 patent and '475 patents are continuations-in-part to the applications sold to Audacious in 2014, there must have been material changes to broaden those original applications, and, therefore, that CRISP's representations of validity did not carry forward to the issued claims. *See* D.I. 28-1 at 21-22. But Defendants provide no evidence to suggest the claims were broadened in any material respect or that any other changes were made during prosecution that created grounds for invalidity that did not exist at the time of the assignments. Defendants' vague arguments on this point only underscore why there is no basis for overcoming estoppel on a motion to dismiss.

### 3.    No "change in law" exception to estoppel applies here

Finally, Defendants contend that there was a "change in law" after certain of the relevant assignments based on the Supreme Court's June 2014 decision in *Alice Corp. Pty. Ltd. v. CLS*

*Bank Int'l*, 573 U.S. 208 (2014).  D.I. 28-1 at 23-24.  Defendants thus seek to invoke *Minerva*'s observation that estoppel may not apply "when a later legal development renders irrelevant the warranty given at the time of assignment."  594 U.S. at 577.  Defendants concede that this argument does not apply to the assignments executed by Mr. Horrocks in 2018; for those assignments, they rely solely on other arguments in opposition to estoppel.  *See* D.I. 28-1 at 23 n.11.  Because those other arguments lack merit for the reasons discussed above, *see supra* § I.B.2, Defendants' "change in law" exception does not get off the ground.

But even as to the assignments entered before June 2014, there was no intervening change in the governing law.  The Supreme Court in *Alice* interpreted a longstanding statute (Section 101 of the Patent Act), and the Supreme Court's "construction of a statute is an authoritative statement of what the statute meant before as well as after the decision of the case giving rise to that construction."  *Rivers v. Roadway Exp., Inc.*, 511 U.S. 298, 312-313 (1994).  In contrast to when Congress changes the legal regime for patents, "it is not accurate to say" a Supreme Court decision interpreting an existing statute "'changed' the law that previously prevailed."  *Id*. at 313 n.12.  That is especially true with respect to *Alice*, a unanimous decision that "affirm[ed]" the judgement from the *en banc* Federal Circuit holding that the software patents at issue were patent-ineligible as abstract ideas.  573 U.S. at 212.  Far from purporting to announce a change to "the governing law," *Minerva*, 594 U.S. at 576, the Court in *Alice* applied an existing two-step "framework" previously "set forth" by the Court in *Mayo Collaborative Servs. v. Prometheus Lab'ys, Inc.*, 566 U.S. 66 (2012).  *See Alice*, 573 U.S. at 217 (applying the *Mayo* framework).  The Supreme Court's 2012 *Mayo* decision predates all the CRISP assignments.  And the Federal Circuit applied the same reasoning in *Mayo* in its *en banc* decision in May 2013.  *See CLS Bank Int'l. v. Alice Corp. Pty.*

*Ltd.*, 717 F.3d 1269, 1282-83 (Fed. Cir. 2013).  So to the extent the law of Section 101 has changed, such change happened before the Supreme Court's *Alice* decision.

　　None of the decisions that Defendants cite discussing *Alice* supports a different conclusion. *See* D.I. 28-1 at 24.  Notably, several cited cases do not reference *Alice* as a "sea change" in isolation, *id.* at 23, but rather identify the decision as part of a series of significant Supreme Court decisions dating back to 2010.  *See MicroStrategy Inc. v. Aptus Corp.*, 118 F. Supp. 3d 888, 899 (E.D. Va. 2015) (describing evolution in Section 101 doctrine "since *Bilski [v. Kappos*, 561 U.S. 593 (2010)], *Mayo*, and *Alice*"); *In re TLI Commc'ns LLC v. Patent Litig.*, 87 F. Supp. 3d 773, 782 (E.D. Va. 2015) (identifying "*two* recent decisions"—*Mayo and Alice*—that "significantly altered the § 101 legal landscape" (emphasis added)).  One of the decisions Defendants cite even recognized "an argument can be made that *Alice* is a modest advance" since it built on earlier Section 101 precedents like *Bliski*.  *Mortgage Grader, Inc. v. Costco Wholesale Corp.*, No. 13-cv-43, 2014 WL 10763261, at *6-7 (C. D. Cal. Oct. 27, 2014).[6]  The fact that courts have characterized *Alice* as important enough to justify amending invalidity contentions, *see Mortgage Grader, Inc. v. First Choice Loan Servs., Inc.*, 811 F.3d 1314, 1321 (Fed. Cir. 2016), and recognized its significance "as applied to the facts of [a] particular case," *Inventor Holdings, LLC v. Bed Bath & Beyond, Inc.*, 876 F.3d 1372, 1379 (Fed. Cir. 2017), does not suggest the decision applying Section 101 represents the kind of fundamental legal change that relieves an assignor from estoppel.

*****

　　Defendants are estopped from challenging the validity of the '962 and '452 patents.  At a

---

[6] *See also JDS Techs., Inc. v. Exacq Techs.*, No. 15-cv-10387, 2016 WL 3165724, at *9 (E.D. Mich. June 7, 2016) (referring to *Alice's* "impact" but declining to invalidate a patent under *Alice*, and recognizing that *Alice* "relied on *Mayo*" on critical points); *Eclipse IP LLC v. McKinley Equip. Corp.*, No. 14-cv-154, 2014 WL 4407592, at *3 (C.D. Cal. Sept. 4, 2014) (referring to the "narrow holding" in *Alice*, and the Court's reliance on the *Mayo* framework).

minimum, Defendants cannot establish that estoppel is inapplicable based on the pleadings alone.

## II.    The Asserted Patents Cover Patentable Subject Matter

### A.    Legal Standard for Patentable Subject Matter Under Section 101

To decide whether an invention is patent eligible, a court must first "determine whether the claims at issue are directed to a patent-ineligible concept." *Alice*, 573 U.S. at 218.  At step one, the Court should consider whether the "focus of the claims is on [a] specific asserted improvement in computer capabilities . . . or, instead, on a process that qualifies as an 'abstract idea' for which computers are invoked merely as a tool." *Enfish LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335-36 (Fed. Cir. 2016).  Claims involving processes that cannot practically be performed in the human mind are not directed to abstract ideas.  *See, e.g.*, *SRI Int'l, Inc., v. Cisco Systems, Inc.*, 930 F.3d 1295, 1303 (Fed. Cir. 2019); *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1314 (Fed. Cir. 2016).  Courts have repeatedly cautioned against oversimplifying claims, which "if carried to its extreme, make[s] all inventions unpatentable." *Diamond v. Diehr*, 450 U.S. 175, 189 n.12 (1981).  Only if the claims fail step one does the court proceed to step two, where it must "consider the elements of each claim both individually and as an ordered combination" to determine whether the claims add an inventive concept that is sufficient to ensure the patent claims more than the abstract idea itself.  *Alice*, 573 U.S. at 217 (internal citations omitted).  The issue of "whether a claim element or combination of elements is well-understood, routine and conventional to a skilled artisan in the relevant field is a question of fact," which "must be proven by clear and convincing evidence." *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368 (Fed. Cir. 2018).

### B.    The Asserted Claims of the '194 Patent Are Patent Eligible

#### 1.    The '194 Patent File History and *Alice* Step One

The '194 patent has already faced and overcome a robust Section 101 challenge during prosecution for being directed to the abstract idea of "collecting information…, analyzing it…,

and displaying certain results of the collection and analysis." D.I. 24 ¶ 48, Ex. 4 at 5. Defendants

recycle the same argument and provide no justification for a different outcome.

Defendants try to analogize the claims of the '194 patent to those in *Electric Power Grp.,*

*LLC v. Alstom S.A.*, 830 F.3d 1350 (Fed. Cir. 2016), even though the Examiner considered that

case in issuing the patent. D.I. 24, Ex. 4 at 5. In response to the Examiner's rejection, the applicant

amended the claims to focus on the particular implementation of determining the readmission

notification through a comparison among specific HL7 ADTs within a certain timeframe. D.I. 24

¶ 48; Ex. 1 (Additional '194 File History) at 4-5. As explained by the applicant:

> [B]ecause the claims as amended recite particulars (comparison of HL7 ADTs
> separated by a timeframe for a same patient) of how to achieve a solution by a
> computer in a novel manner, they are distinguishable from *Electric Power Group*
> and other authorities finding blanket application claims - without specifics as to
> how the solution is achieved – unpatentable. . . . That is, exactly unlike *Electric*
> *Power Group*, **the claims here recite the solution in detail** – "determining-that a
> first HL7 ADT indicates admission of a patient at a first healthcare provider from
> the healthcare information within a readmission time threshold of an encounter
> indicated by a second HL7 ADT for the patient from the healthcare information" –
> i.e., matching a new and threshold older HL7 ADT for a same patient with a
> computer programmed in HL7 (required in that the "healthcare information sources
> [are] networked with a notification system" and produce "healthcare information
> in several different formats" including the "HL7 ADT") to trigger a readmit
> notification. This is the specific and novel solution missing from *Electric Power*
> *Group . . . .*

Ex. 1 ( Additional '194 File History) at 6-7 (emphasis added). In response, the Examiner withdrew

the objection based on *Electric Power Grp*. The Examiner did question whether the '194 patent

claims are directed to the abstract idea of "electronically monitoring healthcare information in

several different formats from several healthcare information sources,." Ex. 1 (Additional '194

File History) at 15. But that objection was overcome by the applicant after it aligned the claims to

comport with the PTO's guidance. D.I. 24, Ex. 4 at 19-23, 42 (withdrawing all remaining

objections to subject matter eligibility). Defendants now try to recycle essentially the same

arguments that Audacious overcame in examination. *See* D.I. 28-1 at 13-14.

Defendants failed to consider whether "the focus of the claims is on [a] specific asserted improvement in computer capabilities." *Enfish LLC*, 822 F.3d at 1335-36. Rather, Defendants list segmented portions of the claims and did not consider whether the claims "character as a whole is directed to excluded subject matter." *Id.* (citations omitted). Defendants list cases that find broad categories of claims as ineligible subject matter, such as claims that involve data in multiple formats or claims that involve analyzing, parsing, and storing data. D.I. 28 at 13-14. But they fail to acknowledge that, unlike in Defendants' cited cases, the '194 patent claims are directed to a specific implementation that improves the capabilities of computers connected in a HIE system.

The '194 patent claims survive step one because they are directed to specific technical improvements in the ability to provide ENS services in real time. A general problem with previous HIE systems was the overwhelming volume of irrelevant information that came from disparate sources, such that important information for specific events or patients was not easily discernable and timely delivered to healthcare providers. D.I. 24 at ¶ 43. The '194 patent claims are directed to a technical solution to these issues of discerning and delivering timely information by determining the readmission notification through a comparison among specific HL7 ADTs within a certain timeframe. *Id.* ¶¶ 48. Specifically, the claims recite a novel ordered combination by reading multiple sources of information, parsing HL7 ADTs, storing patient-identifying information, and then comparing the first-received HL7 ADTs to a later received HL7 ADT to determine whether both refer to the same patient and whether the readmission time falls within a specified threshold. *Id.* ¶ 47. This is a narrowly tailored solution that avoids preempting all types of healthcare information dissemination or healthcare notification delivery while serving as a specific improvement in HIE-connected computers and systems because it allows users to share

relevant information in real-time in a standardized format, regardless of the format in which the information was input by the user.  *Id.*

In *Contour IP Holdings LLC v. GoPro, Inc.*, 113 F.4th 1373 (Fed. Cir. 2024), the panel reversed a district court summary judgment holding on Section 101 grounds in a claim requiring modulating of different data streams to improve performance when seeking to stream video from a wireless camera.  *Id.* at 1379.  The court held that the claims "require specific, technological means—parallel data stream recording with the low-quality recording wirelessly transferred to a remote device—that in turn provide a technological improvement to the real time viewing capabilities of a POV camera's recordings on a remote device."  *Id.* at 1379.  The '194 patent claims likewise improve performance in prior HIE software systems.  As again explained by the applicant in persuading the Examiner to withdraw their rejections on Section 101 grounds:

> [U]sing an HL7-programmed computer to consider two, same-patient ADT bits generated over large timeframes to determine readmission, is a new . . . computational action that cannot support a § 101 rejection . . . .
>
> The specification demonstrates how the claimed HL7 ADT matching for readmit determination was unconventional - it could not be practiced by off-the-shelf computers.  Specifically, reading HL7 ADTs from networked providers requires an HL7 interface programmed or physically structured with this standard . . . . [T]he claimed HL7 ADT comparison over an extended timeframe for readmission is neither conventionally done nor possible in default computers.

Ex. 1 ('194 File History) at 4-6(citations omitted).  For at least these reasons, the challenged claims materially differ from those found unpatentable in *Electric Power Grp.* and *Murj, Inc. v. Rhythm Mgmt. Grp., LLC*, 622 F.Supp. 3d 109, 115 (D. Md. 2022) (claims and specification contain "no explanation of a novel technique or improvement to an existing technique").

## 2.    *Alice* Step Two

In any event, the claims cover patentable subject matter because each claims an "inventive concept" under *Alice* step two.  573 U.S. at 217.  Specifically, the '194 patent claims are valid for

the same reasons as the claims found valid in *Amdocs*.  In *Amdocs*, the Federal Circuit held that claims covering "computer code" that uses "accounting information with which the first networks accounting record is correlated to enhance the first network accounting record" cover patentable subject matter.  841 F.3d at 1300.  This is because the "claim entails an unconventional technological solution (enhancing data in a distributed fashion) to a technological problem (massive record flows which previously required massive databases)."  *Id*. at 1300.

The '194 patent claims similarly serve as an unconventional technological solution to a technological problem.  Before the claimed invention, HIE network computers and notification systems relied solely on information from sources such as HL7 ADT messages from providers to alert the appropriate recipient.  D.I. 24 ¶ 43 (citing '194 patent, 4:34-40.)  This information was often prone to errors because it was commonly recorded by hand and relied heavily on information a patient provided at registration, sometimes under the duress of being in an emergency room or a similar situation.  *Id.*  Thus, at the time of the invention, conventional HIEs and notification systems may have passed poor-quality information to subscribing entities or failed to pass relevant information at all because the routing of the information was based on bad information from patients.  *Id.* (citing '194 patent, 4:42-47).  In addition to being underinclusive and of poor quality, prior HIEs and notification systems often passed too much information directly to providers, resulting in an overwhelming volume of irrelevant information that undermined its utility.  *Id.*

The '194 patent discloses a technological solution:  a notification system and network configured to receive healthcare information from multiple different sources and in different formats.  The system identifies the most pertinent and pressing information and determines and issues relevant alerts or notifications about patients based on the information received.  D.I. 24 ¶ 44 (citing '194 patent, Claims 1, 10, and 16).  The '194 patent system connects simultaneously

to both typical HIE systems and healthcare provider network systems and other databases with different data and interface configurations. *Id.* (citing '194 patent, 5:44-58, Fig. 2). The system can receive and parse information in various formats, including Consolidated Clinical Document Architecture (CCDA) messages and HL7 messages. *Id.* (citing '194 patent, 7:14-38, 10:41-46). And it allows subscribers to delimit a variety of circumstances for which they receive healthcare information and alerts about patients, helping the system to provide more relevant notifications and reducing the volume of irrelevant information. D.I. 24 ¶ 45 (citing '194 patent, 6:52-65).

The '194 patent also provides a specific implementation of determining readmission notifications to better track patients' medical situations in a timely manner by comparing two separate ADT messages received within a predetermined timeframe. D.I. 24 ¶ 45 (citing '194 patent, 11:1-25). The system can prepare these notifications using information from anywhere in the system, including data derived from ADT messages or data from disparate databases or providers. *Id.* (citing '194 patent, 8:15-25). The prior art did not teach or suggest this claimed implementation of generating and transmitting readmission notifications, nor did it teach determining such a notification based on information from at least two different sources with at least two different health record standards. D.I. 24 ¶ 46. These steps and processes are an inventive concept. *See Amdocs (Israel) Ltd.*, 841 F.3d at 1288.

*Desktop Alert, Inc. v. Alertus Techs, LLC*, No. 22-cv-3337, 2024 WL 3819123 (D. Md. Aug. 14, 2024), further supports denial of the motion to dismiss. There, the technology at issue involved a "network-based mass notification platform for sending messages to individual computers over a virtual, public, or private network," and the claims were limited to a "unconventional and useful order of operations." *Id.* at *1. As in *Desktop Alert*, the '194 patent claims also recite an unconventional and useful order of operations—reading multiple sources of

information, parsing HL7 ADTs, storing patient-identifying information, and then comparing the first-received HL7 ADTs to a later received HL7 ADT to determine whether both refer to the same patient and whether the readmission time falls within a specified threshold.  D.I. 24 ¶ 47.  The '194 patent claims survive *Alice* step two because, as in *Desktop Alert*, the claims recite a "specific, discrete implementation" that is limited to an "unconventional and useful order of operations."

## C.    The '962 and '475 Patents Cover Patentable Subject Matter

As discussed, there is no basis for the Court to reach Defendants' invalidity challenges to the '962 and '475 patents because of assignor estoppel.  *See supra* § I.A.  But even absent estoppel, Defendants' invalidity challenges lack merit and provide no basis for dismissal.

The '962 patent claims a network architecture and a graphical user interface with multiple endpoints populated with content from various disparate data streams that aggregate and display information from these streams into a single output.  D.I. 24 ¶ 36.  Before the claimed invention, no single network was able to aggregate and combine all information from multiple healthcare information streams from multiple organizations across multiple communication protocols into a single output that "interrelates all relevant data."  D.I. ¶ 37 (citing '962 patent, 3:47-60.)  This inhibited the sharing and spreading of healthcare information because each data source required unique signal management, authentication and/or communication protocols with each server at each data source needing to be configured.  D.I. 24 ¶ 37.

The '475 patent, in turn, covers a specific healthcare network architecture that can provide communications in real time even after interfacing with multiple diverse inputs.  D.I. 24 ¶ 50.  Prior to the inventions covered by the '475 patent, it was very difficult to exchange certain health care information (*e.g.*, healthcare admissions) across different networks because different sources of information have their own unique data formats, standards, and communication protocols.  D.I. 24 ¶ 51.  This inconsistency in format, along with the fact that the information flow includes

20

potentially thousands or millions of different entries on a daily basis, created a need for a more streamlined and inclusive network. *Id.* Networks that existed before the inventions of the '475 patent operated on a one-way, serial flow of data which required users to query health information at set intervals or be overwhelmed with large amounts of raw information. *Id.* In addition, there was a need for a technical solution that would allow parallel data sources to supplement incomplete or low quality data entries within the same information interface. D.I. 24. ¶ 52.

Defendants fail to establish either step under *Alice* for both the '962 and '475 patents.

### 1.    *Alice* Step One

**'962 patent:** Defendants fail to articulate the abstract idea to which the claims in the '962 patent supposedly are directed. D.I. 28-1 at 11-12. As with the '194 patent, Defendants cherry-pick elements from the '962 patent claims without examining the claims as a whole. For example, Defendants argue that claims covering "aggregation or multiplexing of data" are "patent ineligible." *Id.* But each of Defendants' cited cases is inapposite to the step-one inquiry presented here because none requires actual transformation of data as required by the '962 patent claims.

Defendants first cite *CareDx, Inc. v. Natera, Inc.*, 40 F.4th 1371 (Fed. Cir. 2022), a case evaluating whether claims covering methods for "diagnosing or predicting organ transplant status by using methods to detect a donor's cell-free DNA" cover patentable subject matter. *Id.* at 1373. *CareDx* is irrelevant to the step-one analysis here since it addresses whether the claims cover a natural phenomena under step one—not whether they cover an abstract idea. *Id.* at 1379-80. In a similar vein, the Federal Circuit determined that the claims at issue in *iLifeTechs., Inc. v. Nintendo of Am. Inc.*, 839 F. App'x 534, 537 (Fed. Cir. 2021), were directed to an abstract idea because they "merely recite[] a motion sensor system that evaluates movement of a body using static and dynamic acceleration information." Indeed, in *iLifeTechs*, the Federal Circuit criticized the district court for considering whether claim elements use "conventional" technology as part of the step

one analysis, *id.*, an approach Defendants urge this Court to take here.  *See, e.g.*, D.I. 28-1 at 11-12.  Unlike the claimed method at issue in *In re Gale*, 856 F.App'x 887, 889 (Fed. Cir. 2021), the claims here require transforming the data itself as part of the claim.  *See, e.g.*, '962 patent, claim 1 (requiring the network to "multiplex, a plurality of signals from the plurality of data streams via the protocol interfaces into a single output").

*Bot M8 LLC v. Sony Corp. of Am.*, 4 F.4th 1342, 1358 (Fed. Cir. 2021)—a case relied on by Defendants, D.I. 28-1 at 11—actually illustrates why the '962 patent claims are not directed to an abstract idea.  There, the Federal Circuit affirmed a decision that a claim was directed to the abstract idea of "increasing or decreasing the risk-to-reward ratio, or more broadly the difficulty, of a multiplayer game based upon previous aggregate results" because the claim leaves open *how* to accomplish this.  *Id.*  Unlike the claims in *Bot M8*, the claims here explain how to accomplish the single output required by the claims—specifically, by "multiplex[ing] a plurality of signals from the plurality of data streams."  *See, e.g.*, '962 patent, claim 1.  *Two-Way Media Ltd. v. Comcast Cable Comms.*, 874 F.3d 1329, 1337-38 (Fed. Cir. 2017), is likewise distinguishable because it found an abstract idea where the challenged "claim requires the functional results of 'converting,' 'routing,' 'controlling,' 'monitoring,' and 'accumulating records,' but does not sufficiently describe how to achieve these results in a non-abstract way."

Defendants further state that "[c]ourts routinely find claims directed to disposing, or filtering, of data" and "claims directed to displaying such data patent ineligible."  D.I. 28-1 at 12.  But they offer no explanation for why the claims in the '962 patent are directed to "disposing or filtering of data," much less explain why cases addressing display of information are relevant here where the claims in the '962 patent do not require that any information be displayed.

**'475 patent:**  Defendants contend (in a cursory analysis) that the issued claims cover the

allegedly abstract concepts of "[d]ata analysis" and/or "limiting a user's access to data." D.I. 28-1 at 14-15. But the '475 patent claims do more than cover these general concepts. The claims cover a specific method for conditioning and routing a plurality of parallel streams within a network environment. The claims identify the types of protocols to be used in the multi-protocol interface, how to configure the protocol interface, and the steps needed to obtain the desired output. *See, e.g.*, '475 patent, claim 1. The claims, therefore, stand in contrast to those determined to cover an abstract idea in *Ericsson Inc. v. TCL Commc'n Tech. Holdings Ltd.*, 955 F.3d 1317, 1325-26 (Fed. Cir. 2020) (generally discussing "interface component" with no disclosure concerning the structure of such component).

### 2. *Alice* Step Two

Even if the claims in the '962 and '475 patents are found to be directed to an abstract idea, the claims nonetheless cover patentable subject matter because each claims an "inventive concept" under *Alice* step two. Specifically, the claims of the '962 and '475 patents are valid for the same reasons as those in *Amdocs*. As noted, *supra* § II.B.2, in *Amdocs*, the Federal Circuit held that claims covering "computer code" that uses "accounting information with which the first networks accounting record is correlated to enhance the first network accounting record" cover patentable subject matter. 841 F.3d at 1300. This is because the "claim entails an unconventional technological solution (enhancing data in a distributed fashion) to a technological problem (massive record flows which previously required massive databases)." *Id*. at 1300.

For example, the '962 patent discloses a technological solution in the form of a novel network architecture that has multiple interfaces that receive and analyze signals carrying information from multiple data streams/sources to which various interfaces are connected. D.I. at ¶ 38 (citing '962 patent, 4:18-24). Specifically, claim 1 covers a universal interface that may intercept, receive, and analyze all signals from all streams, and can be configured with several

protocols to determine an operating protocol and properly interface with and analyze data in the protocol. D.I. 24 ¶ 38 (citing '962 patent, 4:24-35). The specification discloses a data stream engine that multiplexes or otherwise aggregates all the incoming signals from the various interfaces and provides the data to a data cluster, which can categorize, organize, store, and/or retrieve real-time and requested data. *Id.* (citing '962 patent, 4:36-49, 4:65-5:1). This data cluster acts as an interface through which users can retrieve or query data streams for single-line network processing and analysis. *Id.* (citing '962 patent, 5:3-6). The claimed network is configured to receive data from multiple data streams and, based on client input, read the HL7 ADT messages and dispose of portions of the HL7 ADT messages that are not needed or requested, and then output the aggregated (and most relevant) information to the GUI. D.I. 24 ¶ 40. The network claimed by the '962 patent was neither well-known nor conventional to skilled artisans as of the priority date. D.I. 24 ¶ 39. The prior art did not teach this unified treatment of multiple disparate data streams and combining them into a single output that alters its display based on the content of the data and input from the client requesting the information. *Id.*

The '475 patent likewise covers a new technological solution for a network architecture that "can interface with multiple data sources having distinct protocols, formatting, or standards and offering unique but related data through a single output interface." D.I. 24 ¶ 53 (quoting '475 patent, 5:45-49). "Specifically, the '475 patent teaches a network that includes an HIE connected to a cluster that is configured to receive, process, and deliver desired healthcare information to healthcare providers that are subscribed to the network." *Id.* (citing '475 patent, 6:4-13). The claimed network and its associated cluster can receive subscriber parameters from the healthcare providers, which define the specific information and serve the specific needs of each healthcare provider. *Id.* (citing '475 patent, 6:14-29). Healthcare providers seeking this information can also

include a limiting set of events or circumstances for the desired information, *i.e.*, a doctor may only want information or notifications when a patient has multiple emergency room visits for a condition that the doctor has previously treated. *Id.* (citing '475 patent, 6:30-52). Based on the subscriber parameters, the cluster can provide specific, relevant, and well-tailored healthcare information to healthcare providers, rather than the overwhelming deluge of information provided by the prior art. *Id.* ¶ 54. The '475 patent claims are thus inventive and describe a substantial improvement in HIE networks and managing healthcare information, enabling the accurate and timely provisions of patient-specific information to healthcare providers. *Id.* ¶ 56.

## III. The Amended Complaint States a Claim for Unfair Competition

Plaintiffs also plausibly allege that Defendants have engaged in unfair competition. Maryland's unfair competition tort is "extremely broad," with "no specific elements required to establish unfair competition under Maryland law." *G. W. Aru, LLC v. W. R. Grace & Co.-Conn.*, 344 F.R.D. 446, 450 (D. Md. 2023) (cleaned up). The tort "'is laid upon the premise that . . . no one . . . is justified in damaging or jeopardizing another's business by fraud, deceit, trickery or unfair methods of any sort.'" *Aarow Elec. Sols. v. Tricore Sys., LLC*, 693 F. Supp. 3d 525, 548 (D. Md. 2023) (citation omitted). "[T]he Maryland Supreme Court has preserved a high degree of flexibility in the law of unfair competition." *Id.* (quotation marks omitted). As a result, "[w]hat constitutes unfair competition in a given case is governed by its own particular facts and circumstances." *Balt. Bedding Corp. v. Moses*, 182 Md. 229, 237 (D. Md. 1943). And given "the expansive scope" of this tort, courts routinely deny motions to dismiss because claims cannot be resolved on the pleadings.[7]

---

[7] *See, e.g.*, *Phreesia, Inc. v. Certify Glob., Inc.*, No. 21-cv-678, 2022 WL 911207 (D. Md. Mar. 29, 2022); *Farm Fresh Direct Direct By a Cut Above, LLC v. Downey*, No. 17-cv-1760, 2017 WL 4865481 (D. Md. Oct. 26, 2017); *Yellow Cab Co. v. Uber Techs., Inc.*, No. 14-cv-2764, 2015 WL 4987653, at *6 (D. Md. Aug. 19, 2015); *Paccar Inc. v. Elliot Wilson Capitol Trucks LLC*, 905 F.

That is the proper course here. Defendants' dismissal arguments are again disconnected from the Rule 12(b)(6) standard, as they introduce contested facts outside the pleadings and refuse to give reasonable inferences to the Amended Complaint's factual allegations. Their preemption argument likewise fails because it rewrites Plaintiffs' claim to fit their theory.

### A.    The Amended Complaint Plausibly Alleges That Defendants Have Engaged in Acts That Rise to the Level of Unfair Competition

The allegations in the Amended Complaint mirror those that Maryland courts have repeatedly recognized violate standards of "common honesty and fairness." *Lowry's Reports, Inc. v. Legg Mason, Inc.*, 271 F. Supp. 2d 737, 754 (D. Md. 2003).

To begin, during the term of its license agreement with Audacious, CRISP took steps to "migrate ENS users directly to CEND by August 2024." D.I. 24 ¶ 106. CRISP misused the licensed technology "to gain a foothold in the market that it then exploited to direct users to an infringing product." *Id.* This type of leveraging of an existing relationship to appropriate customers qualifies as unfair competition. *See, e.g.*, *Vivimetrix, LLC v. Monument Traders All., LLC*, No. 24-cv-3046, 2025 WL 744079, at *4 (D. Md. Mar. 7, 2025) (denying motion to dismiss unfair competition claim based on allegations that defendant reverse engineered plaintiff's product during the license term); *Farm Fresh Direct*, 2017 WL 4865481, at *10-11 (denying motion to dismiss unfair competition claim based on allegations that defendant contacted plaintiff's clients "attempting to 'reap where [plaintiff] has sown'").

Defendants then compounded the harm to Plaintiffs by mispresenting the capabilities of CEND, falsely suggesting that it would provide a superior service compared to ENS. For example, CSS secured a new contract with the Florida AHCA through material and fraudulent

---

Supp. 2d 675, 692 (D. Md. 2012); *MedServ Int'l, Inc. v. Rooney*, No. 05-cv-3173, 2006 WL 8457075, at *3 (D. Md. June 28, 2006).

misrepresentations about CEND's capabilities. D.I. 24 ¶¶ 108-118, 135. CSS "deliberately obscur[ed] the infringing nature of the technology, the volume of notifications it had made, the time period during which it was developed and used, and its ability to transition the Florida market to CSS's infringing technology." *Id.* ¶ 113. And CSS "falsely represented to the AHCA that its CEND system is a fully integrated, productized solution that delivers timely patient-specific alerts for a variety of events," when in fact CEND does not include all of these features. *Id.* ¶ 109. As a result of CSS's false assertions, it secured the AHCA contract. *Id.* ¶¶ 115-117, 135. This conduct, too, is actionable, as Maryland courts have sustained unfair competition claims based on deceptive claims in competitive bidding processes. *See Phreesia*, 2022 WL 911207, at *13-14; (denying motion to dismiss unfair competition claim where healthcare software company alleged losing a bid as a result of defendant using its wrongful competitive advantage to gain customers); *Victor Stanley, Inc. v. Creative Pipe, Inc.*, No. 06-cv-2662, 2007 WL 9896432, at *2 (D. Md. Apr. 30, 2007) (finding unfair competition where defendant made deceptive product claims in bid, including misrepresentations about the origin and capabilities of the products offered).

Defendants disregard the Amended Complaint's allegations because they are made "on information and belief." D.I. 28-1 at 25-26. But the *Twombly/Iqbal* pleading standard "does not prevent a plaintiff from pleading facts alleged upon information and belief." *Malibu Media, LLC v. Doe*, No. 13-cv-365, 2014 WL 7188822, at *4 (D. Md. Dec. 16, 2014). To the contrary, proceeding in that manner is sufficient to survive a motion to dismiss as it "is a permissible way to indicate a factual connection that a plaintiff reasonably believes is true but for which the plaintiff may need discovery to gather and confirm its evidentiary basis." *Davidson v. Sarnova, Inc.*, No. 27-cv-1067, 2017 WL 5564654, at *4 (D. Md. Nov. 20, 2017); *Monterey Mushrooms, Inc. v. HealthCare Strat., Inc.*, No. 20-cv-3061, 2021 WL 1909592, at *4 n.4 (D. Md. May 12, 2021).

27

Plaintiffs' allegations meet this standard.  For example, the Amended Complaint identifies CSS's contradictory descriptions of CEND and discrepancies between its claimed functionalities and development timeline.  D.I. 24 ¶¶ 109, 113.  The Amended Complaint also alleges Defendants took actions during its license "to migrate ENS users directly to CEND by August 2024."  *Id.* ¶ 106.  Taken as a whole, the allegations support a plausible inference that discovery will yield evidence of wrongdoing by Defendants that is not currently available to Plaintiffs, such as oral and written statements made by CSS to the AHCA and other of Plaintiffs' customers.  *Id.* ¶ 111.  The Amended Complaint thus stands in contrast to the pleadings at issue in Defendants' cited decisions.  *See Sirius Fed., LLC v. Jelen*, No. 22-cv-223, 2023 WL 2213929, at *6 (D. Md. Feb. 24, 2023) (complaint "devoid of facts" suggesting "fraud, deceit, or trickery"); *Impact Applications, Inc. v. Concussion Mgmt., LLC*, 19-cv-3108, 2021 WL 978823, at *8 (D. Md. Mar. 16, 2021) (plaintiff neither identified any false statement nor specified what product qualities were absent).

Defendants also introduce factual assertions involving Audacious's bid protest to the Florida DOAH, which they suggest contradicts Plaintiffs' allegations.  *See* D.I. 28-1 at 26. Defendants justify their effort to reach outside the pleadings by urging the Court to "take judicial notice" of "the record of this administrative proceeding."  *Id.* at 26 & n.13.  But judicial notice of the *existence* of the DOAH proceeding does not support accepting *the truth* of statements made in that proceeding.  *See Corbitt v. Balt. City Police Dep't*, 675 F. Supp. 3d 578, 586-87 (D. Md. 2023) (explaining that it would be "improper for the Court to take judicial notice of another court's findings of fact"); *U.S. ex rel. Sheldon v. Forest Lab'ys, LLC*, 754 F. Supp. 3d 615, 639-640 (D. Md. 2024) (recognizing that the court could "not take judicial notice of the truth" of statements in public documents) (citation omitted).  And "when a court considers relevant facts from the public record at the pleading stage, the court must construe such facts in the light most favorable to the

plaintiffs." *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 607 (4th Cir. 2015).

Applying the proper standards, the fact that DOAH denied Audacious's bid protest does nothing to undermine the plausibility of Plaintiffs' claim. By its nature, the protest did not provide an avenue for evaluating CSS's conduct and representations—the legal framework focused on the actions of *the state agency*, asking whether they were "clearly erroneous, contrary to competition, arbitrary, or capricious." D.I. 28-1, Ex. P. at 28-29. Moreover, DOAH recognized that the AHCA had relied "on the representations made by CSS" in evaluating the capabilities of CEND, *id.* at 35, which is exactly what Plaintiffs allege. *See, e.g.*, D.I. 24 ¶¶ 109-111, 113, 116. DOAH did not independently assess whether CSS's representations were false or misleading. Plaintiffs have alleged that CSS did make false or misleading statements about CEND, and they are entitled to corroborate those allegations through discovery, which was not available in the bid protest.

### B.    Plaintiffs' Unfair Competition Claim is Not Preempted

Federal preemption also provides no basis to dismiss Plaintiffs' unfair competition claim. State tort law is not preempted by federal patent law so long as the state cause of action "includes additional elements not found in the federal patent law cause of action and is not an impermissible attempt to offer patent-like protection to subject matter addressed by federal law." *Dow Chem. Co. v. Exxon Corp.*, 139 F.3d 1470, 1473 (Fed. Cir. 1998). Applying this test, the Federal Circuit has recognized that "[u]nfair competition claims" premised on "a business practice that is immoral, unethical, oppressive, unscrupulous, or substantially injurious" are *not* preempted to the extent the state-law claim protects "interests different from federal patent law." *Rodime PLC v. Seagate Tech., Inc.*, 174 F.3d 1294, 1306 (Fed. Cir. 1999). In evaluating a preemption defense, the court reviews "the state law claim as pled" rather than in the abstract. *BearBox, LLC v. Lancium LLC*, 125 F.4th 1101, 1112 (Fed Cir. 2025) (emphasis omitted).

Defendants implicitly concede that Plaintiffs' claim as a whole is not preempted under this

framework—they argue only that one "theory" is preempted.  D.I. 28-1 at 28-29.  But Plaintiffs have not brought a standalone "infringement theory" of unfair competition, *see generally* D.I. 24 ¶¶ 132-137, and Defendants' effort to slice and dice Plaintiffs' claim is improper.  Defendants cannot "hollow out" Plaintiffs' claim by ignoring their "allegations of bad faith separate and apart from bringing the present patent infringement suit."  *10x Genomics, Inc. v. Vizgen, Inc.*, 654 F. Supp. 3d 310, 328 (D. Del. 2023) (denying motion to dismiss).  The fact that one of Defendants' misrepresentations involved obscuring the infringing nature of the CEND technology, D.I. 24 ¶ 113, does not make enforcement of this claim an obstacle to federal patent policy.  *See Dow Chem.*, 139 F.3d at 1478 (rejecting argument that relevance of patent law to "just one element of the tort" resulted in federal preemption).  None of the cases cited by Defendants supports a contrary result, as, in each, the plaintiff failed to allege unfair conduct other than patent infringement.[8]

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' Motion to Dismiss. Alternatively, if the Court grants the motion, any dismissal should be without prejudice and with leave to amend under Rule Fed. R. Civ. P. 15(a)(2) to plead additional facts.  *See Hinks v. Board of Educ. of Hartford Cnty.*, No. 09-cv-1672, 2010 WL 5087598, at *2 (D. Md. Dec. 7, 2010).

---

[8] *See, e.g.*, *Convatec, Inc. v. HR Pharms., Inc.*, No. 24-cv-1248, 2025 WL 1859228, at *3 (D. Del. June 10, 2025) (no allegations "such as bad faith"); *Neonatal Prod. Grp., Inc. v. Shields*, 276 F. Supp. 3d 1120, 1151 (D. Kan. 2017) (use of unjust enrichment claim merely to recover for patent infringement); *Veto Pro Pac, LLC v. Custom Leathercraft Mfg. Co.*, No. 08-cv-302, 2009 WL 276369, at *2-3 (D. Conn. Feb. 5, 2009) (plaintiff merely "incorporate[d] its patent infringement claims" by reference); *Knova Software, Inc. v. Inquira, Inc.*, No. 06-cv-381, 2007 WL 1232186, at *3 (D. Del. Apr. 27, 2007) ("Plaintiffs have not alleged any conduct in support of the state law claim beyond the acts alleged in support of their patent infringement claims."); *Sorias v. Nat'l Cellular USA, Inc.*, 124 F. Supp. 3d 244, 262 (E.D.N.Y. 2015) (claim "based only" on alleged infringing conduct); *Nagle Indus., Inc. v. Ford Motor Co.*, 173 F.R.D. 448 (E.D. Mich. 1997) (claims were "not qualitatively different" from patent infringement claim); *Jerrold Stephens Co. v. Alladin Plastics, Inc.*, 229 F. Supp. 536 (S.D. Cal. 1964) (unfair competition claim "based upon an asserted copying" of a patent preempted).

Dated: October 20, 2025

Respectfully submitted,

/s/ Brian T. Burgess

Brian T. Burgess (Bar No. 19251)
William C Jackson (*pro hac vice*
forthcoming)
**GOODWIN PROCTER LLP**
1900 N Street, N.W.
Washington, D.C. 20036-1612
Telephone: (202) 346-4444
Fax: (202) 346-4444
WJackson@goodwinlaw.com
BBurgess@goodwinlaw.com

Srikanth K. Reddy (*pro hac vice*)
Kevin J. DeJong (*pro hac vice*)
Anna Zhou (*pro hac vice* forthcoming*)
**GOODWIN PROCTER LLP**
100 Northern Avenue
Boston, MA 02210
Telephone: (617) 570-1000
Fax: (617) 523-1231
SReddy@goodwinlaw.com
KDejong@goodwinlaw.com
AZhou@goodwinlaw.com

*Attorneys for Plaintiffs Audacious Inquiry
LLC and Collective Medical Technologies,
Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on October 20, 2025.

*<u>/s/ Brian T. Burgess</u>*
Brian T. Burgess