**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

| | |
|---|---|
| AUDACIOUS INQUIRY LLC and COLLECTIVE MEDICAL TECHNOLOGIES, INC.,<br><br>Plaintiffs/Counterclaim-Defendants,<br><br>v.<br><br>CHESAPEAKE REGIONAL INFORMATION SYSTEM FOR OUR PATIENTS and CRISP SHARED SERVICES, INC. AND AFFILIATES,<br><br>Defendants/Counterclaim-Plaintiffs. | Civil Action No. 25-cv-2264-JRR |

**DEFENDANTS' ANSWER AND COUNTERCLAIMS**

Defendants Chesapeake Regional Information System for Our Patients, Inc. of Maryland ("CRISP Maryland") and CRISP Shared Services, Inc. ("CSS") (collectively, "Defendants" or "Counterclaim-Plaintiffs") hereby file this Answer and Counterclaims to the Amended Complaint, (Dkt. 24), of Plaintiffs Audacious Inquiry LLC ("Audacious") and Collective Medical Technologies, Inc. ("CMT") (collectively, "Plaintiffs" or "Counterclaim-Defendants"). Pursuant to the Court's August 31, 2026 Order (the "Motion to Dismiss Order"), (Dkt. 40), the Court dismissed Count II of Plaintiffs' Amended Complaint. Accordingly, no answer is required for Plaintiffs' allegation of infringement of U.S. Patent No. 11,114,194.

Except as specifically admitted below, Defendants deny the allegations of the Amended Complaint.

## NATURE OF ACTION

1. Denied.

2. Defendants admit that the Amended Complaint purports to plead claims for patent infringement. Defendants deny any remaining allegations of this paragraph.

3. Defendants admit that the Amended Complaint purports to plead claims for common law unfair competition. Defendants deny the remaining allegations of this paragraph.

4. Defendants are without knowledge sufficient to form a belief as to the truth or falsity of the allegations set forth in this paragraph, and on that basis deny them.

5. Defendants are without knowledge sufficient to form a belief as to the truth or falsity of the allegations set forth in this paragraph, and on that basis deny them.

6. Defendants admit that they previously worked with Audacious. Defendants deny any remaining allegations of this paragraph, including specifically denying that either Defendant ever owned any patent rights related to what Plaintiffs refer to as ENS technology.

7. Admitted.

8. Defendants admit that their prior contractual relationship with Audacious terminated in 2024. Otherwise denied.

9. Denied.

10. Denied.

11. Denied.

12. Denied.

## PARTIES

13. Defendants are without knowledge sufficient to form a belief as to the truth or falsity of the allegations set forth in this paragraph, and on that basis deny them.

14. Defendants are without knowledge sufficient to form a belief as to the truth or falsity of the allegations set forth in this paragraph, and on that basis deny them.

15. Admitted.

16. Admitted.

17. Denied.

**JURISDICTION AND VENUE**

18. Defendants admit that Plaintiffs purport to bring this action under the patent laws of the United States, 35 U.S.C. §§ 1 *et seq*.

19. Defendants admit that this Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331, 1332, 1338(a), 1367, 2201, and 2202.

20. This paragraph sets forth conclusions of law to which no response is required. To the extent a response is deemed to be required, Defendants deny the allegations of this paragraph.

21. Defendants deny that they have engaged in acts of infringement or acts of unfair competition. Defendants deny any remaining allegations of this paragraph, except that Defendants do not contest for the purposes of the action only that this Court has personal jurisdiction over Defendants.

22. Defendants deny that they have committed or are committing acts of infringement. The remainder of this paragraph sets forth conclusions of law to which no response is required. To the extent a response is required, Defendants deny the remaining allegations of this paragraph.

**FACTUAL BACKGROUND**

**The Patents-in-Suit**

23. Defendants admit that the identified patent was issued as stated, however deny that said patent should have ever been issued, and further deny that it is valid or enforceable.

24. Defendants admit that the ’962 Patent lists Bill Howard, Paul Cahill, Sandeep Antony, Scott Afzal, and David Horrocks as inventors on its face. Defendants are without knowledge sufficient to form a belief as to the truth or falsity of the remaining allegations set forth in this paragraph, and on that basis deny them.

25. Defendants admit that the ’962 Patent states on its face that it issued from U.S. Patent Application No. 15/911,137, which was filed on March 4, 2018. Defendants are without knowledge sufficient to form a belief as to the truth or falsity of the remaining allegations set forth in this paragraph, and on that basis deny them.

26. Defendants admit that this paragraph includes language from claim 1 of the ’962 Patent.

27. The allegations of this paragraph relate to a claim that has been dismissed pursuant to the Motion to Dismiss Order, and no answer is required. To the extent a response is required, admitted.

28. The allegations of this paragraph relate to a claim that has been dismissed pursuant to the Motion to Dismiss Order, and no answer is required. To the extent a response is required, Defendants admit that the ’194 patent lists Sandeep Antony, Scott Afzal, Evan Carter, Christopher Brandt, and Yedong Tang as inventors on its face. Defendants are without knowledge sufficient to form a belief as to the truth or falsity of the remaining allegations set forth in this paragraph, and on that basis deny them.

29. The allegations of this paragraph relate to a claim that has been dismissed pursuant to the Motion to Dismiss Order, and no answer is required. To the extent a response is required, Defendants admit that the ’194 Patent states on its face that it issued from U.S. Patent Application No. 14/872,445, which was filed on October 1, 2015. Defendants are without knowledge sufficient

to form a belief as to the truth or falsity of the remaining allegations set forth in this paragraph, and on that basis deny them.

30. The allegations of this paragraph relate to a claim that has been dismissed pursuant to the Motion to Dismiss Order, and no answer is required. To the extent a response is required, Defendants admit that this paragraph includes language from claim 1 of the ’194 patent.

31. Defendants admit that the identified patent was issued as stated, however deny that said patent should have ever been issued, and further deny that it is valid or enforceable.

32. Defendants admit that the ’475 Patent lists Sandeep Antony, Scott Afzal, and David Horrocks as inventors on its face. Defendants are without knowledge sufficient to form a belief as to the truth or falsity of the remaining allegations set forth in this paragraph, and on that basis deny them.

33. Defendants admit that the ’475 Patent states on its face that it issued from U.S. Patent Application No. 17/190,358, which was filed on March 2, 2021. Defendants are without knowledge sufficient to form a belief as to the truth or falsity of the remaining allegations set forth in this paragraph, and on that basis deny them.

34. Defendants admit that this paragraph includes language from claim 1 of the ’475 Patent.

**<u>The Patents-in-Suit Cover [Allegedly] Patentable Subject Matter</u>**

35. Defendants admit that Exhibit 1 appears to be a copy of the ’962 Patent. Otherwise, denied.

36. Defendants state that the ’962 Patent speaks for itself and deny the remaining allegations of this paragraph, including specifically Plaintiffs’ characterizations of the ’962 Patent.

37. Denied.

38. Defendants state that the ’962 Patent speaks for itself and deny the remaining allegations of this paragraph, including specifically Plaintiffs’ characterizations of the ’962 Patent.

39. Denied.

40. Denied.

41. The allegations of this paragraph relate to a claim that has been dismissed pursuant to the Motion to Dismiss Order, and no answer is required. To the extent a response is required, Defendants admit that Exhibit 2 appears to be a copy of the ’194 patent. Otherwise, denied.

42. The allegations of this paragraph relate to a claim that has been dismissed pursuant to the Motion to Dismiss Order, and no answer is required. To the extent a response is required, Defendants denied.

43. The allegations of this paragraph relate to a claim that has been dismissed pursuant to the Motion to Dismiss Order, and no answer is required. To the extent a response is required, denied.

44. The allegations of this paragraph relate to a claim that has been dismissed pursuant to the Motion to Dismiss Order, and no answer is required. To the extent a response is required, denied.

45. The allegations of this paragraph relate to a claim that has been dismissed pursuant to the Motion to Dismiss Order, and no answer is required. To the extent a response is required, Defendants state that the ’194 patent speaks for itself and deny the remaining allegations of this paragraph, including specifically Plaintiffs’ characterizations of the ’194 patent.

46. The allegations of this paragraph relate to a claim that has been dismissed pursuant to the Motion to Dismiss Order, and no answer is required. To the extent a response is required, denied.

47. The allegations of this paragraph relate to a claim that has been dismissed pursuant to the Motion to Dismiss Order, and no answer is required. To the extent a response is required, denied.

48. The allegations of this paragraph relate to a claim that has been dismissed pursuant to the Motion to Dismiss Order, and no answer is required. To the extent a response is required, Defendants admit that Exhibit 4 appears to be a copy of excerpts from the file history of the ’194 patent. Defendants deny any remaining allegations of this paragraph, including specifically any characterization of the statements made in the cited excerpts.

49. Defendants admit that Exhibit 3 appears to be a copy of the ’475 Patent. Otherwise, denied.

50. Defendants state that the ’475 Patent speaks for itself and deny the remaining allegations of this paragraph, including specifically Plaintiffs’ characterizations of the ’475 Patent.

51. Denied.

52. Denied.

53. Denied.

54. Defendants state that the ’475 Patent speaks for itself and deny the remaining allegations of this paragraph, including specifically Plaintiffs’ characterizations of the ’475 Patent.

55. Denied.

56. Denied.

57. Defendants admit that the quoted language appears in an e-Health Update available at https://www.crisphealth.org/wp-content/uploads/2017/08/e-Health-Update-Q3-2017-1.pdf. Defendants deny any remaining allegations of this paragraph, including specifically that the quoted language relates in any way to the purported advantages of the Patents-in-Suit, which are not

mentioned, and that CRISP has ever recognized any purported advantage of the purported inventions claimed in the Patents-in-Suit.

**Defendants are [Allegedly] Prohibited From Contesting the Validity of the ’962 and ’475 Patents Under the Doctrine of Assignor Estoppel**

58. Defendants are without knowledge sufficient to form a belief as to the truth or falsity of the allegations set forth in this paragraph, and on that basis deny them.

59. Defendants admit that CRISP Maryland was incorporated on or around June 3, 2008, and that David Horrocks signed the relevant incorporation documents. Otherwise, denied.

60. Defendants admit that CSS was incorporated on or around October 5, 2020, and that David Horrocks signed the relevant incorporation documents. Otherwise, denied.

61. Defendants admit that CRISP Maryland and Audacious entered into an agreement titled Master Professional Services Agreement on or around August 5, 2009, and that David Horrocks signed the agreement on behalf of CRISP Maryland. Defendants state that the agreement speaks for itself and otherwise deny the remaining allegations of this paragraph, including specifically Plaintiffs’ characterizations of the cited agreement.

62. Defendants admit that CRISP Maryland and Audacious entered into an agreement titled Master Professional Services Agreement on or around August 5, 2009. Defendants state that the agreement speaks for itself and otherwise deny the remaining allegations of this paragraph, including specifically Plaintiffs’ characterizations of the cited agreement and the work performed thereunder.

63. Defendants state that the amendment to the relevant agreement between Audacious and CRISP Maryland speaks for itself. Defendants deny the remaining allegations of this paragraph, including specifically Plaintiffs’ characterizations of the cited agreement and any amendments thereto.

64. Defendants admit on information and belief that Audacious caused the ’332 Application to be filed and listed Sandeep Antony and David Horrocks as inventors. Defendants deny that CRISP Maryland caused the ’332 Application to be filed.

65. Denied.

66. Denied.

67. Admitted.

68. Defendants admit on information and belief that Audacious caused the ’625 Application to be filed and listed Sandeep Antony, Scott Afzal, and David Horrocks as inventors. Defendants deny that CRISP Maryland caused the ’625 Application to be filed.

69. Denied.

70. Denied.

71. Admitted.

72. Defendants admit on information and belief that Audacious caused the ’225 Application to be filed and listed Sandeep Antony, Scott Afzal, and David Horrocks as inventors. Defendants deny that CRISP Maryland caused the ’225 Application to be filed.

73. Denied.

74. Denied.

75. Admitted.

76. Denied.

77. Defendants state that the agreement referenced in this paragraph speaks for itself. Defendants deny the remaining allegations of this paragraph, including specifically Plaintiffs’ characterizations of the cited agreement, which is dated December 9, 2013.

78. Defendants state that the agreement referenced in this paragraph speaks for itself. Defendants deny the remaining allegations of this paragraph, including specifically Plaintiffs' characterizations of the cited agreement.

79. Defendants state that the agreement referenced in this paragraph speaks for itself. Defendants deny the remaining allegations of this paragraph, including specifically Plaintiffs' characterizations of the cited agreement and Plaintiffs' allegations that CRISP Maryland ever owned any rights in the '332 Application, the '625 Application, and the '225 Application or any other patents or patent applications related thereto.

80. Defendants state that the agreement referenced in this paragraph speaks for itself. Defendants deny the remaining allegations of this paragraph, including specifically Plaintiffs' characterizations of the cited agreement and any implicit or explicit allegation that CRISP Maryland ever owned any rights as an inventor.

81. Defendants state that the agreement referenced in this paragraph speaks for itself. Defendants deny the remaining allegations of this paragraph, including specifically Plaintiffs' characterizations of the cited agreement.

82. Defendants state that the agreement referenced in this paragraph speaks for itself. Defendants deny the remaining allegations of this paragraph, including specifically Plaintiffs' characterizations of the cited agreement.

83. Defendants admit that the language quoted in this paragraph appears in the referenced agreement and states that the referenced agreement speaks for itself. Defendants deny the remaining allegations of this paragraph, including specifically Plaintiffs' characterizations of the cited agreement and quoted language.

84. Denied.

85. Admitted.

86. Defendants admit that the language quoted in this paragraph appears in the referenced agreement and states that the referenced agreement speaks for itself. Defendants deny the remaining allegations of this paragraph, including specifically Plaintiffs' characterizations of the cited agreement and quoted language.

87. Defendants admit that the language quoted in this paragraph appears in the referenced agreement and states that the referenced agreement speaks for itself. Defendants deny the remaining allegations of this paragraph, including specifically Plaintiffs' characterizations of the cited agreement and quoted language.

88. Denied.

89. Admitted.

90. Admitted.

91. Admitted on information and belief as stated, but denied as to any implication that the referenced application contains any patentable invention.

92. Admitted on information and belief as stated, but denied as to any implication that the referenced application contains any patentable invention.

93. Admitted on information and belief as stated, but denied as to any implication that the referenced application contains any patentable invention.

94. Defendants admit that the '962 Patent issued from the '137 Application. Otherwise, denied.

95. Denied.

96. Denied.

97. Defendants admit that the '475 Patent issued from the '358 Application. Otherwise, denied.

98. Denied.

99. Denied.

100. Defendants admit that CRISP Maryland and Audacious renewed the referenced agreement between 2013 and 2024 and that CRISP Maryland paid fees to Audacious pursuant to the referenced agreement. Defendants deny that CRISP Maryland ever made any representations related to the validity or invalidity of the Patents-in-Suit and further deny that CSS was a party to the referenced agreement before 2022.

101. Defendants state that the agreement referenced in this paragraph speaks for itself. Defendants deny the remaining allegations of this paragraph, including specifically Plaintiffs' characterizations of the cited agreement.

102. Admitted.

103. Defendants admit that CRISP Maryland and CSS opted not to renew the referenced agreement in 2024 and that the agreement terminated on September 1, 2024. Otherwise, denied.

104. Denied.

**CSS Has [Allegedly] Engaged in Unfair Competition To Switch Customers Away From ENS to its New [Allegedly] Infringing System**

105. Defendants admit that Audacious led the software development and implementation of ENS and that Defendants provided notice that they would not renew any license to ENS on May 8, 2024. Defendants are without knowledge sufficient to form a belief as to the truth or falsity of the remaining allegations set forth in this paragraph, and on that basis deny them.

106. Denied.

107. Denied.

108. Defendants admit AHCA issued an ITN on or around May 6, 2024 and that CSS submitted a reply to the ITN. Defendants are without knowledge sufficient to form a belief as to the truth or falsity of the remaining allegations set forth in this paragraph, and on that basis deny them.

109. Denied.

110. Denied.

111. Denied.

112. Defendants are without knowledge as to what Plaintiffs specifically intend to refer to as "the CEND solution" and thus are without knowledge sufficient to form a belief as to the truth or falsity of the allegations set forth in this paragraph, and on that basis deny them.

113. Denied.

114. Defendants admit that AHCA posted its intended award of the contract to CSS on January 23, 2025 and that CSS's winning bid, in part, referenced CEND. Defendants are without knowledge as to what Plaintiffs specifically intend to refer to as "the CEND technology," and deny any remaining allegations of this paragraph, including specifically any implication that CEND was the sole basis for CSS's bid or AHCA's award.

115. Admitted.

116. Denied.

117. Denied.

118. Denied.

119. Denied.

**COUNT I**
**([ALLEGED] DIRECT INFRINGEMENT OF U.S. PATENT NO. 10,938,962)**

120. Defendants re-allege and incorporate the responses set forth in the preceding paragraphs as if fully set forth herein.

121. Denied.

122. Denied.

123. Denied.

**COUNT II**
**([ALLEGED] DIRECT INFRINGEMENT OF U.S. PATENT NO. 11,114,194)**

124. The allegations of this paragraph relate to a claim that has been dismissed pursuant to the Motion to Dismiss Order, and no answer is required. To the extent a response is required, Defendants re-allege and incorporate the responses set forth in the preceding paragraphs as if fully set forth herein.

125. The allegations of this paragraph relate to a claim that has been dismissed pursuant to the Motion to Dismiss Order, and no answer is required. To the extent a response is required, denied.

126. The allegations of this paragraph relate to a claim that has been dismissed pursuant to the Motion to Dismiss Order, and no answer is required. To the extent a response is required, denied.

127. The allegations of this paragraph relate to a claim that has been dismissed pursuant to the Motion to Dismiss Order, and no answer is required. To the extent a response is required, denied.

**COUNT III**
**([ALLEGED] DIRECT INFRINGEMENT OF U.S. PATENT NO. 12,047,475)**

128. Defendants re-allege and incorporate the responses set forth in the preceding paragraphs as if fully set forth herein.

129. Denied.

130. Denied.

131. Denied.

**COUNT IV**
**([ALLEGED] VIOLATION OF MARYLAND COMMON LAW OF UNFAIR COMPETITION)**

132. Defendants re-allege and incorporate the responses set forth in the preceding paragraphs as if fully set forth herein.

133. Denied.

134. Denied.

135. Denied.

136. Denied.

137. Denied.

**[ALLEGED] PRAYER FOR RELIEF**

Defendants deny that Plaintiffs are entitled to any of the relief whatsoever whether it is outlined in their Prayer for Relief or otherwise.

**JURY DEMAND**

Defendants demand a trial by jury on all issues so triable.

## AFFIRMATIVE AND OTHER DEFENSES

Defendants allege and assert at least the following defenses in response to Plaintiffs' allegations in the Amended Complaint and reserves the right to assert additional defenses that become known and available through the course of discovery.

### FIRST DEFENSE
### (FAILURE TO STATE A CLAIM)

1. Plaintiffs' Amended Complaint and the allegations therein fail to state a claim upon which relief may be granted.

### SECOND DEFENSE
### (NON-INFRINGEMENT)

2. Defendants have not infringed and do not infringe directly or indirectly any valid, enforceable, asserted claim of the '962 Patent, either literally or under the doctrine of equivalents, or under any theory of infringement.

3. Defendants have not infringed and do not infringe directly or indirectly any valid, enforceable, asserted claim of the '475 Patent, either literally or under the doctrine of equivalents, or under any theory of infringement.

### THIRD DEFENSE
### (INVALIDITY)

4. Each of the asserted claims of the '962 Patent is invalid for failure to comply with one or more conditions of patentability under the patent laws of the United States, 35 U.S.C. §§ 1 *et seq.*, including 35 U.S.C. §§ 101, 102, 103, and/or 112.

5. Each of the asserted claims of the '475 Patent is invalid for failure to comply with one or more conditions of patentability under the patent laws of the United States, 35 U.S.C. §§ 1 *et seq.*, including 35 U.S.C. §§ 101, 102, 103, and/or 112.

**FOURTH DEFENSE**
**(EQUITABLE DEFENSE)**

6. Plaintiffs' claims against Defendants, including their claims for patent infringement and unfair competition, are barred by one or more of the equitable doctrines of estoppel, prosecution laches, acquiescence, waiver, implied license, and unclean hands.

**FIFTH DEFENSE**
**(ADEQUATE REMEDY AT LAW)**

7. Plaintiffs have an adequate remedy at law, and no basis exists for the grant of injunctive relief.

**SIXTH DEFENSE**
**(LICENSE)**

8. Plaintiffs' purported claims are barred, in whole or in part, because Defendants have an express or implied license to make, use, sell, offer for sale, and/or import the accused products and/or practice the accused methods.

**SEVENTH DEFENSE**
**(UNENFORCEABILITY)**

9. Plaintiffs' purported claims for infringement are barred, in whole or in part, because the asserted patents are unenforceable on the basis of inequitable conduct as further described with particularity in Defendants' Counterclaims, including specifically the Counterclaims' Factual Background section (*e.g.*, Paragraphs 74-117) and the Third and Sixth Counterclaims, the allegations of which Defendants incorporate by reference as if fully set forth herein.

**EIGHTH DEFENSE**
**(UNCLEAN HANDS – INFRINGEMENT)**

10. Plaintiffs' purported claims for infringement are barred, in whole or in part, by the doctrine of unclean hands for the reasons further described in Defendants' Counterclaims, including specifically the Counterclaims' Factual Background section (*e.g.*, Paragraphs 74-117)

and the Third and Sixth Counterclaims, the allegations of which Defendants incorporate by reference as if fully set forth herein.

**NINTH DEFENSE**
**(UNCLEAN HANDS – UNFAIR COMPETITION)**

11. Plaintiffs' purported claim for unfair competition under Maryland common law (Count IV of the Amended Complaint) is barred, in whole or in part, by the doctrine of unclean hands.

12. Upon information and belief, prior to founding or developing the ENS system that is the subject of this action, Audacious, acting at least through its executive Scott Afzal, entered into a contractual relationship with Axolotl Corp. ("Axolotl") under which Audacious contracted with Axolotl to develop and license a health information exchange product substantially similar to the systems described in the Patents-in-Suit.

13. Upon information and belief, through its relationship with Axolotl, Audacious and Mr. Afzal gained access to Axolotl's proprietary technology, methods, and know-how relating to health information exchange and ADT event-notification services.

14. Upon information and belief, after acquiring the knowledge and experience developed through the Axolotl relationship, Audacious terminated its license and contractual relationship with Axolotl and proceeded to develop its own competing product—the ENS system—based on what it had learned during its dealings with Axolotl.

15. The conduct Audacious engaged in with respect to Axolotl echoes the claims Audacious now alleges constitutes unfair competition by CRISP Maryland and CSS. In its Amended Complaint, Audacious alleges that CRISP Maryland and CSS developed a competing system—CEND—using knowledge and experience gained during their prior contractual relationship with Audacious, and then terminated that relationship and deployed their own system.

Audacious previously engaged in a worse pattern of conduct with Axolotl: it contracted with Axolotl to develop and license health information exchange technology, gained access to Axolotl's technology and methods, terminated the relationship, and then developed and commercialized its own competing product—going so far as to then try and patent technology it should have known was not patentable.

16. Because Audacious itself engaged in the sort of conduct it now alleges constitutes unfair competition, Audacious comes before this Court with unclean hands and is barred from obtaining relief on its unfair competition claim.

17. Defendants reserve the right to supplement this defense as discovery proceeds and additional facts supporting Audacious's prior dealings with Axolotl become known.

**TENTH DEFENSE**
**(PATENT MISUSE)**

18. Plaintiff's purported claims for infringement are barred, in whole or in part, by the doctrine of patent misuse, including for example as part of Plaintiff's unfair and anticompetitive schemes as further described in Defendants' Counterclaims, including specifically the Counterclaims' Factual Background section (*e.g.*, Paragraphs 13-117) and the Seventh and Eighth Counterclaims, the allegations of which Defendants incorporate by reference as if fully set forth herein.

**ADDITIONAL DEFENSES**

19. Defendants reserve the right to supplement or amend this Answer and reserves all defenses set out in Rule 8(c) of the Federal Rules of Civil Procedure, and any other defenses which become applicable during the course of discovery or otherwise in the course of litigation.

## COUNTERCLAIMS

For their counterclaims against Counterclaim-Defendants, Counterclaim-Plaintiffs CRISP Maryland and CSS allege as follows:

## INTRODUCTION

1. PointClickCare Corporation bet big that its dominant position in the health information market would allow it to bully Florida into changing the systems it used to provide messaging in Florida. Instead, Florida put control over its Health Information Exchange ("HIE") out for bid. PCC participated in the bidding process, and despite significant structural advantages as the incumbent, came in third place. Stung and incredulous, PCC and its subsidiary companies Audacious and CMT have since engaged in a pernicious and deceptive campaign to strike back, baselessly attempting to contest the award by Florida, asserting irrelevant patents it knows are invalid, and leveraging its dominant market position in health status messaging and its incumbent position in Florida to systematically mislead and coerce healthcare providers in an effort to slow CSS's deployment of Florida's new HIE – with potentially disastrous consequences to patients.

## PARTIES

2. CRISP Maryland is a nonprofit corporation organized and existing under the laws of Maryland, with its principal place of business at 10480 Little Patuxent Parkway, Suite 800, Columbia, Maryland.

3. CSS is a nonprofit corporation organized and existing under the laws of Maryland, with its principal place of business at 10480 Little Patuxent Parkway, Suite 800, Columbia, Maryland.

4. Counterclaim-Defendants are informed and believe that Audacious is a limited liability company organized and existing under the laws of Delaware, with its principal place of

business at 10377 S Jordan Gateway Suite 600, South Jordan, Utah 84095. Counterclaim-Defendants are further informed and believe that Audacious's sole member is CMT.

5. Counterclaim-Plaintiffs are informed and believe that CMT is a corporation organized and existing under the laws of Delaware, with its principal place of business at 10377 S Jordan Gateway Suite 600, South Jordan, Utah 84095.

6. Counterclaim-Plaintiffs are further informed and believe that CMT is a wholly owned subsidiary of PointClickCare Technologies USA Corp., which is in turn a wholly owned subsidiary of PointClickCare Corporation, a foreign corporation organized and exiting under the laws of Canada, with its principal place of business at 5570 Explorer Drive, Mississauga, Ontario, Canada. PointClickCare Technologies USA Corp. and PointClickCare Corporation are collectively referred to herein as "PCC."

**JURISDICTION AND VENUE**

7. This an action at law and in equity that arises under the antitrust laws of the United States (15 U.S.C. §§ 1 and 2, *et seq*.), the patent laws of the United States (35 U.S.C. §§ 1, *et seq*.), and the Declaratory Judgment Act (28 U.S.C. §§ 2201 and 2202).

8. The Court has subject matter jurisdiction over the patent-related Counterclaims pursuant to 28 U.S.C. §§ 1331, 1338, 2201, and 2202, because Counterclaim-Defendants have accused Counterclaim-Plaintiffs of infringing the Patents-in-Suit.

9. The Court has subject matter jurisdiction over the antitrust- and unfair competition-related Counterclaims pursuant to 28 U.S.C. §§ 1331 and 1337(a) seeking monetary and injunctive relief (including treble damages) from Counterclaim-Defendants for violating and to prevent and restrain Counterclaim-Defendants from violating, Section 2 of the Sherman Act (15 U.S.C. § 2), and supplemental jurisdiction over the overlapping claims arising under the common law of the

State of Maryland pursuant to 28 U.S.C. § 1367(a) because the state law claims are so related to the federal claims that they form part of the same case or controversy.

10. This Court also has diversity jurisdiction because each Plaintiff is a Maryland citizen, none of the Counterclaim-Defendants or their member(s) are citizens of Maryland, and because the amount in controversy exceeds $75,000.

11. The Court has personal jurisdiction over Counterclaim-Defendants by virtue of, among other things, Counterclaim-Defendants having consented to the jurisdiction of this Court by filing their Amended Complaint. This Court also has personal jurisdiction over Counterclaim-Defendants in that their actions are causing injury to Counterclaim-Plaintiffs in Maryland.

12. Venue in this judicial district is proper over these Counterclaims pursuant to 28 U.S.C. §§ 1391(b) and 1400(b).

## FACTUAL BACKGROUND

### A. The Florida HIE and AHCA's Transition from Counterclaim-Defendants to CSS

13. For more than eight years, Audacious, and eventually CMT and its ultimate parent company PCC, served as the vendor for the Florida HIE operated under the authority of the Florida Agency for Health Care Administration ("AHCA"). In that role, Counterclaim-Defendants and PCC maintained incumbent relationships with hundreds of Florida healthcare providers, including hospitals, accountable care organizations, and other participants that exchanged Admit-Discharge-Transfer ("ADT") data through the Florida HIE platform.

14. On information and belief, after PCC acquired Audacious and CMT, PCC attempted to have AHCA agree to migrate the Florida HIE off the Audacious ENS platform to PCC's national platform. AHCA raised concerns with the PCC national platform, and rather than acceding to PCC's demands that AHCA migrate, and in anticipation of the expiration of its contract with Counterclaim-Defendants and PCC, on or around May 6, 2024, AHCA issued an Invitation

to Negotiate Procurement ("INP") for a new Florida HIE vendor, intending to replace PCC upon the expiration of its then contract upon its expiration in August, 2025.

15. CSS submitted a response to AHCA's procurement, relying in part on its new CEND system, which CSS independently developed.

16. CRISP Maryland did not submit a response to AHCA's INP.

17. On January 23, 2025, after a completive negotiation process involving four participants, AHCA posted its intended award of the new Florida HIE contract to CSS. Despite Audacious's protest before the Florida Department of Administrative Hearings ("DOAH"), DOAH upheld the award to CSS in June, 2025. Due to the delay in beginning implementation from the protest, PCC was able to force a one year extension of its contract as part of a transition plan.

18. Under the transition plan, Counterclaim-Defendants' existing Florida HIE contract was to terminate no later than August 1, 2026—the "drop dead" cutover date. During the transition period preceding that date, CSS was responsible for onboarding Florida providers under new Participation Agreements and establishing direct data connections. AHCA retained the authority to terminate Counterclaim-Defendants' contract prior to August 1, 2026, and communicated to Counterclaim-Defendants and PCC that the contractual termination would nullify Counterclaim-Defendants' existing Florida HIE services agreements with the hospitals and other healthcare providers of Florida.

19. The agreement between CSS and AHCA, like the predecessor agreement between Audacious and AHCA, was a zero-dollar contract under which no payments were made to or from the State of Florida. The Florida HIE is authorized pursuant to Florida's Electronic Health Records Exchange Act, Fla. Stat. § 408.051, and operates as a statewide framework for the exchange of

health information. Participating providers contribute data to the HIE without compensation from the State. Rather than being funded through state payments under the contract, the program's operating costs are supported through fees paid by subscribers that receive services, such as ADT notifications. Those subscriber fees – overseen by AHCA in conjunction with other Florida agencies – and not state appropriations or provider payments for data submission, are the principal source of revenue supporting HIE operations.

20. The CSS account management team commenced provider outreach and technical onboarding in the fall of 2025, providing each healthcare services provider participant with a Participation Agreement, VPN and networking questionnaires, HL7 ADT interface specifications, and a defined transition process.

21. CRISP Maryland was not and is not involved in CSS's activities in Florida.

**B. Counterclaim-Defendants Misleading Provider Outreach**

22. Rather than cooperate in the transition, Counterclaim-Defendants and PCC launched a coordinated campaign to healthcare providers in Florida ("Florida Providers") designed to slow, obstruct, and undermine the migration of Florida Providers to CSS. Counterclaim-Defendants and PCC sent these communications to Florida Providers who were actively being onboarded by CSS, and upon information and belief, sent substantially similar communications to every acute care hospital in the Florida HIE network.

23. At first, these messages were merely misleading. For example, on September 30, 2025, Brian Smart, PCC's Director of its Acute & Payer Division, sent an email to key IT and interface personnel at the University of Miami Health System ("UHealth"), which was in the process of being onboarded by CSS. Mr. Smart's email made the following misrepresentations, among others:

a. "We will remain the current HIE vendor until August 2026." While PCC's contract could potentially extend to that date, this statement obscured the fact that a transition was actively underway, that AHCA had selected CSS as the replacement vendor, and that AHCA retained the ability to terminate PCC's contract prior to that date.

b. "The only requirement for your organization is to sign the new vendor's HIE agreement. Once this is done, we can handle the rest . . . . You are not required to build a net-new ADT feed to CSS. Once you sign the new agreement, we can submit your existing ADT feed to the new vendor on your behalf to minimize any technical, resource, or vendor costs." This representation implied coordination between Counterclaim-Defendants and PCC on the one hand and AHCA and CSS on the other, which did not exist, and failed to disclose that providers using PCC as an intermediary could face unnecessary duplicative costs by paying PCC for an unnecessary service.

c. "[W]e will serve as an intermediary on your behalf and will send your existing Florida HIE ADT feed to CSS, handle data validation, and connectivity. We will support this workflow as long as you need . . . ." This language implied that PCC would coordinate with CSS and AHCA as a matter of course as part of some official transition, when in fact no such intermediary arrangement had been discussed with, approved by, or was being developed with CSS or AHCA. The statement implied AHCA and CSS were planning for Counterclaim-Defendants and PCC's role as standard operating procedure, which was not the case.

d. "Hospitals are not required to send ADT data directly to the Florida HIE and are permitted to use an intermediary to send ADT data on their behalf (some hospitals are using an intermediary today and can continue to do so)." While true that Hospitals may choose to use an intermediary, in the context of this messaging the statement was designed to discourage providers from completing the transition process that AHCA and CSS had established, and to preserve PCC's intermediary position and revenue stream.

*See* Ex. A.

24. These misrepresentations were not only intended to preserve PCC's revenue stream; they were also intended to undermine CSS's revenue, making the zero-dollar contract unprofitable.

25. Soon thereafter, Counterclaim-Defendants and PCC's messages to Florida Providers began to incorporate outright falsehoods in an effort to delay the transition from Audacious/PCC's Encounter Notifications Service ("ENS") System to CSS's to CEND system.

26. For example, in November 2025, Mr. Smart sent communications to the Palm Beach Accountable Care Organization ("PBACO") through its Analytics Engineer, Martin Drobits and to Advanced Management USA, LLC ("AdvancedACO") through its Technology Project Manager, Jack Fentzke. Mr. Smart told Mr. Drobits and Mr. Fentzke, among other things:

a. "You are not required to transition to CSS, but you do need to sign the CSS agreement. However, you can delegate all technical and invoicing tasks to a third-party vendor. This way, we can handle the technical configuration, onboarding, and even payments to CSS, allowing you to maintain your current workflow and data receipt methods;" and

b. "We have already discussed this process with AHCA and CSS, and it should be straightforward: sign the agreement, delegate PCC as a third-party vendor, and we will take care of the rest at no additional cost."

Ex. B.

27. Mr. Smart's statement that Counterclaim-Defendants and PCC had "already discussed this process with AHCA and CSS" was false. No payment-intermediary arrangement had been discussed with, approved by, or was being developed with CSS or AHCA, and none have been developed to date. Mr. Smart's representation on behalf of Counterclaim-Defendants and PCC that the process would be "at no additional cost" also obscured the financial reality that providers could face duplicative charges for the same services if they complied with Counterclaim-Defendants and PCC's instructions.

28. On information and belief, these communications had their intended effect. Prior to receiving Mr. Smart's communications on behalf of Counterclaim-Defendants and PCC, Mr. Drobits had been engaged with CSS's account management team on the standard transition process. After receiving these communications, Mr. Drobits told CSS that he had been informed that "we do not need to transition to anything, and that our contract with FLHIE can continue as is," and he sought to implement Counterclaim-Defendants and PCC's preferred delegation model rather than the direct-connection model CSS and AHCA had established. Florida Provider confusion, delay, and hesitation resulted. *See* Ex. C.

29. As CSS's Executive Director for the Florida HIE, Michael Van Popering, contemporaneously noted, Counterclaim-Defendants and PCC's communications were "alleging all sort[s] of collaborative undiscussed arrangements," and they further appeared to be "attempting

to upcharge the service by having the participants pay them (PCC) to pay us." Ex. D. Van Popering escalated the matter to AHCA.

30. Nonetheless, Counterclaim-Defendants and PCC's false and misleading messages to Florida Providers continued into 2026 and, upon information and belief, continue through today. For example, in April 2026, PCC Associate Customer Success Manager Logan Hake sent communications to MaxHealth through Senior Director Christopher Stephey. Mr. Hake told Mr. Stephey, among other things:

a. "As a follow-up to our ongoing conversations regarding the Florida HIE Transition following our call today, we now need to **finalize your organization's direction with PointClickCare** to ensure continuity of your current workflows ahead of the upcoming cutover;"

b. "To maintain your existing alert routing, patient roster management, and overall data exchange as they function today, your organization must complete the **Technical Vendor Delegation (third-party) designation form issued through the Florida HIE**. This form formally authorizes PointClickCare to act as your designated technology partner on your behalf following the transition;" and

c. ". . . review and complete the required Florida HIE documentation as soon as possible."

Ex. E (original emphasis). Mr. Smart was CC'd on these communications, as were other individuals affiliated with PCC and Counterclaim-Defendants.

31. Mr. Hake's statement that MaxHealth "must complete the Technical Vendor Delegation (third-party) designation form issued through the Florida HIE" in order to "maintain [its] existing alert routing, patient roster management, and overall data exchange as they function

today" was false, as was his statement that completion of the third party designation documentation was "required." As AHCA's HIE Operations Coordinator, FCCM Milly Hardin later explained when she was added to the communications, "CSS is able to mimic any step-up [*sic*] you currently have" and the third-party designation was not required unless a specific organization "wish[es] to use an intermediary rather than directly connect to the new Florida HIE platform." Ex. E.

32. Upon information and belief, Counterclaim-Defendants and PCC's communications again had their intended effect. After receiving Mr. Hake's communications on behalf of Counterclaim-Defendants and PCC, Mr. Stephey and others within MaxHealth sought to implement Counterclaim-Defendants and PCC's preferred delegation model rather than the direct-connection model CSS and AHCA had established. *See* Ex. E. This resulted in overt confusion over what was required of MaxHealth during the HIE transition process as Mr. Hake's instructions conflicted with the instructions MaxHealth was receiving from its official Florida HIE account manager. Ex. E. It also complicated the process of onboarding MaxHealth as implementing Counterclaim-Defendants and PCC's preferred delegation model required technical integrations between CSS and PCC. Ex. E.

**C. Counterclaim-Defendants' "Evergreen" Agreement Assertions and Data Exchange Delay and Obstruction**

33. On information and belief, Counterclaim-Defendants and PCC's efforts to obstruct and delay Florida Providers' transition to CSS's CEND health information technology system did not stop with its efforts to insert itself as an unnecessary intermediary between Florida Providers and CSS but also extended to untenable reinterpretation of its now-nullified contracts with AHCA and Florida Providers.

34. On information and belief, in February 2026, Counterclaim-Defendants and PCC asserted to AHCA that its existing participant agreements with Florida Providers were

"evergreen," meaning that, unless each individual Florida Provider separately and explicitly directed PCC to stop exchanging data on their behalf, Counterclaim-Defendants and PCC would continue to operate its Florida HIE services notwithstanding AHCA's termination of the PCC contract. PCC's Vice President, David Rodriguez, communicated this position to AHCA's Pamela King on or around February 19, 2026, asserting different interpretations from the preamble of the agreements and requesting that the parties' legal teams meet to resolve the dispute.

35. On information and belief, AHCA rejected Counterclaim-Defendants and PCC's "evergreen" interpretation. AHCA informed Counterclaim-Defendants and PCC that termination of the PCC contract would nullify Counterclaim-Defendants and PCC's Florida HIE services agreements with Florida Providers. On information and belief, notwithstanding AHCA's position, Counterclaim-Defendants and PCC persisted in asserting the "evergreen" interpretation, which has had the effect of delaying and complicating the transition from PCC's ENS system to CSS's CEND system by creating uncertainty among providers regarding whether they needed to take affirmative action to transition, and by providing Counterclaim-Defendants and PCC a basis to continue soliciting providers to remain on Counterclaim-Defendants and PCC's system.

36. Upon information and belief, PCC's assertion that the participation agreements were "evergreen," together with its efforts to prevent Florida Providers from terminating those agreements, was intended to preserve PCC's access to Florida Provider data. Maintaining that data flow allowed PCC to continue generating revenue from data-related services, retain subscribers who might otherwise migrate to the state-designated HIE, and extract additional commercial value from data associated with Florida providers and their patients through its broader national operations.

37. Collectively, Counterclaim-Defendants and PCC's communications with Florida Providers and AHCA are indicative of obstructive tactics that are intended to restrict the ability for CSS and Florida Providers to access, exchange, or use electronic health information and delay Florida Providers and AHCA's transition between Plaintiff and PCC's ENS health information technology system and CSS's CEND health information technology system.

**D. The Patent Infringement Action and the Court's August 31, 2026 Ruling**

38. On July 14, 2025, a month after losing their protest of the award of the contract in Florida, Counterclaim-Defendants initiated this patent infringement action asserting infringement of U.S. Patent No. 10,938,962 ("the '962 Patent"), U.S. Patent No. 11,114,194 ("the '194 patent"), and U.S. Patent No. 12,047,475 ("the '475 Patent") (collectively, the "Patents-in-Suit"). The Patents-in-Suit relate generally to systems and methods for receiving, processing, and routing healthcare data, including ADT messages, through computer networks.

**1. The Asserted Patents**

**a. The '962 Patent**

39. The '962 Patent is entitled "Network Architecture for Multiple Data Stream Management and Endpoint Visualization" and purports to be directed to "[n]etwork architecture with a plurality of data streams" and "multiplex[ing] a plurality of signals from the plurality of data streams." Ex. F ('962 Patent) at Title, Abstract. The '962 Patent issued on March 2, 2021 with the named inventors Bill Howard, Paul Cahill, Sandeep Antony, Scott Afzal, and David Horrocks. Ex. F ('962 Patent) at Inventors.

40. Plaintiffs assert that Defendants "have infringed at least claims 1, 8, and 10 of the '962 Patent." Dkt. 24 at ¶121. However, none of the claims in the '962 Patent are directed to patent-eligible subject matter and therefore are invalid under 35 U.S.C. § 101. The '962 Patent claims taken individually and as a combination, are directed to the established abstract idea of

aggregating or multiplexing data. Further, claim one reciting that the data is updated in "real-time" does not add an inventive concept nor save the claim from ineligibility.

41. The claims in the '962 Patent recite using only generic computer components such as "processor[s]," "interfaces," and "memory" to carry out aggregating and multiplexing data. *See e.g.* Ex. F ('962 Patent) at 9:34-60. Further, the '962 Patent itself recognizes that multiplexing signals to create a single output from multiple inputs is well known. Ex. F ('962 Patent) at 1:43-46 (describing prior art "simple multiplexor feeding signals from each spoke data source to each spoke client in composite or multiplexed fashion"). The '962 Patent claims do not recite an enhancement or improvement to the functioning of computers nor computer networks, only using known components to perform the known concepts of aggregating and multiplexing data.

**b. The '475 Patent**

42. The '475 Patent is entitled "Parallel Network Architecture for Aggregate Data Routing" purports to be directed to "culling or screening output to communications that match user parameters" and "aggregat[ing] and enhanc[ing] information that matches from among [certain] inputs." Ex. G ('475 Patent) at Title, Abstract. The '475 Patent issued on July 23, 2024 with named inventors Sandeep Antony, Scott Afzal, and David Horrocks. Ex. G ('475 Patent) at Inventors.

43. Plaintiffs allege that Defendants "have infringed at least claims 1, 12, 13, and 20 of the '475 Patent." Dkt. 24 at ¶129. However, none of the claims in the '475 Patent are directed to patent-eligible subject matter and therefore are invalid under 35 U.S.C. § 101. The '475 Patent claims taken individually and as a combination, are directed to an established abstract idea because the claims are merely directed to data filtering and limiting access.

44. The claims in the '475 Patent recite using only generic computer components such as "processor[s]," "interface," and "memory." *See e.g.* Ex. G ('475 Patent) at 14:30-53. Further, those generic computer components are merely used to "limit flow of the plurality of streams to a

receiving user." Ex. G ('475 Patent) at 14:47. The '475 Patent claims do not recite an enhancement or improvement to the functioning of computers nor computer networks, only using known components to limit and filter data.

**c. The '194 Patent**

45. The '194 Patent is entitled "Network-Based Systems and Methods for Providing Readmission Notifications" and purports to be directed to "receiving healthcare information and with a computer identifying when a patient is readmitted" then generating "[a] readmission notification." Ex. H ('194 Patent) at Title, Abstract. The '194 Patent issued on September 7, 2021, with named inventors Sandeep Antony, Scott Afzal, Evan Carter, Christopher Brandt, and Yedong Tang. Ex. H ('194 Patent) at Inventors.

46. Plaintiffs allege Defendants "have infringed at least claims 1, 10, 13, and 16 of the '194 Patent." Dkt. 24 at ¶125. However, none of the claims in the '194 Patent are patent-eligible subject matter and therefore are invalid under 35 U.S.C. § 101. The '194 Patent claims taken individually and as a combination, are directed to an established abstract idea because they are directed to merely analyzing and comparing data from multiple sources then generating a notification. The fact that data may arrive in multiple formats is irrelevant. Similarly, the idea of converting multiple data formats into a standardized or singular format is abstract.

47. The claims in the '194 Patent recite using only generic computer components such as "processor[s]," and "memory" to generate "in real-time . . . a readmission notification." Ex. H ('194 Patent) at 16:26-60. The claims themselves do not recite improved accuracy or efficiency in managing healthcare information and the idea of generating and transmitting notifications alone is not an inventive concept.

**2. The Motion to Dismiss**

48. After Counterclaim-Plaintiffs moved to dismiss the original complaint, Counterclaim-Defendants filed its operative Amended Complaint asserting infringement of the same patents on September 22, 2025. Counterclaim-Plaintiffs again filed a motion to dismiss, arguing in relevant part that all claims of the Patents-in-Suit were invalid under 35 U.S.C. § 101 for being directed to patent-ineligible subject matter.

49. On August 31, 2026, this Court issued a Memorandum Opinion and Order (Dkts. 39, 40) granting in part and denying in part Counterclaim-Plaintiffs' Motion to Dismiss. With respect to the '194 patent, the Court held that representative Claim 1 is directed to patent-ineligible subject matter under 35 U.S.C. § 101 and dismissed Count II asserting infringement of the '194 patent with prejudice. In reaching this conclusion, the Court found that the '194 patent is "directed to the abstract idea of receiving, authenticating, and publishing data," "relies on results-focused functional language that fails to identify the 'specific asserted improvements in computer capabilities,'" and "does not describe the 'how' of such improvement in a manner beyond the general function- and results-oriented steps." (Dkt. 39 at 30, 33.) The Court further found that the '194 patent lacks an inventive concept, concluding that it "uses generic computer technology to perform data collection, analysis, and publication and does not recite an improvement to a particular computer technology;" "involve[s] the generic, well-known steps of collecting data, recognizing data, and storing data;" and "lacks the requisite 'something more'" to be patent-eligible. (Dkt. 39 at 38-39.)

50. With respect to the '962 and '475 Patents, the Court did not reach the merits of Counterclaim-Plaintiffs' validity challenge because it determined it could not resolve a threshold question of assignor estoppel at the pleading stage. The Court expressly noted that it "makes no finding and reaches no conclusion as to whether assignor estoppel bars Defendants' validity

challenges" and that "Defendants are free to renew their challenge on a full record on summary judgment." (Dkt. 39 at 27.)

51. On information and belief, the facial claim language of the '962 and '475 Patents—which, like the '194 patent, are directed to the abstract idea of the receiving, processing, and routing information through generic computer components—raises substantial questions regarding their eligibility under 35 U.S.C. § 101 and their validity generally. The '962 Patent is a continuation of the same patent family as the '194 patent, and the Court found the '194 patent claims, which are closely related, to be ineligible.

**E. Injuries to Counterclaim-Plaintiffs**

52. As a direct and proximate result of Counterclaims-Defendants' coordinated exclusionary conduct—including the misleading provider outreach, the "evergreen" agreement assertions, and the assertion of facially questionable patent claims—Counterclaim-Plaintiffs have suffered and continue to suffer injury, including but not limited to:

a. Delay and disruption in the transition of Florida providers from Counterclaims-Defendants and PCC's ENS system to CSS's CEND system, including delays in execution of Participation Agreements, establishment of direct data connections, and commencement of HIE services;

b. Provider confusion regarding the necessity and mechanics of the transition, resulting in lost time, increased support costs, and diversion of CSS resources;

c. Interference with CSS's contractual relationship with AHCA and CSS's prospective business relationships with Florida healthcare providers, including University of Miami Health System, PBACO, AdvancedACO, and others;

d. Costs and expenses incurred in responding to Counterclaim-Defendants' misleading communications, correcting false impressions among providers, and defending against this patent infringement action;

e. Damage to CSS's and CRISP Maryland's reputation and goodwill among Florida Providers and AHCA;

f. Lost revenue and profits from delayed or diverted provider relationships.

**F. Actual Case or Controversy Regarding Infringement and Validity of the '962 and '475 Patents**

53. In their Amended Complaint, Counterclaim-Defendants allege that CMT is the owner of the Patents-in-Suit and have expressly charged Counterclaim-Plaintiffs with infringement of the Patents-in-Suit. Counterclaim-Plaintiffs deny these allegations.

54. As a result of Counterclaim-Defendants' actions and statements, including the filing of the Complaint, (Dkt. 1), and First Amended Complaint, (Dkt. 24), an actual and justiciable controversy has arisen between Counterclaim-Defendants and Counterclaim-Plaintiffs with regard to the validity, enforceability, and infringement of the '962 and '475 Patents.

55. A judicial determination and declaration as to the patent-related Counterclaims is necessary and appropriate at this time given Counterclaim-Defendants' allegations and in order that Counterclaim-Plaintiffs may ascertain their rights and duties with respect to the Patents-in-Suit.

**G. Assignor Estoppel Does Not Bar Counterclaim-Plaintiffs' Challenges to the Validity of the '962 and '475 Patents**

56. Assignor estoppel is an equitable doctrine grounded in principles of fair dealing. Under *Minerva Surgical, Inc. v. Hologic, Inc.*, 594 U.S. 559 (2021), the doctrine applies when an assignor's later invalidity challenge contradicts an express or implied representation made in connection with an assignment that the assigned patent rights were valid. Whether the doctrine

applies therefore turns on whether Counterclaim-Plaintiffs' present invalidity challenges are inconsistent with a representation made in the transaction on which Counterclaim-Defendants rely. As the facts pled herein show, no such inconsistency exists.

57. Audacious personnel comprised all but one of the inventors associated with the patent families leading to the '962 and '475 Patents. At least four of the five relevant inventors were affiliated with Audacious during the pertinent development and prosecution periods, while only one inventor, David Horrocks, was affiliated with CRISP Maryland at relevant times. Audacious thus stood on the inventor and technology-development side of the relevant transactions, not in the position of an arm's-length purchaser lacking knowledge of the technology.

58. Audacious—not CRISP Maryland or CSS—selected and retained prosecution counsel for the relevant patent applications, supplied or supervised prosecution instructions, and controlled decisions concerning continuations, continuations-in-part, claim drafting, amendments, and the claims ultimately pursued in the applications in the '962 and '475 Patent families. CRISP Maryland and CSS did not control those prosecution decisions or have any active role in prosecution. Audacious's role included both inventive contributions and participation in the prosecution of the patent families through which the '962 and '475 Patents issued.

59. In light of Audacious's participation in developing the technology and prosecuting the relevant applications, Audacious (and subsequently CMT) did not acquire the asserted patent rights in reliance on a representation by CRISP Maryland, express or implied, concerning the validity of the later-issued claims.

60. Audacious did not request or receive an express warranty from CRISP Maryland regarding the validity of the claims that ultimately issued in the '962 and '475 Patents.

61. On or about August 5, 2009, Audacious and CRISP Maryland entered into a Master Professional Services Agreement (the "MSA"). The MSA does not contain an express warranty concerning the validity of any patent or future claim or a separate patent assignment directed specifically to the claims that later issued in the '962 and '475 Patents.

62. CRISP Maryland and Audacious subsequently entered into an agreement in December of 2013 that purported to assign to Audacious any rights that CRISP Maryland may have had (if any) to certain "ENS Technology" and "ENS IP". Of course, if CRISP Maryland had no rights in any patents at the time of this agreement, it could not have assigned any patent rights to Audacious. Regardless, the agreement did not expressly address nor provide any warranties with respect to the validity of the claims that would later issue as the '962 or '475 Patents, or any other specifically identified patents or patent applications.

63. CSS was not a party to the December 2013 Agreement between CRISP Maryland and Audacious, and was not formed until on or about October 5, 2020, several years after the alleged December 2013 transfer and after the relevant inventor assignments. CSS therefore never owned and did not assign any patent interest to the Counterclaim-Defendants, nor did it participate in any consideration exchanged for the alleged transfer. Upon information and belief, CSS has not represented, expressly or implicitly, that the claims of the '962 or '475 Patents are valid.

64. The applications from which the '962 and '475 Patents issued were filed after the purported transfer of rights on which Counterclaim-Defendants rely. U.S. Patent Application No. 15/911,137, which led to the '962 Patent, was filed on or about March 4, 2018, more than four years after the alleged December 2013 transfer. U.S. Patent Application No. 17/190,358, from which the '475 Patent issued, was filed on or about March 2, 2021, more than seven years after that alleged transfer.

65. Between the original assignments and the issuance of the Patents-in-Suit, the priority chain passed through intervening continuation-in-part applications, including U.S. Patent Application No. 15/808,887, which ultimately led to the ’475 Patent. Upon information and belief, the ’887 Application combined disclosures from five distinct patent families and included subject matter not contained in the ’332, ’625, and ’225 Applications nor contributed to by Mr. Horrocks. At least three of the contributing families did not identify Mr. Horrocks as an inventor. The later disclosures and claims therefore were not coextensive with the invention covered by Mr. Horrocks’s earlier assignments and were substantively broader in scope.

66. The claims ultimately asserted from the ’962 and ’475 Patents also arose later and differ in scope and focus from the claims in the earlier applications. The asserted claims issued after prosecution of the ’137, ’358, and ’887 Applications, and their final scope had not been established when the alleged 2013 transfer and June 2014 assignments occurred. Those documents therefore did not include any representation concerning the validity of the later claim language.

67. To the extent Audacious also relies on assignments executed by Mr. Horrocks, the 2014 assignments concerning the ’332, ’625, and ’225 Applications and the February 14, 2018 assignments concerning the ’137 and ’887 Applications arose from Mr. Horrock’s amenable cooperation as a co-inventor, or at most from his preexisting assignment obligations, not a contemporaneous assessment of validity.

68. At the time Mr. Horrocks executed any patent assignment to Audacious, he could only assign that which he had a right to assign. Mr. Horrocks was never a CRISP Maryland employee, nor was Mr. Horrocks ever under any obligation to assign any inventions he conceived of to CRISP Maryland during his period of affiliation with CRISP Maryland. Accordingly, CRISP Maryland is unaware of ever having acquired any rights to any Audacious patents due to any

purported invention by Mr. Horrocks. Upon information and belief, Mr. Horrocks was at all times when affiliated with CRISP Maryland an employee of The Johns Hopkins Health System Corporation and had assigned all rights to any work he conceived of during his affiliation with CRISP Maryland to The Johns Hopkins Health System Corporation. Upon information and belief, such assignment would have predated and preempted any purported assignment to Audacious. Alternatively and upon information and belief, if Mr. Horrocks had not assigned his rights to The Johns Hopkins Health System Corporation, he retained those rights personally, and any assignment he may have made of those rights was in his personal capacity, not on behalf of CRISP Maryland or CSS.

69. Audacious and its prosecution counsel determined which CIPs and continuations to file, which amendments to make, and which claims to pursue. Mr. Horrocks, CRISP Maryland, and CSS did not control and were not involved in those decisions. In particular, Mr. Horrocks executed the assignments in his personal capacity without controlling either the initial scope or the final scope of the claims Audacious later selected, and the assignments transferred application rights and required cooperation without expressly addressing the validity of every claim that might later issue.

70. Under these circumstances Plaintiffs cannot rely on assignor estoppel to defeat claims of invalidity in this case. An assignment or obligation to assign made before the specific claims have been established may not include an implied representation concerning the validity of those claims. Similarly, estoppel may not extend to claims whose scope or focus changed after the relevant assignment. The 2018 assignments necessarily arose from perceived obligations that would have attached earlier (if they were at all proper assignments to begin with) and were

executed while Audacious retained control over the prosecution and selection of the claims ultimately asserted

71. An intervening change in law also bears on the scope of any earlier representation. Both CRISP Maryland's alleged direct assignment and Mr. Horrocks's preexisting obligation to assign his rights as an inventor arose before the Supreme Court's June 19, 2014 decision in *Alice Corp. Pty. Ltd. v. CLS Bank International*, 573 U.S. 208 (2014). *Alice* changed the patent-eligibility framework under 35 U.S.C. § 101, particularly for software-related claims, and provided a basis for challenging claims as directed to an abstract idea implemented without an inventive concept. A § 101 challenge based on that subsequent legal development is not inconsistent with an alleged representation made before *Alice*.

72. Based on these circumstances, Counterclaim-Plaintiffs never made an express or implied representation to Counterclaim-Defendants that the later-issued claims of the '962 or '475 Patents were valid. Counterclaim-Plaintiffs' present invalidity challenges therefore are not inconsistent with a representation made in connection with the relevant agreements or assignments, and assignor estoppel does not apply.

73. The foregoing allegations are based in part on matters within the possession, custody, or control of Audacious, the inventors, and prosecution counsel. Counterclaim-Plaintiffs plead those matters upon information and belief where indicated, subject to confirmation through the relevant documents and discovery.

### H. Audacious's Inequitable Conduct During Prosecution of the '962 and '475 Patents

74. Upon information and belief, one or more of Audacious and its patent prosecution counsel, including at least Audacious Managing Partner Christopher Brandt ("Mr. Brandt"), Audacious's former President and named inventor Scott Afzal ("Mr. Afzal"), and the individual attorney(s) who prepared and signed documents submitted during prosecution of the '962 Patent

and the ’475 Patent, including specifically Attorney Ryan Alley (“Mr. Alley”), knowingly and willfully misrepresented and obscured the correct priority date for both the ’962 Patent and the ’475 Patent and further failed to disclose material prior art in the form of at least Audacious’s own publicly disclosed and sold ENS system to the USPTO in violation of their duty of candor and good faith in dealing with the USPTO, which includes a duty to disclose to the USPTO all information known to that individual to be material to patentability.

75. The ’962 Patent issued from U.S. Patent Application No. 15/911,137 (“the ’137 Application”), filed March 4, 2018, and claims the benefit of a chain of eight applications extending back to U.S. Patent Application No. 13/844,332 (“the ’332 Application”), filed March 15, 2013. The chain comprises: (i) the ’332 Application, filed March 15, 2013; (ii) U.S. Patent Application No. 14/142,625 (“the ’625 Application”), filed December 27, 2013, as a continuation of the ’332 Application; (iii) U.S. Patent Application No. 14/189,225 (“the ’225 Application”), filed February 25, 2014; (iv) U.S. Patent Application No. 14/445,562 (“the ’562 Application”), filed July 29, 2014; (v) U.S. Patent Application No. 14/872,445 (“the ’445 Application”), filed October 1, 2015, as a continuation-in-part (“CIP”); (vi) U.S. Patent Application No. 15/010,142 (“the ’142 Application”), filed January 29, 2016, as a CIP; (vii) U.S. Patent Application No. 15/808,887 (“the ’887 Application”), filed November 9, 2017, as a CIP of the ’625, ’225, ’562, ’445, and ’142 Applications; and (viii) the ’137 Application, filed March 4, 2018, as a continuation of the ’887 Application. The ’475 Patent issued from U.S. Patent Application No. 17/190,358 (“the ’358 Application”), which is a continuation of the ’137 Application and shares the same specification as the ’962 Patent. The chain of priority for both the ’962 Patent and the ’475 Patent therefore passes through several disparate patent families, including the ’194 Patent family, and is reflected below with each arrow representing a priority claim for the relevant patent or application.




76. Upon information and belief, Audacious, by and through its patent prosecution counsel Mr. Alley of Ryan Alley IP, its Managing Partner Mr. Brandt, and Audacious executive and named inventor Mr. Afzal, filed a series of CIP applications that combined subject matter from different patent families, creating an artificially complex priority chain designed to obscure that the claims were not supported by the earliest applications and were, in fact, invalid over Audacious's own public prior art as embodied in the ENS system and specifically intended to mislead the USPTO as to the patentability and priority of the claims.

77. Under 35 U.S.C. § 120, a CIP application is entitled to the benefit of a parent's filing date only if the parent's specification provides adequate written-description support under 35 U.S.C. § 112(a).

78. None of the applications filed before the ’887 Application provides written-description support for at least the following limitations recited in the independent claims of the ’962 and ’475 Patents:

a. HL7 Admit-Discharge-Transfer (“ADT”) Messages as a specific class of data stream, distinct from generic HL7 references (*e.g.,* Ex. F (’962 Patent) at Claims 1, 10; Ex. G (’475 Patent) at Claims 1, 12, 20);

b. Identity-based multiplexing or aggregation of data streams into a single output *(e.g.,* Ex. F (’962 Patent) at Claims 1, 10);

c. Disposal or limitation of HL7 ADTs based on content and client input, with output to a multi-field graphical user interface populated in real time (*e.g.,* Ex. F (’962 Patent) at Claims 1, 10; Ex. G (’475 Patent) at Claims 1, 20);

d. A protocol interface configured for different protocols including HL7 (Ex. G (’475 Patent) at Claims 1, 12, 20); and

e. A plurality of streams operating on different protocols (Ex. G (’475 Patent) at Claims 1, 12, 20).

79. The earlier applications (the ’332, ’625, ’225, ’562, ’445, and ’142 Applications) describe healthcare notification-delivery networks and related features, but do not describe the multi-stream visualization architecture that is the subject of the ’962 and ’475 Patent claims.

80. The ’887 Application, filed November 9, 2017, is the first application in the chain that could be reasonably interpreted to provide adequate written-description support for all of these limitations. Accordingly, the claims of the ’962 and ’475 Patents are entitled to an effective filing date no earlier than November 9, 2017, not March 15, 2013.

81. The ’887 Application was filed as a CIP of five different earlier applications (the ’625, ’225, ’562, ’445, and ’142 Applications) and combined disparate technological disclosures from applications directed to distinct aspects of healthcare data exchange. This deliberate strategy of threading CIPs through different patent families created the misleading appearance that the claims were entitled to a March 15, 2013 priority date, when in fact they were not supported by any application filed before November 9, 2017 at the earliest.

82. The complexity of the CIP chain served no legitimate prosecutorial purpose and, the most reasonable inference is that the chain of CIPs was intentionally designed to obscure the lack of written-description support in the earlier applications.

83. Audacious also failed to disclose to the USPTO that the claimed inventions were the subject of a public sale, offer for sale, or prior public use, which constitutes invalidating prior art under 35 U.S.C. § 102 when the true effective filing date of November 9, 2017 is applied. Specifically, Audacious’s ENS system, which Audacious asserts is covered by the claimed inventions of the ’962 and ’475 Patents, was commercially offered and sold to healthcare information exchanges and healthcare providers beginning in 2012 and continuing thereafter.

84. By the end of 2012, 57 organizations were already receiving real-time, actionable information through the ENS system Audacious commercially developed.

85. Audacious knew of this commercial activity because it sold ENS services during the entire period between the true effective filing date and the filing of the applications from which the ’962 and ’475 Patents issued. This information was material to patentability because, under the true effective filing date, the commercial sale and public offering of the ENS system constituted prior art under 35 U.S.C. § 102. Audacious had an obligation under 37 C.F.R. § 1.56 to disclose this information to the USPTO and failed to do so.

86. Audacious's inequitable conduct included both material omissions and express misrepresentations during the prosecution of the '887 Application, the '137 Application, and the '358 Application.

87. On March 8, 2018, nearly four months after the '887 Application was filed on November 9, 2017, Audacious caused to be filed a Power of Attorney (Ex. I) signed by Mr. Brandt on behalf of Audacious naming Mr. Alley as Audacious's attorney for purposes of prosecuting the '887 Application, an Information Disclosure Statement ("the '887 Application IDS") (Ex. J) signed by Mr. Alley, and a Statement Under 37 C.F.R. § 1.78(d)(6) ("the '887 Application Priority Statement") (Ex. K) signed by Mr. Alley.

88. Mr. Afzal executed a Combined Declaration and Global Assignment for Patent Application on February 16, 2018, identifying himself as one of the "original joint inventors of a claimed invention" in the '887 Application. (Ex. L). On information and belief, Mr. Afzal was an Audacious executive at that time and, as a named inventor and representative of the patent applicant Audacious, he owed a duty of candor to the USPTO in connection with prosecution of the '887 Application.

89. The '887 Application IDS identified four patents as purported prior art but omitted any reference to Audacious's own ENS system. (Ex. J.) On information and belief, neither Mr. Alley, Mr. Brandt, nor Mr. Afzal otherwise disclosed Audacious's own ENS system to the USPTO during prosecution of the '887 Application.

90. The '887 Application Priority Statement expressly and falsely represented that the '887 Application "claims the benefit of the filing date of a nonprovisional application filed prior to March 16, 2013. . . ." (Ex. K.) Yet, the subject matter eventually claimed was not entitled to claim priority to that date.

91. The ’887 Application was abandoned on June 4, 2020, after Audacious and its representatives failed to submit a reply to an October 25, 2019 non-final office action that rejected all applied-for claims as unpatentable. (Ex. M.)

92. The ’137 Application, filed on March 4, 2018 as a continuation of the ’887 Application, was accompanied by a Power of Attorney (Ex. N) signed by Mr. Brandt on behalf of Audacious naming Mr. Alley as Audacious’s attorney for purposes of prosecuting the ’137 Application and a Statement Under 37 C.F.R. § 1.78(d)(6) (“the ’137 Application Priority Statement”) (Ex. O) signed by Mr. Alley.

93. Mr. Afzal executed a Combined Declaration and Global Assignment for Patent Application on February 16, 2018, identifying himself as one of the “original joint inventors of a claimed invention” in the ’137 Application. (Ex. P). On information and belief, Mr. Afzal was an Audacious executive at that time and, as a named inventor and representative of the patent applicant Audacious, he owed a duty of candor to the USPTO in connection with prosecution of the ’137 Application.

94. The ’137 Application Priority Statement expressly and falsely represented that the ’887 Application “claims the benefit of the filing date of a nonprovisional application filed prior to March 16, 2013. . . .” (Ex. O.) Yet, the subject matter eventually claimed was not entitled to claim priority to that date.

95. Mr. Alley did not submit an IDS during prosecution of the ’137 Application, nor did any of Mr. Alley, Mr. Brandt, and Mr. Afzal otherwise disclose Audacious’s own ENS system to the USPTO during prosecution of the ’137 Application.

96. After almost three years of prosecution, the ’962 Patent issued from the ’137 Application on March 2, 2021. At no time between the filing of the ’137 Application on March 4,

2018 and the subsequent issuance of the ’962 Patent on March 2, 2021, did Mr. Alley, Mr. Brandt, Mr. Afzal, or any other Audacious representative disclose to the USPTO that its own ENS system embodied the claims of the ’962 Patent and had been publicly disclosed and commercially used at least as early as 2012, nor did they inform the USPTO that the claims of the ’962 Patent were not entitled to claim priority to any date prior to November 9, 2017.

97. The ’358 Application, filed on March 2, 2021 as a continuation of the ’137 Application, was accompanied by an Application Data Sheet (“the ’358 Application Data Sheet”) (Ex. Q) signed by Mr. Alley.

98. The ’358 Application Data Sheet identified Mr. Afzal as an inventor of the ’358 Application. (Ex. Q). On information and belief, Mr. Afzal was an Audacious executive at that time and, as a named inventor and representative of the patent applicant Audacious, he owed a duty of candor to the USPTO in connection with prosecution of the ’358 Application.

99. The ’358 Application Data Sheet expressly and falsely represented that the ’385 Application was entitled to claim priority to several previously filed applications, including the ’332 Application filed on March 15, 2013 and five other applications predating the filing of the ’887 Application. (Ex. Q.)

100. Mr. Alley did not submit an IDS during prosecution of the ’358 Application, nor on information and belief, did any of Mr. Alley, Mr. Brandt, and Mr. Afzal otherwise disclose Audacious’s own ENS system to the USPTO during prosecution of the ’358 Application.

101. After more than three years of prosecution, the ’475 Patent issued from the ’358 Application on July 23, 2024. On information and belief, at no time between the filing of the ’358 Application on March 2, 2021 and the subsequent issuance of the ’475 Patent on July 23, 2024, did Mr. Alley, Mr. Brandt, Mr. Afzal, or any other Audacious representative disclose to the

USPTO that its own ENS system embodied the claims of the ’475 Patent and had been publicly disclosed and commercially used at least as early as 2012, nor did they inform the USPTO that the claims of the ’475 Patent were not entitled to claim priority to any date prior to November 9, 2017.

102. The inequitable conduct described herein was committed solely by Audacious, which had exclusive control over prosecution of the patent applications that led to the ’962 and ’475 Patents, and the Audacious representatives identified herein, including specifically Mr. Alley, Mr. Brandt, and Mr. Afzal.

103. The conduct also took place after inventor David Horrocks, the sole named inventor with any affiliation with CRISP Maryland, executed any inventor assignments associated with the underlying applications. Mr. Horrocks executed assignments of the ’332, ’625, and ’225 Applications to Audacious on June 5, 2014, which Audacious also relied on with respect to the ’358 Application, and executed assignments of the ’137 and ’887 Applications to Audacious on February 14, 2018. These assignments were executed pursuant to preexisting obligations and in Mr. Horrocks’s personal capacity as an inventor, and Mr. Horrocks had no role in or control over the prosecution strategies employed by Audacious following the execution of his assignments.

104. CRISP Maryland and CSS had no role in, knowledge of, or control over the prosecution strategies employed by Audacious, including the filing of the CIP applications that created the misleading priority chain, the failure to disclose the true effective filing date to the USPTO, or the failure to disclose the on-sale-bar or prior public use prior art.

105. Audacious’s conduct was undertaken with the specific intent to deceive the USPTO and procure patent rights to which Audacious was not entitled. Having failed to obtain patents in applications with less written description support (and which did not disclose, for example, HL7 ADT messages specifically), Audacious sought to add matter that it would later rely on to get the

patents issued over prior art—while intentionally obfuscating the fact that such claims were not entitled to the earliest claimed priority dates. All the while, failing to disclose that its own ENS System would be invalidating prior art.

106. Audacious's own prosecution statements demonstrate its awareness that the claimed subject matter was distinct from the disclosures in the earlier applications. For example, during prosecution of the '962 Patent, Mr. Alley, on behalf of Audacious, represented to the USPTO that "HL7 ADTs" denotes "a specific class of HL7 administrative messages with the 'ADT^AXX' field indicating the admission, discharge, or transfer event," as distinct from HL7 generally or other HL7 message types such as ACK messages in an attempt to distinguish the prior art reference U.S. Patent Application Publication No. 2007/0124310 A1 to Mathur. (Ex. R at 9-13.)

107. Mr. Alley, on behalf of Audacious, further reinforced this narrow construction during prosecution of the related '475 Patent (U.S. Application No. 17/190,358), construing "limit flow . . . to only an HL7 ADT" as requiring the removal of all non-HL7 ADT content from the incoming sources while still delivering HL7 ADT content, stating that "[n]othing else from the providers can be streamed to the users under this language." (Ex. S at 12.) In so arguing, Mr. Alley expressly incorporated the '962 Patent prosecution appeal brief admissions into the '475 prosecution record. (*Id.* at 13.)

108. Under Audacious and Mr. Alley's own construction, generic references to "HL7" in the pre-'887 Application patent applications do not constitute a written description of the specific "HL7 ADT" message type recited in the claims. The earlier applications, including the '332 Application, discuss ADT messages and HL7 only in the context of a notification-delivery system, not as a specific class of data stream within a plurality of data streams operating on

different protocols with real-time updates. An applicant that understood its claims required narrow, specific HL7 ADT disclosures—and that knew the earlier applications contained only generic HL7 references in a different technological context—cannot plausibly claim ignorance of the priority-date problem.

109. Despite securing issuance of the ’962 Patent and ’475 Patent claims on the strength based at least in part on their narrow construction of “HL7 ADT,” Audacious, Mr. Alley, Mr. Brandt, and Mr. Afzal simultaneously claimed the benefit of the March 15, 2013 filing date of earlier applications that contain only generic references to HL7 in a notification-delivery context and do not describe the specific HL7 ADT limitations under the very construction Audacious advanced. This internally contradictory prosecution strategy further evidences an intent to deceive.

110. The unnecessary complexity of the CIP chain that lead to the ’962 and ’475 Patents further evidences intent to deceive.

111. The ’887 Application to which both the ’962 and ’475 Patents claim priority was filed as a CIP of five separate earlier applications (the ’625, ’225, ’562, ’445, and ’142 Applications), each of which addressed different aspects of healthcare data exchange. The ’332 and ’625 Applications describe a notification-delivery network. The ’445 Application introduced new matter relating to readmission notification features. The ’142 Application introduced new matter relating to third-party update mechanisms and collaborative data sharing. These disparate disclosures were combined in the ’887 Application, which for the first time described the multi-stream visualization architecture claimed in the ’962 and ’475 Patents.

112. Upon information and belief, the deliberate threading of CIP applications through these different patent families served no legitimate prosecutorial purpose and was designed to

create the misleading appearance that the multi-stream visualization claims were supported by applications filed as early as March 15, 2013.

113. Audacious, Mr. Alley, Mr. Brandt, and Mr. Afzal knew or should have known that the claims of the ’962 and ’475 Patents were not entitled to the March 15, 2013 priority date because the earlier applications in the CIP chain did not provide written-description support for the claimed limitations.

114. Audacious, Mr. Alley, Mr. Brandt, and Mr. Afzal also knew or should have known that Audacious’s own sale and public offering of the ENS system constituted material prior art under the true effective filing date.

115. Audacious was not merely aware of the ENS system’s commercial history, it was itself the provider of ENS services to healthcare information exchanges and healthcare providers throughout the United States. Audacious and its principals had firsthand, personal knowledge of the commercial deployment of the very system embodying the claimed inventions throughout the period between the true effective filing date (November 9, 2017) and the issuance of the ’962 and ’475 Patents.

116. Taking the foregoing facts together, the single most reasonable inference is that Audacious and its representatives Mr. Alley, Mr. Brandt, and Mr. Afzal intended to deceive the USPTO, particularly in view of: (a) the unnecessary complexity of the CIP chain designed to obscure the lack of written-description support; (b) the demonstrated awareness, through express prosecution statements, that the claims required narrow disclosures not present in the earlier applications; (c) the internally contradictory strategy of claiming narrow constructions to overcome prior art while asserting broad priority; and (d) the failure to disclose Audacious’s own commercial product as prior art.

117. But for Audacious, Mr. Alley, Mr. Brandt, and Mr. Afzal's omissions of material information regarding the correct priority date for the claims of the '962 and '475 Patents and Audacious's own public disclosure and sale of the prior art ENS system embodying those claims, the USPTO would not have allowed the claims of the '962 and '475 Patents.

## FIRST COUNTERCLAIM: DECLARATION OF NON-INFRINGEMENT OF THE '962 PATENT

118. Counterclaim-Plaintiffs repeat and reallege every allegation contained in the foregoing paragraphs of its Counterclaims as if set forth fully herein.

119. Counterclaim-Plaintiffs have not infringed, contributed to the infringement of, or induced the infringement of any claim of the '962 Patent, and are not liable for infringement of the '962 Patent.

120. Counterclaim-Plaintiffs are entitled to a declaratory judgment as set forth below.

121. Exemplary claim limitations for which Counterclaim-Defendants cannot demonstrate infringement include at least the following:

a. "multiplex a plurality of signals…" – Plaintiff's claim chart (Dkt. 24, Ex. 5) concedes that its multiplexing allegation rests entirely on "information and belief," stating: "On information and belief CEND multiplexes signals from data streams into a single output." (Dkt. 24, Ex. 5 at 21.) Plaintiffs allege the accused system consolidates ADT messages (*id.* at 24–25), yet there is no evidence that any accused product "multiplexes a plurality of signals" as required by the claims and CRISP Maryland and CSS are unaware of the accused products doing so.

b. "data updated in real-time…" – Plaintiff's claim chart (Dkt. 24, Ex. 5) cites CEND's receipt of healthcare information and ADT messages as satisfying the real-time limitation. (*Id.* at 4.) However, CEND's own architecture documentation

reveals significant batch-processing (*e.g.*, a "3 hour extract"). (*Id.* at 13.) Such batch-processing architecture reveals that the data in the accused products is not "updated in real-time."

c. "Dispose a Portion of the HL7 ADTs" – Plaintiff's claim chart (Dkt. 24, Ex. 5) relies on "information and belief," asserting that "CEND filters out irrelevant or incorrect HL7 ADT information and will modify the display of the information based on client input." (*Id.* at 28.) The accused products do not "dispose" of portions of HL7 ADT data, even when it may limit the display of certain data.

122. Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*, Counterclaim-Plaintiffs are entitled to judgment from this Court finding that Counterclaim-Plaintiffs do not infringe the '962 Patent pursuant to 35 U.S.C. § 271.

123. Additionally, despite alleging that both CRISP Maryland and CSS have infringed one or more claims of the '962 Patent, Counterclaim-Defendants have failed to identify any facts that they allege constitute an act of infringement by CRISP Maryland. Accordingly, CRISP Maryland is entitled to judgment from this Court finding that Counterclaim-Plaintiffs do not infringe the '962 Patent pursuant to 35 U.S.C. § 271 on this independent basis.

**SECOND COUNTERCLAIM:**
**DECLARATION OF INVALIDITY OF THE '962 PATENT**

124. Counterclaim-Plaintiffs repeat and reallege every allegation contained in the foregoing paragraphs of its Counterclaims as if set forth fully herein.

125. One or more claims of the '962 Patent are invalid for failure to comply with the conditions for patentability specified by Title 35 of the United States Code, including without limitation 35 U.S.C. §§ 101, 102, 103, and/or 112.

126. One or more of the claims of the ’962 Patent are invalid under 35 U.S.C. § 101 because the claimed invention is directed to patent-ineligible subject matter.

127. One or more of the claims of the ’962 Patent are invalid under 35 U.S.C. §§ 102 and/or 103 because the claimed invention was patented, described, in a printed publication, in public use, on sale, and/or otherwise available to the public before the effective filing date of the ’962 Patent. For example, the claims of the ’962 Patent are invalid for anticipation in light of the prior art, including without limitation the following patents, publications, and/or their related patent family members: US 2007/0124310 A1, to Mathur; JP 2010267041 A, to Kubota; CN 102185898 A, to Linfa et al.; US 2013/0311516 A1, to Callans et al.; and US 2009/0150185 A1, to Lassetter et al.. To the extent not identically disclosed, the differences between the claimed invention and the prior art are such that the claims of the ’962 Patent would have been obvious before the effective filing date of the ’962 Patent to a person having ordinary skill in the art.

128. One or more claims of the ’962 Patent are invalid under 35 U.S.C. § 112 for (1) failing to comply with the “written description” requirement, (2) failing to comply with the “enablement” requirement, and (3) failing to comply with the “definiteness” requirement. The asserted claims do not satisfy the enablement requirement because the specification does not teach those skilled in the art how to make and how to use the full scope of the claimed invention without undue experimentation to any extent that could fairly be construed as covering the accused subject matter. Finally, the asserted claims do not satisfy the definiteness requirement because those skilled in the art would not understand the full scope of the asserted claims when read in the light of the specification.

129. Counterclaim-Plaintiffs are entitled to a declaratory judgment as set forth below.

130. With respect to invalidity under 35 U.S.C. §§ 102/103, below is an exemplary claim chart demonstrating invalidity of claim one of the ’962 Patent under a combination of references.

| ’962 Claim Language | Invalidating Prior Art |
|---|---|
| 1. A network comprising:<br><br>a plurality of data streams, wherein at least one of the data streams includes data updated in real-time, wherein the plurality of data streams include HL7 Admit, Transfer, Discharge (ADT) Messages; | US 2007/0124310 A1 (“Mathur”) describes a distributed system for exchanging information between remote healthcare applications, including hospitals and physician offices (see, e.g., [0042]-[0048]).<br><br>The system handles HL7 messages, including lab results, discharge summaries, and other clinical data, which are updated and transmitted in real-time ([0049]-[0054], [0131]-[0141]).<br><br>HL7 messages include ADT messages (see [0007], [0131], [0141]). |
| a plurality of protocol interfaces each connected to at least one of the data streams, wherein at least one of the protocol interfaces is configured for HL7; | Mathur describes protocol interfaces for HL7, including an HL7 interface engine at the hospital and at the physician office ([0048]-[0050], [0135], [0140]).<br><br>The system is designed to handle multiple protocols and can be configured for HL7 and other standards ([0007], [0008], [0131], [0140]). |
| a processor coupled with the protocol interfaces; | The system includes nodes with processors that run agents to process, parse, and route HL7 messages ([0046], [0064], [0132], [0134]). |
| an output interface coupled to a display for showing a graphical user interface; and | Mathur describes that the system can include browser-based interfaces for users (e.g., nurses) to view and route HL7 results, and for system administrators to manage nodes and agents ([0148], [0166], [0172]). |

| | |
|---|---|
| | The Results Agent enables office staff to view HL7 results from a browser-based worklist ([0150]). |
| a memory coupled to the processor including instructions that when executed by the processor, cause the processor to, | Mathur includes nodes containing the following: (a) application server, (b) data storage mechanism, (c) secure communications mechanisms, (d) application utilities and methods and (e) management tools and services [0062] |
| multiplex a plurality of signals from the plurality of data streams via the protocol interfaces into a single output, wherein the multiplexing is executed based on an identity of the one of the data stream from which the signal originated, | Mathur describes a system that receives HL7 messages from multiple sources (e.g., different hospitals, labs, etc.), parses and processes them, and routes them to the appropriate destination (e.g., physician office EMR) ([0049]-[0054], [0132]-[0147]).<br><br>The system can aggregate, filter, and route messages based on their origin and content ([0050], [0140], [0145], [0151]).<br><br>The Results Agent and the GUI allow users to view and interact with results from multiple sources in a unified interface ([0148], [0150]).<br><br>US 2009/0150185 A1 ("Lassetter") teaches multiplexing data from a health care data store in order to communicate health data. [0027]. |
| dispose a portion of the HL7 ADTs based on content of the HL7 ADTs and client input, and | Mathur describes receiving HL7 ADT messages and other clinical data, and may filter or process data for relevance (see, e.g., Mathur [0032], [0045], [0050]).<br><br>In [0050] Mathur discloses "removing or modifying data from the original HL7 and discarding duplicates." see also [0136-137]<br><br>"A provider topic 43 provides an index used by the HL7 processor to obtain a list of physicians that can receive HL7 information. The |

| | |
|---|---|
| | ordering physician ID in the received HL7 message is compared to the index of physicians and their associated ID's kept in the provider topic. If a match is made, the HL7 message is further processed. If no match is made, the HL7 message is discarded." [0137]. |
| output the single output to the graphical user interface based on the content and the client input via the output interface, wherein the graphical user interface includes a plurality of fields, and wherein the single output populates at least one of the fields based on the identity of the one of the data stream in real-time. | Mathur describes a user interface that displays integrated patient data from multiple sources (see, e.g., Mathur [0040], [0045]).<br><br>Mathur also describes a GUI including a pull down list displaying the HL7 data. [0150]. |

131. Additionally, Plaintiff's own ENS System is invalidating prior art as by Plaintiff's own admission the ENS System practices the claims and was commercially available and in public use at least as early as 2012, well before the actual priority date of the '962 Patent as explained elsewhere herein. *See* Ex. T, https://www.crisphealth.org/wp-content/uploads/2017/08/e-Health-Update-Q3-2017-1.pdf, previously incorporated by reference into the Amended Complaint by Counterclaim-Defendants, who characterize it as describing the patented technology. Additionally, and upon information and belief, the prior art Axolotl system would also be invalidating prior art.

132. Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*, Counterclaim-Plaintiffs are entitled to judgment from this Court finding that the '962 Patent is invalid pursuant to 35 U.S.C. §§ 101, 102, 103 and/or 112.

## THIRD COUNTERCLAIM: DECLARATION OF UNENFORCEABILITY OF THE '962 PATENT

133. Counterclaim-Plaintiffs repeat and reallege every allegation contained in the foregoing paragraphs of its Counterclaims as if set forth fully herein.

134. The '962 Patent is unenforceable due to inequitable conduct before the USPTO.

135. Audacious as the applicant and prosecuting entity and Mr. Alley, Mr. Brandt, and Mr. Afzal as Audacious's representatives who were involved in the prosecution of the applications leading to the '962 Patent each owed a duty of candor and good faith to the USPTO under 37 C.F.R. § 1.56.

136. Audacious, Mr. Alley, Mr. Brandt, and Mr. Afzal breached this duty by: (a) filing CIP applications structured to create a false appearance of an earlier priority date; (b) failing to disclose to the USPTO that the claims lacked written-description support in the pre-'887 Application patent applications and were not entitled to the March 15, 2013 priority date; and (c) failing to disclose the commercial sale and public offering of the ENS system, which constituted prior art under the correct effective filing date of November 9, 2017.

137. This withheld information was material to patentability. But for Audacious, Mr. Alley, Mr. Brandt, and Mr. Afzal's misconduct, the USPTO would not have allowed the claims of the '962 Patent.

138. Upon information and belief, Audacious, Mr. Alley, Mr. Brandt, and Mr. Afzal acted with the specific intent to deceive the USPTO. The single most reasonable inference from the evidence—including the unnecessary complexity of the CIP chain, Audacious and at least Mr. Alley's demonstrated awareness through their own prosecution statements that the claims required narrow disclosures not present in the earlier applications, the internally contradictory prosecution strategy, and the failure to disclose Audacious's own commercial product as prior art—is that Audacious, Mr. Alley, Mr. Brandt, and Mr. Afzal intended to deceive the USPTO.

139. The inequitable conduct was committed solely by Audacious, which had exclusive control over patent prosecution, and its representatives Mr. Alley, Mr. Brandt, and Mr. Afzal.

140. Counterclaim-Plaintiffs are entitled to a declaratory judgment that the ’962 Patent is unenforceable.

**<u>FOURTH COUNTERCLAIM:</u>**
**DECLARATION OF NON-INFRINGEMENT OF THE ’475 PATENT**

141. Counterclaim-Plaintiffs repeat and reallege every allegation contained in the foregoing paragraphs of its Counterclaims as if set forth fully herein.

142. Counterclaim-Plaintiffs have not infringed, contributed to the infringement of, or induced the infringement of any claim of the ’475 Patent, and are not liable for infringement of the ’475 Patent.

143. Counterclaim-Plaintiffs are entitled to a declaratory judgment as set forth below.

144. Exemplary claim limitations for which Counterclaim-Defendants cannot demonstrate infringement include at least the following:

a. “Different Protocols” – Plaintiff’s claim chart (Dkt. 24, Ex. 7) identifies HL7 ADT messages and Consolidated Clinical Document Architecture (CCDA) documents as representing “different protocols.” (*Id.* at 1.) However, CCDA is a document formatting standard, not a protocol, and therefore this element cannot be met.

b. “limit flow of the plurality of streams… the limiting is executed in real-time with the streams” – CEND’s own architecture documentation describes batch-processing that would not be “real-time”(*e.g.*, “3 hour extract”). (*Id.* at 9.)

c. “limit flow of the plurality of streams…to only an HL7 ADT or a portion of the HL7 ADT” – In the accused products, there is no limiting to “only” HL7 ADT information, regardless of what may eventually be displayed to a user and the manner in which it is displayed.

145. Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*, Counterclaim-Plaintiffs are entitled to judgment from this Court finding that Counterclaim-Plaintiffs do not infringe the '475 Patent pursuant to 35 U.S.C. § 271.

146. Additionally, despite alleging that both CRISP Maryland and CSS have infringed one or more claims of the '475 Patent, Counterclaim-Defendants have failed to identify any facts that it alleges constitute an act of infringement by CRISP Maryland. Accordingly, CRISP Maryland is entitled to judgment from this Court finding that Counterclaim-Plaintiffs do not infringe the '475 Patent pursuant to 35 U.S.C. § 271 on this independent basis.

## FIFTH COUNTERCLAIM
## DECLARATION OF INVALIDITY OF THE '475 PATENT

147. Counterclaim-Plaintiffs repeat and reallege every allegation contained in the foregoing paragraphs of its Counterclaims as if set forth fully herein.

148. One or more claims of the '475 Patent are invalid for failure to comply with the conditions for patentability specified by Title 35 of the United States Code, including without limitation 35 U.S.C. §§ 101, 102, 103, and/or 112.

149. One or more of the claims of the '475 Patent are invalid under 35 U.S.C. § 101 because the claimed invention is directed to patent-ineligible subject matter.

150. One or more of the claims of the '475 Patent are invalid under 35 U.S.C. §§ 102 and/or 103 because the claimed invention was patented, described, in a printed publication, in public use, on sale, and/or otherwise available to the public before the effective filing date of the '475 Patent. For example, the claims of the '475 Patent are invalid for anticipation in light of the prior art, including without limitation the following patents, publications, and/or their related patent family members: US 2007/0250347 A1, to Abraham-Fuchs et al.; US 2013/0117036 A1, to Cothren et al.; US 2007/0124310 A1, to Mathur; US 2009/0150185 A1, to Lassetter et al.; and US

2011/0288877 A1, to Ofek et al. To the extent not identically disclosed, the differences between the claimed invention and the prior art are such that the claims of the ’475 Patent would have been obvious before the effective filing date of the ’475 Patent to a person having ordinary skill in the art.

151. One or more claims of the ’475 Patent are invalid under 35 U.S.C. § 112 for (1) failing to comply with the “written description” requirement, (2) failing to comply with the “enablement” requirement, and (3) failing to comply with the “definiteness” requirement. The asserted claims do not satisfy the enablement requirement because the specification does not teach those skilled in the art how to make and how to use the full scope of the claimed invention without undue experimentation to any extent that could fairly be construed as covering the accused subject matter. Finally, the asserted claims do not satisfy the definiteness requirement because those skilled in the art would not understand the full scope of the asserted claims when read in the light of the specification.

152. Counterclaim-Plaintiffs are entitled to a declaratory judgment as set forth below.

153. With respect to invalidity under 35 U.S.C. §§ 102/103, below is an exemplary claim chart demonstrating invalidity of claim one of the ’962 Patent under a combination of references.

| ’475 Claim Language | Invalidating Prior Art |
|---|---|
| 1. A network connected between a plurality of parallel streams and users to condition and route the streams, the network comprising: | US20070250347A1 (“Abraham-Fuchs”) teaches the claimed “network connected between a plurality of parallel streams and users to condition and route the streams” through its broker-based architecture that sits between multiple healthcare data sources and third-party requesters.<br><br>Specifically, the reference explains that a broker obtains access to health-related information from one or more healthcare |

| | |
|---|---|
| | institutions and, in response to a request from a third party, searches the institutions' servers and forwards selected results to the requesting party. Abraham-Fuchs describes the broker as an intermediary that receives requests, formulates search filters, obtains results from healthcare institution servers, and forwards those results to the third party. It further discloses that the broker may access data from multiple healthcare institutions, thereby obtaining information from a larger data pool, and may enhance, filter, redact, or otherwise limit the information before transmission. [0004]. |
| a protocol interface connected to the plurality of streams, wherein the plurality of streams operate on different protocols and include at least one Health Level 7 (HL7) Admit Discharge Transfer message (ADT) stream, wherein the protocol interface is configured for different protocols including HL7; | Abraham-Fuchs teaches the claimed "protocol interface connected to the plurality of streams, wherein the plurality of streams operate on different protocols ... wherein the protocol interface is configured for different protocols including HL7" through its broker architecture that is designed to access and process health information stored using multiple, distinct healthcare data formats.<br><br>Abraham-Fuchs explains that health-related data may be provided in standardized formats such as DICOM, HL7, and ICD, or alternatively in proprietary formats used by individual healthcare institutions. [0028].<br><br>Abraham-Fuchs further discloses that the broker knows which format is used by a particular healthcare institution and constructs search filters that are compatible with that format. [0039]. |
| an intake interface configured to receive parameters for network operation on the plurality of streams from a plurality of users separate from the plurality of streams; and | Abraham-Fuchs teaches that a third party may request diagnostic information relating to a particular lung disease, and in response the broker constructs a search filter using appropriate ICD codes and/or DICOM header entries based on the format of the underlying data. The broker then applies those user-supplied search criteria to the healthcare |

| | |
|---|---|
| | institution's stored data through the plug-in search engine, which filters and retrieves responsive information. [0040]. *See also* [0037–39]. |
| a processor and memory coupled to the intake interface and protocol interface, wherein the memory includes instructions that when executed by the processor, cause the processor to, | Abraham-Fuchs teaches that the memory 36 stores instructions for the processor 35, and describes multiple mechanisms by which those instructions may be stored and provided to the server. [0022].<br><br>Abraham-Fuchs further teaches that the search filter plug-in 32 comprises a software program having instructions loaded into memory 36 such that the software program may be run via processor 35. [0029].<br><br>Abraham-Fuchs also teaches that memory 36 stores health-related information received from users and healthcare systems, including patient records that may be entered manually through a user input interface or automatically from healthcare institution sources. [0023]. |
| limit flow of the plurality of streams to a receiving user of the plurality users to only an HL7 ADT or a portion of the HL7 ADT, wherein the HL7 ADT or the portion of the HL7 ADT complies with the parameters for network operation for the receiving user, wherein the limiting is executed in real-time with the streams. | Abraham-Fuchs teaches that the broker receives a request from a third party, constructs a customized search filter using user-selected criteria and relevant healthcare data characteristics, including HL7 message characteristics, and then compares the stored healthcare data against that filter to identify responsive information. [0041].<br><br>Abraham-Fuchs contemplates healthcare institution data being transmitted as data streams through the broker-controlled server ([0035]), and the broker service is described as receiving requests, searching for compliant data, and submitting only relevant data in response. [0001].<br><br>US 2007/0124310 A1 ("Mathur") teaches a results agent 9 the listens for HL7 messages |

| | |
|---|---|
| | and processes the messages "as they are received." [0049]. This processing includes parsing the HL7 text string into objects and filtering them based on, e.g., "message type, patient type, ordering provider…" [0050]. *See also* [0136], [0140], [0151]. |

154. Additionally, Plaintiff's own ENS System is invalidating prior art as by Plaintiff's own admission the ENS System practices the claims and was commercially available and in public use at least as early as 2012, well before the actual priority date of the '475 Patent as explained elsewhere herein. *See* Ex. T, https://www.crisphealth.org/wp-content/uploads/2017/08/e-Health-Update-Q3-2017-1.pdf, previously incorporated by reference into the Amended Complaint by Counterclaim-Defendants, who characterize it as describing the patented technology. Additionally, and upon information and belief, the prior art Axolotl system would also be invalidating prior art.

155. Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*, Counterclaim-Plaintiffs are entitled to judgment from this Court finding that the '475 Patent is invalid pursuant to 35 U.S.C. §§ 101, 102, 103 and/or 112.

## SIXTH COUNTERCLAIM
## DECLARATION OF UNENFORCEABILITY OF THE '475 PATENT

156. Counterclaim-Plaintiffs repeat and reallege every allegation contained in the foregoing paragraphs of its Counterclaims as if set forth fully herein.

157. The '475 Patent is unenforceable due to inequitable conduct before the USPTO.

158. The '475 Patent issued from U.S. Patent Application No. 17/190,358, which is a continuation of the '137 Application and shares the same specification as the '962 Patent. During prosecution of the '475 Patent, Audacious expressly incorporated the '137 Application appeal brief admissions into the '475 prosecution record, further demonstrating that Audacious was aware of the priority-date issues.

159. Audacious as the applicant and prosecuting entity and Mr. Alley, Mr. Brandt, and Mr. Afzal as Audacious's representatives who were involved in the prosecution of the applications leading to the '475 Patent each owed a duty of candor and good faith to the USPTO under 37 C.F.R. § 1.56.

160. Audacious, Mr. Alley, Mr. Brandt, and Mr. Afzal each breached this duty by: (a) filing CIP applications structured to create a false appearance of an earlier priority date; (b) failing to disclose to the USPTO that the claims lacked written-description support in the pre-'887 Application patent applications and were not entitled to the March 15, 2013 priority date; and (c) failing to disclose the commercial sale and public offering of the ENS system, which constituted prior art under the correct effective filing date of November 9, 2017.

161. This withheld information was material to patentability. But for Audacious, Mr. Alley, Mr. Brandt, and Mr. Afzal's misconduct, the USPTO would not have allowed the claims of the '475 Patent.

162. Audacious acted with the specific intent to deceive the USPTO. The single most reasonable inference from the evidence—including the unnecessary complexity of the CIP chain, Audacious and at least Mr. Alley's demonstrated awareness through their own prosecution statements that the claims required narrow disclosures not present in the earlier applications, the internally contradictory prosecution strategy, and the failure to disclose Audacious's own commercial product as prior art—is that Audacious, Mr. Alley, Mr. Brandt, and Mr. Afzal intended to deceive the USPTO.

163. The inequitable conduct was committed solely by Audacious, which had exclusive control over patent prosecution, and its representatives Mr. Alley, Mr. Brandt, and Mr. Afzal.

164. In addition to the independent grounds for unenforceability alleged above, the ’475 Patent is also unenforceable under the doctrine of infectious unenforceability.

165. The ’475 Patent issued from the ’358 Application, which is a continuation of the ’137 Application, which issued as the ’962 Patent.

166. The ’475 Patent and the ’962 Patent share the same specification, and the inequitable conduct that renders the ’962 Patent unenforceable, as alleged in the Third Counterclaim, occurred during prosecution of the shared parent applications from which both patents derive—specifically, the ’887 Application and the ’137 Application—and included the misrepresentation of the priority date and the failure to disclose the ENS system as prior art.

167. Because the ’475 Patent is a direct continuation of the same application from which the ’962 Patent issued, and because the same inequitable conduct infected the prosecution chain common to both patents, the inequitable conduct that renders the ’962 Patent unenforceable likewise renders the ’475 Patent unenforceable. The ’475 Patent therefore cannot be enforced regardless of whether its own prosecution independently involved inequitable conduct, because the taint from the common prosecution chain is sufficient to render it unenforceable.

168. Counterclaim-Plaintiffs are entitled to a declaratory judgment that the ’475 Patent is unenforceable.

## SEVENTH COUNTERCLAIM
## UNFAIR COMPETITION UNDER MARYLAND COMMON LAW

169. Counterclaim-Plaintiffs repeat and reallege every allegation contained in the foregoing paragraphs of its Counterclaims as if set forth fully herein.

170. By the acts described herein, Counterclaim-Defendants have engaged in a pattern of unfair, deceptive, and wrongful business practices and competitive activity that have injured,

and will continue to injure, Counterclaim-Plaintiffs and their respective businesses, including by the following acts:

a. Bringing and maintaining a meritless and unnecessary protest against AHCA's contract award to CSS unnecessarily, which was brought for the improper purpose of interfering with the contractual relationship between AHCA and CSS, and delaying and burdening AHCA's transition from PCC's ENS system to CSS's CEND system at significant cost and expense to CSS that CSS now seeks damages over;

b. Making material misrepresentations to Florida healthcare providers regarding the existence and nature of coordination between Counterclaim-Defendants and PCC on the one hand and AHCA and CSS on the other that did not exist;

c. Falsely representing to providers that Counterclaim-Defendants had actively discussed a payment-intermediary arrangement with AHCA and CSS, when no such arrangement existed;

d. Asserting an "evergreen" interpretation of Counterclaim-Defendants and PCC's participant agreements with Florida Providers that AHCA rejected, for the purpose of creating uncertainty and delay in the transition process;

e. Initiating and engaging in sham litigation by which it has asserted facially invalid patent claims, including claims that this Court has already found directed to patent-ineligible subject matter, as part of a coordinated strategy to delay and disrupt the transition and to attempt to eliminate CSS as a competitor in the market;

f. Bringing claims against CRISP Maryland predicated on CRISP Maryland's alleged use of technology to which CRISP Maryland has a perpetual license; and

g. Leveraging Counterclaim-Defendants' dominant market position as one of the first companies to operationalize ADT notifications on a wide scale, and their control over the existing participant agreements, data connections, and provider relationships in the Florida HIE network and other such networks, to coerce and mislead providers into maintaining their existing relationships with Counterclaim-Defendants and PCC rather than transitioning to CSS as directed by AHCA, and asserting invalid and improperly obtained patent claims over core interoperability functions to deter CSS and other potential competitors from entering the market.

171. The assertion of the Patents-in-Suit was objectively baseless. As to the '194 patent, this Court has already held its claims to be directed to patent-ineligible subject matter under 35 U.S.C. § 101. No reasonable litigant could have realistically expected success on the merits of the '194 patent claims.

172. As to the '962 and '475 Patents, which are related to the '194 patent and share similar claim structures directed to the reception, processing, and routing of healthcare data through generic computer components, on information and belief, no reasonable litigant could have realistically expected these claims to withstand validity challenges. With regard to assignor estoppel, Audacious is well aware of the history between the parties and its exclusive management of the asserted patents, and that at the end of the day the facts will not support that Audacious is entitled to rely on its assignor estoppel arguments. Accordingly, the assertion of the '962 and '475 Patents is objectively baseless.

173. Counterclaim-Defendants' assertion of the Patents-in-Suit on July 14, 2025, shortly after its protest of AHCA's contract award to CSS was formally rejected, was not genuinely aimed

at addressing patent infringement but was intended to use the litigation process itself as a weapon of unfair competition to delay and disrupt Counterclaim-Plaintiffs' legitimate business activities.

174. Counterclaim-Defendants' assertion of the Patents-in-Suit against CRISP Maryland was also objectively baseless in view of Counterclaim-Defendants' assertion that all Patents-in-Suit were the subject of the Agreement for the Acquisition of CRISP's Encounter Notification Service dated December 9, 2013 ("ENS Agreement"). Under the terms of the ENS Agreement, CRISP Maryland was granted a perpetual, paid-up, royalty-free license to use, implement, and operate the ENS Technology, and the ENS IP therein, as necessary to provide ENS services to customers in State of Maryland and the District of Columbia.

175. CRISP Maryland operates solely within the State of Maryland.

176. CRISP Maryland's perpetual license under the ENS Agreement survived the termination of the agreement and bars Counterclaim-Defendants' claims against CRISP Maryland.

177. Counterclaim-Defendants have also violated the federal 21st Century Cures Act ("Cures Act"), 42 U.S.C. § 300jj-52, including specifically through its campaign to restrict CSS's access, exchange, or use of Florida Providers' patent data and for purposes of both assisting in patients' treatment and transitioning the Florida HIE from Counterclaim-Defendants' ENS system to CSS's CEND system.

178. The Cures Act prohibits "information blocking" by health information technology developers, health information exchanges, and health information networks. 42 U.S.C. § 300jj-52(a).

179. Information blocking is defined as a practice that "is likely to interfere with, prevent, or materially discourage access, exchange, or use of electronic health information," and which the relevant health information technology developer, health information exchange, or

health information network "knows, or should know . . . is likely to interfere with, prevent, or materially discourage the access, exchange, or use of electronic health information." 42 U.S.C. § 300jj-52(a)(1); 45 C.F.R. § 171.103.

180. The statute provides demonstrative examples of information blocking activities, including:

a. "practices that restrict authorized access, exchange, or use . . . of such information for treatment and other permitted purposes under such applicable law, including transitions between certified health information technologies;"

b. "implementing health information technology in nonstandard ways that are likely to substantially increase the complexity or burden of accessing, exchanging, or using electronic health information;" and

c. "implementing health information technology in ways that are likely to—(i) restrict the access, exchange, or use of electronic health information with respect to exporting complete information sets or in transitioning between health information technology systems; or (ii) lead to fraud, waste, or abuse, or impede innovations and advancements in health information access, exchange, and use, including care delivery enabled by health information technology."

42 U.S.C. § 300jj-52(a)(2).

181. Information blocking is punishable by a penalty of up to $1,000,000 per violation. 42 U.S.C. § 300jj-52(b)(2).

182. Each of the Counterclaim-Defendants, through their parent entity PCC, qualifies as a health information technology developer under 42 U.S.C. § 300jj and a "health IT developer of certified health IT" as defined in 45 C.F.R. § 171.102 and is therefore subject to the information-blocking prohibition. 42 U.S.C. § 300jj-52(a)(1); 45 C.F.R. § 171.103.

183. The conduct described herein—including, but not limited to, Counterclaim-Defendants' misleading outreach designed to discourage Florida Providers from initiating direct connections to CSS and the Florida HIE and the "evergreen" agreement assertions that created uncertainty regarding data exchange—constitutes practices likely to interfere with, prevent, or materially discourage the access, exchange, or use of electronic health information within the meaning of 42 U.S.C. § 300jj-52.

184. Counterclaim-Defendants' conduct further falls within all three of the information-blocking examples provided by the statute as it has: (1) restricted CSS's authorized access, exchange, or use electronic health information for purposes of both assisting in patients' treatment and transitioning the Florida HIE from Counterclaim-Defendants and PCC's ENS system to CSS's CEND system; (2) implemented its ENS system, including the contracts related thereto, in a way that increases the complexity or burden of accessing, exchanging, or using electronic health information by inserting itself as an unnecessary third party intermediary for data exchange between Florida Providers and AHCA/CSS; and (3) implemented its technology in such a way as to impede the Florida HIE's transition from Counterclaim-Defendants and PCC's ENS system to CSS's CEND system.

185. Counterclaim-Defendants' conduct does not fall within any exception to the information-blocking prohibition set forth in 45 C.F.R. §§ 171.200–171.403.

186. Counterclaim-Defendants' campaign to restrict CSS's access, exchange, or use of Florida Providers' patent data and to hinder the transition the Florida HIE's transition to CSS's CEND system is against public policy, as embodied in the Cures Act.

187. Counterclaim-Defendants' assertion of facially invalid patent claims against Counterclaim-Plaintiffs is also against public policy.

188. Counterclaim-Defendants have engaged in unfair and deceptive trade practices by utilizing illegal, deceptive, and wrongful methods to attack the business of a competitor, CSS and CRISP Maryland.

189. Upon information and belief, Counterclaim-Defendants' unfair acts have been committed in bad faith and with unlawful intent.

190. As a direct and proximate result of Counterclaim-Defendants' unfair competitive conduct, Counterclaim-Plaintiffs have suffered and continue to suffer damages, including lost revenues and profits, increased costs, delay, reputational harm, and diversion of resources.

191. Counterclaim-Defendants are entitled to damages and equitable relief.

## EIGHTH COUNTERCLAIM
## ATTEMPTED MONOPOLIZATION IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT

192. Counterclaim-Plaintiffs repeat and reallege every allegation contained in the foregoing paragraphs of its Counterclaims as if set forth fully herein.

193. The relevant market is the market for health information exchange ADT event-notification services for healthcare providers in the United States (the "HIE Notification Market"). HIE ADT event-notification services constitute a distinct relevant product market because they require specialized infrastructure for receiving, aggregating, filtering, and routing real-time admission, discharge, and transfer messages across disparate healthcare provider systems and protocols. Healthcare providers, health information exchanges, and state agencies that require real-time ADT event notification cannot practicably substitute other health information technologies—such as electronic health records, claims-based analytics platforms, or general health information exchange messaging services—to fulfill this function. State health agencies procure these services through dedicated contracts distinct from other health IT services, as illustrated by AHCA's issuance of a standalone procurement for Florida HIE services.

194. Counterclaim-Defendants possessed monopoly power, or at minimum a dangerous probability of achieving monopoly power, in the HIE Notification Market. For example, as the incumbent vendor for the Florida HIE for more than eight years, Counterclaim-Defendants and their parent company PCC controlled the existing participant agreements, data connections, and provider relationships comprising the Florida HIE network and were the exclusive provider of HIE Services in Florida during that period. On information and belief, Counterclaim-Defendants possess similar monopoly power, or at a minimum a dangerous probability of achieving monopoly power, in other states where it has entered into similar exclusive arrangements with governmental HIE networks.

195. Counterclaim-Defendants' dominant market position reflects Audacious Inquiry's first-mover advantage as "one of the first companies to operationalize admission, discharge, and transfer (ADT) notifications on a wide scale."[1] That first-mover advantage was further consolidated when PCC—a company "best known for its dominance in the post-acute EHR space"—acquired Audacious Inquiry and combined it with CMT, which independently maintained "a formidable footprint in emergency department information sharing and high-utilizer patient management."[2] These acquisitions combined the two most significant ADT event-notification and emergency department information-sharing platforms under a single corporate owner.

196. Counterclaim-Defendants' market dominance is reinforced by significant barriers to entry, including: (a) the technical complexity and cost of building and certifying a health information technology platform capable of receiving, processing, and routing real-time ADT messages across thousands of healthcare providers using disparate protocols; (b) the need for

[1] https://www.legalhie.com/audacious-inquiry-sues-crisp-a-patent-showdown-with-national-interoperability-implications/.
[2] https://www.legalhie.com/audacious-inquiry-sues-crisp-a-patent-showdown-with-national-interoperability-implications/.

established relationships with state health agencies that procure HIE services through competitive procurement processes favoring experienced incumbents; (c) Counterclaim-Defendants' control over existing data connections, participant agreements, and provider relationships that create high switching costs for healthcare providers and state agencies seeking to transition to a competing vendor, as demonstrated by the obstacles CSS encountered during the Florida transition; (d) the network effects inherent in HIE services, whereby the value of a platform increases with the number of participating providers, making it difficult for new entrants to achieve the scale necessary to compete effectively; and (e) Counterclaim-Defendants' assertion of patent rights over the fundamental methods underlying encounter notification services, which, if enforced as Counterclaim-Defendants currently threaten, would impose additional barriers on any potential market entrant.

197. Counterclaim-Defendants willfully acquired or maintained monopoly power through exclusionary conduct directed at Counterclaim-Plaintiffs, including specifically CSS, the only competitor that had won the AHCA contract to replace Counterclaim-Defendants as the exclusive provider of HIE services in Florida. Counterclaim-Defendants' exclusionary conduct includes sham litigation through the assertion of facially invalid patent claims.

198. The assertion of the Patents-in-Suit is objectively baseless and is an example of Counterclaim-Defendants' exclusionary conduct. As to the '194 patent, this Court has already held its claims to be directed to patent-ineligible subject matter under 35 U.S.C. § 101. No reasonable litigant could have realistically expected success on the merits of the '194 patent claims.

199. As to the '962 and '475 Patents, which are related to the '194 patent and share similar claim structures directed to the reception, processing, and routing of healthcare data

through generic computer components, on information and belief, no reasonable litigant could have realistically expected these claims to withstand validity challenges.

200. Counterclaim-Defendants' assertion of the Patents-in-Suit on July 14, 2025, shortly after its protest of AHCA's contract award to CSS was formally rejected, was not genuinely aimed at securing patent relief but was intended to use the litigation process itself as an anticompetitive weapon to delay and disrupt Counterclaim-Plaintiffs' legitimate business activities. The timing of this enforcement action—directed at least in part at CRISP Maryland, a state-designated health information exchange performing functions that have been widely treated as part of a shared public good[3]—demonstrates that the assertion of the Patents-in-Suit was intended not to protect legitimate intellectual property interests but to use the litigation process, and specifically the threat of injunctive relief, to exclude CSS as a competitor in the HIE Notification Market, including in part by threatening the ability of CRISP Maryland to fulfill its public service functions.

201. Additionally, Counterclaim-Defendants asserted the '962 and '475 Patents despite their being knowingly and willfully procured through fraud on the USPTO but for which the patents would not have issued, specifically by: (a) filing CIP applications structured to create a false appearance of an earlier priority date; (b) failing to disclose to the USPTO that the claims lacked written-description support in the pre-'887 Application patent applications and were not entitled to the March 15, 2013 priority date; and (c) failing to disclose the commercial sale and public offering of the ENS system, which constituted prior art under the correct effective filing date of November 9, 2017. Counterclaim-Defendants now seek to illegally monopolize the HIE Notification Market by enforcing a fraudulently obtained patent.

[3] https://www.legalhie.com/audacious-inquiry-sues-crisp-a-patent-showdown-with-national-interoperability-implications/.

202. Counterclaim-Defendants' monopolistic and exclusionary conduct has injured Counterclaim-Plaintiffs and competition in the HIE Notification Market. Counterclaim-Plaintiffs and other competitors have been substantially foreclosed from competing in the market, and customers have suffered and will continue to suffer harm in the form of higher prices, diminished product and service quality, reduced interoperability, and suppressed innovation. Such injuries are of the type that the antitrust laws are intended to prohibit and flow directly from Counterclaim-Defendants' anticompetitive conduct in violation of Section 2 of the Sherman Act. Counterclaim-Plaintiffs have also been injured by the need to defend themselves against anticompetitive lawsuits that were themselves part of Counterclaim-Defendants anticompetitive scheme, such as this lawsuit and/or the Florida AHCA protest.

203. Counterclaim-Plaintiffs have suffered antitrust injury, including lost profits, increased costs, delay in establishing competitive operations, and harm to their ability to compete.

204. The conduct of Counterclaim-Defendants is continuing and will continue to impose antitrust injury on Counterclaim-Plaintiffs unless equitable and injunctive relief are granted.

205. Counterclaim-Defendants' actions constitute attempted monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

206. Counterclaim-Plaintiffs are entitled to treble damages under 15 U.S.C. § 15, injunctive relief under 15 U.S.C. § 26, and attorneys' fees and costs under 15 U.S.C. § 15.

## **PRAYER FOR RELIEF**

Counterclaim-Plaintiffs respectfully request that this Court enter an Order and Judgment against Plaintiffs as follows:

A. Denying all claims for relief set forth in the First Amended Complaint and entering judgment in favor of Counterclaim-Plaintiffs and against Plaintiffs on all claims;

B. Declaring that Counterclaim-Plaintiffs have not infringed and are not infringing any valid and/or enforceable claim of the'962 and '475 Patents;

C. Declaring all claims of the '962 and '475 Patents to be invalid;

D. Declaring all claims of the '962 and '475 Patents to be unenforceable;

E. Declaring that Counterclaim-Defendants are not entitled to any damages and/or any claim by Counterclaim-Defendants to damages is additionally barred or limited by one or more of the other affirmative defenses;

F. Declaring that this case is exceptional under 35 U.S.C. § 285 to support an award to Counterclaim-Plaintiffs of their attorneys' fees and costs incurred in connection with this action;

G. Damages and restitution in an amount to be determined at trial, including pre-judgment and post-judgment interest;

H. Punitive and exemplary damages in an amount to be determined at trial, including pre-judgment and post-judgment interest;

I. Trebling of any award of damages; and

J. Such other and further relief as the Court deems just and proper.

## JURY DEMAND

Counterclaim-Plaintiffs request a trial by jury on all issues so triable.

Dated: September 24, 2026

Respectfully submitted,

**FOLEY & LARDNER LLP**

By: *<u>/s/Ruben J. Rodrigues</u>*

Jarren N. Ginsburg
D. Md. Bar No. 19688
Molly Hayssen
D. Md. Bar No. 31871
FOLEY & LARDNER LLP
Washington Harbour
3000 K Street, N.W. Suite 600
Washington, D.C. 20007-5109
Telephone: (202) 672-5300
Facsimile: (202) 672-5399
jginsburg@foley.com
mhayssen@foley.com

Ruben J. Rodrigues *(pro hac vice)*
FOLEY & LARDNER LLP
111 Huntington Avenue
Boston, MA 02199
Telephone: (617) 342-4000
Facsimile: (617) 342-4001
rrodrigues@foley.com

Sarah E. Rieger *(pro hac vice)*
FOLEY & LARDNER LLP
777 East Wisconsin Avenue
Milwaukee, WI 53202
Telephone: (414) 271-2400
Facsimile: (414) 297-4900
srieger@foley.com

**ATTORNEYS FOR DEFENDANTS AND COUNTERCLAIM-PLAINTIFFS CHESAPEAKE REGIONAL INFORMATION SYSTEM FOR OUR PATIENTS, INC. AND CRISP SHARED SERVICES, INC.**