**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

| | |
|---|---|
| AUDACIOUS INQUIRY LLC and COLLECTIVE MEDICAL TECHNOLOGIES, INC.,<br><br>Plaintiffs/Counterclaim-Defendants,<br><br>v.<br><br>CHESAPEAKE REGIONAL INFORMATION SYSTEM FOR OUR PATIENTS and CRISP SHARED SERVICES, INC. AND AFFILIATES,<br><br>Defendants/Counterclaim-Plaintiffs. | Civil Action No. 25-cv-2264-JRR |

**DEFENDANTS' ANSWER AND COUNTERCLAIMS**

Defendants Chesapeake Regional Information System for Our Patients, Inc. of Maryland ("CRISP Maryland") and CRISP Shared Services, Inc. ("CSS") (collectively, "Defendants" or "Counterclaim-Plaintiffs") hereby file this Answer and Counterclaims to the Amended Complaint, (Dkt. 24), of Plaintiffs Audacious Inquiry LLC ("Audacious") and Collective Medical Technologies, Inc. ("CMT") (collectively, "Plaintiffs" or "Counterclaim-Defendants"). Pursuant to the Court's August 31, 2026 Order (the "Motion to Dismiss Order"), (Dkt. 40), the Court dismissed Count II of Plaintiffs' Amended Complaint. Accordingly, no answer is required for Plaintiffs' allegation of infringement of U.S. Patent No. 11,114,194.

Except as specifically admitted below, Defendants deny the allegations of the Amended Complaint.

## NATURE OF ACTION

1. Denied.

2. Defendants admit that the Amended Complaint purports to plead claims for patent infringement. Defendants deny any remaining allegations of this paragraph.

3. Defendants admit that the Amended Complaint purports to plead claims for common law unfair competition. Defendants deny the remaining allegations of this paragraph.

4. Defendants are without knowledge sufficient to form a belief as to the truth or falsity of the allegations set forth in this paragraph, and on that basis deny them.

5. Defendants are without knowledge sufficient to form a belief as to the truth or falsity of the allegations set forth in this paragraph, and on that basis deny them.

6. Defendants admit that they previously worked with Audacious. Defendants deny any remaining allegations of this paragraph, including specifically denying that either Defendant ever owned any patent rights related to what Plaintiffs refer to as ENS technology.

7. Admitted.

8. Defendants admit that their prior contractual relationship with Audacious terminated in 2024. Otherwise denied.

9. Denied.

10. Denied.

11. Denied.

12. Denied.

## PARTIES

13. Defendants are without knowledge sufficient to form a belief as to the truth or falsity of the allegations set forth in this paragraph, and on that basis deny them.

14. Defendants are without knowledge sufficient to form a belief as to the truth or falsity

of the allegations set forth in this paragraph, and on that basis deny them.

15. Admitted.

16. Admitted.

17. Denied.

## JURISDICTION AND VENUE

18. Defendants admit that Plaintiffs purport to bring this action under the patent laws of the United States, 35 U.S.C. §§ 1 *et seq*.

19. Defendants admit that this Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331, 1332, 1338(a), 1367, 2201, and 2202.

20. This paragraph sets forth conclusions of law to which no response is required. To the extent a response is deemed to be required, Defendants deny the allegations of this paragraph.

21. Defendants deny that they have engaged in acts of infringement or acts of unfair competition. Defendants deny any remaining allegations of this paragraph, except that Defendants do not contest for the purposes of the action only that this Court has personal jurisdiction over Defendants.

22. Defendants deny that they have committed or are committing acts of infringement. The remainder of this paragraph sets forth conclusions of law to which no response is required. To the extent a response is required, Defendants deny the remaining allegations of this paragraph.

## FACTUAL BACKGROUND

### The Patents-in-Suit

23. Defendants admit that the identified patent was issued as stated, however deny that said patent should have ever been issued, and further deny that it is valid or enforceable.

24. Defendants admit that the ’962 Patent lists Bill Howard, Paul Cahill, Sandeep Antony, Scott Afzal, and David Horrocks as inventors on its face. Defendants are without knowledge sufficient to form a belief as to the truth or falsity of the remaining allegations set forth in this paragraph, and on

that basis deny them.

25. Defendants admit that the '962 Patent states on its face that it issued from U.S. Patent Application No. 15/911,137, which was filed on March 4, 2018. Defendants are without knowledge sufficient to form a belief as to the truth or falsity of the remaining allegations set forth in this paragraph, and on that basis deny them.

26. Defendants admit that this paragraph includes language from claim 1 of the '962 Patent.

27. The allegations of this paragraph relate to a claim that has been dismissed pursuant to the Motion to Dismiss Order, and no answer is required. To the extent a response is required, admitted.

28. The allegations of this paragraph relate to a claim that has been dismissed pursuant to the Motion to Dismiss Order, and no answer is required. To the extent a response is required, Defendants admit that the '194 patent lists Sandeep Antony, Scott Afzal, Evan Carter, Christopher Brandt, and Yedong Tang as inventors on its face. Defendants are without knowledge sufficient to form a belief as to the truth or falsity of the remaining allegations set forth in this paragraph, and on that basis deny them.

29. The allegations of this paragraph relate to a claim that has been dismissed pursuant to the Motion to Dismiss Order, and no answer is required. To the extent a response is required, Defendants admit that the '194 Patent states on its face that it issued from U.S. Patent Application No. 14/872,445, which was filed on October 1, 2015. Defendants are without knowledge sufficient to form a belief as to the truth or falsity of the remaining allegations set forth in this paragraph, and on that basis deny them.

30. The allegations of this paragraph relate to a claim that has been dismissed pursuant to the Motion to Dismiss Order, and no answer is required. To the extent a response is required,

Defendants admit that this paragraph includes language from claim 1 of the ’194 patent.

31. Defendants admit that the identified patent was issued as stated, however deny that said patent should have ever been issued, and further deny that it is valid or enforceable.

32. Defendants admit that the ’475 Patent lists Sandeep Antony, Scott Afzal, and David Horrocks as inventors on its face. Defendants are without knowledge sufficient to form a belief as to the truth or falsity of the remaining allegations set forth in this paragraph, and on that basis deny them.

33. Defendants admit that the ’475 Patent states on its face that it issued from U.S. Patent Application No. 17/190,358, which was filed on March 2, 2021. Defendants are without knowledge sufficient to form a belief as to the truth or falsity of the remaining allegations set forth in this paragraph, and on that basis deny them.

34. Defendants admit that this paragraph includes language from claim 1 of the ’475 Patent.

**<u>The Patents-in-Suit Cover [Allegedly] Patentable Subject Matter</u>**

35. Defendants admit that Exhibit 1 appears to be a copy of the ’962 Patent. Otherwise, denied.

36. Defendants state that the ’962 Patent speaks for itself and deny the remaining allegations of this paragraph, including specifically Plaintiffs’ characterizations of the ’962 Patent.

37. Denied.

38. Defendants state that the ’962 Patent speaks for itself and deny the remaining allegations of this paragraph, including specifically Plaintiffs’ characterizations of the ’962 Patent.

39. Denied.

40. Denied.

41. The allegations of this paragraph relate to a claim that has been dismissed pursuant to

the Motion to Dismiss Order, and no answer is required. To the extent a response is required, Defendants admit that Exhibit 2 appears to be a copy of the ’194 patent. Otherwise, denied.

42. The allegations of this paragraph relate to a claim that has been dismissed pursuant to the Motion to Dismiss Order, and no answer is required. To the extent a response is required, Defendants denied.

43. The allegations of this paragraph relate to a claim that has been dismissed pursuant to the Motion to Dismiss Order, and no answer is required. To the extent a response is required, denied.

44. The allegations of this paragraph relate to a claim that has been dismissed pursuant to the Motion to Dismiss Order, and no answer is required. To the extent a response is required, denied.

45. The allegations of this paragraph relate to a claim that has been dismissed pursuant to the Motion to Dismiss Order, and no answer is required. To the extent a response is required, Defendants state that the ’194 patent speaks for itself and deny the remaining allegations of this paragraph, including specifically Plaintiffs’ characterizations of the ’194 patent.

46. The allegations of this paragraph relate to a claim that has been dismissed pursuant to the Motion to Dismiss Order, and no answer is required. To the extent a response is required, denied.

47. The allegations of this paragraph relate to a claim that has been dismissed pursuant to the Motion to Dismiss Order, and no answer is required. To the extent a response is required, denied.

48. The allegations of this paragraph relate to a claim that has been dismissed pursuant to the Motion to Dismiss Order, and no answer is required. To the extent a response is required, Defendants admit that Exhibit 4 appears to be a copy of excerpts from the file history of the ’194 patent. Defendants deny any remaining allegations of this paragraph, including specifically any characterization of the statements made in the cited excerpts.

49. Defendants admit that Exhibit 3 appears to be a copy of the ’475 Patent. Otherwise,

denied.

50. Defendants state that the ’475 Patent speaks for itself and deny the remaining allegations of this paragraph, including specifically Plaintiffs’ characterizations of the ’475 Patent.

51. Denied.

52. Denied.

53. Denied.

54. Defendants state that the ’475 Patent speaks for itself and deny the remaining allegations of this paragraph, including specifically Plaintiffs’ characterizations of the ’475 Patent.

55. Denied.

56. Denied.

57. Defendants admit that the quoted language appears in an e-Health Update available at https://www.crisphealth.org/wp-content/uploads/2017/08/e-Health-Update-Q3-2017-1.pdf. Defendants deny any remaining allegations of this paragraph, including specifically that the quoted language relates in any way to the purported advantages of the Patents-in-Suit, which are not mentioned, and that CRISP has ever recognized any purported advantage of the purported inventions claimed in the Patents-in-Suit.

**Defendants are [Allegedly] Prohibited From Contesting the Validity of the ’962 and ’475 Patents Under the Doctrine of Assignor Estoppel**

58. Defendants are without knowledge sufficient to form a belief as to the truth or falsity of the allegations set forth in this paragraph, and on that basis deny them.

59. Defendants admit that CRISP Maryland was incorporated on or around June 3, 2008, and that David Horrocks signed the relevant incorporation documents. Otherwise, denied.

60. Defendants admit that CSS was incorporated on or around October 5, 2020, and that David Horrocks signed the relevant incorporation documents. Otherwise, denied.

61. Defendants admit that CRISP Maryland and Audacious entered into an agreement titled Master Professional Services Agreement on or around August 5, 2009, and that David Horrocks signed the agreement on behalf of CRISP Maryland. Defendants state that the agreement speaks for itself and otherwise deny the remaining allegations of this paragraph, including specifically Plaintiffs' characterizations of the cited agreement.

62. Defendants admit that CRISP Maryland and Audacious entered into an agreement titled Master Professional Services Agreement on or around August 5, 2009. Defendants state that the agreement speaks for itself and otherwise deny the remaining allegations of this paragraph, including specifically Plaintiffs' characterizations of the cited agreement and the work performed thereunder.

63. Defendants state that the amendment to the relevant agreement between Audacious and CRISP Maryland speaks for itself. Defendants deny the remaining allegations of this paragraph, including specifically Plaintiffs' characterizations of the cited agreement and any amendments thereto.

64. Defendants admit on information and belief that Audacious caused the '332 Application to be filed and listed Sandeep Antony and David Horrocks as inventors. Defendants deny that CRISP Maryland caused the '332 Application to be filed.

65. Denied.

66. Denied.

67. Admitted.

68. Defendants admit on information and belief that Audacious caused the '625 Application to be filed and listed Sandeep Antony, Scott Afzal, and David Horrocks as inventors. Defendants deny that CRISP Maryland caused the '625 Application to be filed.

69. Denied.

70. Denied.

71. Admitted.

72. Defendants admit on information and belief that Audacious caused the '225 Application to be filed and listed Sandeep Antony, Scott Afzal, and David Horrocks as inventors. Defendants deny that CRISP Maryland caused the '225 Application to be filed.

73. Denied.

74. Denied.

75. Admitted.

76. Denied.

77. Defendants state that the agreement referenced in this paragraph speaks for itself. Defendants deny the remaining allegations of this paragraph, including specifically Plaintiffs' characterizations of the cited agreement, which is dated December 9, 2013.

78. Defendants state that the agreement referenced in this paragraph speaks for itself. Defendants deny the remaining allegations of this paragraph, including specifically Plaintiffs' characterizations of the cited agreement.

79. Defendants state that the agreement referenced in this paragraph speaks for itself. Defendants deny the remaining allegations of this paragraph, including specifically Plaintiffs' characterizations of the cited agreement and Plaintiffs' allegations that CRISP Maryland ever owned any rights in the '332 Application, the '625 Application, and the '225 Application or any other patents or patent applications related thereto.

80. Defendants state that the agreement referenced in this paragraph speaks for itself. Defendants deny the remaining allegations of this paragraph, including specifically Plaintiffs' characterizations of the cited agreement and any implicit or explicit allegation that CRISP Maryland ever owned any rights as an inventor.

81. Defendants state that the agreement referenced in this paragraph speaks for itself. Defendants deny the remaining allegations of this paragraph, including specifically Plaintiffs' characterizations of the cited agreement.

82. Defendants state that the agreement referenced in this paragraph speaks for itself. Defendants deny the remaining allegations of this paragraph, including specifically Plaintiffs' characterizations of the cited agreement.

83. Defendants admit that the language quoted in this paragraph appears in the referenced agreement and states that the referenced agreement speaks for itself. Defendants deny the remaining allegations of this paragraph, including specifically Plaintiffs' characterizations of the cited agreement and quoted language.

84. Denied.

85. Admitted.

86. Defendants admit that the language quoted in this paragraph appears in the referenced agreement and states that the referenced agreement speaks for itself. Defendants deny the remaining allegations of this paragraph, including specifically Plaintiffs' characterizations of the cited agreement and quoted language.

87. Defendants admit that the language quoted in this paragraph appears in the referenced agreement and states that the referenced agreement speaks for itself. Defendants deny the remaining allegations of this paragraph, including specifically Plaintiffs' characterizations of the cited agreement and quoted language.

88. Denied.

89. Admitted.

90. Admitted.

91. Admitted on information and belief as stated, but denied as to any implication that the referenced application contains any patentable invention.

92. Admitted on information and belief as stated, but denied as to any implication that the referenced application contains any patentable invention.

93. Admitted on information and belief as stated, but denied as to any implication that the referenced application contains any patentable invention.

94. Defendants admit that the ’962 Patent issued from the ’137 Application. Otherwise, denied.

95. Denied.

96. Denied.

97. Defendants admit that the ’475 Patent issued from the ’358 Application. Otherwise, denied.

98. Denied.

99. Denied.

100. Defendants admit that CRISP Maryland and Audacious renewed the referenced agreement between 2013 and 2024 and that CRISP Maryland paid fees to Audacious pursuant to the referenced agreement. Defendants deny that CRISP Maryland ever made any representations related to the validity or invalidity of the Patents-in-Suit and further deny that CSS was a party to the referenced agreement before 2022.

101. Defendants state that the agreement referenced in this paragraph speaks for itself. Defendants deny the remaining allegations of this paragraph, including specifically Plaintiffs’ characterizations of the cited agreement.

102. Admitted.

103. Defendants admit that CRISP Maryland and CSS opted not to renew the referenced agreement in 2024 and that the agreement terminated on September 1, 2024. Otherwise, denied.

104. Denied.

**CSS Has [Allegedly] Engaged in Unfair Competition To Switch Customers Away From ENS to its New [Allegedly] Infringing System**

105. Defendants admit that Audacious led the software development and implementation of ENS and that Defendants provided notice that they would not renew any license to ENS on May 8, 2024. Defendants are without knowledge sufficient to form a belief as to the truth or falsity of the remaining allegations set forth in this paragraph, and on that basis deny them.

106. Denied.

107. Denied.

108. Defendants admit AHCA issued an ITN on or around May 6, 2024 and that CSS submitted a reply to the ITN. Defendants are without knowledge sufficient to form a belief as to the truth or falsity of the remaining allegations set forth in this paragraph, and on that basis deny them.

109. Denied.

110. Denied.

111. Denied.

112. Defendants are without knowledge as to what Plaintiffs specifically intend to refer to as “the CEND solution” and thus are without knowledge sufficient to form a belief as to the truth or falsity of the allegations set forth in this paragraph, and on that basis deny them.

113. Denied.

114. Defendants admit that AHCA posted its intended award of the contract to CSS on January 23, 2025 and that CSS’s winning bid, in part, referenced CEND. Defendants are without knowledge as to what Plaintiffs specifically intend to refer to as “the CEND technology,” and deny

any remaining allegations of this paragraph, including specifically any implication that CEND was the sole basis for CSS's bid or AHCA's award.

115. Admitted.

116. Denied.

117. Denied.

118. Denied.

119. Denied.

**COUNT I**
**([ALLEGED] DIRECT INFRINGEMENT OF U.S. PATENT NO. 10,938,962)**

120. Defendants re-allege and incorporate the responses set forth in the preceding paragraphs as if fully set forth herein.

121. Denied.

122. Denied.

123. Denied.

**COUNT II**
**([ALLEGED] DIRECT INFRINGEMENT OF U.S. PATENT NO. 11,114,194)**

124. The allegations of this paragraph relate to a claim that has been dismissed pursuant to the Motion to Dismiss Order, and no answer is required. To the extent a response is required, Defendants re-allege and incorporate the responses set forth in the preceding paragraphs as if fully set forth herein.

125. The allegations of this paragraph relate to a claim that has been dismissed pursuant to the Motion to Dismiss Order, and no answer is required. To the extent a response is required, denied.

126. The allegations of this paragraph relate to a claim that has been dismissed pursuant to the Motion to Dismiss Order, and no answer is required. To the extent a response is required, denied.

127. The allegations of this paragraph relate to a claim that has been dismissed pursuant to

the Motion to Dismiss Order, and no answer is required. To the extent a response is required, denied.

**COUNT III**
**([ALLEGED] DIRECT INFRINGEMENT OF U.S. PATENT NO. 12,047,475)**

128. Defendants re-allege and incorporate the responses set forth in the preceding paragraphs as if fully set forth herein.

129. Denied.

130. Denied.

131. Denied.

**COUNT IV**
**([ALLEGED] VIOLATION OF MARYLAND COMMON LAW OF UNFAIR COMPETITION)**

132. Defendants re-allege and incorporate the responses set forth in the preceding paragraphs as if fully set forth herein.

133. Denied.

134. Denied.

135. Denied.

136. Denied.

137. Denied.

**[ALLEGED] PRAYER FOR RELIEF**

Defendants deny that Plaintiffs are entitled to any of the relief whatsoever whether it is outlined in their Prayer for Relief or otherwise.

**JURY DEMAND**

Defendants demand a trial by jury on all issues so triable.

**AFFIRMATIVE AND OTHER DEFENSES**

Defendants allege and assert at least the following defenses in response to Plaintiffs' allegations

in the Amended Complaint and reserves the right to assert additional defenses that become known and available through the course of discovery.

**FIRST DEFENSE**
**(FAILURE TO STATE A CLAIM)**

1. Plaintiffs' Amended Complaint and the allegations therein fail to state a claim upon which relief may be granted.

**SECOND DEFENSE**
**(NON-INFRINGEMENT)**

2. Defendants have not infringed and do not infringe directly or indirectly any valid, enforceable, asserted claim of the '962 Patent, either literally or under the doctrine of equivalents, or under any theory of infringement.

3. Defendants have not infringed and do not infringe directly or indirectly any valid, enforceable, asserted claim of the '475 Patent, either literally or under the doctrine of equivalents, or under any theory of infringement.

**THIRD DEFENSE**
**(INVALIDITY)**

4. Each of the asserted claims of the '962 Patent is invalid for failure to comply with one or more conditions of patentability under the patent laws of the United States, 35 U.S.C. §§ 1 *et seq.*, including 35 U.S.C. §§ 101, 102, 103, and/or 112.

5. Each of the asserted claims of the '475 Patent is invalid for failure to comply with one or more conditions of patentability under the patent laws of the United States, 35 U.S.C. §§ 1 *et seq.*, including 35 U.S.C. §§ 101, 102, 103, and/or 112.

**FOURTH DEFENSE**
**(EQUITABLE DEFENSE)**

6. Plaintiffs' claims against Defendants, including their claims for patent infringement and unfair competition, are barred by one or more of the equitable doctrines of estoppel, prosecution

laches, acquiescence, waiver, implied license, and unclean hands.

**FIFTH DEFENSE**
**(ADEQUATE REMEDY AT LAW)**

7. Plaintiffs have an adequate remedy at law, and no basis exists for the grant of injunctive relief.

**SIXTH DEFENSE**
**(LICENSE)**

8. Plaintiffs' purported claims are barred, in whole or in part, because Defendants have an express or implied license to make, use, sell, offer for sale, and/or import the accused products and/or practice the accused methods.

**SEVENTH DEFENSE**
**(UNENFORCEABILITY)**

9. Plaintiffs' purported claims for infringement are barred, in whole or in part, because the asserted patents are unenforceable on the basis of inequitable conduct as further described with particularity in Defendants' Counterclaims, including specifically the Counterclaims' Factual Background section (*e.g.*, Paragraphs 12-94) and the Third and Sixth Counterclaims, the allegations of which Defendants incorporate by reference as if fully set forth herein.

**EIGHTH DEFENSE**
**(UNCLEAN HANDS – INFRINGEMENT)**

10. Plaintiffs' purported claims for infringement are barred, in whole or in part, by the doctrine of unclean hands for the reasons further described in Defendants' Counterclaims, including specifically the Counterclaims' Factual Background section (*e.g.*, Paragraphs 12-94) and the Third and Sixth Counterclaims, the allegations of which Defendants incorporate by reference as if fully set forth herein.

**NINTH DEFENSE**
**(UNCLEAN HANDS – UNFAIR COMPETITION)**

11. Plaintiffs' purported claim for unfair competition under Maryland common law (Count IV of the Amended Complaint) is barred, in whole or in part, by the doctrine of unclean hands.

12. Upon information and belief, prior to founding or developing the ENS system that is the subject of this action, Audacious, acting at least through its executive Scott Afzal, entered into a contractual relationship with Axolotl Corp. ("Axolotl") under which Audacious contracted with Axolotl to develop and license a health information exchange product substantially similar to the systems described in the Patents-in-Suit.

13. Upon information and belief, through its relationship with Axolotl, Audacious and Mr. Afzal gained access to Axolotl's proprietary technology, methods, and know-how relating to health information exchange and ADT event-notification services.

14. Upon information and belief, after acquiring the knowledge and experience developed through the Axolotl relationship, Audacious terminated its license and contractual relationship with Axolotl and proceeded to develop its own competing product—the ENS system—based on what it had learned during its dealings with Axolotl.

15. The conduct Audacious engaged in with respect to Axolotl echoes the claims Audacious now alleges constitutes unfair competition by CRISP Maryland and CSS. In its Amended Complaint, Audacious alleges that CRISP Maryland and CSS developed a competing system—CEND—using knowledge and experience gained during their prior contractual relationship with Audacious, and then terminated that relationship and deployed their own system. Audacious previously engaged in a worse pattern of conduct with Axolotl: it contracted with Axolotl to develop and license health information exchange technology, gained access to Axolotl's technology and methods, terminated the relationship, and then developed and commercialized its own competing product—going so far as to then try and patent technology it should have known was not patentable.

16. Because Audacious itself engaged in the sort of conduct it now alleges constitutes unfair competition, Audacious comes before this Court with unclean hands and is barred from obtaining relief on its unfair competition claim.

17. Defendants reserve the right to supplement this defense as discovery proceeds and additional facts supporting Audacious's prior dealings with Axolotl become known.

**TENTH DEFENSE**
**(PATENT MISUSE)**

18. Plaintiff's purported claims for infringement are barred, in whole or in part, by the doctrine of patent misuse, including for example as part of Plaintiff's unfair and anticompetitive schemes as further described in Defendants' Counterclaims, including specifically the Counterclaims' Factual Background section (*e.g.*, Paragraphs 12-94) and the Seventh and Eighth Counterclaims, the allegations of which Defendants incorporate by reference as if fully set forth herein.

**ADDITIONAL DEFENSES**

19. Defendants reserve the right to supplement or amend this Answer and reserves all defenses set out in Rule 8(c) of the Federal Rules of Civil Procedure, and any other defenses which become applicable during the course of discovery or otherwise in the course of litigation.

## COUNTERCLAIMS

1. PointClickCare Corporation bet big that its dominant position in the health information market would allow it to bully Florida into changing the systems it used to provide messaging in Florida. Instead, Florida put control over its Health Information Exchange ("HIE") out for bid. PCC participated in the bidding process, and despite significant structural advantages as the incumbent, came in third place. Stung and incredulous, PCC and its subsidiary companies Audacious and CMT have since engaged in a pernicious and deceptive campaign to strike back, baselessly attempting to contest the award by Florida, asserting irrelevant patents it knows are invalid, and leveraging its dominant market position in health status messaging and its incumbent position in Florida to systematically mislead and coerce healthcare providers in an effort to slow CSS's deployment of Florida's new HIE – with potentially disastrous consequences to patients.

## PARTIES

2. CRISP Maryland is a nonprofit corporation organized in Maryland, with its principal place of business at 10480 Little Patuxent Parkway, Suite 800, Columbia, Maryland.

3. CSS is a nonprofit corporation in Maryland, with its principal place of business at 10480 Little Patuxent Parkway, Suite 800, Columbia, Maryland.

4. Audacious is a limited liability company organized and existing under the laws of Delaware, with its principal place of business at 10377 S Jordan Gateway Suite 600, South Jordan, Utah 84095. On information and belief, Audacious's sole member is CMT.

5. CMT is a corporation organized and existing under the laws of Delaware, with its principal place of business at 10377 S Jordan Gateway Suite 600, South Jordan, Utah 84095.

6. CMT is a wholly owned subsidiary of PointClickCare Technologies USA Corp., a wholly owned subsidiary of PointClickCare Corporation (collectively, "PCC"), a Canadian corporation with its principal place of business at 5570 Explorer Drive, Mississauga, Ontario, Canada.

## JURISDICTION AND VENUE

7. This an action at law and in equity that arises under the antitrust laws of the United States (15 U.S.C. §§ 1 and 2, *et seq*.), the patent laws of the United States (35 U.S.C. §§ 1, *et seq*.), and the Declaratory Judgment Act (28 U.S.C. §§ 2201 and 2202).

8. The Court has subject matter jurisdiction over the patent-related Counterclaims pursuant to 28 U.S.C. §§ 1331, 1338, 2201, and 2202, subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337(a) to address violations of, and to prevent and restrain Counterclaim-Defendants from violating, § 2 of the Sherman Act (15 U.S.C. § 2), and supplemental jurisdiction over overlapping claims under Maryland common law pursuant to 28 U.S.C. § 1367(a).

9. This Court also has diversity jurisdiction because each Counterclaim-Plaintiff is a Maryland citizen, none of the Counterclaim-Defendants or their member(s) are citizens of Maryland, and because the amount in controversy exceeds $75,000.

10. The Court has personal jurisdiction over Counterclaim-Defendants by virtue of, among other things, Counterclaim-Defendants having consented to the jurisdiction by filing their Amended Complaint, and having injury in the State of Maryland.

11. Venue in this district is proper pursuant to 28 U.S.C. §§ 1391(b) and 1400(b).

## FACTUAL BACKGROUND

### A. The Florida HIE and AHCA's Transition from Counterclaim-Defendants to CSS

12. For more than eight years, Audacious served as the vendor for the Florida HIE operated under the Florida Agency for Health Care Administration ("AHCA"). In that role, Counterclaim-Defendants and PCC maintained incumbent relationships with healthcare providers that exchanged Admit-Discharge-Transfer ("ADT") data through the Florida HIE platform.

13. On information and belief, after PCC acquired Audacious and CMT, PCC attempted to have AHCA agree to migrate the Florida HIE off the Audacious ENS platform to PCC's national

platform. AHCA raised concerns with PCC's platform, and rather than acceding to PCC's demands, and in anticipation of the existing contract's expiration in August 2025, AHCA issued an Invitation to Negotiate Procurement ("INP") for a new Florida HIE vendor on or around May 6, 2024.

14. CSS submitted a response to AHCA's INP, relying partly on its CEND system (which CSS independently developed). CRISP Maryland did not respond to AHCA's INP.

15. On January 23, 2025, after a completive negotiation process involving four participants, AHCA posted its intended award of the new Florida HIE contract to CSS. Despite Audacious's protest before the Florida Department of Administrative Hearings ("DOAH"), DOAH upheld the award to CSS in June, 2025, but PCC obtained a 1-year extension because of the delay.

16. Under the transition plan, Counterclaim-Defendants' existing Florida HIE contract was to terminate no later than August 1, 2026. During the transition period preceding that date, CSS was responsible for onboarding Florida providers under new Participation Agreements and establishing direct data connections. AHCA retained the authority to terminate Counterclaim-Defendants' contract prior to August 1, 2026, and communicated to Counterclaim-Defendants and PCC that termination would nullify Counterclaim-Defendants' existing Florida HIE services agreements.

17. The agreement between CSS and AHCA, like the predecessor agreement between Audacious and AHCA, was a zero-dollar contract under which no payments were made to or from the State of Florida. Operating costs are supported through fees paid by subscribers that receive services, such as ADT notifications. Those subscriber fees – overseen by AHCA and other Florida agencies – are the principal source of revenue supporting HIE operations.

18. CSS commenced provider outreach and technical onboarding in 2025, providing each healthcare services provider participant with a Participation Agreement, VPN and networking questionnaires, HL7 ADT interface specifications, and a defined transition process.

19. CRISP Maryland was not and is not involved in CSS's activities in Florida.

**B. Counterclaim-Defendants Misleading Provider Outreach**

20. Rather than cooperate in the transition, Counterclaim-Defendants and PCC launched a coordinated campaign designed to slow, obstruct, and undermine the migration of healthcare providers in Florida ("Florida Providers") to CSS through communications sent to said Florida Providers and, on information and belief, every acute care hospital in the Florida HIE network.

21. At first, these messages were merely misleading. For example, on September 30, 2025, Brian Smart of PCC' sent an email to key IT and interface personnel at the University of Miami Health System ("UHealth"). Mr. Smart's email made the following misrepresentations, among others:

a. "We will remain the current HIE vendor until August 2026." While PCC's contract could potentially extend to that date, this statement obscured the fact that a transition was underway, that AHCA had selected CSS as the replacement vendor, and that AHCA retained the ability to terminate PCC's contract prior to that date.

b. "The only requirement for your organization is to sign the new vendor's HIE agreement. Once this is done, we can handle the rest.... You are not required to build a net-new ADT feed to CSS. Once you sign the new agreement, we can submit your existing ADT feed to the new vendor on your behalf to minimize any technical, resource, or vendor costs." This implied coordination between Counterclaim-Defendants and PCC on the one hand and AHCA and CSS on the other, which did not exist, and failed to disclose that providers an intermediary could face duplicative costs by paying PCC for an unnecessary service.

c. "[W]e will serve as an intermediary on your behalf and will send your existing Florida HIE ADT feed to CSS, handle data validation, and connectivity. We will support this workflow as long as you need...." This implied that PCC would coordinate with CSS and AHCA as a matter of course as part of the official transition and that AHCA and CSS were planning for

Counterclaim-Defendants and PCC's role as standard operating procedure, when in fact no such intermediary arrangement had been discussed or approved with CSS or AHCA.

d. "Hospitals are not required to send ADT data directly to the Florida HIE and are permitted to use an intermediary to send ADT data on their behalf . . ." While true that hospitals may choose to use an intermediary, in context, this statement was designed to discourage providers from completing the transition to CSS. (*See* Ex. A.)

22. These misrepresentations were not only intended to preserve PCC's revenue stream; they were intended to undermine CSS and to make its zero-dollar contract unprofitable.

23. Soon thereafter, Counterclaim-Defendants and PCC's messages to Florida Providers began to incorporate outright falsehoods in an effort to delay the transition from Audacious/PCC's Encounter Notifications Service ("ENS") System to CSS's to CEND system.

24. For example, in November 2025, Mr. Smart sent communications to the Palm Beach Accountable Care Organization ("PBACO") through its Analytics Engineer, Martin Drobits and to Advanced Management USA, LLC ("AdvancedACO") through its Technology Project Manager, Jack Fentzke. Mr. Smart told Mr. Drobits and Mr. Fentzke, among other things:

a. "You are not required to transition to CSS, but you do need to sign the CSS agreement. However, you can delegate all technical and invoicing tasks to a third-party vendor. This way, we can handle the technical configuration, onboarding, and even payments to CSS, allowing you to maintain your current workflow and data receipt methods;" and

b. "We have already discussed this process with AHCA and CSS, and it should be straightforward: sign the agreement, delegate PCC as a third-party vendor, and we will take care of the rest at no additional cost." (*See* Ex. B.)

25. Mr. Smart's statement that Counterclaim-Defendants and PCC had "already discussed

this process with AHCA and CSS" was false. No payment-intermediary arrangement had been discussed with, approved by, or developed with CSS or AHCA, and none have been developed to date. Mr. Smart's representation on behalf of Counterclaim-Defendants and PCC that the process would be "at no additional cost" also obscured the reality that providers could face duplicative charges for the same services if they complied with Counterclaim-Defendants and PCC's directions.

26. On information and belief, these communications had their intended effect. Prior to receiving Counterclaim-Defendants and PCC's communications, Mr. Drobits had been engaged with CSS's account management team on the transition process. After, Mr. Drobits told CSS that he had been informed that "we do not need to transition to anything, and that our contract with FLHIE can continue as is," and he sought to implement Counterclaim-Defendants and PCC's preferred delegation model. Florida Provider confusion, delay, and hesitation resulted. *See* Ex. C.

27. As CSS's Executive Director for the Florida HIE, Michael Van Popering, contemporaneously noted, Counterclaim-Defendants and PCC's communications were "alleging all sort[s] of collaborative undiscussed arrangements," and they further appeared to be "attempting to upcharge the service by having the participants pay them (PCC) to pay us." (*See* Ex. D.)

28. Counterclaim-Defendants and PCC's false and misleading messages to Florida Providers continued into 2026. In April 2026, PCC associate Logan Hake sent communications to MaxHealth through Senior Director Christopher Stephey. Mr. Hake told Mr. Stephey:

a. "As a follow-up to our ongoing conversations regarding the Florida HIE Transition following our call today, we now need to **finalize your organization's direction with PointClickCare** to ensure continuity of your current workflows ahead of the upcoming cutover;" and

b. "To maintain your existing alert routing, patient roster management, and overall data exchange as they function today, your organization must complete the **Technical Vendor Delegation**

**(third-party) designation form issued through the Florida HIE**. This form formally authorizes PointClickCare to act as your designated technology partner on your behalf following the transition."

c. "... review and complete the required Florida HIE documentation as soon as possible." (*See* Ex. E (original emphasis).)

29. Mr. Hake's statement that MaxHealth "must complete the Technical Vendor Delegation (third-party) designation form issued through the Florida HIE" in order to ensure continued operability of its existing workflows was false, as was his statement that the third party designation was "required." As AHCA's HIE Operations Coordinator, FCCM Milly Hardin later explained when she was added to the communications, "CSS is able to mimic any step-up [*sic*] you currently have" and the third-party designation was not required unless a specific organization "wish[es] to use an intermediary rather than directly connect to the new Florida HIE platform." (Ex. E.)

30. On information and belief, Counterclaim-Defendants and PCC's communications had their intended effect. After receiving Mr. Hake's communications, Mr. Stephey and MaxHealth sought to implement Counterclaim-Defendants and PCC's preferred delegation model rather than the CSS direct-connection model. (*See* Ex. E.) This resulted in confusion for MaxHealth as Mr. Hake's instructions conflicted with the Florida HIE's instructions. (Ex. E.)

### C. The "Evergreen" Agreement Assertions and Data Exchange Delay and Obstruction

31. On information and belief, Counterclaim-Defendants and PCC's efforts to obstruct and delay the transition to CSS's CEND health information technology system did not stop with its efforts to insert itself as an unnecessary intermediary between Florida Providers and CSS but also extended to untenable reinterpretation of its contracts with AHCA and Florida Providers.

32. On information and belief, in February 2026, Counterclaim-Defendants and PCC asserted to AHCA that its existing participant agreements with Florida Providers were "evergreen,"

meaning that, unless each individual Florida Provider separately and explicitly directed PCC to stop exchanging data on their behalf, Counterclaim-Defendants and PCC would continue to operate its Florida HIE services notwithstanding AHCA's termination of the PCC contract. PCC's Vice President, David Rodriguez, communicated this position to AHCA's Pamela King on or around February 19, 2026, asserting different interpretations from the preamble of the agreements and requesting that the parties' legal teams meet to resolve the dispute.

33. On information and belief, AHCA rejected Counterclaim-Defendants and PCC's "evergreen" interpretation. AHCA informed Counterclaim-Defendants and PCC that termination of the PCC contract would nullify Counterclaim-Defendants and PCC's Florida HIE services agreements with Florida Providers. On information and belief, notwithstanding AHCA's position, Counterclaim-Defendants and PCC persisted in asserting the "evergreen" interpretation, which effectively delayed and complicated the transition from to CSS's CEND system by creating uncertainty among providers as to whether they needed to take affirmative action to transition, and by providing Counterclaim-Defendants and PCC a basis to continue soliciting providers to remain on their system.

34. On information and belief, PCC's assertion that the participation agreements were "evergreen," together with its efforts to prevent Florida Providers from terminating those agreements, was intended to preserve PCC's access to Florida Provider data. Maintaining that data flow allowed PCC to continue generating revenue from data-related services, retain subscribers who might otherwise migrate to the state-designated HIE, and extract additional commercial value from data associated with Florida providers and their patients through its broader national operations.

35. Counterclaim-Defendants and PCC's communications with Florida Providers and AHCA were intended frustrate CSS and Florida Providers' ability to access, exchange, or use electronic health information and delay the transition to CSS's CEND system.

**D. The Patent Infringement Action and the Court's August 31, 2026 Ruling**

36. On July 14, 2025, a month after losing their AHCA protest, Counterclaim-Defendants this suit asserting infringement of U.S. Patent No. 10,938,962 ("the '962 Patent"), U.S. Patent No. 11,114,194 ("the '194 patent"), and U.S. Patent No. 12,047,475 ("the '475 Patent") (collectively, the "Patents-in-Suit"). The Patents-in-Suit relate generally to systems and methods for receiving, processing, and routing healthcare data, including ADT messages, through computer networks.

**1. The Asserted Patents**

37. The '962 Patent is entitled "Network Architecture for Multiple Data Stream Management and Endpoint Visualization" and purports to be directed to "[n]etwork architecture with a plurality of data streams" and "multiplex[ing] a plurality of signals from the plurality of data streams." Ex. F ('962 Patent) at 1.

38. None of the claims in the '962 Patent are directed to patent-eligible subject matter under 35 U.S.C. § 101. The '962 Patent claims taken individually and as a combination, are directed to the abstract idea of aggregating or multiplexing data. Further, claim one reciting that the data is updated in "real-time" does not add an inventive concept nor save the claim from ineligibility.

39. The claims in the '962 Patent recite using only generic computer components such as "processor[s]," "interfaces," and "memory.". *See e.g.* Ex. F at 9:34-60. Further, the '962 Patent itself recognizes that multiplexing signals to create a single output from multiple inputs is well known. *Id.* at 1:43-46 (describing prior art "simple multiplexor feeding signals from each spoke data source to each spoke client in composite or multiplexed fashion"). The '962 Patent claims do not recite an enhancement or improvement to the functioning of computers nor computer networks, only using known components to perform the known concepts of aggregating and multiplexing data.

40. The '475 Patent is entitled "Parallel Network Architecture for Aggregate Data Routing" and purports to be directed to "culling or screening output to communications that match

user parameters" and "aggregat[ing] and enhanc[ing] information that matches from among [certain] inputs." Ex. G ('475 Patent) at 1.

41. None of the claims in the '475 Patent are directed to patent-eligible subject matter under 35 U.S.C. § 101. The '475 Patent claims taken individually and as a combination, are directed to an abstract idea because the claims are merely directed to data filtering and limiting access.

42. The claims in the '475 Patent recite using only generic computer components such as "processor[s]," "interface," and "memory." *See e.g.* Ex. G at 14:30-53. Further, those generic computer components are merely used to "limit flow of the plurality of streams to a receiving user." *Id.* at 14:47. The '475 Patent claims do not recite an enhancement or improvement to the functioning of computers nor computer networks, only using known components to limit and filter data.

43. The '194 Patent is entitled "Network-Based Systems and Methods for Providing Readmission Notifications" and purports to be directed to "receiving healthcare information and with a computer identifying when a patient is readmitted" then generating "[a] readmission notification." Ex. H ('194 Patent) at 1. The Court has already determined the the '194 Patent is directed to patnet ineligible subject matter.

**2. The Motion to Dismiss**

44. After Counterclaim-Plaintiffs moved to dismiss the original complaint, Counterclaim-Defendants filed its operative Amended Complaint asserting infringement of the same patents on September 22, 2025. Counterclaim-Plaintiffs again moved to dismiss, arguing in relevant part that all claims of the Patents-in-Suit were patent-ineligible and invalid under 35 U.S.C. § 101 .

45. On August 31, 2026, this Court issued a Memorandum Opinion and Order (Dkts. 39, 40) granting in part and denying in part Counterclaim-Plaintiffs' Motion to Dismiss. As to the '194 patent, the Court held the '194 patent directed to be ineligible and dismissed Count II of the Amended Complaint with prejudice. In reaching this conclusion, the Court found that the '194 patent is "directed

to the abstract idea of receiving, authenticating, and publishing data," "relies on results-focused functional language that fails to identify the 'specific asserted improvements in computer capabilities,'" and "does not describe the 'how' of such improvement in a manner beyond the general function- and results-oriented steps." (Dkt. 39 at 30, 33.) The Court also found that the '194 patent lacks an inventive concept, concluding that it "uses generic computer technology," "does not recite an improvement to a particular computer technology;" "involve[s] the generic, well-known steps of collecting data, recognizing data, and storing data;" and "lacks the requisite 'something more'" to be patent-eligible. (Dkt. 39 at 38-39.)

46. While the Court did not reach the merits as to whether the '962 and '475 patents are patent ineligible because the issue of assignor estoppel couldn't be resolved at pleading stage, the claim language of the '962 and '475 Patents—which, like the '194 patent, are directed to the abstract idea of the receiving, processing, and routing information through generic computer components—suggests that they are also directed to patent ineligible subject matter under 35 U.S.C. § 101.

**E. Injuries to Counterclaim-Plaintiffs**

47. As a direct and proximate result of Counterclaims-Defendants' coordinated exclusionary conduct described above, Counterclaim-Plaintiffs have suffered and continue to suffer injury, including but not limited to:

a. Delay and disruption in the Florida transition from Counterclaims-Defendants and PCC's ENS system to CSS's CEND system, including delays in execution of Participation Agreements, establishing direct data connections, and commencing HIE services;

b. Provider confusion regarding the necessity and mechanics of the transition, resulting in lost time, increased support costs, and diversion of CSS resources;

c. Interference with CSS's business relationships with AHCA and Florida healthcare providers, including UHealth, PBACO, AdvancedACO, and others;

d. Costs incurred in responding to Counterclaim-Defendants' misleading communications, correcting false impressions among providers, and defending against this action;

e. Damage to CSS's and CRISP Maryland's reputation and goodwill;

f. Lost revenue and profits from delayed or diverted provider relationships.

**F. Actual Case or Controversy Regarding the '962 and '475 Patents**

48. In their Amended Complaint, Counterclaim-Defendants allege infringement of the Patents-in-Suit, and Counterclaim-Plaintiffs deny these allegations. As a result of Counterclaim-Defendants' actions, an actual and justiciable controversy has arisen between the parties regarding the validity, enforceability, and infringement of the '962 and '475 Patents.

49. A judicial determination and declaration as to the patent-related Counterclaims is necessary and appropriate at this time given Counterclaim-Defendants' allegations and so that Counterclaim-Plaintiffs may ascertain their rights and duties with respect to the Patents-in-Suit.

**G. Assignor Estoppel Does Not Bar Challenges to the Validity of the '962 and '475 Patents**

50. Assignor estoppel is an equitable doctrine grounded in principles of fair dealing. Under *Minerva Surgical, Inc. v. Hologic, Inc.*, 594 U.S. 559 (2021), the doctrine applies when an assignor's later invalidity challenge contradicts an express or implied representation made in connection with an assignment that the assigned patent rights were valid. Thus, whether the doctrine applies turns on whether Counterclaim-Plaintiffs' invalidity challenges are inconsistent with a representation made in the relied-upon transaction. No such inconsistency exists.

51. All but one of the inventors named in the '962 and '475 Patents were Audacious personnel. At least four inventors were affiliated with Audacious during the pertinent development and prosecution periods, while only one, David Horrocks, was affiliated with CRISP Maryland at relevant times. Audacious thus stood on the inventor and technology-development side of the transactions; it was not an arm's-length purchaser lacking knowledge of the technology.

52. Audacious—not CRISP Maryland or CSS—selected and retained prosecution counsel for the relevant patent applications, supplied or supervised prosecution instructions, and controlled decisions concerning continuation practice, claim drafting, amendments, and the claims ultimately pursued in the'962 and '475 Patent families. CRISP Maryland and CSS did not control or have any active role in prosecution. Audacious's role thus included both inventive contributions and participation in prosecution of the patent families through which the '962 and '475 Patents issued.

53. In light of Audacious's participation in developing the technology and prosecuting the relevant patents, Audacious (and subsequently CMT) did not acquire any patent rights in reliance on a representation by CRISP Maryland, express or implied, concerning the validity of later-issued claims.

54. Audacious did not request or receive an express warranty from CRISP Maryland regarding the validity of the claims that ultimately issued in the '962 and '475 Patents.

55. On or about August 5, 2009, Audacious and CRISP Maryland entered into a Master Professional Services Agreement (the "MSA"). The MSA does not contain an express warranty concerning the validity of any patent or future claim or a separate patent assignment directed specifically to the claims that later issued in the '962 and '475 Patents.

56. CRISP Maryland and Audacious subsequently entered into an agreement dated December 2013 that purported to assign to Audacious any rights CRISP Maryland may have had (if any) to certain "ENS Technology" and "ENS IP". Of course, if CRISP Maryland had no relevant patent rights at that time, it could not have assigned such rights to Audacious. Regardless, the agreement did not expressly address nor provide any warranties of validity as to the claims that later issues as the '962 or '475 Patents, nor any other specific patents or patent applications.

57. CSS was not a party to the December 2013 Agreement between CRISP Maryland and Audacious, and was not formed until on or about October 5, 2020, several years after the alleged

December 2013 transfer and after the relevant inventor assignments. CSS therefore never owned and did not assign any patent interest to the Counterclaim-Defendants, nor did it participate in any consideration exchanged for the alleged transfer. On information and belief, CSS has not represented, expressly or implicitly, that the claims of the ’962 or ’475 Patents are valid.

58. The applications from which the ’962 and ’475 Patents issued were filed after the purported transfer of rights on which Counterclaim-Defendants rely. U.S. Patent Application No. 15/911,137 (“the ’137 Application”), which led to the ’962 Patent, was filed on or about March 4, 2018, more than four years after the alleged December 2013 transfer. U.S. Patent Application No. 17/190,358 (“the ’358 Application”), from which the ’475 Patent issued, was filed on or about March 2, 2021, more than seven years after that alleged transfer.

59. Between the original assignments and the issuance of the Patents-in-Suit, the priority chain passed through intervening continuation-in-part applications, including U.S. Patent Application No. 15/808,887 (“the ’887 Application”). On information and belief, the ’887 Application combined disclosures from five distinct patent families and added subject matter not contained in U.S. Patent Application Nos. 13/844,332 (“the ’332 Application”), 14/142,625 (“the ’625 Application”), and 14/189,225 (“the ’225 Application”)—the three earlier applications naming Mr. Horrocks as an inventor—nor contributed by Mr. Horrocks. At least three contributing families did not identify Mr. Horrocks as an inventor. The later disclosures and claims thus were not coextensive with any invention covered by Mr. Horrocks’s earlier assignments and were substantively broader in scope.

60. The claims ultimately asserted from the ’962 and ’475 Patents also arose later and differ in scope and focus from the claims in the earlier applications. The asserted claims issued after prosecution of the ’137, ’358, and ’887 Applications, and their final scope had not been established when the alleged 2013 transfer and June 2014 assignments occurred. Those documents therefore did

not include any representation concerning the validity of the later claim language.

61. To the extent Audacious also relies on assignments executed by Mr. Horrocks, the 2014 assignments for the ’332, ’625, and ’225 Applications and the February 14, 2018 assignments for the ’137 and ’887 Applications arose from Mr. Horrock’s amenable cooperation as a co-inventor, or at most his preexisting assignment obligations, not a concurrent assessment of validity.

62. At the time Mr. Horrocks executed any patent assignment to Audacious, he could only assign that which he had a right to assign. Mr. Horrocks was never a CRISP Maryland employee, nor was Mr. Horrocks ever under any obligation to assign any inventions he conceived of to CRISP Maryland while affiliated with CRISP Maryland. Accordingly, CRISP Maryland is unaware of ever having acquired any rights to any Audacious patents due to any purported invention by Mr. Horrocks. On information and belief, Mr. Horrocks was at all times when affiliated with CRISP Maryland an employee of The Johns Hopkins Health System Corporation (“Johns Hopkins”) and had assigned all rights to any work he conceived of during his affiliation with CRISP Maryland to Johns Hopkins. On information and belief, such assignment would have predated and preempted any purported assignment to Audacious. Alternatively and on information and belief, if Mr. Horrocks had not assigned his rights to Johns Hopkins, he retained those rights personally, and any assignment he may have made of those rights was in his personal capacity, not on behalf of CRISP Maryland or CSS.

63. Audacious and its prosecution counsel determined which continuations-in-part (“CIPs”) and continuations to file, which amendments to make, and which claims to pursue. Mr. Horrocks, CRISP Maryland, and CSS did not control and were not involved in those decisions. In particular, Mr. Horrocks executed the assignments in his personal capacity without controlling either the initial or final scope of the claims Audacious selected, and the assignments transferred application rights and required cooperation without expressly addressing the validity of any claim that might issue.

64. Under these circumstances Counterclaim-Defendants cannot rely on assignor estoppel to defeat claims of invalidity. An assignment or obligation to assign made before the specific claims have been established may not include an implied representation concerning the validity of those claims. Similarly, estoppel may not extend to claims whose scope or focus changed after the relevant assignment. The 2018 assignments necessarily arose from perceived obligations that would have attached earlier (if they were at all proper assignments to begin with) and were executed while Audacious retained control over the prosecution and selection of the claims ultimately asserted

65. An intervening change in law also bears on the scope of any earlier representation. Both CRISP Maryland's alleged direct assignment and Mr. Horrocks's preexisting obligation to assign arose before the Supreme Court's June 19, 2014 decision in *Alice Corp. Pty. Ltd. v. CLS Bank International*, 573 U.S. 208 (2014). *Alice* changed the patent-eligibility framework under 35 U.S.C. § 101, particularly for software-related claims, and provided a basis for challenging claims as directed to an abstract idea implemented without an inventive concept. A § 101 challenge based on that subsequent legal development is not inconsistent with an alleged representation made before *Alice*.

66. Under these circumstances, Counterclaim-Plaintiffs never made an express or implied representation to Counterclaim-Defendants that the later-issued claims of the '962 or '475 Patents were valid. Counterclaim-Plaintiffs' present invalidity challenges are not inconsistent with a representation made in connection with the relevant agreements or assignments, and assignor estoppel does not apply.

**H. Audacious's Inequitable Conduct During Prosecution of the '962 and '475 Patents**

67. On information and belief, one or more of Audacious and its patent prosecution counsel, including at least Audacious Managing Partner Christopher Brandt, Audacious's former President and named inventor Scott Afzal, and the individual attorney(s) who prepared and signed documents submitted during prosecution of the '962 Patent and the '475 Patent, including specifically Attorney Ryan Alley, knowingly and willfully misrepresented and obscured the priority date for both

the ’962 Patent and the ’475 Patent and further failed to disclose material prior art in the form of at least Audacious’s own publicly disclosed and sold ENS system to the Patent and Trademark Office (“PTO”) in violation of their duty of candor and good faith in dealing with the PTO, which includes a duty to disclose to the PTO all information known to that individual to be material to patentability.

68. The ’962 Patent issued from the ’137 Application, filed March 4, 2018, and claims the benefit of a chain of eight applications extending back to the ’332 Application, filed March 15, 2013. The chain includes: (i) the ’332 Application, filed March 15, 2013; (ii) the ’625 Application, filed December 27, 2013, as a continuation of the ’332 Application; (iii) the ’225 Application, filed February 25, 2014; (iv) U.S. Patent Application No. 14/445,562 (“the ’562 Application”), filed July 29, 2014; (v) U.S. Patent Application No. 14/872,445 (“the ’445 Application”), filed October 1, 2015; (vi) U.S. Patent Application No. 15/010,142 (“the ’142 Application”), filed January 29, 2016; (vii) the ’887 Application, filed November 9, 2017, as a CIP of the ’625, ’225, ’562, ’445, and ’142 Applications; and (viii) the ’137 Application, filed March 4, 2018, as a continuation of the ’887 Application. The ’475 Patent issued from the ’358 Application, which is a continuation of the ’137 Application and shares the same specification. The priority chain for the ’962 and ’475 Patents thus passes through several disparate families, as reflected below with each arrow representing a priority claim.




69. On information and belief, Audacious, by and through its patent prosecution counsel Mr. Alley of Ryan Alley IP, its Managing Partner Mr. Brandt, and its executive and named inventor Mr. Afzal, filed a series of continuation and CIP applications that combined subject matter from different patent families, creating an artificially complex priority chain designed to obscure that the claims were not supported by the earliest applications and were invalid over Audacious's own public prior art ENS system, with the specific intent to mislead the PTO as to patentability.

70. Under 35 U.S.C. § 120, a CIP is entitled to the benefit of a parent's filing date only if the parent specification provides adequate written-description support under 35 U.S.C. § 112(a).

71. None of the applications before the '887 Application provides written-description support for at least the following limitations of the independent claims of the '962 and '475 Patents:

a. HL7 Admit-Discharge-Transfer ("ADT") Messages as a specific class of data stream, distinct from generic HL7 references (*e.g.,* '962 Patent, Claims 1, 10; '475 Patent, Claims 1, 12, 20);

b. Identity-based multiplexing or aggregation of data streams into a single output *(e.g.,* '962 Patent, Claims 1, 10);

c. Disposal or limitation of HL7 ADTs based on content and client input, with output to a multi-field graphical user interface populated in real time (*e.g.,* '962 Patent, Claims 1, 10; '475 Patent, Claims 1, 20);

d. A protocol interface configured for different protocols including HL7 (*e.g.,* '475 Patent, Claims 1, 12, 20); and

e. A plurality of streams operating on different protocols (*e.g.,* '475 Patent, Claims 1, 12, 20).

72. The earlier '332, '625, '225, '562, '445, and '142 Applications describe healthcare notification-delivery networks and related features, but do not describe the foregoing elements.

73. The '887 Application, filed November 9, 2017, is the first application that could be interpreted to provide written-description support for all of these limitations. Accordingly, the '962 and '475 Patent claims are entitled to an effective filing date no earlier than November 9, 2017.

74. The '887 Application was filed as a CIP of five different applications (the '625, '225, '562, '445, and '142 Applications) and combined disparate disclosures from applications directed to distinct aspects of healthcare data exchange. This deliberate strategy of threading CIPs through different families created the misleading appearance that the claims were entitled to a March 15, 2013 priority date, when in fact no disclosure supported them before November 9, 2017 at earliest. The complexity of the CIP chain served no legitimate prosecutorial purpose, and the most reasonable inference is that it was intentionally designed to obscure the lack of earlier written-description support.

75. Audacious also failed to disclose to the PTO that the claimed inventions were the subject of a public sale, offer for sale, or prior public use, which constitutes invalidating prior art under 35 U.S.C. § 102 when the true effective filing date of November 9, 2017 is applied. Specifically, Audacious's ENS system, which Audacious asserts is covered by the inventions claimed in the '962 and '475 Patents, was commercially offered and sold beginning in 2012 and continuing thereafter. By

the end of 2012, 57 organizations used Audacious's commercial ENS system.

76. Audacious knew of this commercial activity as it sold ENS services during the entire period between the true effective filing date and the filing of the applications that issued as the '962 and '475 Patents. This information was material to patentability because, under the true effective filing date, the public sale and offering of the ENS system was prior art under 35 U.S.C. § 102. Audacious had an obligation under 37 C.F.R. § 1.56 to disclose this information to the PTO and failed to do so.

77. Audacious's inequitable conduct included both material omissions and express misrepresentations during the prosecution of the '887,'137, and'358 Applications.

78. The prosecution of the '887,'137, and'358 Applications involved the same basic filings, omissions, and misrepresentations. For the '887 Application, Audacious caused to be filed on March 8, 2018 a Power of Attorney signed by Mr. Brandt naming Mr. Alley as its attorney, an Information Disclosure Statement signed by Mr. Alley, and a Statement Under 37 C.F.R. § 1.78(d)(6) signed by Mr. Alley (Exs. I, J, K); Mr. Afzal had executed a Combined Declaration and Global Assignment for Patent Application on February 16, 2018 identifying himself as an original joint inventor (Ex. L). The '137 Application, filed March 4, 2018 as a continuation of the '887 Application, was accompanied by a Power of Attorney signed by Mr. Brandt naming Mr. Alley as attorney and a Statement Under 37 C.F.R. § 1.78(d)(6) signed by Mr. Alley (Exs. N, O), and Mr. Afzal's February 16, 2018 Combined Declaration and Global Assignment identified him as an original joint inventor (Ex. P). The '358 Application, filed March 2, 2021 as a continuation of the '137 Application, was accompanied by an Application Data Sheet signed by Mr. Alley identifying Mr. Afzal as an inventor (Ex. Q). On information and belief, as Audacious executives, named inventors, attorneys, or representatives of the applicant, Mr. Brandt, Mr. Afzal, and Mr. Alley owed duties of candor and good faith to the PTO in those prosecutions.

79. Each application also asserted an unsupported early priority. The ’887 Application Priority Statement expressly and falsely represented that the ’887 Application “claims the benefit of the filing date of a nonprovisional application filed prior to March 16, 2013. . . .” (Ex. K); the ’137 Application Priority Statement made the same representation for the ’887 Application (Ex. O); and the ’358 Application Data Sheet represented that the ’358 Application was entitled to claim priority to the ’332 Application filed March 15, 2013 and five other applications predating the ’887 Application (Ex. Q), although the claimed subject matter was not entitled to those priority dates.

80. The IDS omissions were common to all three prosecutions. The ’887 Application IDS identified four patents as purported prior art but omitted Audacious’s own ENS system (Ex. J); Mr. Alley submitted no IDS during prosecution of the ’137 or ’358 Applications; and, on information and belief, neither Mr. Alley, Mr. Brandt, nor Mr. Afzal otherwise disclosed the ENS system as prior art.

81. The ’887 Application was abandoned on June 4, 2020 after Audacious and its representatives failed to respond to an October 25, 2019 non-final office action rejecting all applied-for claims as unpatentable (Ex. M). The ’962 Patent issued from the ’137 Application on March 2, 2021, and the ’475 Patent issued from the ’358 Application on July 23, 2024, without disclosure that ENS embodied the claimed subject matter and had been publicly disclosed and commercially used at least as early as 2012 or that the claims were not entitled to a priority date before November 9, 2017.

82. The inequitable conduct described herein was committed solely by Audacious, which had exclusive control over prosecution of the patent applications that led to the ’962 and ’475 Patents, and the its representatives, including Mr. Alley, Mr. Brandt, and Mr. Afzal.

83. The conduct occurred after Mr. Horrocks, the sole named inventor with any affiliation with CRISP Maryland, executed any inventor assignments associated with the underlying applications. Mr. Horrocks executed the assignments Audacious submitted for the ’332, ’625, ’225, and ’358

Applications on June 5, 2014, and executed assignments of the ’137 and ’887 Applications to Audacious on February 14, 2018. These assignments were executed pursuant to preexisting obligations and/or in Mr. Horrocks’s personal capacity as an inventor, and Mr. Horrocks had no role in or control over the prosecution strategies employed by Audacious following the execution of his assignments.

84. CRISP Maryland and CSS had no role in, knowledge of, or control over the prosecution strategies used by Audacious, including the filing of the CIP application, the failure to disclose the true effective filing date, or the failure to disclose on-sale-bar or prior public use prior art.

85. Audacious’s acted with the specific intent to deceive the PTO and procure patent rights to which Audacious was not entitled. Having failed to obtain patents in applications with less written description support (and which did not disclose, for example, HL7 ADT messages specifically), Audacious sought to add matter it would later rely on to get the patents issued over prior art—while intentionally obfuscating that such claims were not entitled to the earliest claimed priority dates and failing to disclose that its own ENS System would be invalidating prior art.

86. Audacious’s prosecution statements demonstrate its awareness that the claimed subject matter was distinct from the disclosures in earlier applications. For example, during prosecution of the ’962 Patent, Mr. Alley represented to the PTO that “HL7 ADTs” denotes “a specific class of HL7 administrative messages with the ‘ADT^AXX’ field indicating the admission, discharge, or transfer event,” distinct from HL7 generally or other HL7 message types such as ACK messages, in an attempt to distinguish the prior art U.S. Patent App. Publ. No. 2007/0124310 to Mathur. (Ex. R at 9-13.)

87. Mr. Alley reiterated this narrow construction during prosecution of the ’475 Patent, construing “limit flow... to only an HL7 ADT” as requiring the removal of all non-HL7 ADT content from the incoming sources while still delivering HL7 ADT content, stating that “[n]othing else from the providers can be streamed to the users under this language.” (Ex. S at 12.) In so arguing, Mr. Alley

incorporated the '962 Patent prosecution statements into the '475 prosecution record. (*Id.* at 13.)

88. Under Audacious and Mr. Alley's own construction, generic references to "HL7" in the pre-'887 Application patent applications do not provide a written description of the specific "HL7 ADT" message type recited in the claims. Yet, despite securing issuance of the '962 and '475 Patent claims at least in part by narrowly construing "HL7 ADT," Audacious, Mr. Alley, Mr. Brandt, and Mr. Afzal simultaneously claimed the benefit of the March 15, 2013 filing date of earlier applications that contain only generic references to HL7 in a notification-delivery context and do not describe the specific HL7 ADT limitations under Audacious's construction. This internally contradictory strategy further evidences an intent to deceive as an applicant that understood its claims to require narrow, specific HL7 ADT disclosures cannot plausibly claim ignorance of the priority-date problem.

89. The unnecessary complexity of the CIP chain that lead to the '962 and '475 Patents further evidences intent to deceive. The '887 Application to which both the '962 and '475 Patents claim priority was filed as a CIP of five separate earlier applications, each of which addressed different aspects of healthcare data exchange. These disparate disclosures were combined in the '887 Application, which then added further new matter and for the first time described the multi-stream visualization architecture claimed in the '962 and '475 Patents.

90. On information and belief, the deliberate threading of a CIP application through these different patent families served no legitimate prosecutorial purpose and was designed to create the misleading appearance that the claims were supported by applications filed as early as March 15, 2013.

91. Audacious, Mr. Alley, Mr. Brandt, and Mr. Afzal knew or should have known that the claims of the '962 and '475 Patents were not entitled to a March 15, 2013 priority date because the earlier applications did not provide written-description support for the claimed limitations.

92. Audacious, Mr. Alley, Mr. Brandt, and Mr. Afzal also knew or should have known that

Audacious's own sale and public offering of the ENS system constituted material prior art under the true effective filing date. Audacious itself provided ENS services in the U.S.. Audacious and its principals had firsthand, personal knowledge of the commercial deployment of the system embodying the claimed inventions prior to the true effective filing date of the '962 and '475 Patents.

93. The single most reasonable inference to be reached from the foregoing facts is that Audacious and its representatives Mr. Alley, Mr. Brandt, and Mr. Afzal intended to deceive the PTO, particularly in view of: (a) the unnecessary complexity of the CIP chain designed to obscure the lack of written-description support; (b) the demonstrated awareness, through express prosecution statements, that the claims required narrow disclosures absent in earlier applications; (c) the internally contradictory strategy of claiming narrow constructions to overcome prior art while asserting broad priority; and (d) the failure to disclose Audacious's commercial prior art.

94. But for Audacious, Mr. Alley, Mr. Brandt, and Mr. Afzal's material omissions and misrepresentations, the PTO would not have allowed the claims of the '962 and '475 Patents.

**<u>FIRST COUNTERCLAIM:</u>**
**DECLARATION OF NON-INFRINGEMENT OF THE '962 PATENT**

95. Counterclaim-Plaintiffs repeat and reallege every allegation contained in the foregoing paragraphs of its Counterclaims as if set forth fully herein.

96. Counterclaim-Plaintiffs have not infringed nor contributed to or induced the infringement of any claim of the '962 Patent, and are not liable for infringement of the '962 Patent.

97. Exemplary claim limitations of the '962 Patent for which Counterclaim-Defendants cannot demonstrate infringement include at least the following: "multiplex a plurality of signals…;" "data updated in real-time…," and "Dispose a Portion of the HL7 ADTs.

98. Pursuant to 28 U.S.C. § 2201, *et seq.*, Counterclaim-Plaintiffs are entitled to declaratory judgment that they do not infringe the '962 Patent under 35 U.S.C. § 271.

99. Additionally, despite alleging that both CRISP Maryland and CSS have infringed one or more claims of the '962 Patent, Counterclaim-Defendants have failed to identify any alleged acts of infringement by CRISP Maryland, which is entitled to judgment of no infringement.

## SECOND COUNTERCLAIM: DECLARATION OF INVALIDITY OF THE '962 PATENT

100. Counterclaim-Plaintiffs repeat and reallege every allegation contained in the foregoing paragraphs of its Counterclaims as if set forth fully herein.

101. One or more claims of the '962 Patent are invalid for failure to comply with the conditions for patentability, including without limitation 35 U.S.C. §§ 101, 102, 103, and/or 112.

102. One or more of the claims of the '962 Patent are invalid under 35 U.S.C. § 101 because the claimed invention is directed to patent-ineligible subject matter.

103. One or more of the claims of the '962 Patent are invalid under 35 U.S.C. §§ 102 and/or 103 because the claimed invention was patented, described in a printed publication, in public use, on sale, and/or otherwise available to the public before the '962 Patent's effective filing date . For example, the claims are anticipated and/or rendered obvious to a person having ordinary skill in the art by at least the following patents, publications, and/or their related patent family members: US 2007/0124310; JP 2010267041; CN 102185898; US 2013/0311516; and US 2009/0150185.

104. One or more claims of the '962 Patent are invalid under 35 U.S.C. § 112 for (1) failing to comply with the "written description" requirement, (2) failing to comply with the "enablement" requirement, and (3) failing to comply with the "definiteness" requirement. The asserted claims are not enabled because the specification does not teach those skilled in the art how to make and how to use the full scope of the claimed invention without undue experimentation. The asserted claims are also indefinite because those skilled in the art would not understand the full scope of the asserted claims when read in the light of the specification.

105. With respect to invalidity under 35 U.S.C. §§ 102/103, below is an exemplary claim chart demonstrating invalidity of claim one of the '962 Patent under a combination of references.

| '962 Claim Language | Invalidating Prior Art |
|---|---|
| 1. A network comprising:<br><br>a plurality of data streams, wherein at least one of the data streams includes data updated in real-time, wherein the plurality of data streams include HL7 Admit, Transfer, Discharge (ADT) Messages; | US 2007/0124310 ("Mathur") describes a distributed system for exchanging information between remote healthcare applications, including hospitals and physician offices (see, e.g., [0042]-[0048]). The system handles HL7 messages, including ADT Messages. ([007], [0131], [0049]-[0054], [0131]-[0141]). |
| a plurality of protocol interfaces each connected to at least one of the data streams, wherein at least one of the protocol interfaces is configured for HL7; | Mathur describes protocol interfaces for HL7, including an HL7 interface engine at the hospital and at the physician office. ([007], [0131], [0049]-[0054], [0131]-[0141]). |
| a processor coupled with the protocol interfaces; | The system includes nodes with processors that run agents to process, parse, and route HL7 messages ([0046], [0064], [0132], [0134]). |
| an output interface coupled to a display for showing a graphical user interface; and | Mathur describes that the system can include browser-based interfaces for users (e.g., nurses) to view and route HL7 results, and for system administrators to manage nodes and agents ([0148], [0150], [0166], [0172]). |
| a memory coupled to the processor including instructions that when executed by the processor, cause the processor to, | Mathur includes nodes containing the following: (a) application server, (b) data storage mechanism, (c) secure communications mechanisms, (d) application utilities and methods and (e) management tools and services [0062] |
| multiplex a plurality of signals from the plurality of data streams via the protocol interfaces into a single output, wherein the multiplexing is executed based on an identity of the one of the data stream from which the signal originated, | Mathur describes a system that receives HL7 messages from multiple sources parses and processes them, and routes them to the appropriate destination ([0049]-[0054], [0132]-[0147]). The system can aggregate, filter, and route messages based on their origin and content ([0050], [0140], [0145], [0151]). The Results Agent and the GUI allow users to view and interact with results from multiple sources in a unified interface ([0148], [0150]).<br><br>US 2009/0150185 ("Lassetter") teaches multiplexing data from a health care data store in order to communicate health data. [0027]. |
| dispose a portion of the HL7 ADTs based on content of the HL7 ADTs and client input, and | Mathur describes receiving HL7 ADT messages and other clinical data, and may filter or process data for relevance (see, e.g., Mathur [0032], [0045], [0050]). In [0050] Mathur discloses "removing or modifying data from the |

| | |
|---|---|
| | original HL7 and discarding duplicates." see also [0136-137] *See also* [0137]. |
| output the single output to the graphical user interface based on the content and the client input via the output interface, wherein the graphical user interface includes a plurality of fields, and wherein the single output populates at least one of the fields based on the identity of the one of the data stream in real-time. | Mathur describes a user interface that displays integrated patient data from multiple sources (see, e.g., Mathur [0040], [0045]).<br><br>Mathur also describes a GUI including a pull down list displaying the HL7 data. [0150]. |

106. Additionally, Counterclaim-Defendants' own ENS System is invalidating prior art as by their own admission the ENS System practices the claims and was commercially available and in public use at least as early as 2012, well before the actual priority date of the '962 Patent. *See* Ex. T, previously cited by Counterclaim-Defendants in the Amended Complaint as describing the patented technology. On information and belief, the Axolotl system would also be invalidating prior art.

107. Pursuant to 28 U.S.C. § 2201, *et seq.*, Counterclaim-Plaintiffs are entitled to declaratory judgment that the '962 Patent is invalid under 35 U.S.C. §§ 101, 102, 103 and/or 112.

## THIRD COUNTERCLAIM: DECLARATION OF UNENFORCEABILITY OF THE '962 PATENT

108. Counterclaim-Plaintiffs repeat and reallege every allegation contained in the foregoing paragraphs of its Counterclaims as if set forth fully herein.

109. The '962 Patent is unenforceable due to inequitable conduct before the PTO.

110. Audacious as the applicant and prosecuting entity and Mr. Alley, Mr. Brandt, and Mr. Afzal as its representatives involved in the prosecution of the applications leading to the '962 Patent each owed a duty of candor and good faith to the PTO under 37 C.F.R. § 1.56.

111. Audacious, Mr. Alley, Mr. Brandt, and Mr. Afzal breached this duty by: (a) filing continuation and CIP applications structured to create a false appearance of an earlier priority date; (b) failing to disclose to the PTO that the claims lacked written-description support in the pre-'887

Application patent applications and were not entitled to the March 15, 2013 priority date; and (c) failing to disclose the commercial sale and public offering of the ENS system, which constituted prior art under the correct effective filing date of November 9, 2017.

112. The withheld information was material to patentability. But for Audacious and its identified representatives' misconduct, the PTO would not have allowed the '962 Patent claims .

113. On information and belief, Audacious, Mr. Alley, Mr. Brandt, and Mr. Afzal acted with the specific intent to deceive the PTO. The single most reasonable inference from the evidence is that Audacious, Mr. Alley, Mr. Brandt, and Mr. Afzal intended to deceive the PTO.

114. The inequitable conduct was committed solely by Audacious, which had exclusive control over patent prosecution, and its representatives Mr. Alley, Mr. Brandt, and Mr. Afzal.

115. Pursuant to 28 U.S.C. § 2201, *et seq.*, Counterclaim-Plaintiffs are entitled to declaratory judgment that the '962 Patent is unenforceable.

## FOURTH COUNTERCLAIM: DECLARATION OF NON-INFRINGEMENT OF THE '475 PATENT

116. Counterclaim-Plaintiffs repeat and reallege every allegation contained in the foregoing paragraphs of its Counterclaims as if set forth fully herein.

117. Counterclaim-Plaintiffs have not infringed nor contributed to or induced the infringement of any claim of the '475 Patent, and are not liable for infringement of the '475 Patent.

118. Exemplary claim limitations of the '475 Patent for which Counterclaim-Defendants cannot demonstrate infringement include at least the following: "different protocols;" "limit flow of the plurality of streams… the limiting is executed in real-time with the streams;" and "limit flow of the plurality of streams… to only an HL7 ADT or a portion of the HL7 ADT."

119. Pursuant to 28 U.S.C. § 2201, *et seq.*, Counterclaim-Plaintiffs are entitled to declaratory judgment that they do not infringe the '475 Patent under 35 U.S.C. § 271.

120. Additionally, despite alleging that both CRISP Maryland and CSS have infringed one or more claims of the ’475 Patent, Counterclaim-Defendants have failed to identify any alleged acts of infringement by CRISP Maryland. Accordingly, CRISP Maryland is entitled to judgment that it does not infringe the ’475 Patent pursuant to 35 U.S.C. § 271 on this independent basis.

## FIFTH COUNTERCLAIM
## DECLARATION OF INVALIDITY OF THE ’475 PATENT

121. Counterclaim-Plaintiffs repeat and reallege every allegation contained in the foregoing paragraphs of its Counterclaims as if set forth fully herein.

122. One or more claims of the ’475 Patent are invalid for failure to comply with the conditions for patentability, including without limitation 35 U.S.C. §§ 101, 102, 103, and/or 112.

123. One or more of the claims of the ’475 Patent are invalid under 35 U.S.C. § 101 because the claimed invention is directed to patent-ineligible subject matter.

124. One or more of the claims of the ’475 Patent are invalid under 35 U.S.C. §§ 102 and/or 103 because the claimed invention was patented, described, in a printed publication, in public use, on sale, and/or otherwise available to the public before the’475 Patent’s effective filing date. For example, the claims of the ’475 Patent are anticipated and/or rendered obvious to a person having ordinary skill in the art by at least the following patents, publications, and/or their related patent family members: US 2007/0250347; US 2013/0117036; US 2007/0124310; US 2009/0150185; and US 2011/0288877.

125. One or more claims of the ’475 Patent are invalid under 35 U.S.C. § 112 for (1) failing to comply with the “written description” requirement, (2) failing to comply with the “enablement” requirement, and (3) failing to comply with the “definiteness” requirement. The asserted claims are not enabled because the specification does not teach those skilled in the art how to make and how to use the full scope of the claimed invention without undue experimentation. The asserted claims are also indefinite because those skilled in the art would not understand the full scope of the asserted claims

when read in the light of the specification.

126. With respect to invalidity under 35 U.S.C. §§ 102/103, below is an exemplary claim chart demonstrating invalidity of claim one of the '962 Patent under a combination of references.

| '475 Claim Language | Invalidating Prior Art |
|---|---|
| 1. A network connected between a plurality of parallel streams and users to condition and route the streams, the network comprising: | US20070250347 ("Abraham-Fuchs") teaches the claimed "network connected between a plurality of parallel streams and users to condition and route the streams." *See* [0004]. |
| a protocol interface connected to the plurality of streams, wherein the plurality of streams operate on different protocols and include at least one Health Level 7 (HL7) Admit Discharge Transfer message (ADT) stream, wherein the protocol interface is configured for different protocols including HL7; | Abraham-Fuchs explains that health-related data may be provided in standardized formats such as DICOM, HL7, and ICD, or alternatively in proprietary formats used by individual healthcare institutions. [0028].<br><br>Abraham-Fuchs further discloses that the broker knows which format is used by a particular healthcare institution and constructs search filters that are compatible with that format. [0039]. |
| an intake interface configured to receive parameters for network operation on the plurality of streams from a plurality of users separate from the plurality of streams; and | Abraham-Fuchs teaches that a third party may request diagnostic information relating to a particular lung disease, and in response the broker constructs a search filter using appropriate ICD codes and/or DICOM header entries based on the format of the underlying data. The broker then applies those user-supplied search criteria to the healthcare institution's stored data through the plug-in search engine, which filters and retrieves responsive information. [0040]. *See also* [0037–39]. |
| a processor and memory coupled to the intake interface and protocol interface, wherein the memory includes instructions that when executed by the processor, cause the processor to, | Abraham-Fuchs teaches that the memory 36 stores instructions for the processor 35, and describes multiple mechanisms by which those instructions may be stored and provided to the server. [0022]; *See also* [0029] and [0023] |
| limit flow of the plurality of streams to a receiving user of the plurality users to only an HL7 ADT or a portion of the HL7 ADT, wherein the HL7 ADT or the portion of the HL7 ADT complies with the parameters for network operation for the receiving user, wherein the limiting is executed in real-time with the streams. | Abraham-Fuchs contemplates healthcare institution data being transmitted as data streams through the broker-controlled server ([0035]), and the broker service is described as receiving requests, searching for compliant data, and submitting only relevant data in response. [0001]; *See also* 41.<br><br>US 2007/0124310 ("Mathur") teaches a results agent 9 the listens for HL7 messages and processes the messages "as they are received." [0049]. This processing includes parsing the HL7 text string into objects and filtering them based on, e.g., |

| | |
|---|---|
| | "message type, patient type, ordering provider…" [0050]. *See also* [0136], [0140], [0151]. |

127. Additionally, Counterclaim-Defendants' own ENS System is invalidating prior art as by their own admission the ENS System practices the claims and was commercially available and in public use as early as 2012, well before the actual priority date of the '475 Patent. *See* Ex. T, previously cited by Counterclaim-Defendants in the Amended Complaint as describing the patented technology. On information and belief, the Axolotl system would also be invalidating prior art.

128. Pursuant to 28 U.S.C. § 2201, *et seq.*, Counterclaim-Plaintiffs are entitled to declaratory judgment that the '475 Patent is invalid under 35 U.S.C. §§ 101, 102, 103 and/or 112.

**SIXTH COUNTERCLAIM**
**DECLARATION OF UNENFORCEABILITY OF THE '475 PATENT**

129. Counterclaim-Plaintiffs repeat and reallege every allegation contained in the foregoing paragraphs of its Counterclaims as if set forth fully herein.

130. The '475 Patent is unenforceable due to inequitable conduct before the PTO.

131. Audacious as the applicant and prosecuting entity and Mr. Alley, Mr. Brandt, and Mr. Afzal as its representatives involved in the prosecution of the applications leading to the '475 Patent each owed a duty of candor and good faith to the PTO under 37 C.F.R. § 1.56.

132. Audacious, Mr. Alley, Mr. Brandt, and Mr. Afzal breached this duty by: (a) filing continuation and CIP applications structured to create a false appearance of an earlier priority date; (b) failing to disclose to the PTO that the claims lacked written-description support in the pre-'887 Application patent applications and were not entitled to the March 15, 2013 priority date; and (c) failing to disclose the commercial sale and public offering of the prior art ENS system.

133. The withheld information was material to patentability. But for Audacious and its identified representatives' misconduct, the PTO would not have allowed the '475 Patent claims.

134. On information and belief, Audacious, Mr. Alley, Mr. Brandt, and Mr. Afzal acted with the specific intent to deceive the PTO. The single most reasonable inference from the evidence is that Audacious, Mr. Alley, Mr. Brandt, and Mr. Afzal intended to deceive the PTO.

135. The inequitable conduct was committed solely by Audacious, which had exclusive control over patent prosecution, and its representatives Mr. Alley, Mr. Brandt, and Mr. Afzal.

136. In addition to the independent grounds for unenforceability alleged above, the ’475 Patent is also unenforceable under the doctrine of infectious unenforceability.

137. The ’475 Patent issued from the ’358 Application, which is a continuation of the ’137 Application, which issued as the ’962 Patent, and the patents share the same specification.

138. The inequitable conduct that renders the ’962 Patent unenforceable, as alleged in the Third Counterclaim, occurred during prosecution of the shared parent applications from which both patents derive—specifically, the ’887 Application and the ’137 Application—and included the misrepresentation of the priority date and the failure to disclose the ENS system as prior art.

139. Because the ’475 Patent is a continuation of the ’962 Patent application, and because the same inequitable conduct infected the prosecution chain common to both patents, the misconduct that renders the ’962 Patent unenforceable likewise renders the ’475 Patent unenforceable regardless of whether its own prosecution independently involved inequitable conduct.

140. Pursuant to 28 U.S.C. § 2201, *et seq.*, Counterclaim-Plaintiffs are entitled to declaratory judgment that the ’475 Patent is unenforceable.

## SEVENTH COUNTERCLAIM
## UNFAIR COMPETITION UNDER MARYLAND COMMON LAW

141. Counterclaim-Plaintiffs repeat and reallege every allegation contained in the foregoing paragraphs of its Counterclaims as if set forth fully herein.

142. By the acts described herein, Counterclaim-Defendants have engaged in a pattern of

unfair, deceptive, and wrongful business practices and competitive activity that have injured, and will continue to injure, Counterclaim-Plaintiffs and their respective businesses, including by:

a. Bringing and maintaining a meritless and unnecessary protest against AHCA's contract award to CSS, which was brought for the improper purpose of interfering with CSS and AHCA's business relationship and delaying and burdening AHCA's transition from PCC's ENS system to CSS's CEND system at significant cost and expense to CSS;

b. Making material misrepresentations to Florida healthcare providers as described above;

c. Asserting an "evergreen" interpretation of participant agreements with Florida Providers that AHCA rejected, for the purpose of creating uncertainty and delay in the transition;

d. Initiating and engaging in sham litigation by which it asserts facially invalid patent claims, including claims already found to be directed to patent-ineligible subject matter, as part of a coordinated strategy to delay and disrupt the transition and eliminate CSS as a competitor;

e. Bringing claims against CRISP Maryland predicated on CRISP Maryland's alleged use of technology to which CRISP Maryland has a perpetual license; and

f. Leveraging Counterclaim-Defendants' dominant market position as one of the first companies to operationalize ADT notifications on a wide scale, and their control as an incumbent in the Florida HIE network and other such networks, to coerce and mislead providers into maintaining relationships with Counterclaim-Defendants and PCC rather than transitioning to CSS as directed by AHCA, and asserting invalid and unenforceable patent claims over core interoperability functions to deter CSS and other competitors from entering the market.

143. The assertion of the Patents-in-Suit was objectively baseless. This Court has already found the '194 Patnet ineligible and no reasonable litigant would have expected a different result..

144. As to the '962 and '475 Patents, which are related to the '194 patent and share similar

claim structures, on information and belief, no reasonable litigant could realistically expect the claims to withstand validity challenges. As to assignor estoppel, Audacious is aware of the parties' history and its exclusive management of the patents, and is aware that the facts will not support Audacious's assignor estoppel arguments. The assertion of the '962 and '475 Patents is objectively baseless.

145. Counterclaim-Defendants' assertion of the Patents-in-Suit on July 14, 2025, shortly after its protest of AHCA's contract award to CSS was formally rejected, was not genuinely aimed at addressing patent infringement but was intended to use the litigation process itself as a weapon of unfair competition to delay and disrupt Counterclaim-Plaintiffs' legitimate business activities.

146. Counterclaim-Defendants' claims against CRISP Maryland were also objectively baseless in view of Counterclaim-Defendants' assertion that all Patents-in-Suit were the subject of the Agreement for the Acquisition of CRISP's Encounter Notification Service dated December 9, 2013 ("ENS Agreement"). Under the ENS Agreement, CRISP Maryland has a perpetual, paid-up, royalty-free license to use, implement, and operate the ENS Technology, and the ENS IP therein, as necessary to provide ENS services in Maryland and the District of Columbia.

147. CRISP Maryland operates solely within the State of Maryland and has perpetual license that bars the patent infringement claims against CRISP Maryland.

148. Counterclaim-Defendants have also violated the 21st Century Cures Act ("Cures Act"), 42 U.S.C. § 300jj-52, including specifically through its campaign to restrict CSS's access, exchange, or use of Florida Providers' patient data for purposes of both assisting in patients' treatment and transitioning the Florida HIE to CSS's CEND system.

149. The Cures Act prohibits "information blocking" by health information technology developers, HIEs, and health information networks, which is punishable by a penalty of up to $1,000,000 per violation. 42 U.S.C. § 300jj-52(a), (b)(2).

150. Information blocking is defined as a practice that "is likely to interfere with, prevent, or materially discourage access, exchange, or use of electronic health information," and which the entity "knows, or should know… is likely to interfere with, prevent, or materially discourage the access, exchange, or use of electronic health information." 42 U.S.C. § 300jj-52(a)(1); 45 C.F.R. § 171.103. The Counterclaim-Defendants, through their parent entity PCC, each qualify as entities subject to the information-blocking prohibition. 42 U.S.C. § 300jj-52(a)(1); 45 C.F.R. § 171.102-103.

151. The conduct described herein—including Counterclaim-Defendants' misleading outreach designed to discourage Florida Providers from initiating direct connections to CSS and the Florida HIE and the "evergreen" agreement assertions that created uncertainty regarding data exchange—constitutes practices likely to interfere with, prevent, or materially discourage the access, exchange, or use of electronic health information within the meaning of 42 U.S.C. § 300jj-52.

152. Counterclaim-Defendants' conduct further falls within all three statutory examples of the information-blocking provided by 42 U.S.C. § 300jj-52(a)(2) as it has: (1) restricted CSS's authorized access, exchange, or use electronic health information for purposes of assisting in patients' treatment and transitioning the Florida HIE from to CSS's CEND system; (2) implemented its ENS system in a way that increases the complexity or burden of accessing, exchanging, or using electronic health information by inserting itself as an unnecessary third party intermediary between Florida Providers and AHCA/CSS; and (3) implemented its technology in a way that impedes the Florida HIE's transition from the ENS system to CSS's CEND system.

153. Counterclaim-Defendants' conduct does not fall within any exception to the information-blocking prohibition set forth in 45 C.F.R. §§ 171.200–171.403.

154. Counterclaim-Defendants' campaign to restrict CSS's access, exchange, or use of patient data and to hinder the Florida HIE's transition to CSS's CEND system and its assertion of

facially invalid and unenforceable patents against Counterclaim-Plaintiffs are against public policy.

155. Counterclaim-Defendants have engaged in unfair and deceptive trade practices by using illegal, deceptive, and wrongful methods to attack the business of CSS and CRISP Maryland.

156. On information and belief, Counterclaim-Defendants' unfair acts have been committed in bad faith and with unlawful intent.

157. As a direct and proximate result of Counterclaim-Defendants' unfair competitive conduct, Counterclaim-Plaintiffs have suffered and continue to suffer damages, including lost revenues and profits, increased costs, delay, reputational harm, and diversion of resources.

158. Counterclaim-Defendants are entitled to damages and equitable relief.

## EIGHTH COUNTERCLAIM
## ATTEMPTED MONOPOLIZATION (§ 2 OF THE SHERMAN ACT)

159. Counterclaim-Plaintiffs repeat and reallege every allegation contained in the foregoing paragraphs of its Counterclaims as if set forth fully herein.

160. The relevant market is the market for health information exchange ADT event-notification services for healthcare providers in the United States (the "HIE Notification Market"). HIE ADT event-notification services constitute a distinct relevant product market because they require specialized infrastructure for receiving, aggregating, filtering, and routing real-time admission, discharge, and transfer messages across disparate healthcare provider systems and protocols. Healthcare providers, HIEs, and state agencies that require real-time ADT event notification cannot practicably substitute other health information technologies to fulfill this function. State health agencies procure these services through dedicated contracts distinct from other health IT services, as illustrated by AHCA's issuance of a standalone procurement for HIE services.

161. Counterclaim-Defendants possessed monopoly power, or at minimum a dangerous probability of achieving monopoly power, in the HIE Notification Market. For example, as the

incumbent vendor for the Florida HIE for more than eight years, Counterclaim-Defendants and their parent company PCC controlled the existing participant agreements, data connections, and provider relationships comprising the Florida HIE network and were the exclusive provider of HIE Services in Florida during that period. On information and belief, Counterclaim-Defendants possess similar monopoly power, or at least a dangerous probability of achieving monopoly power, in other states where it has entered into similar exclusive arrangements with governmental HIE networks.

162. Counterclaim-Defendants' dominant market position reflects Audacious's first-mover advantage as "one of the first companies to operationalize admission, discharge, and transfer (ADT) notifications on a wide scale," and advantage that was further consolidated when PCC—a company "best known for its dominance in the post-acute EHR space"—acquired Audacious and combined it with CMT, which maintained "a formidable footprint in emergency department information sharing and high-utilizer patient management."[1] These acquisitions combined the two most significant event-notification and emergency department information-sharing platforms under a single corporate owner.

163. Counterclaim-Defendants' market dominance is reinforced by significant barriers to entry, including: (a) the technical complexity and cost of building and certifying a health information technology platform capable of processing and routing real-time ADT messages across providers using disparate protocols; (b) the need for established relationships with state health agencies and the advantages held by experienced incumbents in governmental procurements; (c) Counterclaim-Defendants' control over existing data connections, participant agreements, and provider relationships that create high switching costs for healthcare providers and state agencies; (d) network effects inherent in HIE services that make it difficult for new entrants to achieve the scale necessary to compete; and

[1] https://www.legalhie.com/audacious-inquiry-sues-crisp-a-patent-showdown-with-national-interoperability-implications/.

(e) the assertion of alleged patent rights over fundamental encounter-notification methods, which, if enforced as threatened, would impose additional barriers on potential market entrant.

164. Counterclaim-Defendants willfully acquired or maintained monopoly power through exclusionary conduct, including sham litigation, directed at Counterclaim-Plaintiffs, including specifically CSS, the competitor that won the AHCA contract to replace Counterclaim-Defendants as the exclusive provider of HIE services in Florida.

165. Counterclaim-Plaintiffs incorporate by reference the Seventh Counterclaim's allegations concerning the objectively baseless assertion of the Patents-in-Suit and sham litigation. Counterclaim-Plaintiffs further incorporate the allegations concerning inequitable conduct and fraudulent procurement in the Factual Background and Third and Sixth Counterclaims. The assertion of the Patents-in-Suit, shortly after rejection of the AHCA protest, was intended to use litigation as an anticompetitive weapon to delay and disrupt Counterclaim-Plaintiffs' operations and exclude CSS from the HIE Notification Market, including by threatening CRISP Maryland's operations. This conduct constitutes exclusionary conduct under § 2 of the Sherman Act.

166. Counterclaim-Defendants' monopolistic and exclusionary conduct has injured Counterclaim-Plaintiffs and competition in the HIE Notification Market. Counterclaim-Plaintiffs and others have been substantially foreclosed from competing, and customers have suffered and will continue to suffer harm in the form of higher prices, lower product and service quality, reduced interoperability, and suppressed innovation. Counterclaim-Plaintiffs are also injured by the need to defend against anticompetitive actions initiated as part of this anticompetitive scheme, such as this lawsuit and/or the Florida AHCA protest. Antitrust laws are intended to prohibit such injuries, which flow directly from Counterclaim-Defendants' anticompetitive acts in violation of the Sherman Act.

167. Counterclaim-Plaintiffs have suffered antitrust injury, including lost profits, increased

costs, delay in establishing competitive operations, and harm to their ability to compete.

168. The conduct of Counterclaim-Defendants is continuing and will continue to impose antitrust injury on Counterclaim-Plaintiffs unless equitable and injunctive relief are granted.

169. Counterclaim-Defendants' actions constitute attempted monopolization in violation of § 2 of the Sherman Act, 15 U.S.C. § 2.

170. Counterclaim-Plaintiffs are entitled to treble damages under 15 U.S.C. § 15, injunctive relief under 15 U.S.C. § 26, and attorneys' fees and costs under 15 U.S.C. § 15.

## PRAYER FOR RELIEF

Counterclaim-Plaintiffs respectfully request that an Order and Judgment as follows:

A. Denying all claims for relief set forth in the First Amended Complaint and entering judgment in favor of Counterclaim-Plaintiffs and against Plaintiffs on all claims;

B. Declaring that Counterclaim-Plaintiffs have not infringed and are not infringing any valid and/or enforceable claim of the'962 and '475 Patents;

C. Declaring all claims of the '962 and '475 Patents to be invalid and unenforceable;

D. Declaring that Counterclaim-Defendants are not entitled to any damages and/or any that any such claim to damages is barred or limited by affirmative defenses;

E. Declaring this case exceptional under 35 U.S.C. § 285;

F. Damages and restitution in an amount to be determined at trial;

G. Punitive and exemplary damages in an amount to be determined at trial;

H. Trebling of any award of damages;

I. Any and all pre-judgment and post-judgment interest; and

J. Such other and further relief as the Court deems just and proper.

## JURY DEMAND

Counterclaim-Plaintiffs request a trial by jury on all issues so triable.

Dated: September 25, 2026

Respectfully submitted,

**FOLEY & LARDNER LLP**

By: */s/Ruben J. Rodrigues*
Jarren N. Ginsburg
D. Md. Bar No. 19688
Molly Hayssen
D. Md. Bar No. 31871
FOLEY & LARDNER LLP
Washington Harbour
3000 K Street, N.W. Suite 600
Washington, D.C. 20007-5109
Telephone: (202) 672-5300
Facsimile: (202) 672-5399
jginsburg@foley.com
mhayssen@foley.com

Ruben J. Rodrigues *(pro hac vice)*
FOLEY & LARDNER LLP
111 Huntington Avenue
Boston, MA 02199
Telephone: (617) 342-4000
Facsimile: (617) 342-4001
rrodrigues@foley.com

Sarah E. Rieger *(pro hac vice)*
FOLEY & LARDNER LLP
777 East Wisconsin Avenue
Milwaukee, WI 53202
Telephone: (414) 271-2400
Facsimile: (414) 297-4900
srieger@foley.com

**ATTORNEYS FOR DEFENDANTS AND COUNTERCLAIM-PLAINTIFFS CHESAPEAKE REGIONAL INFORMATION SYSTEM FOR OUR PATIENTS, INC. AND CRISP SHARED SERVICES, INC.**